# **EXHIBIT 1**

LEASE

BETWEEN

### 30 WEST PERSHING, LLC,
A MISSOURI LIMITED LIABILITY COMPANY

("LANDLORD")

AND

### ALAMO MISSION, LLC, A CALIFORNIA LIMITED LIABILITY COMPANY

("TENANT")

FOR THE LEASE OF

### THE MISSION THEATER
SAN FRANCISCO

_____August   21_____ ____, 2013

# TABLE OF CONTENTS

LEASE BETWEEN 30 WEST PERSHING, LLC, AS LANDLORD
AND ALAMO MISSION, LLC, AS TENANT,
COVERING PREMISES IN
SAN FRANCISCO, CALIFORNIA

**Page**

ARTICLE 1. ATTACHMENTS TO LEASE; EXHIBITS ...................................................... 1

ARTICLE 2. DEFINITIONS ............................................................................................ 1

    2.1    **Definitions** ....................................................................................................... 1

ARTICLE 3. DEMISE OF PREMISES ........................................................................... 4

    3.1    **Demise of Premises** ....................................................................................... 4
    3.2    **Development Matters** .................................................................................... 4
    3.3    **Landlord's Covenant** ..................................................................................... 4
    3.4    **No Representations by Landlord** ................................................................. 4

ARTICLE 4. TERM ...................................................................................................... 5

    4.1    **Term** ............................................................................................................... 5
    4.2    **Options to Extend** ......................................................................................... 5
    4.3    **Continued Possession of Tenant** ................................................................. 5
    4.4    **Certain Landlord Rights on Termination for Reletting.** ............................ 6

ARTICLE 5. RENT ...................................................................................................... 6

    5.1    **Payment of Rent** ........................................................................................... 6
    5.2    **Annual Fixed Rent; Escalation** .................................................................... 6
    5.3    **Percentage Rent** ........................................................................................... 7

ARTICLE 6. EXPENSES ............................................................................................. 9

    6.1    **Payment of Expenses** ................................................................................... 9
    6.2    **Tenant's Real Estate Taxes.** ......................................................................... 9
    6.3    **Restrictive Agreements; Common Facilities** ........................................... 10
    6.4    **Utility Payments** ......................................................................................... 11

ARTICLE 7. TITLE INSURANCE; TRANSFER OF TITLE ....................................... 11

    7.1    **Leasehold Title Policy** ................................................................................ 11
    7.2    **Change of Ownership** ................................................................................. 11

ARTICLE 8. TENANT'S COVENANT TO OPERATE; USE OF PREMISES .............. 11

    8.1    **Operating Covenant** ................................................................................... 11
    8.2    **During Tenant's Operating Period** ............................................................ 12
    8.3    **After Tenant's Operating Period** ............................................................... 12
    8.4    **Continuing Use Restrictions** ..................................................................... 12
    8.5    **Prohibition of Use** ...................................................................................... 14

i

8.6     **Landlord Assistance** ........................................................................ 14
8.7     **Tenant's Right to Control Operations** .......................................... 14

ARTICLE 9. TENANT REPORTING ............................................................. 14

ARTICLE 10. SUBLETTING AND ASSIGNING ......................................... 15

10.1   **Permitted Assignment, Subletting and Licenses** ........................ 15
10.2   **Continuation/Release of Liability** .............................................. 16
10.3   **Default Notices After Assignments** ............................................ 17
10.4   **Assignment of Rights in Sublease** ............................................... 17
10.5   **Landlord's Assignment** ............................................................... 17
10.6   **REIT Limitations** ......................................................................... 17

ARTICLE 11. TENANT'S PROPERTY ........................................................ 18

ARTICLE 12. GOVERNMENTAL COMPLIANCE ..................................... 18

12.1   **Tenant Responsibilities Generally** .............................................. 18
12.2   **Parties; Environmental Knowledge** ........................................... 19
12.3   **Landlord's Environmental Responsibilities During the Term of this Lease** ........ 19
12.4   **Tenant's Environmental Responsibilities** .................................. 19
12.5   **Environmental Indemnities** ........................................................ 19
12.6   **Definition** ..................................................................................... 20
12.7   **Survival** ........................................................................................ 20

ARTICLE 13. MAINTENANCE AND REPAIRS .......................................... 20

13.1   **Warranty** ...................................................................................... 20
13.2   **Maintenance and Repairs** ........................................................... 20
13.3   **Minor Alterations** ........................................................................ 21
13.4   **Certain Limitations** ..................................................................... 21

ARTICLE 14. ALTERATIONS AND TENANT'S LIENS ............................. 21

14.1   **Title to Tenant's Alterations** ....................................................... 21
14.2   **No Tenant Liens** ........................................................................... 22
14.3   **Landlord Elective Improvements** ............................................... 22

ARTICLE 15. DAMAGE CLAUSE ............................................................... 22

15.1   **Damage** ......................................................................................... 22
15.2   **Right to Terminate on Certain Damage** ..................................... 23
15.3   **Rights to Insurance Proceeds** ..................................................... 23

ARTICLE 16. CONDEMNATION .................................................................. 23

16.1   **In General** ..................................................................................... 23
16.2   **Temporary Taking Awards** .......................................................... 24

ARTICLE 17. INSURANCE, INDEMNITY, WAIVER OF SUBROGATION  AND FIRE PROTECTION ................................................................................ 24

17.1   **Casualty Policy** ............................................................................ 24

17.2     **DIC Policy Endorsement**........................................................................25
17.3     **Liability Insurance; Tenant Negligence** .............................................25
17.4     **Liability Insurance; Landlord Negligence**...........................................26
17.5     **Rental Loss/Business Interruption Insurance** ...................................26
17.6     **Workers' Compensation Insurance** .....................................................26
17.7     **Release; Waiver of Subrogation** ..........................................................26
17.8     **General** ...................................................................................................27

ARTICLE 18. INDEMNIFICATION GENERALLY ........................................27

ARTICLE 19. LEASEHOLD MORTGAGES .....................................................28

19.1     **Rights to Mortgage Lease**....................................................................28
19.2     **Leasehold Mortgagee Qualifications** .................................................28
19.3     **Defaults** ..................................................................................................29
19.4     **Continuation of Liability** .....................................................................33

ARTICLE 20. TENANT'S SIGNS ....................................................................34

20.1     **Location and Type**................................................................................34
20.2     **Design**....................................................................................................34
20.3     **Protection of Signs Visibility**..............................................................34
20.4     **Interior Signs** .......................................................................................35

ARTICLE 21. ESTOPPEL; ATTORNMENT AND SUBORDINATION .................35

21.1     **Estoppel Certificate** .............................................................................35
21.2     **Attornment by Tenant**.........................................................................35
21.3     **Subordination/Non-Disturbance** .......................................................35
21.4     **Form of Documents** .............................................................................35

ARTICLE 22. DEFAULT ................................................................................36

22.1     **Tenant Default** .....................................................................................36
22.2     **Remedies** ...............................................................................................36
22.3     **Landlord Default, Cure Rights** ...........................................................38
22.4     **Self Help** ................................................................................................38
22.5     **Remedies Cumulative** ..........................................................................38
22.6     **Limitation on Landlord's Liability** ....................................................38
22.7     **Interest on Past Due Obligations; Late Charges; Application of Payments
        to Past Due Obligations**........................................................................38
22.8     **Development Agreement Breaches** ......................................................39

ARTICLE 23. ACCESS TO PREMISES ...........................................................39

23.1     **Ongoing Access and Inspection Rights**...............................................39
23.2     **Landlord's Construction Inspection Rights**.......................................39

iii

ARTICLE 24. FORCE MAJEURE ................................................................... 40

ARTICLE 25. MISCELLANEOUS ................................................................... 40

25.1    Lease Not to be Recorded ........................................................... 40
25.2    Notices ....................................................................................... 40
25.3    Waiver of Performance and Disputes .......................................... 41
25.4    Modification of Lease ................................................................. 42
25.5    Captions ..................................................................................... 42
25.6    Lease Binding on Successors and Assigns, etc. ........................... 42
25.7    Brokers ....................................................................................... 42
25.8    Landlord's Status as a REIT ....................................................... 42
25.9    Governing Law ........................................................................... 42
25.10   Estoppel ..................................................................................... 42
25.11   Joint Preparation ........................................................................ 42
25.12   Interpretation ............................................................................. 43
25.13   Severability ................................................................................ 43
25.14   Landlord and Tenant .................................................................. 43
25.15   Authority .................................................................................... 43
25.16   Time is of the Essence ............................................................... 43
25.17   Consent ...................................................................................... 43
25.18   Attorneys' Fees .......................................................................... 43
25.19   Further Assurances ..................................................................... 44
25.20   Counterparts ............................................................................... 44
25.21   Rules of Construction ................................................................. 44

ARTICLE 26. WAIVER OF TRIAL BY JURY ................................................ 44

iv

# LEASE

THIS LEASE, dated as of ___August 21___, 2013 (the "***Effective Date***"), is made by and between 30 WEST PERSHING, LLC, a Missouri limited liability company, with an office at c/o Entertainment Properties Trust, 909 Walnut Street, Suite 200, Kansas City, Missouri 64106 ("***Landlord***"), and **ALAMO MISSION, LLC,** a California limited liability company, with an office at 612 East 6th Street, Austin, Texas 78701 ("***Tenant***").

## ARTICLE 1.
## ATTACHMENTS TO LEASE; EXHIBITS

Attached to this Lease and hereby made a part hereof are the following:

**EXHIBIT A** – a description of the tract of land constituting the Leased Premises.

**EXHIBIT B** – a site plan (the "***Site Plan***") of the Leased Premises.

**EXHIBIT C** – a description of the Theater Facility and the improvements to be constructed on the Leased Premises.

**EXHIBIT D** – a listing of Restrictive Agreements.

**EXHIBIT E** – Memorandum of Term Commencement.

## ARTICLE 2.
## DEFINITIONS

2.1    **Definitions.**    The following terms for purposes of this Lease shall have the meanings hereinafter specified (additional terms may be defined elsewhere in the Lease):

"***ADA***" means the Americans with Disabilities Act of 1990, as amended, 42 U.S.C. 12.101, *et seq.*

"***Affiliate***" means as applied to a person or entity, any other person or entity directly or indirectly controlling, controlled by, or under common control with, that person or entity.

"***Annual Fixed Rent***" means the annual fixed rent payable under this Lease, as set forth in Section 5.2.

"***Authorized Institution***" means a bank, savings and loan institution, trust or insurance company, real estate investment trust, pension, welfare or retirement fund, acting either in its own capacity or as a trustee.

"***Code***" means the Internal Revenue Code of 1986, as the same may be amended or supplemented, and the rules and regulations promulgated thereunder.

"***Commencement Date***" is defined in Section 4.1.

"***Construction Term***" is defined in Section 4.1.

1

"*CPI*" means the Consumer Price Index for all Urban Consumers, U.S. City Average, published by the Bureau of Labor Statistics of the United States Department of Labor (base year 1982-84=100), or any successor index thereto.

"*Default Rate*" means the lesser of (i) the per annum interest rate from time to time publicly announced by Citibank, N.A., New York, New York as its base rate (i.e., its Prime Rate) plus four percent (4%) or (ii) the highest rate of interest that may lawfully be charged to the party then required to pay interest under this Lease at the Default Rate. If Citibank, N.A. should cease to publicly announce its base rate, the Prime Rate hereunder shall be the prime, base or reference rate of the largest bank (based on assets) in the United States which announces such rate.

"*Development Agreement*" means that certain Theater Development Agreement between Landlord and Tenant of even date herewith.

"*Effective Date*" is the date first above written.

"*Final Plans*" means the final plans, drawings and specifications for the Theater Facility as built.

"*Fiscal Tax Year*" is defined in Section 6.2(a)(i).

"*Force Majeure*" is defined in Article 24.

"*Governmental Authorities*" means all federal, state, county, municipal and local departments, commissions, boards, bureaus, agencies and offices thereof, having or claiming jurisdiction over all or any part of the Theater Facility or the use thereof.

"*Gross Receipts*" is defined in Article 5.

"*Guarantor*" shall mean Timothy League and Karrie League, jointly and severally.

"*Guaranty*" means the Guaranty by and between Landlord and Guarantor of even date herewith.

"*Hazardous Substances*" is defined in Section 12.6.

"*Initial Fixed Term*" is defined in Section 4.1.

"*Knowledge*" means the actual knowledge of Landlord without duty of inquiry or investigation.

"*Laws*" means all present and future requirements, administrative and judicial orders, laws, statutes, ordinances, codes, rules and regulations of any Governmental Authority, including, but not limited to the ADA applicable to the Leased Premises.

"*Lease Year*" means a period of twelve (12) full calendar months. The first Lease Year shall begin on the first day of the calendar month following the Commencement Date, unless the Term commences on the first day of a calendar month, in which case the first Lease Year shall

2

begin on the Commencement Date. Each succeeding Lease Year shall commence on the anniversary of the first Lease Year.

"*Leased Premises*" means the Theater Facility, the land thereunder described on **Exhibit A** attached hereto, and all improvements, fixtures, appurtenances, rights, easements and privileges thereunto belonging or in any way appertaining, and all other rights, easements and privileges granted to Tenant in this Lease, excluding, however, Tenant's Property as defined below.

"*Market Area*" means the greater San Francisco, California, metropolitan area.

"*Mortgage*" means any mortgage or deed of trust or other instrument in the nature thereof evidencing a security interest in the Leased Premises or any part thereof.

"*Option Periods*" is defined in Section 4.2

"*Percentage Rent*" is defined in Section 5.3.

"*Plans and Specifications*" is defined in the Development Agreement.

"*Related Lease*" means any lease between Landlord, or an Affiliate of Landlord, and Tenant, or an affiliate of Tenant.

"*Rent*" means Annual Fixed Rent, Percentage Rent and any other charges, expenses or amounts payable by Tenant under this Lease.

"*Restrictive Agreements*" means those certain reciprocal easement agreements, operating agreements, development agreements, easement agreements and/or other similar agreements and instruments that govern and regulate the development of the Leased Premises, including without limitation the agreements described on **Exhibit D** attached hereto and by this reference made a part hereof.

"*Taxes*" is defined in Section 6.2(a)(ii).

"*Taxes Applicable to Leased Premises*" is defined in Section 6.2(a)(iii).

"*Tenant's Operating Covenant*" is defined in Section 8.1.

"*Tenant's Operating Period*" means the period beginning on the Commencement Date and ending on the expiration of the Term of this Lease.

"*Tenant's Property*" is defined in Article 11.

"*Tenant's Signs*" is defined in Section 20.2.

"*Term*" and "*Term of this Lease*" means the initial fixed term as provided in Article 4 and any renewal or extension thereof.

"*Theater Facility*" means the theater to be located on the Leased Premises described on **Exhibit C**.

## ARTICLE 3.
## DEMISE OF PREMISES

3.1 **Demise of Premises.** Landlord hereby demises and leases the Leased Premises unto Tenant, and Tenant hereby leases the same from Landlord, for the consideration and upon the terms and conditions set forth in this Lease.

3.2 **Development Matters**. All matters related to the development and construction of the Theater Facility shall be governed by the Development Agreement.

3.3 **Landlord's Covenant.** Landlord represents and warrants to Tenant that: (i) Landlord has full right and lawful authority to enter into and perform Landlord's obligations under this Lease for the Term of this Lease, and Landlord has not suffered, incurred or entered into any contracts, leases, tenancies, agreements, restrictions, violations, encumbrances or defects in title of any nature whatsoever which materially adversely affect Landlord's right, title and interest in the Leased Premises or the fulfillment of its obligations under this Lease; (ii) except for any Mortgages which exist upon the Commencement Date, Tenant's rights under this Lease shall not be subject or subordinate to any Mortgage except for such subordination as may be accomplished in accordance with the provisions of Article 21; and (iii) if Tenant fully discharges the obligations herein set forth to be performed by Tenant, Tenant shall have and enjoy, during the Term of this Lease, the quiet and undisturbed possession of the Leased Premises free from interference by Landlord or any party claiming by, through or under Landlord but none other.

3.4 **No Representations by Landlord.** Tenant hereby accepts the Leased Premises in its "as is, where is" condition as of the Commencement Date. Tenant acknowledges that, except as herein expressly set forth, Landlord has not made, does not make, and specifically negates and disclaims any representations, warranties, promises, covenants, agreements or guaranties of any kind or character whatsoever, whether express or implied, oral or written, of, as to, concerning, or with respect to, (i) the value, nature, quality or condition of the Leased Premises, including, without limitation, the water, soil and geology; (ii) the suitability of the Leased Premises for any and all activities and uses which may be conducted thereon; (iii) the compliance of or by the Leased Premises with any laws, rules, ordinances or regulations of any applicable governmental authority or body; (iv) the habitability, merchantability, marketability, profitability or fitness for a particular purpose of the Leased Premises, or (v) any other matter with respect to the Leased Premises, and specifically, Landlord has not made, does not make and specifically negates and disclaims any representations or warranties regarding compliance of the Leased Premises with any environmental protection, pollution or land use laws, rules, regulations, orders or requirements, including without limitation, those pertaining to solid waste, as defined by the U.S. Environmental Protection Agency Regulations at 40 C.F.R., Part 261, or the disposal or existence, in or on the Premises, of any hazardous substances, as defined by The Comprehensive Environmental Response Compensation and Liability Act of 1980, as amended, and the regulations promulgated thereunder. Tenant shall rely solely on its own investigation of the Leased Premises and not on any information provided or to be provided by Landlord, its

4

directors, contractors, agents, employees or representatives. Landlord shall not be liable or bound in any manner by any verbal or written statements, representations or information pertaining to the Leased Premises or the operation thereof, furnished by any party purporting to act on behalf of Landlord.

## ARTICLE 4.
## TERM

4.1    **Term.** The Construction Term of this Lease shall commence on the Effective Date and shall expire on the earlier of (a) the date that Tenant opens for business in the Premises, or (b) the date that is eighteen (18) months after the Effective Date. The Initial Fixed Term of this Lease shall commence on the expiration of the Construction Term (the "**Commencement Date**"), and shall expire (unless extended in accordance with Article 4.2) at midnight on the last day of the month that is twenty (20) years after the Commencement Date. After the Commencement Date, Tenant and Landlord shall promptly execute a Memorandum of Term Commencement in the form attached hereto as Exhibit F.

4.2    **Options to Extend.** Provided Tenant is not in default under this Lease and the default remains uncured beyond applicable cure periods, Tenant shall have the right to extend the Term of this Lease for two (2) successive periods of five (5) years each, followed by one (1) successive period of forty (40) months (the "***Option Periods***") from the date upon which the Term would otherwise expire upon the same terms and conditions as those herein specified. If Tenant elects to exercise its option for any Option Period, it shall do so by giving Landlord written notice of such election at least nine (9) months before the beginning of the Option Period for which the Term of this Lease is to be extended by the exercise of such option. If Tenant gives such notice, the Term of this Lease shall be automatically extended for the Option Period covered by the option so exercised without execution of an extension or renewal lease. Failure to extend the Lease for any Option Period shall constitute waiver of any subsequent Option Periods.

4.3    **Continued Possession of Tenant.** Tenant acknowledges that if it does not exercise any applicable option to extend the Term of this Lease for an Option Period, then Tenant shall, in addition to the amounts hereinafter set forth, indemnify and hold Landlord harmless from any and all damages and expenses, including attorneys' fees, that Landlord may incur by reason of Tenant's holding over without the consent of Landlord. In addition, any holding over after the last day of any extension of the Term of this Lease shall be construed to be a month-to-month tenancy, on and subject to the terms of this Lease, terminable by either party on not less than one (1) month's notice, with the exception that Annual Fixed Rent shall be increased to (i) one hundred twenty-five percent (125%) (if such holdover by Tenant is done with Landlord's written consent), or (ii) one hundred fifty percent (150%) (if such holdover by Tenant is without Landlord's consent) of the Annual Fixed Rent that existed for the year prior to the expiration of the then current Term. Except in the case of default, Tenant shall have thirty (30) days after such notice of termination by either party to remove Tenant's Property, and any of Tenant's Property not so removed shall be deemed abandoned. Tenant shall repair any structural damage to the Theater Facility caused by the removal of Tenant's Property or any of its sublessees' or licensees' property but Tenant shall not be required to patch any bolt holes resulting from such removal.

5

4.4    **Certain Landlord Rights on Termination for Reletting**.

(a)    If Tenant has not exercised the applicable Option Period option to extend this Lease, then Landlord or its agent shall thereafter have the right to enter the Leased Premises at all reasonable times for the purpose of exhibiting the Leased Premises to others and to place upon the Leased Premises during the period commencing one hundred eighty (180) days prior to the expiration of the then current Term "for sale" or "for rent" notices or signs of such number and in such locations as Tenant reasonably approves. Tenant hereby waives all notice to vacate upon the expiration or other termination of this Lease.

(b)    Upon the expiration or earlier termination of this Lease, Tenant shall, at the option of Landlord, transfer to and relinquish to Landlord or Landlord's nominee and reasonably cooperate with Landlord or Landlord's nominee in connection with the processing by Landlord or such nominee of all licenses, other than liquor licenses, operating permits, and other governmental authorizations and all assignable service contracts, which may be necessary or appropriate for the operation by Landlord or such nominee of the Leased Premises; provided that the costs and expenses of any such transfer or the processing of any such application shall be paid by Landlord or Landlord's nominee.

## ARTICLE 5.
## RENT

5.1    **Payment of Rent**.    Tenant shall timely pay all Rent due under this Lease to Landlord by check or electronic transfer payable to Landlord at Landlord's address first written above until Tenant receives other written instructions from Landlord.

5.2    **Annual Fixed Rent; Escalation**.    Tenant shall pay Landlord, during the Term of this Lease, the Annual Fixed Rent for each Lease Year, payable in equal monthly installments on or before the first day of each calendar month, in advance during such Lease Year. If the Annual Fixed Rent is payable for a fraction of a month, the amount payable shall be a pro rata share of a full month's rent. The Annual Fixed Rent shall be prorated for any partial Lease Year. Annual Fixed Rent under this Lease shall be as follows:

(a)    From the Effective Date through the end of the Construction Term, Variable Rent calculated in accordance with Section 2.2(a) of the Development Agreement.

(b)    From the end of the Construction Term through the fifth Lease Year, One Million One Hundred Thirteen Thousand Dollars ($1,113,000.00) per year ($92,750.00 per month).

(c)    On the first day of the sixth, eleventh and sixteenth Lease Years and the first day of each Option Period, if exercised (each an "*Escalation Date*"), Annual Fixed Rent shall be increased to an amount, per annum, equal to the sum of (i) the Annual Fixed Rent payable during the immediately preceding Lease Year, plus (ii) an amount equal to the Annual Fixed Rent payable during the immediately preceding Lease Year

6

multiplied by the Percentage Escalator. The *"Percentage Escalator"* shall be the lesser of (A) ten percent (10%) or (B) three (3) times the percentage increase in the CPI between the CPI in effect during the first month of the then-current Lease Year and the same month five years earlier. Annual Fixed Rent, as increased on each Escalation Date, shall remain in effect for the following five (5) Lease Years until the succeeding Escalation Date or expiration of the Term of this Lease, as applicable.

5.3    **Percentage Rent.**    In addition to the Annual Fixed Rent, Tenant shall pay Landlord as percentage rent (the *"Percentage Rent"*) an amount for each Lease Year equal to six percent (6%) (the *"Percentage Rate"*) of the Gross Receipts (defined below) for such Lease Year in excess of an amount (the *"Base Amount"*) equal to the quotient obtained by dividing the Annual Fixed Rent payable for such Lease Year by the Percentage Rate. For the purpose of computing the Percentage Rent for the first Lease Year, the Gross Receipts for the partial calendar month preceding the first Lease Year shall be included in the Gross Receipts for the first Lease Year. Within sixty (60) days following the end of each Lease Year, Tenant shall furnish Landlord with a statement, verified by a corporate officer of Tenant, showing the amount of Gross Receipts for the preceding Lease Year, which statement shall be accompanied by Tenant's payment of Percentage Rent, if any is due.

(a)    Landlord shall have the right, not more often than once each year, to audit Tenant's records of Gross Receipts, but only for the purpose of ascertaining the amount of the Gross Receipts during the preceding Lease Year. Such audit shall be made on behalf of Landlord by a certified public accountant to be selected by Landlord. If Landlord wishes to audit Tenant's records for any Lease Year, Landlord shall notify Tenant and proceed with such audit within twelve (12) months after the end of the Lease Year in question. Should Landlord fail to exercise the right to audit the records of Tenant within twelve (12) months after the end of any Lease Year, then Landlord shall have no further right to audit the records of Tenant for such Lease Year, and Tenant's statement of Gross Receipts for such Lease Year shall conclusively be deemed to be correct. Any such audit shall be at Landlord's own expense, except as hereinafter provided. If any such audit discloses that Tenant has understated the Gross Receipts for such Lease Year by more than three percent (3%) and Landlord is entitled to any additional Percentage Rent as a result of such understatement, then Tenant shall promptly pay to Landlord the cost of such audit. Tenant shall, in any event, pay Landlord the amount of any deficiency in Percentage Rent.

(b)    The term *"Gross Receipts"* shall mean: (i) the entire amount of the price charged, whether wholly or partially in cash or on credit, or otherwise, for all goods, wares, merchandise and chattels of any kind sold, leased, licensed or delivered (specifically including without limitation theater admission tickets and concession items), and all charges for services sold or performed in, at, upon or from any part of or through the use of the Leased Premises or any part thereof by Tenant or any other party, or by means of any mechanical or other vending device (other than pay telephones, and those soft drink and other similar vending devices operated primarily for the convenience of Tenant's employees); and (ii) all gross income of Tenant and any other party from any operations in, at, upon or from the Leased Premises which are neither included in nor excluded from Gross Receipts by other provisions of this Lease, but without duplication.

7

Should Tenant enter into any "four-wall" deals or rent one or more theaters for special events such as a rally, fashion show, speech or the like, the Gross Receipts shall be deemed the rental received by Tenant and shall not include monies, if any, received by the sponsor of the event.

Gross Receipts shall not include, or if included, there shall be deducted (but only to the extent they have been included), as the case may be, (i) the net amount of cash or credit refunds upon Gross Receipts, where the merchandise sold or some part of it is returned by the purchaser to and accepted by Tenant (but not exceeding in any instance the selling price of the item in question); (ii) the amount of any sales tax, use tax or retail excise tax which is imposed by any duly constituted governmental authority directly on sales and which is added to the selling price (or absorbed therein) and is paid to the taxing authority by Tenant (but not any vendor of Tenant); (iii) exchanges of merchandise between the Leased Premises and other theaters of Tenant or its Affiliates to the extent the same are made solely for the convenient operation of Tenant's business and not for the purpose of depriving Landlord of the benefit of Gross Receipts; (iv) returns of merchandise to shippers, suppliers or manufacturers; (v) proceeds from the sale of Tenant's Property; (vi) discount sales to Tenant's employees of merchandise not intended for resale; (vii) all receipts or proceeds from Tenant's financing; (viii) gift certificates or like vouchers until the time they have been converted into a sale or redemption at the Leased Premises; (ix) income, revenues, receipts or proceeds from Tenant's investment of any funds in a deposit institution; separately stated interest and service charges; credits or refunds made to customers; (x) all federal state, county and city sales taxes or other similar taxes; (xi) all occupational taxes, use taxes and other taxes which must be paid by Tenant or collected by Tenant, by whatever name they are known or assessed, and regardless of whether or not they are imposed under any existing or future orders, regulations, laws or ordinances; and (xii) agency commissions paid to independent third parties for selling tickets and surcharges in excess of the standard ticket price for tickets purchased by use of credit cards, but only to the extent such commissions or surcharges are actually remitted to independent third parties.

(c)     During Tenant's Operating Period, Tenant shall operate the Leased Premises in a first-class manner, fully stocked and staffed with trained personnel in order to maximize Tenant's Gross Receipts.  Notwithstanding the foregoing, it is understood and agreed by Landlord that Tenant has made no representation of any kind whatsoever as to the minimum or maximum amount of Gross Receipts which will be made in the Leased Premises during any Lease Year of the Term of this Lease nor are there any assurances that Percentage Rent shall be generated.

(d)     Landlord agrees not to divulge to any party the amount of Gross Receipts made by Tenant in the Leased Premises, except to the taxing authorities with authority to inquire therein; to Landlord's accountants, attorneys, consultants and employees; to an existing or bona fide prospective mortgagee or bona fide prospective purchaser of the Leased Premises; or in connection with any action to collect Percentage Rent from Tenant.

DB04/0503816.0339/8130936.5

## ARTICLE 6.
## EXPENSES

6.1    **Payment of Expenses**.    In addition to Tenant's obligation to pay Rent to Landlord under this Lease, Tenant shall timely pay all operating expenses, maintenance costs, governmental charges, capital expenditures, and any other expenses related to the ownership and operation of the Leased Premises, whether or not specifically mentioned in this Lease.

6.2    **Tenant's Real Estate Taxes.**

(a)    As used in this Article, the following terms shall have the following meanings:

(i)    *"Fiscal Tax Year"* means the twelve (12) month period established as the real estate tax year by the taxing authority having jurisdiction over the Leased Premises.

(ii)    *"Taxes"* means all ad valorem taxes and assessments and governmental charges (including sewer charges), general or special, ordinary or extraordinary, foreseen or unforeseen, of any kind or nature whatsoever, whether imposed by any Governmental Authorities, which are levied on or charged against the Leased Premises, the Theater Facility, Tenant's Property, the real estate on which the Theater Facility is located, personal property or rents, or on the right or privilege of leasing real estate or collecting rents thereon, and any other taxes and assessments attributable to the Leased Premises or its operation or any tax or assessment or governmental charge imposed or collected in lieu of or in substitution for any such tax, assessment or governmental charge, including without limitation all special assessments, impact fees, development fees, traffic generation fees, parking fees in respect of any Fiscal Tax Year falling wholly within the Term of this Lease and a portion of any real estate taxes so imposed in respect of any Fiscal Tax Year falling partly within and partly without the Term of this Lease, equal to the proportion which the number of days of such Fiscal Tax Year falling within the Term of this Lease bears to the total number of days of such Fiscal Tax Year; excluding, however, any income, franchise, corporate, capital levy, capital stock, excess profits, transfer, revenue, estate, inheritance, gift, devolution or succession tax payable by Landlord or any other tax, assessment, charge or levy upon the Rent payable hereunder by Tenant, except to the extent any such tax, assessment, charge or levy is imposed in substitution for any ad valorem tax or assessment.

(iii)    *"Taxes Applicable to Leased Premises"* means an amount equal to the Taxes levied against the land and improvements within the Leased Premises.

(b)    Tenant shall pay the Taxes Applicable to the Leased Premises directly to the appropriate taxing authorities prior to their delinquency.  Tenant shall have the right (but shall not be obligated) to contest the Taxes Applicable to the Leased Premises or the validity thereof by appropriate legal proceedings or in such other manner as it deems

9

suitable, and Landlord shall join in such contest, protest or proceeding, but at Tenant's sole cost and expense. Landlord shall not, during the pendency of such legal or other proceeding or contest, pay or discharge any Taxes on the Leased Premises, or tax lien or tax title pertaining thereto, provided Landlord may do so in order to stay a sale of the Leased Premises through foreclosure of a tax lien thereon. Any refund obtained by Tenant shall be paid first to Tenant to the extent of its costs and expenses of such contest and on account of any portion of the Taxes so refunded which was previously paid by Tenant.

6.3    **Restrictive Agreements.** The Leased Premises are subject to the Restrictive Agreements. Landlord and Tenant hereby agree as follows:

(a)    Landlord will not approve or agree to any amendment of the Restrictive Agreements which materially derogates the rights enjoyed by Tenant thereunder or increases the liabilities of Tenant without Tenant's prior consent, which shall not be unreasonably withheld.

(b)    Landlord hereby agrees to use commercially reasonable efforts, at Tenant's expense, to enforce the cross-easement rights, operating covenants and other rights contained in the Restrictive Agreements on Tenant's behalf to the extent fee simple ownership is required to enforce such rights, and if Landlord fails to proceed with its reasonable efforts to enforce said rights on Tenant's behalf within thirty (30) days after notice thereof from tenant, Landlord agrees that Tenant shall have the right to enforce said rights under the Restrictive Agreements directly and in the name of and on behalf of Landlord if required (all at Tenant's expense), Landlord hereby conferring such enforcement rights unto Tenant.

(c)    Tenant shall, during the Term of this Lease, comply with and promptly perform each and all of the terms and provisions of the Restrictive Agreements insofar as they relate to the Theater Facility and the Leased Premises. Without limiting the generality of the foregoing, Tenant agrees to pay any assessments, costs, common area maintenance and operating charges, lighting charges, all common area cost contributions, and any and all other amounts that Landlord is obligated to pay under the Restrictive Agreement.

(d)    Landlord agrees to use commercially reasonable efforts, at Tenant's Expense, to cooperate with Tenant in the exercise of any rights or remedies pursuant to the Restrictive Agreements the exercise of which Tenant reasonably believes is necessary or prudent with respect to the Leased Premises. Tenant hereby covenants and agrees to indemnify and hold harmless Landlord from and against any and all claims, costs, demands, losses or liabilities (including attorneys' fees) which Landlord may suffer or incur by reason of any failure by Tenant to pay and perform all of the terms of, or any violation of or noncompliance with any of the covenants and agreements contained in, the Restrictive Agreements, or any of them. If at any time any claims, costs, demands, losses or liabilities are asserted against Landlord by reason of any failure by Tenant to pay and perform all of the terms of, or any violation of or noncompliance with any of the covenants and agreements contained in, the Restrictive Agreements, Tenant will, upon

10

notice from Landlord, defend any such claims, costs, demands, losses or liabilities at Tenant's sole cost and expense by counsel reasonably acceptable to Landlord. Landlord will promptly provide to Tenant a copy of any notice received by Landlord in connection with any Restrictive Agreement.

6.4    **Utility Payments.** Tenant shall pay all charges for gas, electricity, water, sewer service and other utilities used in the Theater Facility and the Leased Premises during the Term of this Lease, all such utilities to be separately metered and to be obtained by Tenant from the applicable utility company. Tenant also shall be solely responsible for the payment of any connection, tap, hookup or other fee(s) imposed by Governmental Authorities or by any utility company to extend, connect or continue utility service to the Leased Premises.

## ARTICLE 7.
## TITLE INSURANCE; TRANSFER OF TITLE

7.1    **Leasehold Title Policy.** At the request of Tenant, Landlord shall furnish Tenant, at Tenant's sole cost and expense, a binding commitment for the issuance of a leasehold owner's title insurance policy on the then-current policy form available in the state in which the Leased Premises is located, in the amount so requested by Tenant, written by a title company selected by Landlord and reasonably acceptable to Tenant, committing to insure the then-present condition of title to the leasehold estate as of the date of the recording of a memorandum of this Lease. The acceptance of such commitment or resulting title policy by Tenant shall in no way be construed as a waiver of, or in any way be deemed to impair, Landlord's representations and warranties set forth in Section 3.3. By executing this Lease, Tenant shall be deemed to have approved and accepted the status of title as reflected in such title commitment. The cost of any title policy and any supplemental endorsements issued to Tenant shall be borne by Tenant.

7.2    **Change of Ownership.** Landlord shall promptly notify Tenant in writing of any change in the ownership of Landlord's interest in the Leased Premises, giving the name and address of the new owner and instructions regarding the payment of Rent, provided however, that the failure to give notice of transfer to Tenant shall not be a default or give Tenant the right to terminate this Lease. In the event of any change in or transfer of title of Landlord in and to the Leased Premises or any part thereof, whether voluntary or involuntary, or by act of Landlord or by operation of Laws, Tenant shall have the right to continue to pay Rent to the party-Landlord to which Tenant was making such payments prior to such change in title until (i) Tenant is notified of such change in title and given satisfactory proof thereof (it being hereby agreed that a letter from the prior owner of the Leased Premises notifying Tenant of such transfer and the name and address of the new owner will be satisfactory proof of such change in title), and (ii) such new owner shall execute and deliver an agreement in recordable form whereby such new owner assumes and agrees with Tenant to discharge all obligations of Landlord under this Lease.

## ARTICLE 8.
## TENANT'S COVENANT TO OPERATE; USE OF PREMISES

8.1    **Operating Covenant.** So long as Landlord is not in default under this Lease, Tenant will, except when prevented from so doing by Force Majeure or by other causes beyond

11

its reasonable control (including the unavailability of film) and subject to the provisions of Article 15 and Article 16 during Tenant's Operating Period, operate or cause to be operated a movie Theater complex in the Theater Facility in accordance with the terms of this Article 8 (such covenant being herein called *"Tenant's Operating Covenant"*).

8.2   **During Tenant's Operating Period.**   During Tenant's Operating Period, the Theater Facility shall not be used for any purposes except (i) primarily as a Theater and auditorium for presentation of first-run and special event motion pictures, revival exhibitions of old feature films, and technological successors thereto, telecasts and other audio-visual presentations, and for meetings and other public presentations and entertainment similar to entertainments presented at other Alamo Drafthouse Cinemas from time to time; (ii) for use by the performing arts; (iii) for television and radio broadcasts and other media broadcasts such as closed-circuit exhibitions; (iv) for the broadcast presentation of concerts, sporting events, operas and other entertainments by live performance or delayed broadcast or presented by other means as new technologies or means of electronic transmission evolve; (v) for meetings, lectures and presentations of educational, civic, charitable and other groups or entities; (vi) for the incidental operation therein of games and other amusement devices (electronic or otherwise); (vii) for the retail sale therein of food, beverages and refreshments, including alcoholic beverages; (viii) for the incidental sale or rental (or both) of video cassettes and discs; (ix) for the incidental sale of records, compact discs, books, magazines, toys and novelties related to the movie industry; (x) for the incidental sale of other goods, wares, merchandise and services; and (xi) such other incidental lawful retail, service or entertainment purpose(s) which are not specifically prohibited under this Lease.   Tenant shall not operate a discount theater or "second run" house on the Leased Premises at any time during Tenant's Operating Period.

8.3   **After Tenant's Operating Period.**   Following Tenant's Operating Period, the Theater Facility, if used at all, may be used for any lawful purpose(s) which are not specifically prohibited under this Lease.   Notwithstanding anything to the contrary herein, Tenant shall not have the right to use the Leased Premises, or any part thereof, for any use or purpose which is not permitted by, or which results in a violation of, any agreement, covenant or restriction to which the Leased Premises is subject, including the Restrictive Agreements.

8.4   **Continuing Use Restrictions.**   Notwithstanding anything in this Lease to the contrary, Tenant shall not have the right to use the Leased Premises, or any part thereof, for any use or purpose which is not permitted by, or which results in a violation of, any agreement, covenant or restriction to which the Leased Premises is subject as of the date of this Lease, including the Restrictive Agreements.   The Leased Premises shall not be used for any use inconsistent with the customary character of a first-class retail shopping center.   Tenant agrees not to permit any unlawful practice to be carried on at or committed in the Leased Premises. Tenant shall not:   (i) use strobe or flashing or rotating lights visible from outside the Leased Premises or in any signs therefor; (ii) use, sell or distribute any leaflets, handbills, bumper stickers, decals, or other such articles in the Leased Premises; (iii) operate any loudspeaker, television set, phonograph, radio, CD player or other musical or electronic or other type of sound producing equipment or device that can be heard outside the Leased Premises; (iv) bring or permit any pet or dog (except for assistance animals used by handicapped persons) or other animal, fish, bird or other creature in the Leased Premises; (v) do or permit anything on or about the Leased Premises that creates any noise, vibration, litter, dust, dirt, odor or other activity

12

which may constitute a public or private nuisance; (vi) do or permit anything in or about the Leased Premises that is pornographic, or which creates or maintains a public or private nuisance; (vii) use or permit upon the Leased Premises anything that violates the certificates of occupancy issued for the Leased Premises; (viii) use or permit upon the Leased Premises anything that may be dangerous to persons or property (including but not limited to the storage, display or sale of fireworks, or any unusual fire, explosive or other damaging or dangerous hazards, flammable oils, fluids, paints, chemicals, firearms, or any other explosive articles or materials except for cleaning and maintenance materials used in compliance with applicable laws); (ix) offer within all or any part of the Leased Premises any goods or services that Landlord determines, in its reasonable judgment, to be inconsistent with the image of a first-class, family-oriented retail development or permit within all or any part of the Leased Premises the display, sale, or rental of any item or thing which, in Landlord's reasonable judgment, is pornographic (including, without limitation, any suggestive "adult" newspaper, book, magazine, picture, representation or merchandise of any kind, nude photographs, sexual devices, objects depicting genitalia, and any similar items), provided, however, that this restriction shall not preclude Tenant from exhibiting films which are widely distributed or exhibited in other Alamo Drafthouse Cinemas; (x) use or allow the Leased Premises to be used as a "sex," "head," or "pawn" shop, (xi) conduct or permit in the Leased Premises any fire, bankruptcy, auction, "closeout," "going out of business" or similar sale; (xii) use or permit the Leased Premises to be used for any warehouse operation (an operation engaged in the retail sale of merchandise to the general public, but utilizing a "rack style" or "wholesale" concept of merchandising, shall not constitute a warehouse for this purpose); (xiii) use or permit the Leased Premises to be used for any assembling, manufacturing, distilling, refining, smelting, industrial, agricultural, drilling or mining operation; (xiv) use or permit the Leased Premises to be used for any trailer court or mobile home park; (xv) use or permit the Leased Premises to be used for any automobile body work or other automotive repair work or any lot or showroom for the sale of new or used motor vehicles; (xvi) use or permit the Leased Premises to be used for any labor camp, junk yard, stockyard or animal raising operation; (xvii) use or permit the Leased Premises to be used for any dumping, disposal, incineration or reduction of garbage or refuse, other than handling or reducing such waste if produced on the Leased Premises from authorized uses and if handled in a clean and sanitary manner; (xviii) use or permit the Leased Premises to be used for any commercial laundry or dry cleaning plant (but this shall not be deemed to prohibit nominal supportive facilities for on-site service oriented pickup and delivery by the ultimate consumer), laundromat, veterinary hospital, car washing establishment, mortuary, funeral home, or similar service establishment; (xix) use or permit the Leased Premises to be used for any medical or dental clinic or offices; (xx) use or permit the Leased Premises to be used for any massage parlor; (xxi) use or permit the Leased Premises to be used for any living quarters, sleeping apartments or lodging rooms; (xxii) use or permit the Leased Premises to be used for any training or educational facility, including beauty schools, barber colleges, places of instruction or other operations catering primarily to students or trainees rather than to customers; (xxiii) use or permit the Leased Premises to be used for any flea market, swap shop, or store that primarily sells used or damaged merchandise; or (xxiv) use or permit the Leased Premises to be used for the exhibition of any motion pictures that are marketed or advertised as rated "X" or any combination of "X"s, any motion picture that is classified as pornographic by Law, or any motion picture that is not rated by the Motion Picture Association of America or a successor rating agency due to sexually explicit content.  Notwithstanding anything to the contrary contained herein, nothing contained in this Lease shall be deemed or

13

construed to prohibit Tenant from operating the Leased Premises consistent with other Alamo Drafthouse Cinemas, including the presentation of exhibitions and promotions which are unique to the Alamo brand. The Leased Premises shall be kept in a clean condition, and all health and police regulations shall, in all respects and at all times, be fully complied with by Tenant.

8.5    **Prohibition of Use.**  If at any time during the Term of this Lease, (i) any Law prohibits the use of the Theater Facility for the purposes permitted in Section 8.1(i) and (iii) of this Lease (the "*Prohibition*"), then immediately upon the earlier to occur of (a) Tenant becoming aware of any proposed Prohibition, or (b) Tenant's receipt of any notice from any Governmental Authorities of any Prohibition, Tenant shall promptly notify Landlord of such fact, and Tenant may proceed, in its or Landlord's name, and at Tenant's sole cost and expense, to take such action as Tenant determines to be necessary or desirable to contest or challenge the Prohibition. If a Prohibition should occur or be imposed, nothing in this Lease shall be deemed to impair Tenant's obligations to comply with all Laws and with Article 12 of this Lease at any time during which Tenant is not prohibited from using the Theater Facility for the purposes permitted in this Lease by the Prohibition.

8.6    **Landlord Assistance.**  Landlord agrees to execute, without cost to Landlord, such customary applications, consents and other instruments as are required by Governmental Authorities to permit the operation of the Theater Facility as permitted by this Lease, so long as such applications, consents or other instruments do not impose or subject Landlord to any liability or claim, and Tenant hereby covenants and agrees to defend, indemnify and hold harmless Landlord from and against any and all claims, costs, demands, losses or liabilities (including attorneys' fees) which Landlord suffers or incurs by reason of Landlord's execution of any such applications, consents or other instruments as Tenant requests. If at any time any claims, costs, demands, losses or liabilities are asserted against Landlord by reason of Landlord's execution of any such applications, consents or other instruments as Tenant requests, Tenant will, upon notice from Landlord, defend any such claims, costs, demands, losses or liabilities at Tenant's sole cost and expense by counsel reasonably acceptable to Landlord.

8.7    **Tenant's Right to Control Operations.**  Nothing contained in this Lease or in rules or regulations (if any) promulgated by Landlord shall be deemed in any way to (i) regulate the manner of operation by Tenant of its business in the Theater Facility and/or the hours and/or days of such operation, provided that Tenant agrees that it will operate its business in the Theater Facility during at least the same general hours and days of operation as other movie theater operators operating similar facilities located within the Market Area, (ii) require Tenant to operate at times or hours different than the majority of its Affiliate's theater properties, or (iii) subject to Section 8.3, give Landlord any right, express or implied, of censorship over any attractions exhibited in the Theater Facility or over the content of Tenant's advertising.

### ARTICLE 9.
### TENANT REPORTING

Tenant hereby covenants and agrees to deliver to Landlord the following: (a) within ninety (90) days after the end of each fiscal year of Guarantor, consolidated statements of income, retained earnings and cash flows of Guarantor for such fiscal year and the related consolidated balance sheets as at the end of such fiscal year, setting forth in each case in

14

comparative form the corresponding consolidated figures for the preceding fiscal year, and accompanied by an opinion thereon of independent certified public accountants of recognized national standing, which opinion shall state that such consolidated financial statements fairly present the consolidated financial condition and results of operations of Guarantor as at the end of, and for, such fiscal year in accordance with generally accepted accounting principles; (b) within ninety (90) days after the end of each fiscal year of Tenant, unaudited statements of income for such fiscal year and the related unaudited balance sheet as at the end of such fiscal year, setting forth in each case in comparative form the corresponding figures for the preceding fiscal year; (c) within twenty (20) days after the end of each calendar month, unaudited operating statements of Tenant's revenue and expenses for the Leased Premises demonstrating operating income for the preceding calendar month, the year to date, and the previous twelve months; and (d) within forty-five (45) days after the end of each interim quarterly fiscal period of each fiscal year of Guarantor, unaudited consolidated statements of income, retained earnings and cash flows of Guarantor for such period and for the period from the beginning of the respective fiscal year to the end of such period, and the related consolidated balance sheets as at the end of such period, setting forth in each case in comparative form the corresponding consolidated figures for the corresponding periods in the preceding fiscal year (except that, in the case of balance sheets, such comparison shall be to the last day of the prior fiscal year), accompanied by a certificate of a financial officer of Guarantor, as applicable, which certificate shall state that such consolidated financial statements fairly present the consolidated financial condition and results of operations of the respective Guarantor in accordance with generally accepted accounting principles, consistently applied, as at the end of, and for, such period; (e) within forty-five (45) days after the end of each interim quarterly fiscal period of each fiscal year of Tenant, unaudited statements of income for such period and for the period from the beginning of the respective fiscal year to the end of such period in each case in comparative form the corresponding figures for the corresponding periods in the preceding fiscal year; (f) within twenty (20) days after the end of each calendar month, an income and expense statement detailing all sources of revenue, including but not limited to ticket sales, concession sales and other revenues, and all expenses relating to the Leased Premises, accompanied by a certificate of a financial officer of Tenant stating that such items are true, correct, accurate and completely and fairly present the financial condition and results of the operations of Tenant.

## ARTICLE 10.
## SUBLETTING AND ASSIGNING

10.1    **Permitted Assignment, Subletting and Licenses.**

(a)    Subject to the provisions of Article 19 of this Lease and except as provided in this Section 10.1, Tenant shall not assign this Lease or sublet the Leased Premises in whole or in part without the consent of Landlord, which consent Landlord agrees not to unreasonably withhold, condition or delay.  Tenant may assign this Lease to a party who (i) has (or has a guarantor with) a tangible net worth, determined in accordance with generally accepted accounting principles, of at least Twenty-Five Million Dollars ($25,000,000.00), and (ii) operates, or an entity engaged by such party to manage the Leased Premises pursuant to a management agreement in form reasonably acceptable to Landlord operates, at least one hundred (100) motion picture screens in North America.

15

(b)    In addition to the foregoing, Tenant may assign this Lease or sublet the Leased Premises in whole or in part without Landlord's consent to an Affiliate, provided that Tenant gives Landlord at least thirty (30) days advance notice of such assignment. Any party that is permitted to take assignment of this Lease shall execute an assignment and assumption agreement in form acceptable to Landlord whereby such assignee agrees to assume all obligations of Tenant under this Lease.

(c)    Tenant may also, without Landlord's prior approval, license or sublease portions of the Theater Facility to concessionaires or licensees to: (i) operate games or other amusement devices; and (ii) sell food, beverages and refreshments. Each sublease will be subject and subordinate to the provisions of this Lease relating to the Leased Premises. The sublease will not affect or reduce any of the obligations of Tenant, nor will the sublease impose any additional obligations on Landlord. Tenant will, within ten (10) days after the execution and delivery of any sublease, deliver a duplicate original thereof to Landlord. Without Landlord's prior approval Tenant shall not enter into any sublease, license agreement or other arrangement which would have the effect of causing all or a portion of the amount received or accrued by the Landlord under this Lease to be treated as other than "rents from real property" within the meaning of Section 856(d) of the Code. If Tenant enters into any subleases of any portion of the Leased Premises with any third party, Tenant shall notify Landlord if such third party is an Affiliate of Tenant, and Tenant shall obtain from such third party, and submit to Landlord, all information necessary to permit Landlord to determine the Gross Receipts of such third party derived from operations conducted at the Theater Facility.

(d)    For purposes of this Section 10.1, "subleases" shall include any licenses, concession arrangements, management contracts or other arrangements relating to the possession or use of all or any part of the Leased Premises, excluding, however, "four-wall" deals whereby the Theater Facility or any part thereof is permitted to be used by others on a temporary limited engagement basis for any use permitted to be made thereof by Tenant. Tenant shall have the right to enter into such "four-wall" deals in the ordinary course of Tenant's business without Landlord's consent and only payments made to Tenant under four wall deals will be included in Gross Receipts.

10.2    **Continuation/Release of Liability.** If Tenant requests, and Landlord consents, to an assignment of this Lease or a sublet of all or any part of the Leased Premises or if Tenant assigns this Lease or sublets all or part of the Leased Premises to an Affiliate, Tenant and Guarantor shall remain liable and responsible under this Lease except as provided in this Section 10.2. Tenant shall be released and relieved from further liability under this Lease only if Tenant requests and Landlord consents to an assignment or if Tenant assigns this Lease to an Affiliate and (i) the assignee, by written instrument, duly executed and acknowledged and delivered to Landlord, assumes and covenants and agrees with Landlord to perform all the terms, covenants and conditions of this Lease which by the terms hereof are binding on Tenant from and after such transfer, and (ii) such assignee (or the guarantor of such assignee's obligations under this Lease) has a book net worth of not less than $25,000,000.00 as of the end of the calendar month preceding the month during which any such assignment becomes effective, as demonstrated to Landlord's reasonable satisfaction (e.g., by audited financial statements or the delivery of a 10-Q report, in the case of a public company).

16

10.3 **Default Notices After Assignments.** If Tenant assigns this Lease other than to an Affiliate and remains liable hereunder, then Landlord, when giving notice to said assignee or any future assignee in respect of any default, shall also serve a copy of such notice in the manner provided herein upon the original tenant named in this Lease, Alamo Mission, LLC (the "*Original Tenant*") and any guarantor of the Original Tenant remaining liable under this Lease (an "*Original Guarantor*"). The Original Tenant and any Original Guarantor, at its sole option, shall have the same period that such assignee as Tenant under this Lease has to cure such default. The right of Original Tenant and Original Guarantor to receive notice as provided in this Section 10.3 is an accommodation only to and for the benefit of Original Tenant and Original Guarantor and shall not be construed to grant the assignee Tenant any additional rights not specifically provided in this Lease.

10.4 **Assignment of Rights in Sublease.** As security for performance of its obligations under this Lease, Tenant hereby grants, conveys and assigns to Landlord all right, title and interest of Tenant in and to all subleases now in existence or hereinafter entered into for any or all of the Leased Premises, and all extensions, modifications and renewals thereof and all rents, issues and profits therefrom ("*Assignment of Subleases*"). Landlord hereby grants to Tenant a license to collect and enjoy all rents and other sums of money payable under any sublease of any of the Leased Premises; provided, however, that Landlord shall have the absolute right at any time after the occurrence and continuance of an event of default as herein provided, upon notice to Tenant and any subtenants, to revoke said license and to collect such rents and sums of money and to retain the same. Tenant shall not (i) consent to, cause or allow any material modification or alteration of any of the terms, conditions or covenants of any of the subleases or the termination thereof, without the prior written approval of Landlord which shall not be unreasonably withheld or delayed, nor (ii) accept any rents (other than customary security deposits) more than thirty (30) days in advance of the accrual thereof nor (iii) permit anything to be done, the doing of which, nor omit or refrain from doing anything, the omission of which, will or could be a breach of or default in the terms of any of the subleases. Notwithstanding anything herein to the contrary, Landlord agrees that the Assignment of Subleases shall be subject and subordinate to Tenant's assignment to any Leasehold Mortgagee of such similar rights as contained in the Assignment of Subleases.

10.5 **Landlord's Assignment.** Anything in this Lease to the contrary notwithstanding, Landlord shall have the right, without Tenant's consent, to sell, transfer, or assign Landlord's interest in the Leased Premises and/or this Lease at any time and in such event, Landlord shall be relieved of Landlord's obligations under this Lease to the extent such obligations arise after the date of such sale, transfer, or assignment, provided that such transferee, or assignee agrees to assume all of the unaccrued obligations under this Lease and agrees to perform to the full extent required under the terms and conditions of this Lease.

10.6 **REIT Limitations.** At such time as the Landlord in this Lease is a real estate investment trust, this Section 10.6 shall apply. Anything contained in this Lease to the contrary notwithstanding, Tenant shall not: (i) sublet or assign or enter into other arrangements such that the amounts to be paid by the sublessee or assignee thereunder would be based, in whole or in part, on the income or profits derived by the business activities of the sublessee or assignee; (ii) sublet or assign the Leased Premises or this Lease to any person that Landlord owns, directly or indirectly (by applying constructive ownership rules set forth in Section 856(d)(5) of the

17

Internal Revenue Code), a ten percent (10%) or greater interest within the meaning of Section 856(d)(2)(B) of the Code; or (iii) sublet or assign the Leased Premises or this Lease in any other manner or otherwise derive any income which could cause any portion of the amounts received by Landlord pursuant to this Lease or any sublease to fail to qualify as "rents from real property" within the meaning of Section 856(d) of the Code, or which could cause any other income received by Landlord to fail to qualify as income described in Section 856(c)(2) of the Code. The requirements of this Section 10.6 shall likewise apply to any further subleasing by any subtenant.

## ARTICLE 11.
## TENANT'S PROPERTY

Any and all trade fixtures and equipment, signs, appliances, furniture and other personal property of any nature installed in the Theater Facility on the Commencement Date or at any time thereafter by Tenant, including without limitation, seats and projection screens, lighting fixtures, concessions stands and related equipment, acoustical wall panels, projection and sound equipment, and satellite dishes, if installed (all of the foregoing being collectively referred to in this Lease as "**Tenant's Property**"), shall not become a part of the realty. Provided that Tenant is not in default under this Lease, Tenant's Property other than seats and projection screens may be removed from the Theater Facility by Tenant at any time during the Term of this Lease or upon the termination of the Term of this Lease; provided, however, if and to the extent that Tenant is in default of this Lease, then Landlord shall have any and all rights at law or in equity, including, but not limited to, any and all liens, claims, demands or rights, including rights of levy, execution, sale and distraint for unpaid rent, or any other right, interest or lien which Landlord has or may hereafter acquire in any of Tenant's Property. Tenant may grant to its lender(s) a security interest or other lien in, or enter into, an equipment lease for, Tenant's Property other than seats and projection screens and Landlord will permit Tenant's lender(s) or lessor(s) reasonable access to the Theater Facility to inspect Tenant's Property or to remove Tenant's Property (other than seats and projection screens) in connection with any action to enforce such security interest, lease or other lien. Tenant shall not pledge the seats and projection screens in the Theater Facility as collateral for any security interest, lease or other lien without first obtaining Landlord's written consent, which may be withheld or granted in Landlord's sole discretion. Upon expiration or termination of this Lease, Tenant shall abandon all seats and projection screens in the Theater Facility, and the same shall immediately become the property of Landlord, free and clear of all liens. Landlord hereby and at all times subordinates any lien it may have by statute or otherwise against Tenant's Property, excluding seats and screens, to the lien held by any permitted Leasehold Mortgagee against Tenant's Property. Landlord will execute and deliver a standard form of landlord's waiver required of Tenant's lender(s) or lessor(s) to confirm such entity's security interest in or ownership of Tenant's Property.

## ARTICLE 12.
## GOVERNMENTAL COMPLIANCE

12.1    **Tenant Responsibilities Generally.** Tenant shall comply with the terms of the Restrictive Agreements and all Laws which affect the Leased Premises and the Theater Facility located thereon and the use and occupancy thereof. If Tenant receives written notice of any

18

violation of any governmental requirements applicable to the Leased Premises, Tenant shall give prompt notice thereof to Landlord.

12.2 **Parties; Environmental Knowledge.** Except as disclosed in the Environmental Report (hereinafter defined), Landlord warrants and represents to Tenant that to Landlord's actual knowledge with no duty of investigation: (i) no release leak, discharge, spill, storage, disposal or emission of "Hazardous Substances"(hereinafter defined) has occurred in, on or under the Leased Premises, and that the Leased Premises are free of Hazardous Substances as of the date hereof, (ii) there are no underground storage tanks under or adjacent to the Leased Premises, (iii) there has not been any notice of intent to sue, notice of violation, citation, warning or similar notification under any federal, state or local environmental law or regulation regarding the Leased Premises or arising out of operations on the Leased Premises, and (iv) there is no investigation or inquiry by any Governmental Authority concerning the Leased Premises or the operations thereon; PROVIDED, HOWEVER, Tenant hereby acknowledges and agrees that (x) it has received copies of a Phase I Environmental Assessment prepared by ACC Environmental and dated October 14, 2005, respecting the Leased Premises (the *"Environmental Report"*), Tenant is fully aware of the contents of the Environmental Report, Tenant is fully aware of the condition and historical uses of the Leased Premises, and Tenant accepts the Leased Premises subject to all matters and conditions disclosed in the Environmental Report, (y) Landlord has not undertaken any investigation or inquiry with respect to environmental aspects of the Leased Premises other than the Environmental Report, and the warranties and representations of Landlord set forth in this Section 12.2 are based solely upon the contents of the Environmental Report, and (z) the representations and warranties contained in this Section 12.2 are subject to the matters and conditions disclosed in the Environmental Report, and Landlord shall not be deemed to be in breach of the warranties and representations contained in this Section 12.2 to the extent the matter or condition which would otherwise be a breach of such warranties and representations is disclosed in the Environmental Report.

12.3 **Landlord's Environmental Responsibilities During the Term of this Lease.** During the Term of this Lease, Landlord shall not cause any Hazardous Substances to be used, stored, generated or disposed of (collectively, *"Used"*) on, in or under the Leased Premises by Landlord, except for those Hazardous Substances which may lawfully be Used in the ordinary course of business in the operation of such properties or which may be reasonably required in the performance by Landlord of its obligations under this Lease, and then only to the extent no Laws in effect at such time are violated by Landlord.

12.4 **Tenant's Environmental Responsibilities.** During the Term of this Lease, Tenant shall not cause or permit any Hazardous Substances to be Used on, in or under the Leased Premises by Tenant, Tenant's agents, employees or contractors, or anyone claiming by, through or under Tenant, except in the ordinary course of business in the operation of Tenant's business as permitted by Article 8 of this Lease, or as reasonably required in performing the obligations of Tenant under this Lease, and then only to the extent no Laws in effect at such time are violated by Tenant.

12.5 **Environmental Indemnities.** Each party (*"Indemnifying Party"*) shall indemnify, defend and hold the other party (*"Indemnified Party"*) harmless from any and all claims of third parties, and damages, costs and losses owing to third parties or suffered by

19

Indemnified Party, including court costs, reasonable attorneys' fees and consultants' fees, arising during or after the Term and reasonably incurred or suffered by the Indemnified Party as a result of any default or breach of any representation, warranty or covenant made by Indemnifying Party under this Article 12. It is a condition of this indemnification and hold harmless obligation that the Indemnifying Party must receive notice of any such claim against the Indemnified Party promptly after Indemnified Party first has knowledge thereof, but no failure by the Indemnified Party to promptly notify the Indemnifying Party of any such claim shall adversely affect the Indemnified Party's right to indemnification except (and only to the extent) that the Indemnifying Party can prove prejudice as a result of the failure to receive prompt notice. This indemnification and hold harmless obligation includes any and all costs reasonably incurred by the Indemnified Party after notice to Indemnifying Party for any cleanup, removal or restoration mandated by any public official acting lawfully under applicable Laws if Indemnifying Party fails to timely perform such work.

12.6    **Definition.**  As used herein, *"Hazardous Substance"* means any substance that is toxic radioactive, ignitable, flammable, explosive, reactive or corrosive and that is, in the form, quantity, condition and location then found upon or under the Leased Premises, regulated by any Governmental Authority. "Hazardous Substance" includes any and all materials and substances that are defined as "hazardous waste," "hazardous chemical," "pollutant," "contaminant" or "hazardous substance," in the form, quantity, condition and location then found upon the Leased Premises pursuant to Law. "Hazardous Substance" includes asbestos, polychlorinated biphenyls and petroleum-based substances.

12.7    **Survival.**  The provisions of this Article 12 shall survive the expiration or sooner termination of this Lease.

## ARTICLE 13.
## MAINTENANCE AND REPAIRS

13.1    **Warranty.**  As more particularly set forth in the Development Agreement, Landlord will, so long as no event of default has occurred and is continuing, assign or otherwise make available to the Tenant any and all rights the Landlord may have under any vendor's or manufacturer's warranties or undertakings with respect to the Leased Premises, but Landlord does not warrant or represent that any such warranties or undertakings are or will be available to Tenant, and Landlord shall have no further obligations or responsibilities respecting such warranties or undertakings.

**TENANT HEREBY WAIVES ALL STATUTORY REPRESENTATIONS AND WARRANTIES ON THE PART OF LANDLORD, INCLUDING, WITHOUT LIMITATION, ALL WARRANTIES THAT THE LEASED PREMISES ARE FREE FROM DEFECTS OR DEFICIENCIES, WHETHER HIDDEN OR APPARENT, AND ALL WARRANTIES THAT THEY ARE SUITABLE FOR TENANT'S USE.**

13.2    **Maintenance and Repairs.**  Tenant shall pay all costs, expenses, fees and charges incurred in connection with the use or occupancy of the Leased Premises. Tenant shall at all times, at its own expense, and subject to reasonable wear and tear, operate and keep the Leased Premises in first class operating order, repair, condition and appearance and shall allow

DB04/0503816.0339/8130936.5

no nuisances to exist or be maintained therein. With respect to the Leased Premises, the undertaking to maintain in first class repair shall include, without limitation, all interior and exterior repairs (including all replacements of components, systems or parts which are a part of, or are incorporated into, the Leased Premises or any part thereof), whether structural or nonstructural, foreseen or unforeseen, ordinary or extraordinary and all common area maintenance including, without limitation, removal of dirt, snow, ice, rubbish and other obstructions and maintenance of sidewalks and landscaping. In addition to the foregoing, Tenant shall, at Tenant's expense, furnish, install and maintain in good condition and repair, (i) to points in the Theater Facility, all storm and sanitary sewers, and all gas, water, telephone, electrical facilities and other utilities of such size and type as may be required to provide adequate service for the Leased Premises, and (ii) to Tenant's Pylon, electrical facilities of such size and type as may be required to adequately service Tenant's Pylon.

13.3  **Minor Alterations.**  So long as no event of default has occurred and is continuing, Tenant may, at its expense, make interior and exterior nonstructural additions and alterations to the Leased Premises with the prior written consent Landlord. Notwithstanding the foregoing, Landlord's consent shall not be required if the cost of such additions and alterations is less than Two Hundred Fifty Thousand Dollars ($250,000.00) (2013 Constant); provided, that (i) upon completion of such additions and alterations, neither the fair market value of the Leased Premises shall be lessened thereby nor the utility or condition of the Leased Premises impaired, below the value, utility or condition thereof immediately prior to such action, (ii) such additions and alterations shall not result in a change of use of the Leased Premises, (iii) such work shall be completed in a good and workmanlike manner and in compliance with all applicable Laws and insurance requirements; and (iv) Tenant gives Landlord thirty (30) days advance notice of any such work. Any and all such additions and alterations shall be and remain part of the Leased Premises and shall be subject to this Lease. In no event shall Landlord be obligated to reimburse or compensate Tenant or any other person or entity for any such additions, alterations or improvements to the Leased Premises and Tenant hereby waives any right to reimbursement or compensation for the same. Whenever a constant is referred to herein (e.g., "2013 Constant" or "measured in 2013 dollars"), the CPI shall be utilized to gauge the inflationary rate to be applied to determine the sum of money in then current dollars that is equivalent to the applicable amount of dollars circa 2013.

13.4  **Certain Limitations.**  The obligations Tenant set forth in this Article 13 shall be subject to the provisions set forth in Article 15 and Article 16.

**ARTICLE 14.**
**ALTERATIONS AND TENANT'S LIENS**

14.1  **Title to Tenant's Alterations.**  Subject to the provisions of Article 11, any alterations, changes, improvements and additions to the Leased Premises made by Tenant shall immediately become the property of Landlord and shall be considered a part of the Theater Facility, but Landlord will not be obligated to compensate or reimburse Tenant or any other person or entity for any such alterations, changes, improvements or additions made by Tenant, and Tenant hereby waives all right to any such compensation or reimbursement.

14.2 **No Tenant Liens.** Tenant shall not permit any mechanic's, materialman's or other similar lien to be foreclosed against the Leased Premises by reason of work, labor, services or materials performed by or furnished to Tenant or anyone holding any part of the Leased Premises under Tenant. If any such lien is filed, Tenant may contest the same in good faith but Tenant shall, prior to foreclosure thereof, cause such lien to be released of record by payment, bond, order of a court of competent jurisdiction or otherwise. Nothing contained in this Lease shall be construed as a consent on the part of Landlord to subject Landlord's estate in the Leased Premises to any lien or liability under the lien laws of the state in which the Leased Premises are located. Notwithstanding the foregoing, if any mechanics', materialmen's or other similar lien is filed against the Leased Premises, and the amount of such lien claim exceeds One Hundred Thousand Dollars ($100,000.00) by reason of any act or omission of Tenant, then Tenant shall, within ten (10) days after the filing thereof, provide to Landlord a bond in the amount of one hundred twenty-five percent (125%) of the amount of such lien claim, or other security satisfactory to Landlord, protecting Landlord from loss or liability by reason of such lien. Tenant hereby covenants and agrees to defend, indemnify and hold harmless Landlord from and against any and all claims, costs, demands, losses or liabilities (including attorneys' fees) which Landlord may suffer or incur by reason of any such mechanics', materialmen's or other similar lien.

14.3 **Landlord Elective Improvements.** During the Term of this Lease, Landlord shall not be required to build or rebuild any improvements to the Leased Premises or the Theater Facility, or to make any repairs, replacements, alterations, restorations or renewals thereto. In the event that Landlord should, in its sole discretion elect to make capital improvements to the Leased Premises, it may only do so with Tenant's consent, which may be given or withheld in Tenant's sole discretion, and it is understood and agreed that Landlord will generally condition any such election on an increase in the Annual Fixed Rent to reflect such expenditures.

## ARTICLE 15.
## DAMAGE CLAUSE

15.1 **Damage.** If the Theater Facility is damaged or destroyed by fire, casualty or any cause whatsoever, either in whole or in part, and Tenant does not elect to terminate this Lease pursuant to the provisions of Section 15.2 hereof, Tenant shall with due diligence remove any resulting debris and repair or rebuild the damaged or destroyed structures and other improvements, including any improvements or betterments made by Landlord or Tenant, in accordance with the Final Plans subject to such modifications as Tenant reasonably determines are appropriate to conform to current standards and prototypes of Tenant (to the extent then permitted by law). Subject to Section 17.1 hereof, Landlord shall make all insurance proceeds available as a result of such fire, casualty or other destruction to Tenant for restoration. Tenant shall obtain Landlord's consent (which shall not be unreasonably withheld or delayed) to any material deviation from the Final Plans which Tenant is required to make to obtain approval from Governmental Authorities having jurisdiction for such restoration. Until the earlier of (i) the date that is ninety (90) days after the date the Theater Facility is repaired, rebuilt and put in good and tenantable order, or (ii) the date Tenant reopens the portions(s) of the Theater Facility so damaged or destroyed, the Annual Fixed Rent and other charges hereby reserved, or a fair and just proportion thereof according to the nature and extent of the damage sustained, shall be

22

abated, but only to the extent of any proceeds of rental interruption insurance carried by Tenant that are actually received by Landlord.

15.2    **Right to Terminate on Certain Damage.**  If during the final three (3) years of the Initial Fixed Term or during any Option Period, the Theater Facility is damaged or destroyed by fire, casualty or any cause whatsoever to such an extent that all or a portion thereof is rendered unsuitable for use as a movie theater and the cost of restoration would exceed fifty percent (50%) of the amount it would cost to replace the Theater Facility in its entirety at the time such damage or destruction occurred, and if Tenant has complied with its insurance obligations under this Lease (including maintaining insurance against loss of rents by Landlord), Tenant may terminate this Lease by notice to Landlord given within sixty (60) days after such damage or destruction.  If Tenant elects to terminate this Lease as provided herein, Tenant shall authorize payment to Landlord, as a condition upon the effectiveness of such termination, within sixty (60) days after such notice (except payment for any of Tenant's Property) together with an amount equal to the positive difference, if any, between the amount of insurance proceeds turned over to Landlord and the net book value of the Theater Facility as accurately reflected in Landlord's financial records as of the date of such damage or destruction.  Upon the giving of such notice by Tenant to terminate, and Tenant's authorization for payment of all amounts provided for herein, this Lease shall automatically terminate and the Annual Fixed Rent and other charges hereunder shall be equitably adjusted as of the date of such destruction.

15.3    **Rights to Insurance Proceeds.**  If this Lease is terminated as provided in this Article 15 following damage to or destruction of the Theater Facility, the proceeds of all hazard insurance on the Theater Facility which is maintained by Tenant or Landlord pursuant to Article 17 shall belong to Landlord or Landlord's lender, subject to Landlord's obligation to rebuild under this Lease, if any.  Insurance proceeds with respect to Tenant's Property shall belong to Tenant.

## ARTICLE 16.
## CONDEMNATION

16.1    **In General.**  If any material part of the Leased Premises (meaning any part of the Theater Facility or the parking or access ways serving the Theater Facility) is taken in any proceeding by any Governmental Authority by condemnation or otherwise, or is acquired for public or quasi-public purposes, or is to be conveyed under threat of such taking or acquiring (which Landlord shall not do without Tenant's prior written consent), and Tenant reasonably determines that the remaining portion will not permit Tenant to operate its business on the Leased Premises, Tenant shall have the option of terminating this Lease by notice to Landlord of its election to do so given on or before the date which is thirty (30) days after Tenant is deprived of possession of the condemned property, and upon the giving of such notice, this Lease shall automatically terminate and the Annual Fixed Rent and other charges hereunder shall be adjusted as of the date of such notice.  If a material part of the Leased Premises (meaning any part of the Theater Facility or the parking or access ways serving the Theater Facility) is so taken and Tenant elects not to terminate this Lease, then Tenant shall, to the extent and making use of the condemnation award, restore the Theater Facility to a complete unit as similar as reasonably possible in design, character and quality to the building which existed before such taking.  If the Theater Facility is partially taken and this Lease is not terminated, there shall be no reduction or

23

adjustment in the Annual Fixed Rent and other charges thereafter payable hereunder. Any restoration work to be performed pursuant to this Article 16 shall be completed in accordance with plans and specifications which shall have been approved by Landlord and Tenant, which approvals shall not be unreasonably withheld. If all or part of the Leased Premises is taken and Tenant elects to terminate this Lease in accordance with this Article 16, each party shall be free to make claim against the condemning authority for the amount of the actual provable damage done to each of them by such taking. If the condemning authority refuses to permit separate claims to be made, then Landlord shall prosecute with counsel reasonably satisfactory to Tenant the claims of both Landlord and Tenant, and the proceeds of the award, after payment of Landlord's reasonable attorneys' fees and other costs incurred, shall be divided between Landlord and Tenant in a fair and equitable manner; provided, however, in the event of a condemnation which results in Tenant's election to terminate this Lease, Tenant shall be entitled to its portion of the condemnation award only so long as the amount of the award received by Landlord is equal to or greater than the net book value of the property taken, as reflected on the Landlord's financial statements on the date of the condemnation.

16.2  **Temporary Taking Awards.**  If by reason of a taking Tenant is temporarily deprived in whole or in part of the use of the Theater Facility or any part thereof, the entire award made as compensation therefor shall belong to Tenant, and there shall be no abatement of the Annual Fixed Rent payable hereunder.

<div align="center">

**ARTICLE 17.**
**INSURANCE, INDEMNITY, WAIVER OF SUBROGATION**
**AND FIRE PROTECTION**

</div>

17.1  **Casualty Policy.**  During the Term of this Lease, Tenant shall at its expense keep the Leased Premises insured in the name of Landlord and Tenant (as their interests may appear with each as named insured, additional insured or loss payee, as applicable) against damage or destruction by all risks of direct physical loss or damage including terrorism, fire and the perils commonly covered under a special form policy in an amount equal to the full replacement cost thereof (without deduction for physical depreciation), and shall have deductibles no greater than One Hundred Thousand and No/100 Dollars ($100,000.00) (with higher deductibles for wind and earthquake coverage as the applicable insurer may require). Such policy also shall cover floods if any portion of the Leased Premises is at any time located in a "100-year flood plain" or an area designated as having special flood hazards (including Zones A, B, C, V, X and shaded X areas), along with earthquake and other similar hazards as may be customary for comparable properties in the Market Area, and such other "additional coverage" insurance as Landlord or any holder of a Mortgage on the Leased Premises may reasonably require, which at the time is usual and commonly obtained in connection with properties similar in type of building size and use to the Theater Facility located in the Market Area. Tenant shall be responsible for determining that the amount of property damage coverage insurance maintained complies with the requirements of this Lease. The proceeds of such insurance in case of loss or damage shall be held in trust and applied on account of the obligation of Tenant to repair and rebuild the Leased Premises pursuant to Article 15 to the extent that such proceeds are required for such purpose. The insurance required to be carried by Tenant under this Article 17 may be covered under a so-called "blanket" policy covering other operations of Tenant and Affiliates, so long as the amount of coverage available under said "blanket" policy with respect to the Leased Premises, or

<div align="center">24</div>

Tenant's liability under this Lease, at all times meets the requirements set forth in this Lease, and shall be evidenced by a certificate of insurance (issued on ACORD 28 or equivalent form) from Tenant's insurer, authorized agent or broker.  Upon request, Tenant shall name the holder of any Mortgage on the Leased Premises pursuant to a standard mortgagee, additional insured or loss payee clause as such holder shall elect with respect to the foregoing property insurance, provided such holder agrees with Tenant in writing to disburse such insurance proceeds to Tenant for, and periodically during the course of, repair and restoration of the Theater Facility as set forth in this Lease.

17.2    **DIC Policy Endorsement.**  If required by Landlord's lender or the holder of a Mortgage during the Term of this Lease, Tenant shall, at its expense, keep the Leased Premises insured in the name of Landlord and Tenant (as their interests may appear with each as named insured, additional insured or loss payee, as applicable, to provide each with the best position) against the perils of flood and earthquake , under a so-called difference in conditions policy or endorsement ("*DIC Policy*") in the amount of which shall include the following endorsements: Agreed Value and Ordinance or Law – Coverage for loss to undamaged portion of building, demolition costs and increased cost of construction, rental loss/business income insurance.  To the extent flood and earthquake perils not covered under the casualty or DIC policy and a separate policy must obtained, Tenant shall insure the property against flood and earthquake perils by a separate policy at the maximum amount available in the marketplace, up to 100% of replacement cost written with "per occurrence" and "annual aggregate" limits.  The proceeds of such insurance in case of loss or damage shall be held in trust and applied on account of the obligation of Tenant to repair and rebuild the Leased Premises pursuant to Article 15 to the extent that such proceeds are required for such purpose.  The insurance required to be carried by Tenant under this Section 17.2 shall be evidenced by a certificate of insurance (issued on ACORD 28 or equivalent form) from Tenant's insurer, authorized agent or broker.  Upon request, Tenant shall name the holder of any Mortgage on the Leased Premises pursuant to a standard mortgagee, additional insured or loss payee clause as such holder shall elect with respect to the DIC Policy, provided such holder agrees in writing to disburse such insurance proceeds to Tenant for, and periodically during the course of, repair and restoration of the Leased Premises as set forth in this Lease.

17.3    **Liability Insurance; Tenant Negligence.**  Tenant will, subject to Section 17.7 and Section 12.5, defend, indemnify and hold Landlord, its trustees, directors, officers, agents and servants, harmless from and against any and all claims, actions, liability and expense: arising out of any occurrence in, upon or at the Theater Facility, the Leased Premises, or the occupancy or use by Tenant of the Theater Facility or the Leased Premises or any part thereof, except to the extent the same is caused by the willful or grossly negligent act or omission of Landlord; or occasioned wholly or in part by any negligent act or omission of Tenant, its agents, employees, contractors, licensees, servants, subtenants, lessees or concessionaires.  If any action or proceeding is brought against Landlord, its officers, employees, agents or servants by reason of any of the aforementioned causes, Tenant, upon receiving notice thereof from Landlord, agrees to defend such action or proceeding by counsel reasonably acceptable to Landlord at Tenant's own expense.  Tenant agrees to insure the foregoing obligation by contractual endorsement under a commercial general public liability policy (including personal injury and property damage, terrorism and liquor liability, if applicable) to be maintained by Tenant with not less than Twenty-Five Million Dollars ($25,000,000.00) per occurrence/ Twenty-Five

25

Million Dollars ($25,000,000.00) products & completed operations aggregate/ Twenty-Five Million Dollars ($25,000,000.00) general aggregate on a per location basis. Tenant shall cause Landlord to be named as an additional insured on all policies of liability insurance maintained by Tenant (including excess liability and umbrella policies) on a primary basis and non-contributory with any other insurance coverage carried by the Landlord with respect to the Leased Premises. The insurance required to be carried by Tenant under this Section 17.3 shall be evidenced by a certificate of insurance (issued on ACORD 25 or equivalent form) from Tenant's insurer, authorized agent or broker.

17.4   **Liability Insurance; Landlord Negligence.**   Landlord will, subject to Section 17.7 and Section 12.5, defend, indemnify and hold Tenant, its officers, agents and servants, harmless from and against any and all claims, actions, suits, judgments, decrees, orders, liability and expense in connection with loss of life, bodily injury and/or damage to property occasioned wholly or in part by any willful or negligent act or omission of Landlord, its agents, employees or servants. If any action or proceeding is brought against Tenant, its agents or servants by reason of any of the aforementioned causes, Landlord, upon receiving written notice thereof from Tenant in the manner provided herein, agrees to defend such action or proceeding by counsel reasonably acceptable to Tenant at Landlord's own expense.

17.5   **Rental Loss/Business Interruption Insurance.**   During the Term of this Lease, Tenant shall, at its expense, keep and maintain for the benefit of Tenant and Landlord, coverage for the loss of Rent payable hereunder for a period of at least the next succeeding eighteen (18) months.

17.6   **Workers' Compensation Insurance.**   Tenant shall maintain, with respect to its operations and all of its employees at the Leased Premises, a policy or policies of workers' compensation insurance in accordance with and in the amounts required by applicable Laws, protecting Tenant from and against any and all claims from any persons employed directly or indirectly on or about the Leased Premises for injury or death of such persons.

17.7   **Release; Waiver of Subrogation.**   Anything in this Lease to the contrary notwithstanding, it is agreed that each party (the "*Releasing Party*") hereby releases the other (the "*Released Party*") from any liability which the Released Party would, but for this Article 17.7, have had to the Releasing Party during the Term of this Lease resulting from any accident or occurrence or casualty (i) which is covered by Tenant's property insurance required under this Lease, or (ii) which is covered by any other casualty or property damage insurance being carried by the Releasing Party at the time of such occurrence, which casualty may have resulted in whole or in part from any act or omission of the Released Party, its officers, agents or employees; PROVIDED, HOWEVER, the mutual releases hereinabove set forth shall become inoperative and null and void if the Releasing Party wishes to place such insurance with an insurance company which (y) takes the position that the existence of such release vitiates or would substantially adversely affect any policy so insuring the Releasing Party and notice thereof is given to the Released Party, or (z) requires the payment of a higher premium by reason of the existence of such release, unless in the latter case the Released Party within twenty (20) days after notice thereof from the Releasing Party pays such increase in premium. Notwithstanding anything to the contrary herein, Tenant agrees and acknowledges that Landlord shall have no responsibility or liability for any loss, damage or injury to Tenant's Property which

26

is located in, on or about the Leased Premises at any time and from time to time, regardless of the cause of such loss, damage or injury, and that all of Tenant's Property is located in, on and about the Leased Premises at Tenant's sole risk. Tenant hereby releases Landlord from any and all claims with respect to loss, damage or injury to Tenant's Property located in, on and about the Leased Premises, regardless of the cause of such loss, damage or injury.

      17.8   **General.** All policies of insurance required pursuant to this Article 17 shall be issued by companies approved by Landlord, with an A. M. Best Rating of A – X or better and authorized to do business in the state where the Leased Premises is located. Furthermore, any such insurance company shall have a claims paying ability rating of "AA" or better by Standard & Poor's (other than the issuer of any policy for earthquake insurance, which issuer shall have a claims paying ability rating of "A" or better by Standard & Poor's, and shall issue policies which (i) include effective waivers by the insurer of all claims for insurance premiums against all loss payees, additional loss payee, additional insured or named insured; (ii) shall contain such provisions as Landlord deems reasonably necessary or desirable to protect its interest including any endorsements providing that neither Tenant, Landlord nor any other party shall be a co-insurer under said policies and that no modification, reduction, cancellation or termination in amount of, or material change (other than an increase) in, coverage of any of the policies required hereby shall be effective until at least thirty (30) days after receipt by each named insured, additional insured and loss payee of written notice thereof or ten (10) days after receipt of such notice with respect to nonpayment of premium; (iii) provisions which permit Landlord to pay the premiums and continue any insurance upon failure of Tenant to pay premiums when due; and (iv) provisions stating that the insurance shall not be impaired or invalidated by virtue of (A) any act, failure to act, negligence of, or violation of declarations, warranties or conditions contained in such policy by Tenant, Landlord or any other named insured, additional insured or loss payee, except for the willful misconduct of Landlord knowingly in violation of the conditions of such policy or (B) the occupation, use, operation or maintenance of the Leased Premises for purposes more hazardous than permitted by the terms of the policy.

### ARTICLE 18.
### INDEMNIFICATION GENERALLY

      Except as provided in Section 12.5 and Section 17.4, Tenant agrees to defend, indemnify and hold Landlord, its trustee, directors, officers, employees, agents and servants harmless from and against all liabilities, costs and expenses (including reasonable attorney's fees and expenses) and all actual or consequential damages imposed upon or asserted against the Landlord, as owner of the Leased Premises, including, without limitation, any liabilities, costs and expenses and actual or consequential damages imposed upon or asserted against Landlord, on account of (i) any use, misuse, non-use, condition, maintenance or repair by Tenant of the Leased Premises, (ii) any Taxes and other impositions which are the obligation of Tenant to pay pursuant to the applicable provisions of this Lease, (iii) any failure on the part of Tenant to perform or comply with any other of the terms of this Lease or any sublease, (iv) any liability Landlord may incur or suffer as a result of Tenant's breach of any environmental laws or the ADA affecting the Leased Premises, and (vi) accident, injury to or death of any person or damage to property on or about the Leased Premises. If at any time any claims, costs, demands, losses or liabilities are asserted against Landlord by reason of any of the matters as to which Tenant indemnifies Landlord hereunder, Tenant will, upon notice from Landlord, defend any such claims, costs, demands,

losses or liabilities at Tenant's sole cost and expense by counsel reasonably acceptable to Landlord.   Landlord agrees to indemnify and save harmless, Tenant from and against all liabilities, costs and expenses (including reasonable attorney's fees) imposed upon or asserted against Tenant solely as a result of any failure on the part of Landlord to perform or comply with any of the terms of this Lease after expiration of all applicable notice and cure periods hereunder.

## ARTICLE 19.
## LEASEHOLD MORTGAGES

19.1   **Rights to Mortgage Lease.**   Tenant, and its permitted successors and assigns shall have the right to mortgage and pledge its interest in this Lease (*"Leasehold Mortgage"*), only in accordance with and subject to the terms, conditions, requirements and limitations of this Article 19. Any such mortgage or pledge shall not impair or affect the rights of Landlord hereunder and shall not encumber the Landlord's fee interest in the Leased Premises.

19.2   **Leasehold Mortgagee Qualifications.**   No holder of a Leasehold Mortgage on this Lease shall have the rights or benefits mentioned in this Article 19, nor shall the provisions of this Article 19 be binding upon Landlord, unless and until each of the following terms, conditions and restrictions have been fully satisfied (and only upon all of the following terms, conditions and restrictions being fully satisfied shall the holder of a Leasehold Mortgage on this Lease be deemed a *"Leasehold Mortgagee"*):

(a)   Either the Leasehold Mortgagee or a Trustee thereof, or participant in the underlying loan secured by the Leasehold Mortgage must have and maintain a tangible net worth, determined in accordance with generally accepted accounting principles, of at least $25,000,000.00;

(b)   The Leasehold Mortgage shall contain provisions requiring that copies of all notices of default under said Leasehold Mortgage must be simultaneously sent to Landlord;

(c)   Simultaneously with or promptly after the recording of the Leasehold Mortgage, Tenant shall, at its own expense, cause a copy of the Leasehold Mortgage to be delivered to Landlord and, if so requested by Landlord, shall cause to be recorded in the office of the recorder of the county or township (as applicable) where the Leased Premises is located, a written request executed and acknowledged by Landlord for a copy of all notices of default and all notices of sale under the Leasehold Mortgage as provided by applicable Laws.  Inclusion of a request for notice having the effect described above in the body of the recorded Leasehold Mortgage shall constitute compliance with this provision;

(d)   The Leasehold Mortgage shall be subordinate to the Landlord's fee interest in the Leased Premises and the Landlord's rights under this Lease and shall not cover any interest in any other real property of Landlord other than the leasehold estate created by this Lease including any easements contained therein;

(e)   The Leasehold Mortgage shall not permit or authorize, or be construed to permit or authorize, any Leasehold Mortgagee to devote the Leased Premises to any uses,

28

or to construct any improvements thereon, other than those uses and improvements provided for and authorized by and pursuant to the terms of this Lease;

(f)    The Leasehold Mortgage shall not contain terms which are inconsistent with the terms of this Lease and Tenant shall provide Landlord with a true and accurate copy of the documentation creating and evidencing the Leasehold Mortgage and the loan evidenced thereby promptly following execution of such documents by Tenant;

(g)    The Leasehold Mortgage shall secure a bona fide extension of credit to Tenant or an Affiliate of Tenant and shall not be for the purpose of avoiding or extending any obligations of or restrictions on Tenant under this Lease, including restrictions on transfer or periods for curing defaults; and

(h)    The Leasehold Mortgage shall provide that any proceeds from fire and other casualty insurance and extended coverage insurance shall be applied in accordance with the Lease.

19.3    **Defaults.**  If Tenant, or Tenant's successors or assigns, mortgage this Lease in compliance with the provisions of this Article 19, then so long as any such mortgage shall remain unsatisfied of record, the following provisions shall apply:

(a)    Tenant shall immediately provide Landlord with written notice that a Leasehold Mortgage has been filed, along with the name, facsimile, contact person, e-mail address, and address of the Leasehold Mortgagee.  Tenant shall promptly give Landlord written notice of any change in any Leasehold Mortgagee and shall ensure that Landlord has current contact information for such Leasehold Mortgagee at all times. Landlord, upon serving any notice of default on Tenant pursuant to Article 22 or any other notice under the provisions of this Lease, shall also serve a copy of such notice upon Leasehold Mortgagee, at the address provided to Landlord in writing by Tenant and no notice shall be deemed to have been duly given as to the Leasehold Mortgagee unless and until a copy thereof has been so served upon the Leasehold Mortgagee.  Landlord's furnishing a copy of such notice to Leasehold Mortgagee shall not in any way affect or become a condition precedent to the effectiveness of any notice given or served upon Tenant, provided, that Landlord may not terminate this Lease or exercise any remedies against Tenant without first giving Leasehold Mortgagee notice and opportunity to cure. Any notice or other communication which Leasehold Mortgagee desires or is required to give to or serve upon Landlord shall be deemed to have been duly given or served if sent in accordance with Section 25.2.

(b)    Any Leasehold Mortgagee, in case Tenant is in default under this Lease, shall have the right to remedy such default (or cause the same to be remedied) within the same period provided to Tenant hereunder and otherwise as herein provided, and Landlord shall accept such performance by or at the instance of Leasehold Mortgagee as if the same had been made by Tenant.

(c)    For the purposes of this Article 19, no default shall be deemed to exist under Article 22 in respect of the performance of work required to be performed, or of

29

acts to be done, or of conditions to be remedied, if steps shall, in good faith, have been commenced by Leasehold Mortgagee within the time permitted therefor to rectify the same and shall be prosecuted to completion with diligence and continuity and within the time periods provided therefor in Article 22.

(d)    Notwithstanding anything in this Lease to the contrary, upon the occurrence of an event of default other than an event of default which can be cured by the payment of money ("***Monetary Default***"), Landlord shall take no action to effect a termination of this Lease without first giving Leasehold Mortgagee at least thirty (30) days written notice of its intent to terminate if Tenant's default is of any type other than a Monetary Default (a "***Non-Monetary Default***"), and Leasehold Mortgagee fails to cure such Non-Monetary Default within said thirty (30) day period. If such Non-Monetary Default cannot reasonably be cured within said thirty (30) day period (or is such that possession of the Leased Premises is necessary to remedy the Non-Monetary Default), the date for termination shall be extended for such period of time as may be reasonably required to remedy such Non-Monetary Default, if and only if (i) subject to Section 19.4, within thirty (30) days of Landlord's notice of its intent to terminate the Lease, Leasehold Mortgagee or its designee irrevocably agrees in writing to assume Tenant's obligations under the Lease following Leasehold Mortgagee's obtaining possession of the Leased Premises, (ii) Leasehold Mortgagee shall have fully cured any default in the payment of any monetary obligations of Tenant under this Lease within five (5) business days after its receipt of notice of Landlord's intent to terminate, and shall continue to pay currently such monetary obligations as and when the same are due, subject to the applicable notice and cure provisions provided in this Lease, and (iii) Leasehold Mortgagee continues its good faith and diligent efforts to remedy such Non-Monetary Default (including its acquisition of possession of the Leased Premises if necessary to cure such Default); provided, however, that Leasehold Mortgagee shall not be obligated to pursue the cure of any Non-Monetary Default until it has obtained possession of the Leased Premises if, but only if, (x) Leasehold Mortgagee fully complies with the obligation to cure any Monetary Default of Tenant and to keep current all monetary obligations under this Lease as provided in, and within the time set forth in, subclause (d)(i) above, and (y) Leasehold Mortgagee is diligently and continuously pursuing such actions as are necessary to enable it to obtain possession of the Leased Premises at the earliest possible date.

(e)    The rights granted Leasehold Mortgagee in this Section 19.3 are accommodations only to and for the benefit of Leasehold Mortgagee and shall not be construed to grant Tenant any additional rights not specifically provided in this Lease. Nothing in this Section 19.3 shall be construed to require a Leasehold Mortgagee to continue any foreclosure proceeding it may have commenced against Tenant after all defaults have been cured by Leasehold Mortgagee, and if such defaults are cured and the Leasehold Mortgagee discontinues such foreclosure proceedings, this Lease shall continue in full force and effect as if Tenant had not defaulted under this Lease; provided, however, that in no event shall this provision be applied to allow a defaulting Tenant to remain on the Leased Premises following its failure to cure any default within the Tenant's prescribed cure period. Nothing in this Article 19 shall require a Leasehold Mortgagee who has acquired Tenant's leasehold interest and has taken possession of the Leased Premises to cure any Non-Monetary Default which is not capable of being cured

30

by such Leasehold Mortgagee. Any such uncurable Non-Monetary Default shall be deemed to be waived following Leasehold Mortgagee's acquisition of Tenant's leasehold interest and such Leasehold Mortgagee's timely cure of all Monetary Defaults and all Non-Monetary Defaults which are capable of cure by such Leasehold Mortgagee in accordance with this Article 19. Notwithstanding the foregoing:

(i)    Leasehold Mortgagee shall not be obligated to continue such possession or to continue such foreclosure proceedings after such defaults have been cured,

(ii)    Landlord shall not be precluded from exercising any rights or remedies under this Lease with respect to any other default by Tenant during the pendency of such foreclosure proceedings other than termination of this Lease;

(iii)    if Leasehold Mortgagee is an entity or person other than an Authorized Institution, such Leasehold Mortgagee shall agree with Landlord in writing to comply with such of the terms, covenants and conditions of this Lease as are reasonably susceptible of being complied with by Leasehold Mortgagee during the period of forbearance by Landlord from taking action to effect a termination of this Lease; and

(iv)    it is understood and agreed that Leasehold Mortgagee, or its designee, or any purchaser in foreclosure proceedings (including, without limitation, an entity formed by Leasehold Mortgagee or by the holder(s) of the bonds or obligations secured by the Leasehold Mortgage) may, subject to the following terms of this Section 19.3, become the legal owner and holder of this Lease through such foreclosure proceedings or by assignment of this a Lease in lieu of foreclosure.

(f)    Subject to Section 19.4, it shall be a condition precedent to any assignment or transfer of this Lease by foreclosure of any Leasehold Mortgage, deed in lieu thereof or otherwise that Leasehold Mortgagee, or its designee (including, without limitation, an entity which has such a tangible net worth formed by Leasehold Mortgagee or by the holder(s) of the bonds or obligations secured by the Leasehold Mortgage) or any purchaser in any such foreclosure proceedings (any such transferee of the Lease, a "*Transferee*") (a) have and maintain (or have a guarantor with) a tangible net worth, determined in accordance with generally accepted accounting principles, of at least $25,000,000.00, (b) upon becoming the legal owner and holder of this Lease shall execute an agreement with Landlord, reasonably acceptable to Landlord, pursuant to which such Transferee agrees to assume all obligations of Tenant under this Lease, and (c) either the Transferee or an entity engaged by such Transferee to manage the Leased Premises (pursuant to a management agreement in form and substance reasonably acceptable to Landlord), operates at least 100 motion picture screens in North America and is otherwise reasonably acceptable to Landlord.

(g)    Notwithstanding the foregoing, if a Leasehold Mortgagee forecloses or takes a deed in lieu of foreclosure, but at the time of such foreclosure or taking of a deed

31

in lieu such Leasehold Mortgagee does not meet the financial or other requirements specified in the immediately preceding paragraph, such Leasehold Mortgagee shall have ninety (90) days from the date it acquires the demised premises to either transfer the Leasehold Mortgagee's interest in this Lease to a Transferee who complies with such requirements, or otherwise comes into compliance on its own. Failure to comply with this paragraph shall be a Default under this Lease.

(h)     In the event of the termination of this Lease prior to the expiration of the Term, whether by summary proceedings to dispossess, service of notice to terminate, or otherwise, due to default of Tenant, Landlord shall serve upon Leasehold Mortgagee written notice that the Lease has been terminated together with a statement of any and all sums which would at that time be due under this Lease but for such termination, and of all other defaults, if any, under this Lease then known to Landlord. Leasehold Mortgagee shall thereupon have the option to obtain a new lease in accordance with and upon the following terms and conditions:

(i)     Upon the written request of Leasehold Mortgagee, delivered to Landlord within thirty (30) days after service of such notice that the Lease has been terminated to Leasehold Mortgagee, Landlord shall enter into a new lease of the Leased Premises with Leasehold Mortgagee or its designee, having (or having a guarantor having) a tangible net worth in accordance with generally accepted accounting principles of at least $25,000,000.00.

(ii)     Such new lease shall be entered into within thirty (30) days of such Leasehold Mortgagee's written request at the sole cost of Leasehold Mortgagee or such designee, shall be effective as of the date of termination of this Lease, shall require Leasehold Mortgagee, such designee, or an entity engaged to manage the Leased Premises to operate at least 100 motion picture screens in North America, shall be for the remainder of the Term of this Lease, and at the Rent and upon all the terms, covenants and conditions of this Lease, including any applicable Option Periods, provided that Leasehold Mortgagee or such designee shall contemporaneously with the delivery of such request pay to Landlord all the installments of Rent payable by Tenant hereunder which are then due.

(iii)     Such new lease shall require the tenant to perform any unfulfilled obligation of Tenant under this Lease which is reasonably susceptible of being performed by such tenant.

(iv)     Upon the execution of such new lease, the tenant named therein shall pay any and all Rent and other sums which would at the time of the execution thereof be due under this Lease but for such termination and shall pay all expenses, including counsel fees, court costs and disbursements incurred by Landlord in connection with such defaults and termination, the recovery of possession of the Leased Premises, and the preparation, execution and delivery of such new lease.

32

Nothing in this Section 19.3 shall impose any obligation on the part of Landlord to deliver physical possession of the Leased Premises to the Leasehold Mortgagee, Transferee, or any designee unless Landlord at the time of the execution and delivery of such new lease has obtained physical possession thereof.

(i)     If Tenant is in default under this Lease and by reason of Tenant's failure either to exercise any renewal option contained herein, or for any other reason whatsoever, including being in default, Tenant is not entitled to renew this Lease for any Option Period.  Landlord shall serve upon Leasehold Mortgagee written notice thereof and Leasehold Mortgagee shall have the option upon written request served upon Landlord to obtain from Landlord a new lease of the Leased Premises for such Option Period, provided that such written request is served upon Landlord no later than thirty (30) days after the service of the aforementioned notice by Landlord on Leasehold Mortgagee.  Within thirty (30) days after the service of such written request from Leasehold Mortgagee, Landlord and Leasehold Mortgagee, or Leasehold Mortgagee's designee having a tangible net worth (with its guarantor, if any), determined in accordance with generally accepted accounting principles, of at least $25,000,000.00, and either (1) alone or with its Affiliates, operates at least 100 motion picture screens in North America, or (2) causes the Leased Premises to be operated by an entity which operates at least one hundred (100) motion picture screens in North America, shall enter into a new lease of the Leased Premises as follows:

(i)     Such new lease shall be entered into at the sole cost and expense of the tenant thereunder, shall be effective as of the date of termination of the then current Term of this Lease, and shall be for the renewal term next succeeding the then current Term of this Lease, and at the rent and upon all the terms, covenants and conditions of this Lease, including any applicable Option Periods.

(ii)    Such new lease shall require tenant to perform any unfulfilled obligation of Tenant under this Lease which is reasonably susceptible of being performed by such tenant.

(iii)   Upon the execution of such new lease the tenant therein named shall pay any and all sums remaining unpaid under this Lease, plus all expenses reasonably incurred by Landlord in connection with the preparation, execution and delivery of such new lease.

19.4    **Continuation of Liability.**  If any Leasehold Mortgagee acquires title to Tenant's interest in this Lease, by foreclosure of a mortgage thereon or by assignment in lieu of foreclosure or by an assignment from a nominee or wholly owned subsidiary of such mortgagee, or under a new lease pursuant to this Article 19, such mortgagee may assign such Lease to a party (i) having a tangible net worth, or whose guarantor has a tangible net worth, determined in accordance with generally accepted accounting principles, of not less than $25,000,000.00, and (ii) either (1) alone or with its Affiliates operates at least 100 motion picture screens in North America or (2) causes the Leased Premises to be operated by an entity which operates at least one hundred (100) motion picture screens in North America, and notwithstanding anything contained in Article 10, shall thereupon be released from all liability for the performance or

33

observance of the terms, covenants and conditions in such Lease contained on Tenant's part to be performed and observed from and after the date of such assignment, provided that the assignee from such Leasehold Mortgagee shall have assumed such new lease in accordance with this Article 19. Furthermore, it is the intention of the parties that entering into a Leasehold Mortgage or other pledge or hypothecation by Tenant that does not comply with the provisions of this Article 19 shall constitute a default and shall otherwise be a non-permitted transfer under this Lease. The holder of such Leasehold Mortgage or other pledge or hypothecation shall not enjoy the rights granted to a Leasehold Mortgagee under this Article 19.

## ARTICLE 20.
## TENANT'S SIGNS

20.1    **Location and Type.**  Tenant shall have the right to erect and maintain the following signs in accordance with the provisions of this Article 20 and subject to any applicable provisions of the Site Plan, the Restrictive Agreements and Laws:

(a)    illuminated signs on the exterior walls of the Theater Facility and on the theater canopy or marquee;

(b)    signs on the interior or exterior of any windows of the Theater Facility;

(c)    easel or placard signs within the lobby entrance or on sidewalks immediately in front of the Theater Facility, provided the same do not unreasonably interfere with pedestrian traffic;

(d)    poster cases within the lobby of the Theater Facility and on the exterior walls of the Theater Facility;

(e)    electronic displays and billboards ("*Display Signs*") on the exterior walls of the Theater Facility; and

(f)    directional signage on the Leased Premises.

20.2    **Design.**  The design of all signs presently located on the Leased Premises is hereby approved by Landlord with the design of all future signs which Tenant elects to construct pursuant to Section 20.1 (such present and future signs referred to as "*Tenant's Signs*") to be subject to Landlord's approval, which Landlord agrees not to unreasonably withhold or delay so long as Tenant's Signs are consistent with Tenant's standard signage and do not otherwise violate applicable Laws. Tenant's Signs shall advertise Tenant's business in the Theater Facility and shall be constructed and maintained in good repair at Tenant's expense. Tenant shall pay the cost of electricity consumed in illuminating Tenant's Signs.

20.3    **Protection of Signs Visibility.**  Landlord shall not erect or permit to be erected any sign or advertising device on the roof or exterior walls of the Theater Facility, nor any landscaping, signs or other obstructions on the Leased Premises which would block the view of Tenant's Pylon from adjoining streets.

34

20.4    **Interior Signs.**  Nothing in this Lease shall restrict Tenant's unlimited right to maintain signs on the interior of the Theater Facility.

### ARTICLE 21.
### ESTOPPEL; ATTORNMENT AND SUBORDINATION

21.1    **Estoppel Certificate.**  Each party agrees, within ten (10) days after request by the other party, to execute, acknowledge and deliver to and in favor of the proposed holder of any Mortgage or purchaser of the Leased Premises, any Leasehold Mortgagee, or any proposed sublessee or assignee of Tenant, an estoppel certificate in such form as Landlord may reasonably require, but stating no less than:  (i) whether this Lease is in full force and effect; (ii) whether this Lease has been modified or amended and, if so, identifying and describing any such modification or amendment; (iii) the date to which rent and any other charges have been paid; and (iv) whether such party knows of any default on the part of the other party or has any claim against the other party and, if so, specifying the nature of such default or claim.

21.2    **Attornment by Tenant.**  Tenant shall, in the event any proceedings are brought for the foreclosure of, or in the event of the exercise of the power of sale under, any Mortgage prior in lien to this Lease made by Landlord, attorn to the purchaser upon any such foreclosure or sale and recognize such purchaser as Landlord under this Lease, provided such purchaser assumes in writing Landlord's obligations under this Lease.

21.3    **Subordination/Non-Disturbance.**  Upon request of the holder of any Mortgage, Tenant will subordinate its rights under this Lease to the lien thereof and to all advances made or hereafter to be made upon the security thereof, and Tenant shall execute, acknowledge and deliver an instrument effecting such subordination; PROVIDED, HOWEVER, Tenant's obligation to (a) subordinate its rights under this Lease to the lien of any holder of a Mortgage and (b) execute and deliver such instrument shall be conditioned upon Landlord obtaining and delivering to Tenant, in recordable form, from the holder of any Mortgage to which this Lease is to become subordinate a non-disturbance agreement reasonably acceptable to Tenant containing a covenant binding upon the holder thereof to the effect that as long as Tenant is not in default under this Lease, this Lease shall not be terminated or modified in any respect whatsoever, nor shall the rights of Tenant hereunder or its occupancy of the Leased Premises be affected in any way by reason of such Mortgage or any foreclosure action or other proceeding that may be instituted in connection therewith, and that, except to the extent that the holder of such Mortgage is required to do so to effectively foreclose such Mortgage, Tenant shall not be named as a defendant in any such foreclosure action or other proceeding.  Landlord warrants to Tenant that Landlord has not granted a mortgage encumbering the Leased Premises as of the date of execution of this Lease.

21.4    **Form of Documents.**  Landlord and Tenant, upon request of any party in interest, shall execute promptly such commercially reasonable instruments or certificates to carry out the provisions of this Article 21; provided, however, neither party shall be required to execute any such instruments or certificates that would in any way modify the terms and provisions of this Lease.

35

## ARTICLE 22.
## DEFAULT

22.1    **Tenant Default.**  An event of default shall exist under this Lease if:

(i)    Tenant neglects or fails to pay any installment of Rent, including Annual Fixed Rent, Percentage Rent and any other charge under this Lease within ten (10) days after notice of default (but Landlord is not required to give more than two such default notices during any one Lease Year); or

(ii)    Tenant neglects or fails to perform or observe any of the other covenants, terms, provisions or conditions on its part to be performed or observed under this Lease, within thirty (30) days after notice of default (or if more than thirty (30) days shall be reasonably required because of the nature of the default, if Tenant fails to proceed diligently to cure such default after such notice); or

(iii)    Upon the occurrence of any default under a Related Lease or the Guaranty that remains uncured after the expiration of the applicable cure period thereunder; or

(iv)    Tenant (a) admits in writing its inability to pay its debts generally as they become due, (b) commences any case, proceeding or other action seeking to have an order for relief entered on its behalf as debtor or to adjudicate it a bankrupt or insolvent, or seeking reorganization, arrangement, adjustment, liquidation, dissolution or composition of it or its debts under any federal, state or local law relating to bankruptcy, insolvency, reorganization or relief of debtors, (c) makes an assignment for the benefit of its creditors, (d) seeks or consents to the appointment of a receiver of itself or of the whole or any substantial part of its property, or (e) files a petition or answer seeking reorganization or arrangement under an order or decree appointing, without the consent of Tenant, a receiver of Tenant of the whole or substantially all of its property, and such case, proceeding or other action is not dismissed within ninety (90) days after the commencement thereof; or

(v)    the estate or interest of Tenant in the Leased Premises or any part thereof is levied upon or attached in any proceeding and the same is not vacated or discharged within the later of ninety (90) days after commencement thereof or thirty (30) days after receipt by Tenant of notice thereof from Landlord (unless Tenant is contesting such lien or attachment in accordance with this Lease); or

(vi)    Tenant permanently abandons or vacates the Leased Premises during the Term of this Lease.

22.2    **Remedies.**  Upon an event of default under this Lease, Landlord may immediately or at any time thereafter, as permitted by law, give Tenant written notice of Landlord's termination of this Lease, and, upon such notice, Tenant's rights to possession of the Leased Premises shall cease and this Lease shall thereupon be terminated, and Landlord may re-enter and take possession of the Leased Premises as its own property; or Landlord may remain out of

36

possession of the Leased Premises and treat the Term of the Lease as subsisting and in full force and effect, in which event Landlord shall have all rights and remedies available at law, in equity or hereunder; and as an alternative remedy Landlord may, at Landlord's election, without terminating the then current Term, or this Lease, re-enter the Leased Premises or take possession thereof pursuant to legal proceedings or pursuant to any notice provided for by law, and having elected to re-enter or take possession of the Leased Premises without terminating the Term, or this Lease, Landlord shall use reasonable diligence as Tenant's agent to relet the Leased Premises, or parts thereof, for such term (which may be greater or less than the remaining balance of the then current Term) or terms and at such rental and upon such other terms and conditions (which may include concessions or free rent) as Landlord may reasonably deem advisable, with the right to make alterations and repairs to the Leased Premises, and no such re-entry or taking of possession of the Leased Premises by Landlord shall be construed as an election on Landlord's part to terminate this Lease, and no such re-entry or taking of possession by Landlord shall relieve Tenant of its obligation to pay Rent (at the time or times provided herein), or of any of its other obligations under this Lease, all of which shall survive such re-entry or taking of possession, and Tenant shall continue to pay Rent as provided in this Lease until the end of the Term and whether or not the Leased Premises have been relet, less the net proceeds, if any, of any reletting of the Leased Premises after deducting all of Landlord's expenses in connection with such reletting, including without limitation all repossession costs, brokerage commissions, legal expenses, expenses of employees, alterations costs and expenses of preparation for reletting.  If Landlord elects to terminate this Lease, then Landlord may re-lease the Leased Premises for such price and on such terms as may be immediately obtainable, and Tenant will be and remain liable, not only for all Rent due and other obligations incurred up to the date on which the termination becomes effective, for all holdover damages that accrue under Section 4.3 until Tenant vacates or is removed from the Leased Premises, but also for stipulated or liquidated damages for its nonperformance equal to the sum of (i) all expenses that Landlord may reasonably incur in re-entering and repossessing the Leased Premises, putting the Leased Premises in proper repair and curing any default by Tenant, and removing Tenant's improvements, if Landlord has elected to require such removal, making any reasonable non-structural modifications that may be required for any new tenants, and reletting the Leased Premises, including reasonable attorneys' fees and disbursements, sheriff's fees and brokerage fees in doing so, plus (ii) twenty-four (24) months of the Annual Fixed Rent provided in this Lease.  Having elected either to remain out of possession and treating this Lease as remaining in full force and effect or to re-enter or take possession of the Leased Premises without terminating the Term, or this Lease, Landlord may by notice to Tenant given at any time thereafter while Tenant is in default in the payment of Rent or in the performance of any other obligation under this Lease, elect to terminate this Lease and, upon such notice, this Lease shall thereupon be terminated.  If in accordance with any of the foregoing provisions of this Article 22, Landlord shall have the right to elect to re-enter and take possession of the Leased Premises, Landlord may enter and expel Tenant and those claiming through or under Tenant and remove the effects of both or either (forcibly if necessary) without being guilty of any manner of trespass and without prejudice to any remedies for arrears of Rent or preceding breach of covenant.  Pursuit of any of the foregoing remedies shall not preclude pursuit of any of the other remedies herein provided or any other remedies provided by law, nor shall pursuit of any remedy herein provided constitute a forfeiture or waiver of any Rent due to Landlord hereunder or of any damage accruing to Landlord by reason of the violation of any of the terms, provisions and covenants herein

37

contained.  Forbearance by Landlord to enforce one or more of the remedies herein provided upon the occurrence of an event of default shall not be deemed or construed to constitute a waiver of such default.  Following an event of default, all amounts due from Tenant to Landlord pursuant to this Lease shall bear interest at the Default Rate.

22.3    **Landlord Default, Cure Rights.**  Landlord shall be in default under this Lease if Landlord neglects or fails to perform or observe any of the material covenants, terms, provisions or conditions on its part to be performed or observed under this Lease, and such failure continues for a period of thirty (30) days after written notice thereof (or if more than thirty (30) days shall be reasonably required because of the nature of the default, if Landlord fails to proceed diligently to cure such default after such notice). In the event of a Landlord default, then Tenant may immediately or at any time thereafter, in addition to any other rights and remedies as may otherwise be provided in this Lease for a Landlord default, pursue all rights and remedies it may have at law and equity generally.

22.4    **Self Help.**  If either party (the "*Defaulting Party*") fails to perform any agreement or obligation on its part to be performed under this Lease, the other party (the "*Curing Party*") shall have the right (i) if no emergency exists, to perform the same after giving thirty (30) days' notice to the Defaulting Party, and (ii) in any emergency situation to perform the same immediately without notice or delay.  For the purpose of rectifying a default of the Defaulting Party as aforesaid, the Curing Party shall have the right to enter the Leased Premises.  The Defaulting Party shall on demand reimburse the Curing Party for the costs and expenses incurred by the Curing Party in rectifying defaults as aforesaid, including reasonable attorneys' fees, together with interest thereon at the Default Rate.  Any act or thing done by the Curing Party pursuant to this Section 22.4 shall not constitute a waiver of any such default by the Curing Party or a waiver of any covenant, term or condition herein contained or the performance thereof.

22.5    **Remedies Cumulative.**  The various rights and remedies given to or reserved to Landlord and Tenant by this Lease or allowed by law shall be cumulative, irrespective of whether so expressly stated.

22.6    **Limitation on Landlord's Liability.**  Notwithstanding anything to the contrary in this Lease: Tenant will look solely to the interest of Landlord (or its successor as Landlord hereunder) in the Leased Premises and income therefrom for the satisfaction of any judgment or other judicial process requiring the payment of money as a result of (i) any negligence (including gross negligence) or (ii) any breach of this Lease by Landlord or its successor (including any beneficial owners, partners, shareholders, trustees or others affiliated or related to Landlord or such successor) and Landlord shall have no personal liability hereunder of any kind.

22.7    **Interest on Past Due Obligations; Late Charges; Application of Payments to Past Due Obligations.**  Except where another rate of interest is specifically provided for in this Lease, any amount due from either party to the other under this Lease which is not paid when due shall bear interest at the Default Rate from the date such payment was due to and including the date of payment.  In addition, Tenant acknowledges that the late payment of any installment of Annual Fixed Rent, Percentage Rent or any other amounts due Landlord will cause Landlord to incur certain costs and expenses, the exact amount of which are extremely difficult or impractical to fix.  These costs and expenses may include, without limitation, administrative and

38

collection costs and processing and accounting expenses. Therefore, if any installment of Rent, including Annual Fixed Rent, Percentage Rent, and any other amount due Landlord is not received by Landlord from Tenant when due, Tenant shall immediately pay to Landlord a late charge equal to the lesser of (i) four percent (4%) of such delinquent amount, or (ii) One Thousand Dollars ($1,000.00). Landlord and Tenant agree that this late charge represents a reasonable estimate of the costs and expenses Landlord will incur and is fair compensation to Landlord for its loss suffered by reason of late payment by Tenant. Upon accrual, all such late charges shall be deemed Additional Rent. Tenant further acknowledges that Landlord shall have the right to apply any payment of Rent, including Annual Fixed Rent, Percentage Rent or any other amounts due Landlord, in reduction of any amount due under this Lease, in such order and satisfaction as Landlord may elect in its sole discretion and regardless of whether Tenant has designated how such payment is to be applied.

22.8    **Development Agreement Breaches**. A breach by either party of its obligations under the Development Agreement shall constitute, at the option of the other party, an event of default under this Lease and entitle the non-defaulting party, after notice and opportunity to cure has been given under <u>Section 22.1(ii)</u> with respect to a Tenant breach or under <u>Section 22.3</u> with respect to a Landlord breach (as applicable), to exercise any remedy available to the non-defaulting party under this Lease, at law or in equity by reason of such breach.

## ARTICLE 23.
## ACCESS TO PREMISES

23.1    **Ongoing Access and Inspection Rights.** Tenant shall permit Landlord and its authorized representatives to enter the Theater Facility at all reasonable times (upon 48 hours prior notice, except in the event of an emergency, in which no prior notice is required prior to entry) for the purposes of (i) serving or posting or keeping posted thereon notices required or permitted by Law, (ii) conducting periodic inspections, (iii) performing any work thereon required or permitted to be performed by Landlord pursuant to this Lease, and (iv) showing the Leased Premises to prospective purchasers or lenders.

23.2    **Landlord's Construction Inspection Rights.** During the Construction Term and any other period of Tenant's fixturing or construction in the Leased Premises, Landlord shall have the right to physically inspect, and to cause one or more engineers or other representatives of Landlord to physically inspect, the Leased Premises, as long as the same does not interfere with Tenant's operation of or construction activities on the Leased Premises. Such inspections shall include (without limitation) such tests, inspections and audits of environmental and soils conditions as Landlord deems necessary. Landlord shall make such inspections in good faith and with due diligence. All inspection fees, appraisal fees, engineering fees, environmental fees and other expenses of any kind incurred by Landlord relating to the inspection of the Leased Premises will be solely Landlord's expense. Tenant shall cooperate with Landlord in all reasonable respects in making such inspections. Tenant reserves the right to have a representative present at the time Landlord conducts any such inspection of the Leased Premises. Landlord shall notify Tenant not less than two (2) business days in advance of making any such inspection. In making any inspection, Landlord will treat, and will cause any representative of Landlord to treat, all information obtained by Landlord pursuant to the terms of this Section 23.2 as strictly confidential. Landlord agrees to indemnify and hold Tenant, its directors, contractors,

39

employees, agents and representatives harmless from any and all injuries, losses, liens, claims, judgments, liabilities, costs, expenses or damages (including reasonable attorneys' fees and court costs), actual or threatened, which result from or arise out of any inspections by Landlord or its authorized representatives pursuant to this Section 23.2. Notwithstanding any provision herein to the contrary, the indemnity contained in the preceding sentence shall survive the termination of this Lease.

## ARTICLE 24.
## FORCE MAJEURE

If either party is delayed or hindered in or prevented from the performance of any act required under this Lease by reason of strikes, lockouts, labor troubles, inability to procure materials, failure of power, restrictive Laws (except as otherwise specifically provided herein), riots, insurrection, terrorist acts, war or other reason beyond the reasonable control of and not the fault of the party delayed in performing the work or doing the acts required under the terms of this Lease (collectively, "*Force Majeure*"), then performance of such act shall be excused for the period of the delay, and the period for the performance of any such act shall be extended for a period equivalent to the period of such delay. The provisions of this Article shall not (i) operate to excuse Tenant from prompt payment of Rent or any other payment required by Tenant under the terms of this Lease, or (ii) be applicable to delays resulting from the inability of a party to obtain financing or to proceed with its obligations under this Lease because of a lack of funds.

## ARTICLE 25.
## MISCELLANEOUS

25.1    **Lease Not to be Recorded.**    Upon request of Landlord or Tenant, the parties hereto shall promptly execute and deliver a memorandum of this Lease for recording purposes in mutually agreeable recordable form. If Tenant elects to record such memorandum, Landlord shall promptly cause the same to be recorded, at Tenant's expense. Neither party may record this Lease without the consent of the other party.

25.2    **Notices.**    All notices, consents, requests, approvals and authorizations (collectively, "*Notices*") required or permitted under this Lease shall only be effective if in writing. All Notices (except Notices of default, which may only be sent pursuant to the methods described in (A) and (B) below) shall be sent (A) by registered or certified mail (return receipt requested), postage prepaid, or (B) by Federal Express, U.S. Post Office Express Mail, Airborne or similar nationally recognized overnight courier which delivers only upon signed receipt of the addressee, and addressed as follows or at such other address, and to the attention of such other person, as the parties shall give notice as herein provided:

|  |  |
|---|---|
| If intended for Landlord: | 30 West Pershing, LLC |
| | c/o EPR Properties |
| | Attention:  General Counsel |
| | 909 Walnut Street, Suite 200 |
| | Kansas City, Missouri 64106 |
| | Telephone:    (816) 472-1700 |
| | Facsimile:    (816) 472-5794 |

40

|                        |                                                                                                                                                            |
|------------------------|------------------------------------------------------------------------------------------------------------------------------------------------------------|
| <u>With a copy to:</u>     | Entertainment Properties Trust<br>Attention:  General Counsel<br>909 Walnut Street, Suite 200<br>Kansas City, Missouri 64106<br>Telephone:     (816) 472-1700<br>Facsimile:      (816) 472-5794 |
| <u>If intended for Tenant:</u> | Alamo Mission, LLC<br>Attention:  Tim Reed<br>612 East 6th Street<br>Austin, Texas  78701<br>Telephone:     (512) 861-7013 |
| <u>With a copy to:</u>     | Alamo Mission, LLC<br>Attn:  CFO<br>612 East 6th Street<br>Austin, Texas  78701<br>Telephone:  (512) 861-7006 |
| <u>With a copy to:</u>     | Mark A. Manulik<br>Schwabe, Williamson & Wyatt<br>1211 S.W. Fifth Avenue, Suite 1800<br>Portland, Oregon  97204<br>Telephone:     (503) 796-2990 |

A notice, request and other communication shall be deemed to be duly received if delivered by a nationally recognized overnight delivery service, when delivered to the address of the recipient, if sent by mail, on the date of receipt by the recipient as shown on the return receipt card, or if sent by facsimile, upon receipt by the sender of an acknowledgment or transmission report generated by the machine from which the facsimile was sent indicating that the facsimile was sent in its entirety to the recipient's facsimile number; provided that if a notice, request or other communication is served by hand or is received by facsimile on a day which is not a Business Day, or after 5:00 p.m. local time on any Business Day at the addressee's location, such notice or communication shall be deemed to be duly received by the recipient at 9:00 a.m. local time of the addressee on the first Business Day thereafter.  Rejection or other refusal to accept or the inability to delivery because of changed address of which no Notice was given shall be deemed to be receipt of the Notice as of the date of such rejection, refusal or inability to deliver.

25.3    **Waiver of Performance and Disputes.**  One or more waivers of any covenant, term or condition of this Lease by either party shall not be construed as a waiver of a subsequent breach of the same or any other covenant, term or condition, nor shall any delay or omission by either party to seek a remedy for any breach of this Lease or to exercise a right accruing to such party by reason of such breach be deemed a waiver by such party of its remedies or rights with respect to such breach.  The consent or approval by either party to or of any act by the other party requiring such consent or approval shall not be deemed to waive or render unnecessary consent to or approval of any similar act.

41

25.4 **Modification of Lease.** The terms, covenants and conditions hereof may not be changed orally, but only by an instrument in writing signed by the party against whom enforcement of the change, modification or discharge is sought, or by such party's agent.

25.5 **Captions.** Captions throughout this instrument are for convenience and reference only and the words contained therein shall in no way be deemed to explain, modify, amplify or aid in the interpretation or construction of the provisions of this Lease.

25.6 **Lease Binding on Successors and Assigns, etc.** Except as herein otherwise expressly provided, all covenants, agreements, provisions and conditions of this Lease shall be binding upon and inure to the benefit of the parties hereto and their heirs, devisees, executors, administrators, successors in interest and assigns as well as grantees of Landlord, and shall run with the land. Without limiting the generality of the foregoing, all rights of Tenant under this Lease may be granted by Tenant to any permitted sublessee of Tenant, subject to the terms of this Lease.

25.7 **Brokers.** Landlord represents and warrants to Tenant that it has not incurred or caused to be incurred any liability for real estate brokerage commissions or finder's fees in connection with the execution or consummation of this Lease for which Tenant may be liable. Tenant represents and warrants to Landlord that it has not incurred or caused to be incurred any liability for real estate brokerage commissions or finder's fees in connection with the execution or consummation of this Lease for which Landlord may be liable. Each of the parties agrees to indemnify and hold the other harmless from and against any and all claims, liabilities or expense (including reasonable attorneys' fees) in connection with any breach of the foregoing representations and warranties.

25.8 **Landlord's Status as a REIT.** The following clause shall be applicable if the Landlord is a real estate investment trust: Tenant acknowledges that Landlord intends to elect to be taxed as a real estate investment trust (*"REIT"*) under the Code. Tenant shall exercise its reasonable best efforts not do anything which would materially adversely affect Landlord's status as a REIT. Tenant agrees to enter into reasonable modifications of this Lease which do not materially adversely affect Tenant's rights and liabilities if such modifications are required to retain or clarify Landlord's status as a REIT.

25.9 **Governing Law.** This Lease shall be governed by and construed in accordance with the laws of the State where the Leased Premises are located, but not including such State's conflict-of-laws rules.

25.10 **Estoppel.** Landlord and Tenant each confirm and agree that (a) it has read and understood all of the provisions of this Lease; (b) it is an experienced real estate investor and is familiar with major sophisticated transactions such as that contemplated by this Lease; (c) it has negotiated with the other party at arm's length with equal bargaining power; and (d) it has been advised by competent legal counsel of its own choosing.

25.11 **Joint Preparation.** This Lease (and all exhibits thereto) is deemed to have been jointly prepared by the parties hereto, and any uncertainty or ambiguity existing herein, if any,

42

shall not be interpreted against any party, but shall be interpreted according to the application of the rules of interpretation for arm's-length agreements.

25.12  **Interpretation.**  It is hereby mutually acknowledged and agreed that the provisions of this Lease have been fully negotiated between parties of comparable bargaining power with the assistance of counsel and shall be applied according to the normal meaning and tenor thereof without regard to the general rule that contractual provisions are to be construed narrowly against the party that drafted the same or any similar rule of construction.

25.13  **Severability.**  If any provisions of this Lease are determined to be invalid by a court of competent jurisdiction, the balance of this Lease shall remain in full force and effect, and such invalid provision shall be construed or reformed by such court in order to give the maximum permissible effect to the intention of the parties as expressed therein.

25.14  **Landlord and Tenant.**  Nothing contained in this Lease shall be deemed or construed by the parties hereto or by any third party to create the relationship of principal and agent or of partnership or of joint venture or of any association whatsoever between Landlord and Tenant, it being expressly understood and agreed that neither the computation of rent nor any other provision contained in this Lease nor any act or acts of the parties hereto shall be deemed to create any relationship between Landlord and Tenant other than the relationship of landlord and tenant.

25.15  **Authority.**  The persons executing this Lease on behalf of Tenant and Landlord covenant and warrant to the other party that (a) they are duly authorized to execute this Lease on behalf of the party for whom they are acting, and (b) the execution of this Lease has been duly authorized by the party for whom they are acting.

25.16  **Time is of the Essence.**  Time is of the essence with respect to the performance of each of the terms, provisions, covenants and conditions contained in this Lease.

25.17  **Consent.**  The parties agree to act in good faith and with fair dealing with one another in the execution, performance and implementation of the terms and provisions of this Lease.  Whenever the consent, approval or other action of a party is required under any provision of this Lease, such consent, approval or other action shall not be unreasonably withheld, delayed or conditioned by a party unless the provision in question expressly authorizes such party to withhold or deny consent or approval or decline to take action in accordance with a different standard, in which case the consent or approval or the decision to not take action may be withheld, delayed or conditioned in accordance with the different standard (any provision indicating that consent is not to be unreasonably withheld is to be interpreted to mean that consent shall not be unreasonably withheld, delayed or conditioned.

25.18  **Attorneys' Fees.**  In case suit is brought because of the breach of any agreement or obligation contained in this Lease on the part of Tenant or Landlord to be kept or performed, and a breach is established, the prevailing party shall be entitled to recover all expenses incurred in connection with such suit, including reasonable attorneys' fees.

25.19 **Further Assurances.** Each of the parties hereto shall execute and provide all additional documents and other assurances that are reasonably necessary to carry out and give effect to the intent of the parties reflected in this Lease.

25.20 **Counterparts.** This Lease may be executed at different times and in any number of counterparts, each of which when so executed shall be deemed to be an original and all of which taken together shall constitute one and the same agreement. Delivery of an executed counterpart of a signature page to this Lease by facsimile shall be as effective as delivery of a manually executed counterpart of this Lease. In proving this Lease, it shall not be necessary to produce or account for more than one such counterpart signed by the party against whom enforcement is sought.

25.21 **Rules of Construction.** The following rules of construction shall be applicable for all purposes of this Lease, unless the context otherwise requires:

(a)    The terms "hereby," "hereof," "hereto," "herein," "hereunder" and any similar terms shall refer to this Lease, and the term "hereafter" shall mean after, and the term "heretofore" shall mean before, the date of this Lease.

(b)    Words of the masculine, feminine or neuter gender shall mean and include the correlative words of the other genders and words importing the singular number shall mean and include the plural number and vice versa.

(c)    The terms "include," "including" and similar terms shall be construed as if followed by the phrase "without being limited to."

### ARTICLE 26.
### WAIVER OF TRIAL BY JURY

TO THE FULLEST EXTENT PERMITTED BY LAW, TENANT AND LANDLORD HEREBY WAIVE TRIAL BY JURY IN ANY ACTION, PROCEEDING OR COUNTERCLAIM BROUGHT BY EITHER OF THE PARTIES HERETO AGAINST THE OTHER IN ANY MATTERS ARISING OUT OF OR IN CONNECTION WITH THIS LEASE, THE RELATIONSHIP OF LANDLORD AND TENANT, TENANT'S USE AND OCCUPANCY OF THE THEATER FACILITY, AND ANY CLAIM OF INJURY OR DAMAGE.

*[signature page follows]*

44

IN WITNESS WHEREOF, Landlord and Tenant have caused this Lease to be duly executed as of the day and year first above written.

**LANDLORD:**

**30 WEST PERSHING, LLC,**
a Missouri limited liability company

By:    _____

Name:    ___Gregory K. Silvers___
_____Vice President_____
Title:    _____

**TENANT:**

**ALAMO MISSION, LLC,**
a California limited liability company

By:    _____

Name:    _____

Title:    _____

45

IN WITNESS WHEREOF, Landlord and Tenant have caused this Lease to be duly executed as of the day and year first above written.

**LANDLORD:**

**30 WEST PERSHING, LLC,**
a Missouri limited liability company

By:    _____

Name:  _____

Title: _____

**TENANT:**

**ALAMO MISSION, LLC,**
a California limited liability company

By:    _____

Name:  *Timothy A. League*

Title: *Manager*

45

## EXHIBIT A

### Description of the Leased Premises

Real property in the City of San Francisco, County of San Francisco, State of California, described as follows:

Parcel B, Lot 83 of Assessor's Block 3616 as shown on the map of Parcel Map no. 6894 filed May 1, 2013, Book 48 of Parcel Maps, pages 132 and 133, San Francisco County Records.

Assessor's Lot 007; Block 3616 (portion)
New Assessor's Lot 083, Block 3616

A-1

# **EXHIBIT B**

## **Site Plan**

B-1

DB04/0503816.0339/8130936.5



ABBREVIATIONS

AB ASSESSOR'S BLOCK
AC ASPHALT CONCRETE
BW BACK OF SIDEWALK
BLDG BUILDING
CLR CLEAR
CONC CONCRETE
COR CORNER
DW DRIVEWAY
ELEV ELEVATION
FLG FLOW LINE GUTTER
SQ FT SQUARE FEET
OV OVER
PM PARKING METER
P/L PROPERTY LINE
(PR) PROPOSED
TC TOP OF CURB
TW TOP OF WALL
TYP. TYPICAL
(UO) UNKNOWN ORIGIN
OR OFFICIAL RECORDS

LEGEND

SET NAIL & TAG LS 6975
FOUND NAIL & TAG
FOUND L CUT
FOUND CROSS
FOUND TACK
CLEAN OUT
GAS VALVE
WATER METER
WATER VALVE
FIRE HYDRANT
DROP INLET
STREET LIGHT BOX
LIGHT POLE
ELECTROLIER
ELECTRIC MANHOLE
MANHOLE
SEWER MANHOLE
TELEPHONE MANHOLE
PARKING METER
CONCRETE

LEGEND

PROPERTY LINE
PROPERTY LINE (OTHERS)
RIGHT OF WAY LINE
MONUMENT LINE
BUILDING LINE
FENCE LINE
GAS LINE
WATER LINE
SEWER LINE
ELECTRIC LINE

BENCH MARK
MISSION & 22ND STREETS (N.E. CORNER)
LETTER "O" IN "OPEN" TOP HPFS HYDRANT
ELEV. = 93.216 (CITY DATUM)

NOTES

NO FLOOD ZONE DESIGNATION IS AVAILABLE

THIS SITE IS ZONED MISSION STREET NEIGHBORHOOD COMMERCIAL TRANSIT DISTRICT

NO HEIGHT RESTRICTIONS ARE PROVIDED

THERE IS NO EVIDENCE OF EARTH MOVING WORK OR BUILDING CONSTRUCTION AT THE TIME OF THIS SURVEY

THERE ARE NO WETLANDS IN THE DESIGNATED AREA

SITE DETAIL

GRAPHIC SCALE

1 inch = 20 feet
Metric (1:240)

VICINITY MAP
NOT TO SCALE

CONTROL DIAGRAM

GRAPHIC SCALE

1 inch = 100 feet
Metric (1:1200)

SURVEYOR'S STATEMENT

TO 2558 MISSION LLC, IBEW NECA DIVERSIFIED UNDERWRITTEN REAL ESTATE FUND, LLC, NATIONAL REAL ESTATE ADVISORS, LLC, NREA HOLDINGS, LLC, AND POTTS-DUPRE, DIFEDE & HAWKINS, CHARTERED, INDURE LENDING, LLC, A CALIFORNIA LIMITED LIABILITY COMPANY, AND FIRST AMERICAN TITLE INSURANCE COMPANY:

THIS IS TO CERTIFY THAT THIS MAP OR PLAT AND THE SURVEY ON WHICH IT IS BASED WERE MADE IN ACCORDANCE WITH "MINIMUM STANDARD DETAIL REQUIREMENT FOR ALTA/ACSM LAND TITLE SURVEYS" JOINTLY ESTABLISHED AND ADOPTED BY ALTA, ACSM AND NSPS IN 2011, AND INCLUDES ITEMS 1,2,3,4,5,6(a)(b),7,8,9,11(b),13,18,19 OF TABLE A THEREOF. PURSUANT TO THE ACCURACY STANDARDS AS ADOPTED BY ALTA, NSPS, AND ACSM AND IN EFFECT ON THE DATE OF THIS CERTIFICATION, UNDERSIGNED FURTHER CERTIFIES THAT:

THE SURVEY MEASUREMENTS WERE MADE IN ACCORDANCE WITH THE "MINIMUM ANGLE, DISTANCE, AND CLOSURE REQUIREMENTS FOR SURVEY MEASUREMENTS WHICH CONTROL LAND BOUNDARIES FOR ALTA/ACSM LAND TITLE SURVEYS".

(SIGNED) [signature]
BARRY A PIERCE, LS 6975

(DATE) 6·20·13

| | |
|---|---|
| Job No | 6344 |
| Sheet No | 1 OF 2 |
| Date | JUNE 2013 |
| Survey | BP 2/11/11 |
| Design | MA — |
| Drawn | JT 05/10/13 |
| Checked | BP 05/23/13 |
| Scale | 1" = 20' |

TRANSAMERICAN ENGINEERS

FOX PLAZA
1390 MARKET ST., Suite 314
San Francisco, CA 94102

ALTA/ACSM LAND TITLE SURVEY

THE LANDS OF GUS MUNRAD & ASSOCIATES AS SAID LAND IS SHOWN ON PARCEL MAP NO. 6894 RECORDED MAY 1, 2013 IN BOOK 48 OF PARCEL MAPS, AT PAGES 132 & 133, O.R. S.F. ASSESSOR'S BLOCK No. 3616, LOT No. 84
2558 MISSION STREET

SAN FRANCISCO CALIFORNIA

| Revisions | By |
|---|---|
| JUNE 2013 | BP/JT |

## EXHIBIT C

### Theater Facility Description

A 5 screen motion picture Theater containing 20,160 square feet of floor area and 57 Theater seats known as "Alamo Drafthouse Cinema" as generally depicted on plans prepared by Hodge & Associates P.L.L.C. and dated June 17, 2013.

C-1

## EXHIBIT D

### Restrictive Agreement

All matters of record affecting the Leased Premises.

D-1

DB04/0503816.0339/8130936.5

## EXHIBIT E

### Memorandum of Term Commencement

THIS MEMORANDUM OF TERM COMMENCEMENT (the "*Memorandum*") is made as of the _____ day of _____, 2013, by and between **30 WEST PERSHING, LLC,** a Missouri limited liability company, with an office at 909 Walnut Street, Suite 200, Kansas City, Missouri 64106 ("**Landlord**") and **ALAMO MISSION, LLC,** a California limited liability company, with an office at 612 East 6th Street, Austin, Texas 78701 ("*Tenant*").

### AGREEMENT

1.      Pursuant to that certain Lease dated as of _____, 2013 (the "**Lease**"), between Landlord and Tenant, Landlord leased to Tenant and Tenant leased from Landlord certain premises located on certain real property in the City of San Francisco, California, as more particularly described in the Lease (the "*Premises*").

2.      The Lease is for an initial term of _____ years commencing on _____, 2013 and expiring on _____, 20_____ (the "*Expiration Date*"), unless extended in accordance with the Lease.

3.      All of the other terms and conditions of the Lease are more fully set forth in the Lease and are incorporated herein by this reference.

4.      This Memorandum shall inure to the benefit of and be binding upon Landlord and Tenant and their respective representatives, successors and assigns.

IN WITNESS WHEREOF, Landlord and Tenant have caused this Memorandum of Term Commencement to be duly executed as of the day and year first above written.

**LANDLORD:**                                    **TENANT:**

**30 WEST PERSHING, LLC,**            **ALAMO MISSION, LLC,**
a Missouri limited liability company      a California limited liability company


By: _____            By: _____

Name: _____            Name: _____

Title: _____            Title: _____

E-1

# EXHIBIT 2

## SECOND AMENDMENT TO LEASE

**THIS SECOND AMENDMENT TO LEASE** (this "**Amendment**") is made and entered into as of the 21st day of November, 2014 (the "**Amendment Effective Date**"), by and between 30 WEST PERSHING, LLC, a Missouri limited liability company (hereinafter referred to as "**Landlord**"), and ALAMO MISSION, LLC, a California limited liability company (hereinafter referred to as "**Tenant**").

### RECITALS:

A.      Landlord and Tenant are parties to a Lease dated August 21, 2013 (the "**Original Lease**"), with respect to certain real property in San Francisco, California.

B.      The Original Lease was modified and amended pursuant to that certain First Amendment to Lease dated November 7, 2013 (as amended, the "**Lease**").

C.      Landlord and Tenant desire to amend the Lease as set forth below.

**NOW THEREFORE**, in consideration of the above premises, the mutual covenants and agreements stated herein and other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the parties hereto agree as follows:

1.      **Annual Fixed Rent**. Effective from and after the Amendment Effective Date, Section 5.2(a) and Section 5.2(b) of the Lease are hereby deleted and replaced with the following:

(a)      From the Effective Date through the end of the Construction Term, Variable Rent (defined in the Development Agreement), calculated and payable in accordance with the terms of the Development Agreement.

(b)      From the Commencement Date through the fifth Lease Year, One Million Two Hundred Twenty-Four Thousand Eight Hundred Twenty-Five and No/100 Dollars ($1,224,825.00) per year ($102,068.75 per month).

2.      **Counterparts.**   This Amendment may be executed in any number of counterparts, each of which shall be deemed to be an original and all of which shall together constitute one agreement which is binding upon all the parties hereto, notwithstanding that all parties are not signatories to the same counterpart.

3.      **Affirmation of Lease**. All other terms and provisions of the Lease that are not specifically modified by this Amendment shall remain in full force and effect, unmodified by the terms of this Amendment. All references herein or in the Lease to the "Lease" shall mean and refer to the Lease as amended by this Amendment. Capitalized terms used but not otherwise defined in this Amendment shall have the meanings assigned to them in the Lease.

4.      **Binding Effect**. This Amendment shall be binding upon and inure to the benefit of the parties and their respective successors and assigns.

DB04/0503816 0339/11494598.2

IN WITNESS WHEREOF, Landlord and Operator have caused this Amendment to be duly executed as of the day and year first above written.

**Landlord:**

**30 WEST PERSHING, LLC,**
a Missouri limited liability company

By: _____
Name: _____ Gregory K. Silvers
Title: _____ Vice President

**Operator:**

**ALAMO MISSION, LLC,**
a California limited liability company

By: _____
Name: _____ TIMOTHY A. LEAGUE
Title: _____ PRESIDENT

## GUARANTOR'S CONSENT

The undersigned Guarantor of the Lease hereby (i) acknowledges and consents to the terms of the foregoing Amendment, (ii) reaffirms the full force and effect of its Guaranty dated August 21, 2013 (the "**Guaranty**"), as of the day and year first above written, and (iii) agrees that the Guaranty guarantees payment and performance of all Obligations, as defined in the Guaranty, as modified pursuant to this Amendment.

IN WITNESS WHEREOF, Guarantor has duly executed this Guaranty of Lease as of the day and year first above written.

GUARANTOR:

Timothy League

Karrie League

## GUARANTOR'S CONSENT

The undersigned Guarantor of the Lease hereby (i) acknowledges and consents to the terms of the foregoing Amendment, (ii) reaffirms the full force and effect of its Guaranty dated August 21, 2013 (the "**Guaranty**"), as of the day and year first above written, and (iii) agrees that the Guaranty guarantees payment and performance of all Obligations, as defined in the Guaranty, as modified pursuant to this Amendment.

IN WITNESS WHEREOF, Guarantor has duly executed this Guaranty of Lease as of the day and year first above written.

**GUARANTOR:**

Timothy League

Karrie League

# EXHIBIT 3



February 10, 2021

VIA EMAIL


Missy Reynolds
Alamo Drafthouse Cinema
612 A East 6th Street
Austin, TX 78701
missy.reynolds@drafthouse.com



RE:    Lease dated August 21, 2013, as amended, (the "Lease") by and between 30 West Pershing, LLC
       (the "Landlord") and Alamo Mission, LLC ("Tenant") for the premises located at  2550 Mission
       Street, San Francisco, CA 94110 (the "Property").

Dear Ms. Reynolds:

Pursuant to Section 5.2 (c) of the Lease, a rental adjustment is due on the first day of the sixth Lease Year,
which was January 1, 2021.  The rental increase is to be the lesser of 10% or three times the CPI increase
over the prior 5 year term.  Since three times the CPI of 10.125% is greater than 10%, the annual rent will
increase by 10%.  The new Annual Rent effective January 1, 2021 is $1,473,957.72, which is
$122,829.81 per month.

Please remit the additional $11,166.35 that was due for January as soon as possible and make sure to
update the February monthly payment to reflect the new rent amount of $122,829.81.


Please feel free to call me at (816) 472-1700 or e-mail me at johnnad@eprkc.com if you have any
questions.

Sincerely,

*Johnna Davis*

Johnna Davis
Senior Lease Administrator
30 West Pershing, LLC


CC:    ZoAnn Peace

909 Walnut, Suite 200
Kansas City, MO 64106
816.472.1700
Toll Free: 888 EPR REIT
Fax: 816.472.5794
www.eprkc.com

| | | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Database: | ENTERTAINPRP | | | | | | CPI Increase Report | | | | | Page: | | 1 |
| Compare Period: | 12/20 | | | | | | EPR Properties | | | | | Date: | | 2/10/2021 |
| Posted to Batch #HO032372 | | | | | | | | | | | | Time: | | 11:42 AM |

| Lease Id Occupant Name | Formula | Inc Cat Actual/ Alt. | CPI Frq. | Index Id | R B Y | Base/ Comp Period | Base/ Comp Index | Max/ Min. % | CPI Incr % | Annual Amt to Base Calc | Limit % | U C | Annual Increase Amount | Current Annual Amount to Increase | Bill Freq | New Recurring Amount | Effective/ Next Bill Date | Retroactive/ Rent Tax Billing |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 100741-HO0634 | | MIN | | | | 12/15 | 236.5250.0000 | | | | | | | | | | 1/1/2021 | 11,166.35 |
| Alamo Mission, LLC | CPIBILL3 | | 60 | CPIU | Y | 12/20 | 260.474 | | 30.38 | 1,339,961.52 | 100.00 | Y | 133,996.15 | 1,339,961.52 | M | 122,829.81 | 2/1/2021 | 0.00 |

# EXHIBIT 4

| | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Database: | ENTERTAINPRP | | | Tenant Ledger Detail Report | | | | | Page: | 1 | | |
| Tenant Status: | Current | | | | | | | | Date: | 3/4/2021 | | |
| | | | | Alamo Mission, LLC | | | | | Time: | 12:43 PM | | |
| | | | | Transactions From 04/20 through 03/21. | | | | | | | | |

**Period**

| Code | Date | BldgId | LeasId | Type | Description | Currency | Debit | Credit | Receipt | Chk # | Invoice | Batch | Transaction ID | Balance |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **04/20** | | | | | | | | | | | | | | |
| MIN | 4/1/2020 | 100741 | HO0634 | CH | AUTOCHRG @T4/30/2020 | | 111,663.46 | | | | | HO030336 | 0000226008 | 111,663.46 |
| **05/20** | | | | | | | | | | | | | | |
| MIN | 5/1/2020 | 100741 | HO0634 | CH | AUTOCHRG @T5/31/2020 | | 111,663.46 | | | | | HO030442 | 0000227149 | 223,326.92 |
| **06/20** | | | | | | | | | | | | | | |
| MIN | 6/1/2020 | 100741 | HO0634 | CH | AUTOCHRG @T6/30/2020 | | 111,663.46 | | | | | HO030682 | 0000229764 | 334,990.38 |
| **07/20** | | | | | | | | | | | | | | |
| MIN | 7/1/2020 | 100741 | HO0634 | CH | AUTOCHRG @T7/31/2020 | | 111,663.46 | | | | | HO031080 | 0000233670 | 446,653.84 |
| **08/20** | | | | | | | | | | | | | | |
| MIN | 8/1/2020 | 100741 | HO0634 | CH | AUTOCHRG @T8/31/2020 | | 111,663.46 | | | | | HO031210 | 0000234874 | 558,317.30 |
| **09/20** | | | | | | | | | | | | | | |
| MIN | 9/1/2020 | 100741 | HO0634 | CH | AUTOCHRG @T9/30/2020 | | 111,663.46 | | | | | HO031488 | 0000237670 | 669,980.76 |
| **10/20** | | | | | | | | | | | | | | |
| MIN | 10/1/2020 | 100741 | HO0634 | CH | AUTOCHRG @T10/31/2020 | | 111,663.46 | | | | | HO031651 | 0000239413 | 781,644.22 |
| **11/20** | | | | | | | | | | | | | | |
| MIN | 11/1/2020 | 100741 | HO0634 | CH | AUTOCHRG @T11/30/2020 | | 111,663.46 | | | | | HO031713 | 0000240299 | 893,307.68 |
| **12/20** | | | | | | | | | | | | | | |
| MIN | 12/1/2020 | 100741 | HO0634 | CH | AUTOCHRG @T12/31/2020 | | 111,663.46 | | | | | HO032127 | 0000244883 | 1,004,971.14 |
| **01/21** | | | | | | | | | | | | | | |
| MIN | 1/1/2021 | 100741 | HO0634 | CH | AUTOCHRG @T1/31/2021 | | 111,663.46 | | | | | HO032301 | 0000247067 | 1,116,634.60 |
| **02/21** | | | | | | | | | | | | | | |
| MIN | 1/1/2021 | 100741 | HO0634 | CH | CPI Adjustment 12/20 | | 11,166.35 | | | | | HO032372 | 0000248040 | 1,127,800.95 |
| MIN | 2/1/2021 | 100741 | HO0634 | CH | AUTOCHRG @T2/28/2021 @R | | 122,829.81 | | | | | HO032447 | 0000248474 | 1,250,630.76 |
| **03/21** | | | | | | | | | | | | | | |
| MIN | 3/1/2021 | 100741 | HO0634 | CH | AUTOCHRG @T3/31/2021 | | 122,829.81 | | | | | HO032544 | 0000250082 | 1,373,460.57 |

| Database: | ENTERTAINPRP | | Tenant Ledger Detail Report | | | Page: | 1 |
| Tenant Status: | Current | | | | | Date: | 3/4/2021 |
| | | | Lakeline/Alamo-Facility Lease | | | Time: | 12:40 PM |
| | | | Transactions From 04/20 through 03/21. | | | | |

| Period Code | Date | BldgId | LeasId | Type | Description | Currency | Debit | Credit | Receipt | Chk # | Invoice | Batch | Transaction ID | Balance |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **04/20** | | | | | | | | | | | | | | |
| MIN | 4/1/2020 | 100740 | HO0437 | CH | AUTOCHRG @T4/30/2020 | | 84,777.00 | | | | | HO030336 | 0000226007 | **84,777.00** |
| **05/20** | | | | | | | | | | | | | | |
| MIN | 5/1/2020 | 100740 | HO0437 | CH | AUTOCHRG @T5/31/2020 | | 84,777.00 | | | | | HO030442 | 0000227148 | **169,554.00** |
| **06/20** | | | | | | | | | | | | | | |
| MIN | 6/1/2020 | 100740 | HO0437 | CH | AUTOCHRG @T6/30/2020 | | 84,777.00 | | | | | HO030682 | 0000229763 | **254,331.00** |
| **07/20** | | | | | | | | | | | | | | |
| MIN | 7/1/2020 | 100740 | HO0437 | CH | AUTOCHRG @T7/31/2020 | | 84,777.00 | | | | | HO031080 | 0000233669 | **339,108.00** |
| **08/20** | | | | | | | | | | | | | | |
| MIN | 8/1/2020 | 100740 | HO0437 | CH | AUTOCHRG @T8/31/2020 | | 84,777.00 | | | | | HO031210 | 0000234873 | **423,885.00** |
| **09/20** | | | | | | | | | | | | | | |
| MIN | 9/1/2020 | 100740 | HO0437 | CH | AUTOCHRG @T9/30/2020 | | 84,777.00 | | | | | HO031488 | 0000237669 | **508,662.00** |
| **10/20** | | | | | | | | | | | | | | |
| MIN | 10/1/2020 | 100740 | HO0437 | CH | AUTOCHRG @T10/31/2020 | | 84,777.00 | | | | | HO031651 | 0000239412 | **593,439.00** |
| **11/20** | | | | | | | | | | | | | | |
| MIN | 11/1/2020 | 100740 | HO0437 | CH | AUTOCHRG @T11/30/2020 | | 84,777.00 | | | | | HO031731 | 0000240415 | **663,528.05** |
| MIN | 11/19/2020 | 100740 | HO0437 | CR | Receipt | | | -14,687.95 LOC | 13289 | | | HO031814 | 0000241245 | |
| **12/20** | | | | | | | | | | | | | | |
| MIN | 12/1/2020 | 100740 | HO0437 | CH | AUTOCHRG @T12/31/2020 | | 84,777.00 | | | | | HO032127 | 0000244882 | **733,649.83** |
| MIN | 12/10/2020 | 100740 | HO0437 | CR | Receipt | | | -14,655.22 LOC | 13306 | | | HO031961 | 0000243192 | |
| **01/21** | | | | | | | | | | | | | | |
| MIN | 1/1/2021 | 100740 | HO0437 | CH | AUTOCHRG @T1/31/2021 | | 84,777.00 | | | | | HO032301 | 0000247066 | **802,079.83** |
| MIN | 1/6/2021 | 100740 | HO0437 | CR | Receipt | | | -16,347.00 LOC | 13317 | | | HO032094 | 0000244638 | |
| **02/21** | | | | | | | | | | | | | | |
| MIN | 2/1/2021 | 100740 | HO0437 | CH | AUTOCHRG @T2/28/2021 | | 84,777.00 | | | | | HO032447 | 0000248473 | **886,856.83** |
| **03/21** | | | | | | | | | | | | | | |
| MIN | 3/1/2021 | 100740 | HO0437 | CH | AUTOCHRG @T3/31/2021 | | 84,777.00 | | | | | HO032544 | 0000250081 | **971,633.83** |

# **EXHIBIT 5**

# Treasurer & Tax Collector
CITY AND COUNTY OF SAN FRANCISCO

## Property Tax Account at 2550 MISSION ST
Account 3616-083

See all bills for Current Owner

# 2020 Secured Annual Bill #20200101463     [ View Bill ]

## Bill Information
Bill #: 20200101463
Assessment Year: 2020
Tax Year: 2020
Account Number: 3616-083
Tax Rate Area: 001-000
Total: **$264,675.47**

## Property
*Address*
2550 MISSION ST

### Bill Status and Payment

2020 Secured Annual Bill #20200101463
Assessee: Current Owner

| | | |
|---|---|---|
| **1st Installment** Delinquent After 12/10/2020 | **$138,639.53** | **PAID** 01/11/2021 |
| **2nd Installment** Delinquent After 04/12/2021 | **$126,035.94** | [ Add to Cart ] |

### Ad Valorem Taxes

| Taxing Authority | Rate | Assessed | Exemptions | Taxable | Total Tax |
|---|---|---|---|---|---|
| General City Bond Debt Fund | 0.11972733% | $20,971,163 | $0 | $20,971,163 | $25,108.20 |
| S.F. Community College District Bond Fund | 0.01973594% | $20,971,163 | $0 | $20,971,163 | $4,138.84 |
| S.F. Unified School Dist. Bond Fund | 0.04510041% | $20,971,163 | $0 | $20,971,163 | $9,458.08 |
| San Francisco Bay Area Rapid Transit District | 0.01390000% | $20,971,163 | $0 | $20,971,163 | $2,914.98 |
| Countywide Tax (Secured) | 1.00000000% | $20,971,163 | $0 | $20,971,163 | $209,711.62 |

### Special Assessments and Direct Charges

| Levying Authority | Phone Number | Tax |
|---|---|---|
| 45 - Living Wage for Educators 2018 Tax | (415) 355-2203 | $319.76 |
| 46 - San Francisco Bay Restoration Authority | (888) 508-8157 | $12.00 |
| 89 - SFUSD Facilities District | (415) 355-2203 | $39.04 |
| 91 - SFCCD Parcel Tax | (415) 487-2400 | $99.00 |
| 98 - SFUSD - Teacher Support | (415) 355-2203 | $270.36 |

### Fees and Penalties

| Type | Tax |
|---|---|
| Late Penalty | $12,603.59 |

### Total: $264,675.47

Combined taxes and assessments: **$252,071.88**

# **EXHIBIT 6**

LEASE

BETWEEN

30 WEST PERSHING, LLC,
A MISSOURI LIMITED LIABILITY COMPANY

("LANDLORD")

AND

ALAMO LAKELINE LLC,
A TEXAS LIMITED LIABILITY COMPANY

("TENANT")

FOR THE LEASE OF

LAKELINE THEATER

SEPTEMBER 17, 2012

# TABLE OF CONTENTS

Lease between 30 West Pershing, as Landlord
and Alamo Lakeline LLC, as Tenant,
covering premises in
Austin, Texas

**Page**

ARTICLE 1. ATTACHMENTS TO LEASE; EXHIBITS ............................................................1

ARTICLE 2. DEFINITIONS ..............................................................................................1

    2.1    Definitions ..........................................................................................1

ARTICLE 3. DEMISE OF PREMISES ...............................................................................4

    3.1    Demise of Premises ...........................................................................4
    3.2    Development Matters ..........................................................................4
    3.3    Landlord's Covenant ..........................................................................4
    3.4    No Representations by Landlord ...........................................................5

ARTICLE 4. TERM .........................................................................................................5

    4.1    Term ................................................................................................5
    4.2    Options to Extend ..............................................................................6
    4.3    Continued Possession of Tenant ...........................................................6
    4.4    Certain Landlord Rights on Termination for Reletting. ...........................6

ARTICLE 5. RENT ..........................................................................................................7

    5.1    Payment of Rent ................................................................................7
    5.2    Annual Fixed Rent; Escalation .............................................................7
    5.3    Percentage Rent ................................................................................7

ARTICLE 6. EXPENSES ..................................................................................................9

    6.1    Payment of Expenses .........................................................................9
    6.2    Tenant's Real Estate Taxes. .................................................................9
    6.3    Restrictive Agreements; Common Facilities ..........................................10
    6.4    Utility Payments ..............................................................................11

ARTICLE 7. TITLE INSURANCE; TRANSFER OF TITLE ..................................................12

    7.1    Leasehold Title Policy .......................................................................12
    7.2    Change of Ownership ........................................................................12

ARTICLE 8. TENANT'S COVENANT TO OPERATE; USE OF PREMISES ...........................12

    8.1    Operating Covenant ..........................................................................12
    8.2    During Tenant's Operating Period ........................................................12
    8.3    After Tenant's Operating Period ..........................................................13
    8.4    Continuing Use Restrictions ...............................................................13
    8.5    Prohibition of Use ............................................................................15

| 8.6 | Landlord Assistance ........................................................................................................ 15 |
| 8.7 | Tenant's Right to Control Operations ............................................................................ 15 |

ARTICLE 9. TENANT REPORTING ........................................................................................15

ARTICLE 10. SUBLETTING AND ASSIGNING........................................................................16

| 10.1 | Landlord's Consent; Permitted Assignment, Subletting and Licenses........................ 16 |
| 10.2 | Continuation/Release of Liability................................................................................ 17 |
| 10.3 | Default Notices After Assignments.............................................................................. 17 |
| 10.4 | Assignment of Rights in Sublease................................................................................ 18 |
| 10.5 | Landlord's Assignment................................................................................................. 18 |
| 10.6 | REIT Limitations.......................................................................................................... 18 |

ARTICLE 11. TENANT'S PROPERTY........................................................................................19

ARTICLE 12. GOVERNMENTAL COMPLIANCE ....................................................................19

| 12.1 | Tenant Responsibilities Generally................................................................................ 19 |
| 12.2 | Parties; Environmental Knowledge.............................................................................. 19 |
| 12.3 | Landlord's Environmental Responsibilities During the Term of this Lease ............... 20 |
| 12.4 | Tenant's Environmental Responsibilities..................................................................... 20 |
| 12.5 | Environmental Indemnities........................................................................................... 20 |
| 12.6 | Definition...................................................................................................................... 21 |
| 12.7 | Survival......................................................................................................................... 21 |

ARTICLE 13. MAINTENANCE AND REPAIRS .......................................................................21

| 13.1 | Warranty ....................................................................................................................... 21 |
| 13.2 | Maintenance and Repairs.............................................................................................. 21 |
| 13.3 | Minor Alterations ......................................................................................................... 22 |
| 13.4 | Certain Limitations ...................................................................................................... 22 |

ARTICLE 14. ALTERATIONS AND TENANT'S LIENS............................................................22

| 14.1 | Title to Tenant's Alterations........................................................................................ 22 |
| 14.2 | No Tenant Liens ............................................................................................................ 22 |
| 14.3 | Landlord Elective Improvements ................................................................................. 23 |

ARTICLE 15. DAMAGE CLAUSE..............................................................................................23

| 15.1 | Damage.......................................................................................................................... 23 |
| 15.2 | Right to Terminate on Certain Damage........................................................................ 23 |
| 15.3 | Rights to Insurance Proceeds........................................................................................ 24 |

ARTICLE 16. CONDEMNATION ...............................................................................................24

| 16.1 | In General ..................................................................................................................... 24 |
| 16.2 | Temporary Taking Awards........................................................................................... 25 |

ARTICLE 17. INSURANCE, INDEMNITY, WAIVER OF SUBROGATION AND
FIRE PROTECTION ........................................................................................................................25

| | | |
|---|---|---|
| 17.1 | Casualty Policy ................................................................................................ | 25 |
| 17.2 | DIC Policy Endorsement .................................................................................. | 26 |
| 17.3 | Liability Insurance; Tenant Negligence ........................................................... | 26 |
| 17.4 | Liability Insurance; Landlord Negligence ........................................................ | 26 |
| 17.5 | Rental Loss/Business Interruption Insurance .................................................... | 27 |
| 17.6 | Workers' Compensation Insurance ................................................................... | 27 |
| 17.7 | Release; Waiver of Subrogation ....................................................................... | 27 |
| 17.8 | General .............................................................................................................. | 27 |

ARTICLE 18. INDEMNIFICATION GENERALLY .......................................................................28

ARTICLE 19. LEASEHOLD MORTGAGES .................................................................................29

| | | |
|---|---|---|
| 19.1 | Rights to Mortgage Lease ................................................................................. | 29 |
| 19.2 | Leasehold Mortgagee Qualifications ................................................................ | 29 |
| 19.3 | Defaults ............................................................................................................. | 30 |
| 19.4 | Continuation of Liability .................................................................................. | 34 |

ARTICLE 20. TENANT'S SIGNS .................................................................................................35

| | | |
|---|---|---|
| 20.1 | Location and Type ............................................................................................ | 35 |
| 20.2 | Design ............................................................................................................... | 35 |
| 20.3 | Access to Tenant's Pylon ................................................................................. | 35 |
| 20.4 | Loss of Tenant's Pylon ..................................................................................... | 35 |
| 20.5 | Protection of Signs Visibility .......................................................................... | 36 |
| 20.6 | Interior Signs .................................................................................................... | 36 |

ARTICLE 21. ESTOPPEL; ATTORNMENT AND SUBORDINATION ....................................36

| | | |
|---|---|---|
| 21.1 | Estoppel Certificate .......................................................................................... | 36 |
| 21.2 | Attornment by Tenant ....................................................................................... | 36 |
| 21.3 | Subordination/Non-Disturbance ....................................................................... | 36 |
| 21.4 | Form of Documents .......................................................................................... | 37 |

ARTICLE 22. DEFAULT ...............................................................................................................37

| | | |
|---|---|---|
| 22.1 | Tenant Default .................................................................................................. | 37 |
| 22.2 | Remedies ........................................................................................................... | 38 |
| 22.3 | Landlord Default, Cure Rights .......................................................................... | 39 |
| 22.4 | Self Help ........................................................................................................... | 39 |
| 22.5 | Remedies Cumulative ....................................................................................... | 39 |
| 22.6 | Limitation on Landlord's Liability ................................................................... | 39 |
| 22.7 | Interest on Past Due Obligations; Late Charges ............................................... | 40 |
| 22.8 | Development Agreement Breaches .................................................................... | 40 |

ARTICLE 23. ACCESS TO PREMISES ........................................................................................40

| | | |
|---|---|---|
| 23.1 | Ongoing Access and Inspection Rights ............................................................ | 40 |
| 23.2 | Landlord's Construction Inspection Rights ...................................................... | 40 |

ARTICLE 24. FORCE MAJEURE ............................................................................................41

ARTICLE 25. MISCELLANEOUS ........................................................................................41
25.1    Lease Not to be Recorded.................................................................................. 41
25.2    Notices............................................................................................................... 41
25.3    Waiver of Performance and Disputes................................................................. 42
25.4    Modification of Lease......................................................................................... 43
25.5    Captions............................................................................................................. 43
25.6    Lease Binding on Successors and Assigns, etc .................................................. 43
25.7    Brokers............................................................................................................... 43
25.8    Landlord's Status as a REIT............................................................................... 43
25.9    Governing Law................................................................................................... 43
25.10   Estoppel ............................................................................................................. 43
25.11   Joint Preparation ............................................................................................... 44
25.12   Interpretation ..................................................................................................... 44
25.13   Severability........................................................................................................ 44
25.14   Landlord and Tenant.......................................................................................... 44
25.15   Authority............................................................................................................ 44
25.16   Time is of the Essence ...................................................................................... 44
25.17   Consent .............................................................................................................. 44
25.18   Attorneys' Fees.................................................................................................. 44
25.19   Further Assurances ............................................................................................ 45
25.20   Counterparts....................................................................................................... 45
25.21   Rules of Construction ........................................................................................ 45
25.22   Repurchase Obligations..................................................................................... 45

ARTICLE 26. WAIVER OF TRIAL BY JURY .....................................................................45

DB04/0503816.0340/5552953.4

## LEASE

THIS LEASE, dated as of September 17, 2012 (the "***Effective Date***"), is made by and between 30 WEST PERSHING, LLC, a Missouri limited liability company, with an office at 909 Walnut, Suite 200, Kansas City, Missouri 64106 ("***Landlord***"), and ALAMO LAKELINE LLC, a Texas limited liability company, with an office at 1717 West 6th Street, Austin, Texas 78703 ("***Tenant***").

### ARTICLE 1.
### ATTACHMENTS TO LEASE; EXHIBITS

Attached to this Lease and hereby made a part hereof are the following:

**EXHIBIT A** – a description of the tract of land constituting the Leased Premises.

**EXHIBIT B** – a description of the tract of land constituting the Center.

**EXHIBIT C** – a site plan (the "***Site Plan***") of the Leased Premises and the Center showing (i) the location of the Theater Facility, and (ii) the Center of which the Leased Premises are a part, and (iii) the location of any other buildings and improvements constructed or to be constructed, if known, within the Center by any person or entity, including Tenant's Pylon.

**EXHIBIT D** – a description of the Theater Facility and the improvements to be constructed on the Leased Premises.

**EXHIBIT E** – a listing of Restrictive Agreements.

**EXHIBIT F** – Memorandum of Term Commencement.

### ARTICLE 2.
### DEFINITIONS

**2.1     Definitions.** The following terms for purposes of this Lease shall have the meanings hereinafter specified (additional terms may be defined elsewhere in the Lease):

"***ADA***" means the Americans with Disabilities Act of 1990, as amended, 42 U.S.C. 12.101, *et seq.*

"***Affiliate***" means as applied to a person or entity, any other person or entity directly or indirectly controlling, controlled by, or under common control with, that person or entity.

"***Annual Fixed Rent***" means the annual fixed rent payable under this Lease, as set forth in Article 5.2.

"***Annual Percentage Rent***" is defined in Article 5.3.

"***Authorized Institution***" means a bank, savings and loan institution, trust or insurance company, real estate investment trust, pension, welfare or retirement fund, acting either in its own capacity or as a trustee.

1

"***Center***" means the tract of land described on **Exhibit B** and identified on the Site Plan where the Theater Facility is located, together with any buildings, Common Facilities and other improvements thereon, as the Center is constituted from time to time.

"***Code***" means the Internal Revenue Code of 1986, as the same may be amended or supplemented, and the rules and regulations promulgated thereunder.

"***Commencement Date***" is defined in Article 4.1.

"***Common Facilities***" includes all parking areas, streets, driveways, curb cuts, access facilities, aisles, sidewalks, malls, landscaped areas, sanitary and storm sewer lines, water, gas, electric, telephone and other utility lines, systems, conduits and facilities and other common and service areas within the Center designed for use by all tenants and owners of properties situated in the Center, all as more particularly defined in the REA and the other Restrictive Agreements, whether or not shown on the Site Plan, and regardless of by whom owned.

"***Common Facilities Expense***" means to the extent covered by or levied under the REA or any other Restrictive Agreement, all expenses, fees, assessments and costs in connection with operating, maintaining, repairing, insuring, lighting, protecting and securing the Common Facilities.

"***Construction Term***" is defined in Article 4.1.

"***CPI***" means the Consumer Price Index for all Urban Consumers, U.S. City Average, published by the Bureau of Labor Statistics of the United States Department of Labor (base year 1982-84=100), or any successor index thereto.

"***Default Rate***" means the lesser of (i) the per annum interest rate from time to time publicly announced by Citibank, N.A., New York, New York as its base rate (i.e., its Prime Rate) plus four percent (4%) or (ii) the highest rate of interest that may lawfully be charged to the party then required to pay interest under this Lease at the Default Rate. If Citibank, N.A. should cease to publicly announce its base rate, the Prime Rate hereunder shall be the prime, base or reference rate of the largest bank (based on assets) in the United States which announces such rate.

"***Development Agreement***" means that certain Theater Development Agreement between Landlord and Tenant of even date herewith.

"***Effective Date***" is the date first above written.

"***Final Plans***" means the final plans, drawings and specifications for the Theater Facility as built.

"***Fiscal Tax Year***" is defined in Article 6.2(a)(i).

"***Force Majeure***" is defined in Article 24.

"***Governmental Authorities***" means all federal, state, county, municipal and local departments, commissions, boards, bureaus, agencies and offices thereof, having or claiming

2

jurisdiction over all or any part of the Center (if applicable) or the Theater Facility or the use thereof.

"***Gross Receipts***" is defined in Article 5.

"***Guarantor***" means David J. Kennedy.

"***Guaranty***" means the Guaranty by and between Landlord and Guarantor of even date herewith.

"***Hazardous Substances***" is defined in Article 12.6.

"***Initial Fixed Term***" is defined in Article 4.1.

"***Knowledge***" means the actual knowledge of Landlord without duty of inquiry or investigation.

"***Laws***" means all present and future requirements, administrative and judicial orders, laws, statutes, ordinances, rules and regulations of any Governmental Authority, including, but not limited to the ADA applicable to the Leased Premises.

"***Lease Year***" means a period of twelve (12) full calendar months. The first Lease Year shall begin on the first day of the calendar month following the Commencement Date, unless the Term commences on the first day of a calendar month, in which case the first Lease Year shall begin on the Commencement Date. Each succeeding Lease Year shall commence on the anniversary of the first Lease Year.

"***Leased Premises***" means the Theater Facility, the land thereunder described on **Exhibit A** attached hereto, and all improvements, fixtures, appurtenances, rights, easements and privileges thereunto belonging or in any way appertaining, and all other rights, easements and privileges granted to Tenant in this Lease, excluding, however, Tenant's Property as defined below.

"***Market Area***" means the greater Austin, Texas metropolitan area.

"***Mortgage***" means any mortgage or deed of trust or other instrument in the nature thereof evidencing a security interest in the Leased Premises or any part thereof.

"***Option Periods***" is defined in Article 4.2

"***Percentage Rent***" is defined in Article 5.3.

"***Plans and Specifications***" is defined in the Development Agreement.

"***REA***" means that certain Declaration of Covenants, Restrictions and Reciprocal Easements dated September 14, 2012, and Declaration of Protective Covenants and Common Area Maintenance Agreement dated September 14, 2012, each executed by, among other parties,

3

Lakeline Market, Ltd., a Texas limited partnership ("***Declarant***"), and affecting the Leased Premises.

"***Related Lease***" means any lease between Landlord, or an Affiliate of Landlord, and Tenant, or an Affiliate of Tenant.

"***Rent***" means Annual Fixed Rent, Annual Percentage Rent and any other charges, expenses or amounts payable by Tenant under this Lease.

"***Restrictive Agreements***" means those certain reciprocal easement agreements, operating agreements, development agreements, easement agreements and/or other similar agreements and instruments that govern and regulate the development of the Leased Premises, including without limitation the REA and all other agreements described on **Exhibit E** attached hereto and by this reference made a part hereof.

"***Taxes***" is defined in Article 6.2(a)(ii).

"***Taxes Applicable to Leased Premises***" is defined in Article 6.2(a)(iii).

"***Tenant's Operating Covenant***" is defined in Article 8.1.

"***Tenant's Operating Period***" means the period beginning on the Commencement Date and ending on the 15th anniversary of such date.

"***Tenant's Property***" is defined in Article 11.

"***Tenant's Pylon***" is defined in Article 20.1.

"***Tenant's Signs***" is defined in Article 20.2.

"***Term***" and "***Term of this Lease***" means the initial fixed term as provided in Article 4 and any renewal or extension thereof.

"***Theater Facility***" means the theater to be located on the Leased Premises described on **Exhibit D**.

### ARTICLE 3.
### DEMISE OF PREMISES

**3.1** **Demise of Premises.** Landlord hereby demises and leases the Leased Premises unto Tenant, and Tenant hereby leases the same from Landlord, for the consideration and upon the terms and conditions set forth in this Lease.

**3.2** ***Development Matters***. All matters related to the development and construction of the Theater Facility shall be governed by the Development Agreement.

**3.3** **Landlord's Covenant.** Landlord represents and warrants to Tenant that: (i) Landlord has full right and lawful authority to enter into and perform Landlord's obligations under this Lease for the Term of this Lease, and Landlord has not suffered, incurred or entered

4

into any contracts, leases, tenancies, agreements, restrictions, violations, encumbrances or defects in title of any nature whatsoever which materially adversely affect Landlord's right, title and interest in the Leased Premises or the fulfillment of its obligations under this Lease; (ii) except for any Mortgages which exist upon the Commencement Date, Tenant's rights under this Lease shall not be subject or subordinate to any Mortgage except for such subordination as may be accomplished in accordance with the provisions of Article 21; and (iii) if Tenant fully discharges the obligations herein set forth to be performed by Tenant, Tenant shall have and enjoy, during the Term of this Lease, the quiet and undisturbed possession of the Leased Premises together with the right to use the Common Facilities, as in this Lease contemplated, free from interference by Landlord or any party claiming by, through or under Landlord.

**3.4     No Representations by Landlord.** Tenant hereby accepts the Leased Premises in its "as is, where is" condition as of the Commencement Date. Tenant acknowledges that, except as herein expressly set forth, Landlord has not made, does not make, and specifically negates and disclaims any representations, warranties, promises, covenants, agreements or guaranties of any kind or character whatsoever, whether express or implied, oral or written, of, as to, concerning, or with respect to, (i) the value, nature, quality or condition of the Leased Premises, including, without limitation, the water, soil and geology; (ii) the suitability of the Leased Premises for any and all activities and uses which may be conducted thereon; (iii) the compliance of or by the Leased Premises with any laws, rules, ordinances or regulations of any applicable governmental authority or body; (iv) the habitability, merchantability, marketability, profitability or fitness for a particular purpose of the Leased Premises, or (v) any other matter with respect to the Leased Premises, and specifically, Landlord has not made, does not make and specifically negates and disclaims any representations or warranties regarding compliance of the Leased Premises with any environmental protection, pollution or land use laws, rules, regulations, orders or requirements, including without limitation, those pertaining to solid waste, as defined by the U.S. Environmental Protection Agency Regulations at 40 C.F.R., Part 261, or the disposal or existence, in or on the Premises, of any hazardous substances, as defined by The Comprehensive Environmental Response Compensation and Liability Act of 1980, as amended, and the regulations promulgated thereunder. Tenant shall rely solely on its own investigation of the Leased Premises and not on any information provided or to be provided by Landlord, its directors, contractors, agents, employees or representatives. Landlord shall not be liable or bound in any manner by any verbal or written statements, representations or information pertaining to the Leased Premises or the operation thereof, furnished by any party purporting to act on behalf of Landlord.

## ARTICLE 4.
## TERM

**4.1     Term**. The Construction Term of this Lease shall commence on the Effective Date and shall expire on the earlier of (a) the date that Tenant opens for business in the Premises, or (b) the date that is twelve (12) months after the Effective Date. The Initial Fixed Term of this Lease shall commence on the expiration of the Construction Term (the "**Commencement Date**"), and shall expire (unless extended in accordance with Article 4.2) at midnight on the last day of the month that is twenty (20) years after the Commencement Date. After the Commencement Date, Tenant and Landlord shall promptly execute a Memorandum of Term Commencement in the form attached hereto as Exhibit F.

5

**4.2     Options to Extend.** Provided Tenant is not in default under this Lease and the default remains uncured beyond applicable cure periods, Tenant shall have the right to extend the Term of this Lease for four (4) successive periods of five (5) years each (the "*Option Periods*") from the date upon which the Term would otherwise expire upon the same terms and conditions as those herein specified. If Tenant elects to exercise its option for any Option Period, it shall do so by giving Landlord written notice of such election at least nine (9) months before the beginning of the Option Period for which the Term of this Lease is to be extended by the exercise of such option. If Tenant gives such notice, the Term of this Lease shall be automatically extended for the Option Period covered by the option so exercised without execution of an extension or renewal lease. Failure to extend the Lease for any Option Period shall constitute waiver of any subsequent Option Periods.

**4.3     Continued Possession of Tenant.** Tenant acknowledges that if it does not exercise any applicable option to extend the Term of this Lease for an Option Period, then Tenant shall, in addition to the amounts hereinafter set forth, indemnify and hold Landlord harmless from any and all damages and expenses, including attorneys' fees, that Landlord may incur by reason of Tenant's holding over without the consent of Landlord. In addition, any holding over after the last day of any extension of the Term of this Lease shall be construed to be a month-to-month tenancy, on and subject to the terms of this Lease, terminable by either party on not less than one (1) month's notice, with the exception that Annual Fixed Rent shall be increased to (i) one hundred twenty-five percent (125%) (if such holdover by Tenant is done with Landlord's written consent), or (ii) one hundred fifty percent (150%) (if such holdover by Tenant is without Landlord's consent) of the Annual Fixed Rent that existed for the year prior to the expiration of the then current Term. Except in the case of default, Tenant shall have thirty (30) days after such notice of termination by either party to remove Tenant's Property, and any of Tenant's Property not so removed shall be deemed abandoned. Tenant shall repair any structural damage to the Theater Facility caused by the removal of Tenant's Property or any of its sublessees' or licensees' property but Tenant shall not be required to patch any bolt-holes resulting from such removal.

**4.4     Certain Landlord Rights on Termination for Reletting.**

(a)     If Tenant has not exercised the applicable Option Period option to extend this Lease, then Landlord or its agent shall thereafter have the right to enter the Leased Premises at all reasonable times for the purpose of exhibiting the Leased Premises to others and to place upon the Leased Premises during the period commencing one hundred eighty (180) days prior to the expiration of the then current Term "for sale" or "for rent" notices or signs of such number and in such locations as Tenant reasonably approves. Tenant hereby waives all notice to vacate upon the expiration or other termination of this Lease.

(b)     Upon the expiration or earlier termination of this Lease, Tenant shall, at the option of Landlord, transfer to and relinquish to Landlord or Landlord's nominee and reasonably cooperate with Landlord or Landlord's nominee in connection with the processing by Landlord or such nominee of all licenses other than liquor licenses, operating permits, and other governmental authorizations and all assignable service contracts, which may be necessary or appropriate for the operation by Landlord or such

6

nominee of the Leased Premises; provided that the costs and expenses of any such transfer or the processing of any such application shall be paid by Landlord or Landlord's nominee.

## ARTICLE 5.
## RENT

**5.1    Payment of Rent.**  Tenant shall timely pay all Rent due under this Lease to Landlord by check or electronic transfer payable to Landlord at Landlord's address first written above until Tenant receives other written instructions from Landlord.

**5.2    Annual Fixed Rent; Escalation.**  Tenant shall pay Landlord, during the Term of this Lease, the Annual Fixed Rent for each Lease Year, payable in equal monthly installments on or before the first day of each calendar month, in advance during such Lease Year.  If the Annual Fixed Rent is payable for a fraction of a month, the amount payable shall be a pro rata share of a full month's rent.  The Annual Fixed Rent shall be prorated for any partial Lease Year.  Annual Fixed Rent under this Lease shall be as follows:

(a)    From the Effective Date through the end of the Construction Term, Two Hundred Sixty Two Thousand Five Hundred and No/100 Dollars ($262,500.00) per year ($21,875.00 per month).Variable Rent (defined in the Development Agreement), calculated and payable in accordance with the terms of the Development Agreement.

(b)    From the Commencement Date through the fifth Lease Year, Eight Hundred Forty Thousand Eight Hundred Forty and No/100 Dollars ($840,840.00) per year ($70,070.00 per month).

(c)    On the first day of the sixth, eleventh and sixteenth Lease Years and the first day of each Option Period, if exercised (each an "***Escalation Date***"), Annual Fixed Rent shall be increased to an amount, per annum, equal to the sum of (i) the Annual Fixed Rent payable during the immediately preceding Lease Year, plus (ii) an amount equal to the Annual Fixed Rent payable during the immediately preceding Lease Year multiplied by the Percentage Escalator. The "***Percentage Escalator***" shall be the lesser of (A) ten percent (10%) or (B) three (3) times the percentage increase in the CPI between the CPI in effect during the first month of the then-current Lease Year and the same month five years earlier. Annual Fixed Rent, as increased on each Escalation Date, shall remain in effect for the following five (5) Lease Years until the succeeding Escalation Date or expiration of the Term of this Lease, as applicable.

**5.3    Percentage Rent.**  In addition to the Annual Fixed Rent, Tenant shall pay Landlord as percentage rent (the "***Annual Percentage Rent***") an amount for each Lease Year equal to six percent (6%) (the "***Percentage Rate***") of the Gross Receipts (defined below) for such Lease Year in excess of an amount ("***Base Amount***") equal to the quotient obtained by dividing the Annual Fixed Rent payable for such Lease Year by the Percentage Rate.  For the purpose of computing the Annual Percentage Rent for the first Lease Year, the Gross Receipts for the partial calendar month preceding the first Lease Year shall be included in the Gross Receipts for the first Lease Year.  Within sixty (60) days following the end of each Lease Year,

7

Tenant shall furnish Landlord with a statement, verified by a corporate officer of Tenant, showing the amount of Gross Receipts for the preceding Lease Year, which statement shall be accompanied by Tenant's payment of Annual Percentage Rent, if any is due.

(a)     Landlord shall have the right, not more often than once each year, to audit Tenant's records of Gross Receipts, but only for the purpose of ascertaining the amount of the Gross Receipts during the preceding Lease Year. Such audit shall be made on behalf of Landlord by a certified public accountant to be selected by Landlord. If Landlord wishes to audit Tenant's records for any Lease Year, Landlord shall notify Tenant and proceed with such audit within twelve (12) months after the end of the Lease Year in question. Should Landlord fail to exercise the right to audit the records of Tenant within twelve (12) months after the end of any Lease Year, then Landlord shall have no further right to audit the records of Tenant for such Lease Year, and Tenant's statement of Gross Receipts for such Lease Year shall conclusively be deemed to be correct. Any such audit by Landlord shall be at Landlord's own expense, except as hereinafter provided. If any such audit discloses that Tenant has understated the Gross Receipts for such Lease Year by more than three percent (3%) and Landlord is entitled to any additional Annual Percentage Rent as a result of such understatement, then Tenant shall promptly pay to Landlord the cost of such audit. Tenant shall, in any event, pay Landlord the amount of any deficiency in Annual Percentage Rent.

(b)     The term "**_Gross Receipts_**" means: (i) the entire amount of the price charged, whether wholly or partially in cash or on credit, or otherwise, for all goods, wares, merchandise and chattels of any kind sold, leased, licensed or delivered (specifically including without limitation theater admission tickets and concession items), and all charges for services sold or performed in, at, upon or from any part of or through the use of the Leased Premises or any part thereof by Tenant or any other party, or by means of any mechanical or other vending device (other than pay telephones, and those soft drink and other similar vending devices operated primarily for the convenience of Tenant's employees); and (ii) all gross income of Tenant and any other party from any operations in, at, upon or from the Leased Premises which are neither included in nor excluded from Gross Receipts by other provisions of this Lease, but without duplication. Should Tenant enter into any "four-wall" deals or rent one or more theaters for special events such as a rally, fashion show, speech or the like, the Gross Receipts shall be deemed the rental received by Tenant and shall not include monies, if any, received by the sponsor of the event.

Gross Receipts shall not include, or if included, there shall be deducted (but only to the extent they have been included), as the case may be, (i) the net amount of cash or credit refunds upon Gross Receipts, where the merchandise sold or some part of it is returned by the purchaser to and accepted by Tenant (but not exceeding in any instance the selling price of the item in question); (ii) the amount of any sales tax, use tax or retail excise tax which is imposed by any duly constituted governmental authority directly on sales and which is added to the selling price (or absorbed therein) and is paid to the taxing authority by Tenant (but not any vendor of Tenant); (iii) exchanges of merchandise between the Leased Premises and other theaters of Tenant or its Affiliates to the extent the same are made solely for the convenient operation of Tenant's business and

8

not for the purpose of depriving Landlord of the benefit of Gross Receipts; (iv) returns of merchandise to shippers, suppliers or manufacturers; (v) proceeds from the sale of Tenant's Property; (vi) discount sales to Tenant's employees of merchandise not intended for resale; (vii) all receipts or proceeds from Tenant's financing; (viii) gift certificates or like vouchers until the time they have been converted into a sale or redemption at the Leased Premises; (ix) income, revenues, receipts or proceeds from Tenant's investment of any funds in a deposit institution; separately stated interest and service charges; credits or refunds made to customers; (x) all federal state, county and city sales taxes or other similar taxes; (xi) all occupational taxes, use taxes and other taxes which must be paid by Tenant or collected by Tenant, by whatever name they are known or assessed, and regardless of whether or not they are imposed under any existing or future orders, regulations, laws or ordinances; and (xii) agency commissions paid to independent third parties for selling tickets and surcharges in excess of the standard ticket price for tickets purchased by use of credit cards, but only to the extent such commissions or surcharges are actually remitted to independent third parties.

(c)     During Tenant's Operating Period, Tenant shall operate the Leased Premises in a first-class manner, fully stocked and staffed with trained personnel in order to maximize Tenant's Gross Receipts. Notwithstanding the foregoing, it is understood and agreed by Landlord that Tenant has made no representation of any kind whatsoever as to the minimum or maximum amount of Gross Receipts which will be made in the Leased Premises during any Lease Year of the Term of this Lease nor are there any assurances that Percentage Rent shall be generated.

(d)     Landlord agrees not to divulge to any party the amount of Gross Receipts made by Tenant in the Leased Premises, except to the taxing authorities with authority to inquire therein; to Landlord's accountants, attorneys, consultants and employees; to an existing or bona fide prospective mortgagee or bona fide prospective purchaser of the Center or the Leased Premises; or in connection with any action to collect Percentage Rent from Tenant.

## ARTICLE 6.
## EXPENSES

**6.1     Payment of Expenses..**  In addition to Tenant's obligation to pay Rent to Landlord under this Lease, Tenant shall timely pay all operating expenses, maintenance costs, governmental charges, capital expenditures, and any other expenses related to the ownership and operation of the Leased Premises, whether or not specifically mentioned in this Lease.

### 6.2     Tenant's Real Estate Taxes.

(a)     As used in this Article, the following terms shall have the following meanings:

(i)     "***Fiscal Tax Year***" means the twelve (12) month period established as the real estate tax year by the taxing authority having jurisdiction over the Center.

9

(ii)    "**Taxes**" means all ad valorem taxes and assessments and governmental charges (including sewer charges), general or special, ordinary or extraordinary, foreseen or unforeseen, of any kind or nature whatsoever, whether imposed by any Governmental Authorities, which are levied on or charged against the Leased Premises, the Theater Facility, Tenant's Property, the real estate on which the Theater Facility is located, personal property or rents, or on the right or privilege of leasing real estate or collecting rents thereon, and any other taxes and assessments attributable to the Leased Premises or its operation or any tax or assessment or governmental charge imposed or collected in lieu of or in substitution for any such tax, assessment or governmental charge, including without limitation all special assessments, impact fees, development fees, traffic generation fees, parking fees in respect of any Fiscal Tax Year falling wholly within the Term of this Lease and a portion of any real estate taxes so imposed in respect of any Fiscal Tax Year falling partly within and partly without the Term of this Lease, equal to the proportion which the number of days of such Fiscal Tax Year falling within the Term of this Lease bears to the total number of days of such Fiscal Tax Year; excluding, however, any income, franchise, corporate, capital levy, capital stock, excess profits, transfer, revenue, estate, inheritance, gift, devolution or succession tax payable by Landlord or any other tax, assessment, charge or levy upon the Rent payable hereunder by Tenant, except to the extent any such tax, assessment, charge or levy is imposed in substitution for any ad valorem tax or assessment.

(iii)    "**Taxes Applicable to Leased Premises**" means an amount equal to the Taxes levied against the land and improvements within the Leased Premises.

(b)    Tenant shall pay the Taxes Applicable to the Leased Premises directly to the appropriate taxing authorities prior to their delinquency. Tenant shall have the right (but shall not be obligated) to contest the Taxes Applicable to the Leased Premises or the validity thereof by appropriate legal proceedings or in such other manner as it deems suitable, and Landlord shall join in such contest, protest or proceeding, but at Tenant's sole cost and expense. Landlord shall not, during the pendency of such legal or other proceeding or contest, pay or discharge any Taxes on the Leased Premises, or tax lien or tax title pertaining thereto, provided Landlord may do so in order to stay a sale of the Leased Premises through foreclosure of a tax lien thereon. Any refund obtained by Tenant shall be paid first to Tenant to the extent of its costs and expenses of such contest and on account of any portion of the Taxes so refunded which was previously paid by Tenant.

**6.3    Restrictive Agreements; Common Facilities.** The Leased Premises constitute a part of the Center, which is subject to the Restrictive Agreements encumbering and benefiting all or any portion of the Center. Landlord and Tenant hereby agree as follows:

(a)    Tenant agrees to timely pay the Common Facilities Expense applicable to the Leased Premises directly to the appropriate party under the REA and any other applicable Restrictive Agreement for each Lease Year, which shall be computed and paid

10

in accordance with the REA and other applicable Restrictive Agreement. Landlord shall not be liable for any Common Facilities Expense.

(b)     Landlord will not approve or agree to any amendment of the Restrictive Agreements which materially derogates the rights enjoyed by Tenant thereunder or increases the liabilities of Tenant without Tenant's prior consent, which shall not be unreasonably withheld.

(c)     Landlord hereby agrees to use commercially reasonable efforts, at Tenant's expense, to enforce the cross-easement rights, operating covenants and other rights contained in the Restrictive Agreements on Tenant's behalf to the extent fee simple ownership is required to enforce such rights, and if Landlord fails to proceed with its reasonable efforts to enforce said rights on Tenant's behalf within thirty (30) days after notice thereof from tenant, Landlord agrees that Tenant shall have the right to enforce said rights under the Restrictive Agreements directly and in the name of and on behalf of Landlord if required (all at Tenant's expense), Landlord hereby conferring such enforcement rights unto Tenant.

(d)     Tenant shall, during the Term of this Lease, comply with and promptly perform each and all of the terms and provisions of the REA and all other Restrictive Agreements insofar as they relate to the Theater Facility and the Leased Premises. Without limiting the generality of the foregoing, Tenant agrees to pay any assessments, costs, common area maintenance and operating charges, lighting charges, all common area cost contributions, and any and all other amounts that Landlord is obligated to pay under the REA or any other Restrictive Agreement.

(e)     Landlord agrees to use commercially reasonable efforts, at Tenant's Expense, to cooperate with Tenant in the exercise of any rights or remedies pursuant to the Restrictive Agreements the exercise of which Tenant reasonably believes is necessary or prudent with respect to the Leased Premises. Tenant hereby covenants and agrees to indemnify and hold harmless Landlord from and against any and all claims, costs, demands, losses or liabilities (including attorneys' fees) which Landlord may suffer or incur by reason of any failure by Tenant to pay and perform all of the terms of, or any violation of or noncompliance with any of the covenants and agreements contained in, the Restrictive Agreements, or any of them. If at any time any claims, costs, demands, losses or liabilities are asserted against Landlord by reason of any failure by Tenant to pay and perform all of the terms of, or any violation of or noncompliance with any of the covenants and agreements contained in, the Restrictive Agreements, Tenant will, upon notice from Landlord, defend any such claims, costs, demands, losses or liabilities at Tenant's sole cost and expense by counsel reasonably acceptable to Landlord. Landlord will promptly provide to Tenant a copy of any notice received by Landlord in connection with any Restrictive Agreement.

**6.4     Utility Payments.** Tenant shall pay all charges for gas, electricity, water, sewer service and other utilities used in the Theater Facility and the Leased Premises during the Term of this Lease, all such utilities to be separately metered and to be obtained by Tenant from the applicable utility company. Tenant also shall be solely responsible for the payment of any

11

connection, tap, hookup or other fee(s) imposed by Governmental Authorities or by any utility company to extend, connect or continue utility service to the Leased Premises.

## ARTICLE 7.
## TITLE INSURANCE; TRANSFER OF TITLE

**7.1** **Leasehold Title Policy.** At the request of Tenant, Landlord shall furnish Tenant, at Tenant's sole cost and expense, a binding commitment for the issuance of a leasehold owner's title insurance policy on the then-current policy form available in the state in which the Leased Premises is located, in the amount so requested by Tenant, written by a title company selected by Landlord and reasonably acceptable to Tenant, committing to insure the then-present condition of title to the leasehold estate as of the date of the recording of a memorandum of this Lease. The acceptance of such commitment or resulting title policy by Tenant shall in no way be construed as a waiver of, or in any way be deemed to impair, Landlord's representations and warranties set forth in Article 3.3. By executing this Lease, Tenant shall be deemed to have approved and accepted the status of title as reflected in such title commitment. The cost of any title policy and any supplemental endorsements issued to Tenant shall be borne by Tenant.

**7.2** **Change of Ownership.** Landlord shall promptly notify Tenant in writing of any change in the ownership of Landlord's interest in the Leased Premises, giving the name and address of the new owner and instructions regarding the payment of Rent, provided however, that the failure to give notice of transfer to Tenant shall not be a default or give Tenant the right to terminate this Lease. In the event of any change in or transfer of title of Landlord in and to the Leased Premises or any part thereof, whether voluntary or involuntary, or by act of Landlord or by operation of Laws, Tenant shall have the right to continue to pay Rent to the party-Landlord to which Tenant was making such payments prior to such change in title until (i) Tenant is notified of such change in title and given satisfactory proof thereof (it being hereby agreed that a letter from the prior owner of the Leased Premises notifying Tenant of such transfer and the name and address of the new owner will be satisfactory proof of such change in title), and (ii) such new owner shall execute and deliver an agreement in recordable form whereby such new owner assumes and agrees with Tenant to discharge all obligations of Landlord under this Lease.

## ARTICLE 8.
## TENANT'S COVENANT TO OPERATE; USE OF PREMISES

**8.1** **Operating Covenant.** So long as Landlord is not in default under this Lease, Tenant will, except when prevented from so doing by Force Majeure or by other causes beyond its reasonable control (including the unavailability of film) and subject to the provisions of Article 15 and Article 16 during Tenant's Operating Period, operate or cause to be operated a movie Theater complex in the Theater Facility in accordance with the terms of this Article 8 (such covenant being herein called "*Tenant's Operating Covenant*").

**8.2** **During Tenant's Operating Period.** During Tenant's Operating Period, the Theater Facility shall not be used for any purposes except (i) primarily as a Theater and auditorium for presentation of first-run and special event motion pictures, revival exhibitions of old feature films, and technological successors thereto, telecasts and other audio-visual

12

presentations, and for meetings and other public presentations and entertainment similar to entertainments presented at other Alamo Drafthouse Cinemas from time to time; (ii) for use by the performing arts; (iii) for television and radio broadcasts and other media broadcasts such as closed-circuit exhibitions; (iv) for the broadcast presentation of concerts, sporting events, operas and other entertainments by live performance or delayed broadcast or presented by other means as new technologies or means of electronic transmission evolve; (v) for meetings, lectures and presentations of educational, civic, charitable and other groups or entities; (vi) for the incidental operation therein of games and other amusement devices (electronic or otherwise); (vii) for the retail sale therein of food, beverages and refreshments, including alcoholic beverages; (viii) for the incidental sale or rental (or both) of video cassettes and discs; (ix) for the incidental sale of records, compact discs, books, magazines, toys and novelties related to the movie industry; (x) for the incidental sale of other goods, wares, merchandise and services; and (xi) such other incidental lawful retail, service or entertainment purpose(s) which are not specifically prohibited under this Lease. Tenant shall not operate a discount theater or "second run" house on the Leased Premises at any time during Tenant's Operating Period.

      **8.3**    **After Tenant's Operating Period.** Following Tenant's Operating Period, the Theater Facility, if used at all, may be used for any lawful purpose(s) which are not specifically prohibited under this Lease. Notwithstanding anything to the contrary herein, Tenant shall not have the right to use the Leased Premises, or any part thereof, for any use or purpose which is not permitted by, or which results in a violation of, any agreement, covenant or restriction to which the Leased Premises is subject, including the REA and any other Restrictive Agreement.

      **8.4**    **Continuing Use Restrictions.** Notwithstanding anything in this Lease to the contrary, Tenant shall not have the right to use the Leased Premises, or any part thereof, for any use or purpose which is not permitted by, or which results in a violation of, any agreement, covenant or restriction to which the Leased Premises is subject as of the date of this Lease, including the REA and the Restrictive Agreements. The Leased Premises shall not be used for any use inconsistent with the customary character of a first-class retail shopping center. Tenant agrees not to permit any unlawful practice to be carried on at or committed in the Leased Premises or the Center. Tenant shall not: (i) use strobe or flashing or rotating lights visible from outside the Leased Premises or in any signs therefor; (ii) use, sell or distribute any leaflets, handbills, bumper stickers, decals, or other such articles in the Leased Premises or in other areas of the Center; (iii) operate any loudspeaker, television set, phonograph, radio, CD player or other musical or electronic or other type of sound producing equipment or device that can be heard outside the Leased Premises; (iv) operate any electrical or other device which interferes with or impairs radio, television, microwave, cellular or other broadcasting or reception from or in the Center which was in operation prior to the operation by Tenant of such devices; (v) bring or permit any pet or dog (except for assistance animals used by handicapped persons) or other animal, fish, bird or other creature in the Center or the Leased Premises; (vi) do or permit anything on or about the Leased Premises that creates any noise, vibration, litter, dust, dirt, odor or other activity which may constitute a public or private nuisance; (vii) do or permit anything in or about the Leased Premises that is pornographic, or which creates or maintains a public or private nuisance; (viii) use or permit upon the Leased Premises anything that violates the certificates of occupancy issued for the Leased Premises; (ix) use or permit upon the Leased Premises anything that may be dangerous to persons or property (including but not limited to the storage, display or sale of fireworks, or any unusual fire, explosive or other damaging or

13

dangerous hazards, flammable oils, fluids, paints, chemicals, firearms, or any other explosive articles or materials except for cleaning and maintenance materials used in compliance with applicable laws); (x) offer within all or any part of the Leased Premises any goods or services that Landlord determines, in its reasonable judgment, to be inconsistent with the image of a first-class, family-oriented retail development or permit within all or any part of the Leased Premises the display, sale, or rental of any item or thing which, in Landlord's reasonable judgment, is pornographic (including, without limitation, any suggestive "adult" newspaper, book, magazine, picture, representation or merchandise of any kind, nude photographs, sexual devices, objects depicting genitalia, and any similar items), provided, however, that this restriction shall not preclude Tenant from exhibiting films which are widely distributed or exhibited in other Alamo Drafthouse Cinemas; (xi) use or allow the Leased Premises to be used as a "sex," "head," or "pawn" shop, (xii) conduct or permit in the Leased Premises any fire, bankruptcy, auction, "closeout," "going out of business" or similar sale; (xiii) use or permit the Leased Premises to be used for any warehouse operation (an operation engaged in the retail sale of merchandise to the general public, but utilizing a "rack style" or "wholesale" concept of merchandising, shall not constitute a warehouse for this purpose); (xiv) use or permit the Leased Premises to be used for any assembling, manufacturing, distilling, refining, smelting, industrial, agricultural, drilling or mining operation; (xv) use or permit the Leased Premises to be used for any trailer court or mobile home park; (xvi) use or permit the Leased Premises to be used for any automobile body work or other automotive repair work or any lot or showroom for the sale of new or used motor vehicles; (xvii) use or permit the Leased Premises to be used for any labor camp, junk yard, stockyard or animal raising operation; (xviii) use or permit the Leased Premises to be used for any dumping, disposal, incineration or reduction of garbage or refuse, other than handling or reducing such waste if produced on the Leased Premises from authorized uses and if handled in a clean and sanitary manner; (xix) use or permit the Leased Premises to be used for any commercial laundry or dry cleaning plant (but this shall not be deemed to prohibit nominal supportive facilities for on-site service oriented pickup and delivery by the ultimate consumer), laundromat, veterinary hospital, car washing establishment, mortuary, funeral home, or similar service establishment; (xx) use or permit the Leased Premises to be used for any medical or dental clinic or offices; (xxi) use or permit the Leased Premises to be used for any massage parlor; (xxii) use or permit the Leased Premises to be used for any living quarters, sleeping apartments or lodging rooms; (xxiii) use or permit the Leased Premises to be used for any training or educational facility, including beauty schools, barber colleges, places of instruction or other operations catering primarily to students or trainees rather than to customers; provided that, this prohibition shall not be applicable to on-site employee or customer training by a tenant incidental to the conduct of its business at the Center; (xxiv) use or permit the Leased Premises to be used for any flea market, swap shop, or store that primarily sells used or damaged merchandise; or (xxv) use or permit the Leased Premises to be used for the exhibition of any motion pictures that are marketed or advertised as rated "X" or any combination of "X"s, any motion picture that is classified as pornographic by Law, or any motion picture that is not rated by the Motion Picture Association of America or a successor rating agency due to sexually explicit content. Notwithstanding anything to the contrary contained herein, nothing contained in this Lease shall be deemed or construed to prohibit Tenant from operating the Leased Premises consistent with other Alamo Drafthouse Cinemas, including the presentation of exhibitions and promotions which are unique to the Alamo brand. The Leased Premises shall be

14

kept in a clean condition, and all health and police regulations shall, in all respects and at all times, be fully complied with by Tenant.

**8.5    Prohibition of Use.** If at any time during the Term of this Lease, (i) any Law prohibits the use of the Theater Facility for the purposes permitted in Article 8.1(i) and (iii) of this Lease (the "***Prohibition***"), then immediately upon the earlier to occur of (a) Tenant becoming aware of any proposed Prohibition, or (b) Tenant's receipt of any notice from any Governmental Authorities of any Prohibition, Tenant shall promptly notify Landlord of such fact, and Tenant may proceed, in its or Landlord's name, and at Tenant's sole cost and expense, to take such action as Tenant determines to be necessary or desirable to contest or challenge the Prohibition. If a Prohibition should occur or be imposed, nothing in this Lease shall be deemed to impair Tenant's obligations to comply with all Laws and with Article 12 of this Lease at any time during which Tenant is not prohibited from using the Theater Facility for the purposes permitted in this Lease by the Prohibition.

**8.6    Landlord Assistance.** Landlord agrees to execute, without cost to Landlord, such customary applications, consents and other instruments as are required by Governmental Authorities to permit the operation of the Theater Facility as permitted by this Lease, so long as such applications, consents or other instruments do not impose or subject Landlord to any liability or claim, and Tenant hereby covenants and agrees to defend, indemnify and hold harmless Landlord from and against any and all claims, costs, demands, losses or liabilities (including attorneys' fees) which Landlord suffers or incurs by reason of Landlord's execution of any such applications, consents or other instruments as Tenant requests. If at any time any claims, costs, demands, losses or liabilities are asserted against Landlord by reason of Landlord's execution of any such applications, consents or other instruments as Tenant requests, Tenant will, upon notice from Landlord, defend any such claims, costs, demands, losses or liabilities at Tenant's sole cost and expense by counsel reasonably acceptable to Landlord.

**8.7    Tenant's Right to Control Operations.** Nothing contained in this Lease or in rules or regulations (if any) promulgated by Landlord shall be deemed in any way to (i) regulate the manner of operation by Tenant of its business in the Theater Facility and/or the hours and/or days of such operation, provided that Tenant agrees that it will operate its business in the Theater Facility during at least the same general hours and days of operation as other movie theater operators operating similar facilities located within the Market Area, (ii) require Tenant to operate at times or hours different than the majority of its Affiliate's theater properties, or (iii) subject to Article 8.3, give Landlord any right, express or implied, of censorship over any attractions exhibited in the Theater Facility or over the content of Tenant's advertising.

### ARTICLE 9.
### TENANT REPORTING

Tenant hereby covenants and agrees to deliver to Landlord the following: (a) within ninety (90) days after the end of each fiscal year of Guarantor, consolidated statements of income, retained earnings and cash flows of Guarantor for such fiscal year and the related consolidated balance sheets as at the end of such fiscal year, setting forth in each case in comparative form the corresponding consolidated figures for the preceding fiscal year, and accompanied by an opinion thereon of independent certified public accountants of recognized

15

national standing, which opinion shall state that such consolidated financial statements fairly present the consolidated financial condition and results of operations of Guarantor as at the end of, and for, such fiscal year in accordance with generally accepted accounting principles; (b) within ninety (90) days after the end of each fiscal year of Tenant, unaudited statements of income for such fiscal year and the related unaudited balance sheet as at the end of such fiscal year, setting forth in each case in comparative form the corresponding figures for the preceding fiscal year; (c) within twenty (20) days after the end of each calendar month, unaudited operating statements of Tenant's revenue and expenses for the Leased Premises demonstrating operating income for the preceding calendar month, the year to date, and the previous twelve months; and (d) within forty-five (45) days after the end of each interim quarterly fiscal period of each fiscal year of Guarantor, unaudited consolidated statements of income, retained earnings and cash flows of Guarantor for such period and for the period from the beginning of the respective fiscal year to the end of such period, and the related consolidated balance sheets as at the end of such period, setting forth in each case in comparative form the corresponding consolidated figures for the corresponding periods in the preceding fiscal year (except that, in the case of balance sheets, such comparison shall be to the last day of the prior fiscal year), accompanied by a certificate of a financial officer of Guarantor, as applicable, which certificate shall state that such consolidated financial statements fairly present the consolidated financial condition and results of operations of the respective Guarantor in accordance with generally accepted accounting principles, consistently applied, as at the end of, and for, such period; (e) within forty-five (45) days after the end of each interim quarterly fiscal period of each fiscal year of Tenant, unaudited statements of income for such period and for the period from the beginning of the respective fiscal year to the end of such period in each case in comparative form the corresponding figures for the corresponding periods in the preceding fiscal year; (f) within twenty (20) days after the end of each calendar month, an income and expense statement detailing all sources of revenue, including but not limited to ticket sales, concession sales and other revenues, and all expenses relating to the Leased Premises, accompanied by a certificate of a financial officer of Tenant stating that such items are true, correct, accurate and completely and fairly present the financial condition and results of the operations of Tenant.

## ARTICLE 10.
## SUBLETTING AND ASSIGNING

### 10.1 Landlord's Consent; Permitted Assignment, Subletting and Licenses.

(a) Subject to the provisions of Article 19 of this Lease and except as provided in this Article 10.1, Tenant shall not assign this Lease or sublet the Leased Premises in whole or in part without the consent of Landlord, which consent Landlord agrees not to unreasonably withhold, condition or delay.

(b) Notwithstanding the foregoing, Tenant may assign this Lease or sublet the Leased Premises in whole or in part without Landlord's consent to an Affiliate, provided that Tenant gives Landlord at least thirty (30) days advance notice of such assignment. Any party that is permitted to take assignment of this Lease shall execute an assignment and assumption agreement in form acceptable to Landlord whereby such assignee agrees to assume all obligations of Tenant under this Lease.

16

(c)     Tenant may also, without Landlord's prior approval, license or sublease portions of the Theater Facility to concessionaires or licensees to: (i) operate games or other amusement devices; and (ii) sell food, beverages and refreshments. Each sublease will be subject and subordinate to the provisions of this Lease relating to the Leased Premises. The sublease will not affect or reduce any of the obligations of Tenant, nor will the sublease impose any additional obligations on Landlord. Tenant will, within ten (10) days after the execution and delivery of any sublease, deliver a duplicate original thereof to Landlord. Without Landlord's prior approval Tenant shall not enter into any sublease, license agreement or other arrangement which would have the effect of causing all or a portion of the amount received or accrued by the Landlord under this Lease to be treated as other than "rents from real property" within the meaning of Section 856(d) of the Code. If Tenant enters into any subleases of any portion of the Leased Premises with any third party, Tenant shall notify Landlord if such third party is an Affiliate of Tenant, and Tenant shall obtain from such third party, and submit to Landlord, all information necessary to permit Landlord to determine the Gross Receipts of such third party derived from operations conducted at the Theater Facility.

(d)     For purposes of this Article 10.1, "subleases" shall include any licenses, concession arrangements, management contracts or other arrangements relating to the possession or use of all or any part of the Leased Premises, excluding, however, so-called "four-wall" deals whereby the Theater Facility or any part thereof is permitted to be used by others on a temporary limited engagement basis for any use permitted to be made thereof by Tenant. Tenant shall have the right to enter into such "four-wall" deals in the ordinary course of Tenant's business without Landlord's consent and only payments made to Tenant under four-wall deals will be included in Gross Receipts.

**10.2     Continuation/Release of Liability.** If Tenant requests, and Landlord consents, to an assignment of this Lease or a sublet of all or any part of the Leased Premises or if Tenant assigns this Lease or sublets all or part of the Leased Premises to an Affiliate, Tenant and Guarantor shall remain liable and responsible under this Lease except as provided in this Article 10.2. Tenant shall be released and relieved from further liability under this Lease only if Tenant requests and Landlord consents to an assignment or if Tenant assigns this Lease to an Affiliate and (i) the assignee, by written instrument, duly executed and acknowledged and delivered to Landlord, assumes and covenants and agrees with Landlord to perform all the terms, covenants and conditions of this Lease which by the terms hereof are binding on Tenant from and after such transfer, and (ii) such assignee (or the guarantor of such assignee's obligations under this Lease) has a book net worth of not less than $25,000,000 as of the end of the calendar month preceding the month during which any such assignment becomes effective, as demonstrated to Landlord's reasonable satisfaction (e.g., by audited financial statements or the delivery of a 10-Q report, in the case of a public company).

**10.3     Default Notices After Assignments.** If Tenant assigns this Lease other than to an Affiliate and remains liable hereunder, then Landlord, when giving notice to said assignee or any future assignee in respect of any default, shall also serve a copy of such notice in the manner provided herein upon the original tenant named in this Lease (the "***Original Tenant***") and any guarantor of the Original Tenant remaining liable under this Lease (an "***Original Guarantor***"). The Original Tenant and any Original Guarantor, at its sole option, shall have the same period

17

that such assignee as Tenant under this Lease has to cure such default. The right of Original Tenant and Original Guarantor to receive notice as provided in this Article 10.3 is an accommodation only to and for the benefit of Original Tenant and Original Guarantor and shall not be construed to grant the assignee Tenant any additional rights not specifically provided in this Lease.

    **10.4**   **Assignment of Rights in Sublease.**   As security for performance of its obligations under this Lease, Tenant hereby grants, conveys and assigns to Landlord all right, title and interest of Tenant in and to all subleases now in existence or hereinafter entered into for any or all of the Leased Premises, and all extensions, modifications and renewals thereof and all rents, issues and profits therefrom ("***Assignment of Subleases***"). Landlord hereby grants to Tenant a license to collect and enjoy all rents and other sums of money payable under any sublease of any of the Leased Premises; provided, however, that Landlord shall have the absolute right at any time after the occurrence and continuance of an event of default as herein provided, upon notice to Tenant and any subtenants, to revoke said license and to collect such rents and sums of money and to retain the same. Tenant shall not (i) consent to, cause or allow any material modification or alteration of any of the terms, conditions or covenants of any of the subleases or the termination thereof, without the prior written approval of Landlord which shall not be unreasonably withheld or delayed, nor (ii) accept any rents (other than customary security deposits) more than thirty (30) days in advance of the accrual thereof nor (iii) permit anything to be done, the doing of which, nor omit or refrain from doing anything, the omission of which, will or could be a breach of or default in the terms of any of the subleases. Notwithstanding anything herein to the contrary, Landlord agrees that the Assignment of Subleases shall be subject and subordinate to Tenant's assignment to any Leasehold Mortgagee of such similar rights as contained in the Assignment of Subleases.

    **10.5**   **Landlord's Assignment.** Anything in this Lease to the contrary notwithstanding, Landlord shall have the right, without Tenant's consent, to sell, transfer, or assign Landlord's interest in the Leased Premises and/or this Lease at any time and in such event, Landlord shall be relieved of Landlord's obligations under this Lease to the extent such obligations arise after the date of such sale, transfer, or assignment, provided that such transferee, or assignee agrees to assume all of the unaccrued obligations under this Lease and agrees to perform to the full extent required the terms and conditions of this Lease.

    **10.6**   **REIT Limitations.** At such time as the Landlord in this Lease is a real estate investment trust, this Article 10.6 shall apply. Anything contained in this Lease to the contrary notwithstanding, Tenant shall not: (i) sublet or assign or enter into other arrangements such that the amounts to be paid by the sublessee or assignee thereunder would be based, in whole or in part, on the income or profits derived by the business activities of the sublessee or assignee; (ii) sublet or assign the Leased Premises or this Lease to any person that Landlord owns, directly or indirectly (by applying constructive ownership rules set forth in Section 856(d)(5) of the Internal Revenue Code), a ten percent (10%) or greater interest within the meaning of Section 856(d)(2)(B) of the Code; or (iii) sublet or assign the Leased Premises or this Lease in any other manner or otherwise derive any income which could cause any portion of the amounts received by Landlord pursuant to this Lease or any sublease to fail to qualify as "rents from real property" within the meaning of Section 856(d) of the Code, or which could cause any other income received by Landlord to fail to qualify as income described in Section 856(c)(2) of the Code.

18

The requirements of this Article 10.6 shall likewise apply to any further subleasing by any subtenant.

## ARTICLE 11.
## TENANT'S PROPERTY

Any and all trade fixtures and equipment, signs, appliances, furniture and other personal property of any nature installed in the Theater Facility on the Commencement Date or at any time thereafter by Tenant, including without limitation, seats and projection screens, lighting fixtures, concessions stands and related equipment, acoustical wall panels, projection and sound equipment, and satellite dishes, if installed (all of the foregoing being collectively referred to in this Lease as "***Tenant's Property***"), shall not become a part of the realty. Provided that Tenant is not in default under this Lease, Tenant's Property other than seats and projection screens may be removed from the Theater Facility by Tenant at any time during the Term of this Lease or upon the termination of the Term of this Lease; provided, however, if and to the extent that Tenant is in default of this Lease, then Landlord shall have any and all rights at law or in equity, including, but not limited to, any and all liens, claims, demands or rights, including rights of levy, execution, sale and distraint for unpaid rent, or any other right, interest or lien which Landlord has or may hereafter acquire in any of Tenant's Property. Tenant may grant to its lender(s) a security interest or other lien in, or enter into, an equipment lease for, Tenant's Property other than seats and projection screens and Landlord will permit Tenant's lender(s) or lessor(s) reasonable access to the Theater Facility to inspect Tenant's Property or to remove Tenant's Property (other than seats and projection screens) in connection with any action to enforce such security interest, lease or other lien. Tenant shall not pledge the seats and projection screens in the Theater Facility as collateral for any security interest, lease or other lien without first obtaining Landlord's written consent, which may be withheld or granted in Landlord's sole discretion. Upon expiration or termination of this Lease, Tenant shall abandon all seats and projection screens in the Theater Facility, and the same shall immediately become the property of Landlord, free and clear of all liens. Landlord hereby and at all times subordinates any lien it may have by statute or otherwise against Tenant's Property, excluding seats and screens, to the lien held by any permitted Leasehold Mortgagee against Tenant's Property. Landlord will execute and deliver a standard form of landlord's waiver required of Tenant's lender(s) or lessor(s) to confirm such entity's security interest in or ownership of Tenant's Property.

## ARTICLE 12.
## GOVERNMENTAL COMPLIANCE

**12.1     Tenant Responsibilities Generally.**  Tenant shall comply with the terms of the Restrictive Agreements and all Laws which affect the Leased Premises and the Theater Facility located thereon and the use and occupancy thereof.  If Tenant receives written notice of any violation of any governmental requirements applicable to the Leased Premises, Tenant shall give prompt notice thereof to Landlord.

**12.2     Parties; Environmental Knowledge.**  Except as disclosed in the Environmental Report (hereinafter defined), Landlord warrants and represents to Tenant that to Landlord's actual knowledge with no duty of investigation:  (i) no release leak, discharge, spill, storage, disposal or emission of "Hazardous Substances"(hereinafter defined) has occurred in, on or

19

under the Leased Premises, and that the Leased Premises are free of Hazardous Substances as of the date hereof, (ii) there are no underground storage tanks under or adjacent to the Leased Premises, (iii) there has not been any notice of intent to sue, notice of violation, citation, warning or similar notification under any federal, state or local environmental law or regulation regarding the Leased Premises or arising out of operations on the Leased Premises, and (iv) there is no investigation or inquiry by any Governmental Authority concerning the Center or the operations thereon; PROVIDED, HOWEVER, Tenant hereby acknowledges and agrees that (x) it has received copies of an environmental site assessment prepared by Terracon Consultants, Inc. (the "***Consultant***"), dated December 28, 2010, respecting the Leased Premises (the "***Environmental Report***"), Tenant is fully aware of the contents of the Environmental Report, Tenant is fully aware of the condition and historical uses of the Leased Premises, and Tenant accepts the Leased Premises subject to all matters and conditions disclosed in the Environmental Report, (y) Landlord has not undertaken any investigation or inquiry with respect to environmental aspects of the Leased Premises other than the Environmental Report, and the warranties and representations of Landlord set forth in this Article 12.2 are based solely upon the contents of the Environmental Report, and (z) the representations and warranties contained in this Article 12.2 are subject to the matters and conditions disclosed in the Environmental Report, and Landlord shall not be deemed to be in breach of the warranties and representations contained in this Article 12.2 to the extent the matter or condition which would otherwise be a breach of such warranties and representations is disclosed in the Environmental Report. Landlord shall cause Consultant to acknowledge by written agreement that Tenant is an intended recipient of the Environmental Report and that Tenant may rely on it.

**12.3 Landlord's Environmental Responsibilities During the Term of this Lease.** During the Term of this Lease, Landlord shall not cause any Hazardous Substances to be used, stored, generated or disposed of (collectively, "***Used***") on, in or under the Leased Premises by Landlord, except for those Hazardous Substances which may lawfully be Used in the ordinary course of business in the operation of such properties or which may be reasonably required in the performance by Landlord of its obligations under this Lease, and then only to the extent no Laws in effect at such time are violated by Landlord.

**12.4 Tenant's Environmental Responsibilities.** During the Term of this Lease, Tenant shall not cause or permit any Hazardous Substances to be Used on, in or under the Leased Premises by Tenant, Tenant's agents, employees or contractors, or anyone claiming by, through or under Tenant, except in the ordinary course of business in the operation of Tenant's business as permitted by Article 8 of this Lease, or as reasonably required in performing the obligations of Tenant under this Lease, and then only to the extent no Laws in effect at such time are violated by Tenant.

**12.5 Environmental Indemnities.** Each party ("***Indemnifying Party***") shall indemnify, defend and hold the other party ("***Indemnified Party***") harmless from any and all claims of third parties, and damages, costs and losses owing to third parties or suffered by Indemnified Party, including court costs, reasonable attorneys' fees and consultants' fees, arising during or after the Term and reasonably incurred or suffered by the Indemnified Party as a result of any default or breach of any representation, warranty or covenant made by Indemnifying Party under this Article 12. It is a condition of this indemnification and hold harmless obligation that the Indemnifying Party must receive notice of any such claim against the Indemnified Party

20

promptly after Indemnified Party first has knowledge thereof, but no failure by the Indemnified Party to promptly notify the Indemnifying Party of any such claim shall adversely affect the Indemnified Party's right to indemnification except (and only to the extent) that the Indemnifying Party can prove prejudice as a result of the failure to receive prompt notice. This indemnification and hold harmless obligation includes any and all costs reasonably incurred by the Indemnified Party after notice to Indemnifying Party for any cleanup, removal or restoration mandated by any public official acting lawfully under applicable Laws if Indemnifying Party fails to timely perform such work.

**12.6** **Definition.** As used herein, "*Hazardous Substance*" means any substance that is toxic radioactive, ignitable, flammable, explosive, reactive or corrosive and that is, in the form, quantity, condition and location then found upon or under the Leased Premises and/or the remainder of the Center, as the case may be, regulated by any Governmental Authority. "Hazardous Substance" includes any and all materials and substances that are defined as "hazardous waste," "hazardous chemical," "pollutant," "contaminant" or "hazardous substance," in the form, quantity, condition and location then found upon the Leased Premises or the remainder of the Center, as the case may be, pursuant to Law. "Hazardous Substance" includes asbestos, polychlorinated biphenyls and petroleum-based substances.

**12.7** **Survival.** The provisions of this Article 12 shall survive the expiration or sooner termination of this Lease.

## ARTICLE 13.
## MAINTENANCE AND REPAIRS

**13.1** **Warranty.** As more particularly set forth in the Development Agreement, Landlord will, so long as no event of default has occurred and is continuing, assign or otherwise make available to the Tenant any and all rights the Landlord may have under any vendor's or manufacturer's warranties or undertakings with respect to the Leased Premises, but Landlord does not warrant or represent that any such warranties or undertakings are or will be available to Tenant, and Landlord shall have no further obligations or responsibilities respecting such warranties or undertakings.

**TENANT HEREBY WAIVES ALL STATUTORY REPRESENTATIONS AND WARRANTIES ON THE PART OF LANDLORD, INCLUDING, WITHOUT LIMITATION, ALL WARRANTIES THAT THE LEASED PREMISES ARE FREE FROM DEFECTS OR DEFICIENCIES, WHETHER HIDDEN OR APPARENT, AND ALL WARRANTIES THAT THEY ARE SUITABLE FOR TENANT'S USE.**

**13.2** **Maintenance and Repairs.** Tenant shall pay all costs, expenses, fees and charges incurred in connection with the use or occupancy of the Leased Premises. Tenant shall at all times, at its own expense, and subject to reasonable wear and tear, operate and keep the Leased Premises in first class operating order, repair, condition and appearance and shall allow no nuisances to exist or be maintained therein. With respect to the Leased Premises, the undertaking to maintain in first class repair shall include, without limitation, all interior and exterior repairs (including all replacements of components, systems or parts which are a part of, or are incorporated into, the Leased Premises or any part thereof), whether structural or

21

nonstructural, foreseen or unforeseen, ordinary or extraordinary and all common area maintenance including, without limitation, removal of dirt, snow, ice, rubbish and other obstructions and maintenance of sidewalks and landscaping. In addition to the foregoing, Tenant shall, at Tenant's expense, furnish, install and maintain in good condition and repair, (i) to points in the Theater Facility, all storm and sanitary sewers, and all gas, water, telephone, electrical facilities and other utilities of such size and type as may be required to provide adequate service for the Leased Premises, and (ii) to Tenant's Pylon, electrical facilities of such size and type as may be required to adequately service Tenant's Pylon.

**13.3** **Minor Alterations.** So long as no event of default has occurred and is continuing, Tenant may, at its expense, make interior and exterior nonstructural additions and alterations to the Leased Premises with the prior written consent Landlord. Notwithstanding the foregoing, Landlord's consent shall not be required if the cost of such additions and alterations is less than $250,000 (2012 Constant); provided, that (i) upon completion of such additions and alterations, neither the fair market value of the Leased Premises shall be lessened thereby nor the utility or condition of the Leased Premises impaired, below the value, utility or condition thereof immediately prior to such action, (ii) such additions and alterations shall not result in a change of use of the Leased Premises, (iii) such work shall be completed in a good and workmanlike manner and in compliance with all applicable Laws and insurance requirements; and (iv) Tenant gives Landlord thirty (30) days advance notice of any such work. Any and all such additions and alterations shall be and remain part of the Leased Premises and shall be subject to this Lease. In no event shall Landlord be obligated to reimburse or compensate Tenant or any other person or entity for any such additions, alterations or improvements to the Leased Premises and Tenant hereby waives any right to reimbursement or compensation for the same. Whenever a constant is referred to herein (e.g., "2012 Constant" or "measured in 2012 dollars"), the CPI shall be utilized to gauge the inflationary rate to be applied to determine the sum of money in then current dollars that is equivalent to the applicable amount of dollars circa 2012.

**13.4** **Certain Limitations.** The obligations of Tenant set forth in this Article 13 shall be subject to the provisions set forth in Article 15 and Article 16.

## ARTICLE 14.
## ALTERATIONS AND TENANT'S LIENS

**14.1** **Title to Tenant's Alterations.** Subject to the provisions of Article 11, any alterations, changes, improvements and additions to the Leased Premises made by Tenant shall immediately become the property of Landlord and shall be considered a part of the Theater Facility, but Landlord will not be obligated to compensate or reimburse Tenant or any other person or entity for any such alterations, changes, improvements or additions made by Tenant, and Tenant hereby waives all right to any such compensation or reimbursement.

**14.2** **No Tenant Liens.** Tenant shall not permit any mechanic's, materialman's or other similar lien to be foreclosed against the Leased Premises by reason of work, labor, services or materials performed by or furnished to Tenant or anyone holding any part of the Leased Premises under Tenant. If any such lien is filed, Tenant may contest the same in good faith but Tenant shall, prior to foreclosure thereof, cause such lien to be released of record by payment, bond, order of a court of competent jurisdiction or otherwise. Nothing contained in this Lease

shall be construed as a consent on the part of Landlord to subject Landlord's estate in the Leased Premises to any lien or liability under the lien laws of the state in which the Leased Premises are located. Notwithstanding the foregoing, if any mechanics', materialmen's or other similar lien is filed against the Leased Premises, and the amount of such lien claim exceeds One Hundred Thousand Dollars ($100,000.00) by reason of any act or omission of Tenant, then Tenant shall, within ten (10) days after the filing thereof, provide to Landlord a bond in the amount of one hundred twenty-five percent (125%) of the amount of such lien claim, or other security satisfactory to Landlord, protecting Landlord from loss or liability by reason of such lien. Tenant hereby covenants and agrees to defend, indemnify and hold harmless Landlord from and against any and all claims, costs, demands, losses or liabilities (including attorneys' fees) which Landlord may suffer or incur by reason of any such mechanics', materialmen's or other similar lien.

**14.3    Landlord Elective Improvements.** During the Term of this Lease, Landlord shall not be required to build or rebuild any improvements to the Leased Premises or the Theater Facility, or to make any repairs, replacements, alterations, restorations or renewals thereto. In the event that Landlord should, in its sole discretion elect to make capital improvements to the Leased Premises, it may only do so with Tenant's consent, which may be given or withheld in Tenant's sole discretion, and it is understood and agreed that Landlord will generally condition any such election on an increase in the Annual Fixed Rent to reflect such expenditures.

## ARTICLE 15.
## DAMAGE CLAUSE

**15.1    Damage.** If the Theater Facility or the Common Facilities are damaged or destroyed by fire, casualty or any cause whatsoever, either in whole or in part, and Tenant does not elect to terminate this Lease pursuant to the provisions of Article 15.2 hereof, Tenant shall with due diligence remove any resulting debris and repair or rebuild the damaged or destroyed structures and other improvements, including any improvements or betterments made by Landlord or Tenant, in accordance with the Final Plans subject to such modifications as Tenant reasonably determines are appropriate to conform to current standards and prototypes of Tenant (to the extent then permitted by law). Subject to Article 17.1 hereof, Landlord shall make all insurance proceeds available as a result of such fire, casualty or other destruction to Tenant for restoration. Tenant shall obtain Landlord's consent (which shall not be unreasonably withheld or delayed) to any material deviation from the Final Plans which Tenant is required to make to obtain approval from Governmental Authorities having jurisdiction for such restoration. Until the earlier of (i) the date that is ninety (90) days after the date the Theater Facility and the Common Facilities are repaired, rebuilt and put in good and tenantable order, or (ii) the date Tenant reopens the portions(s) of the Theater Facility so damaged or destroyed, the Annual Fixed Rent and other charges hereby reserved, or a fair and just proportion thereof according to the nature and extent of the damage sustained, shall be abated, but only to the extent of any proceeds of rental interruption insurance carried by Tenant that are actually received by Landlord.

**15.2    Right to Terminate on Certain Damage.** If during the final three (3) years of the Initial Fixed Term or during any Option Period, the Theater Facility is damaged or destroyed by fire, casualty or any cause whatsoever to such an extent that all or a portion thereof is

23

rendered unsuitable for use as a movie theater and the cost of restoration would exceed fifty percent (50%) of the amount it would cost to replace the Theater Facility in its entirety at the time such damage or destruction occurred, and if Tenant has complied with its insurance obligations under this Lease (including maintaining insurance against loss of rents by Landlord), Tenant may terminate this Lease by notice to Landlord given within sixty (60) days after such damage or destruction. If Tenant elects to terminate this Lease as provided herein, Tenant shall authorize payment to Landlord, as a condition upon the effectiveness of such termination, within sixty (60) days after such notice (except any for Tenant's Property) together with an amount equal to the positive difference, if any, between the amount of insurance proceeds turned over to Landlord and the net book value of the Theater Facility as accurately reflected in Landlord's financial records as of the date of such damage or destruction. Upon the giving of such notice by Tenant to terminate, and Tenant's authorization of payment of all amounts provided for herein, this Lease shall automatically terminate and the Annual Fixed Rent and other charges hereunder shall be equitably adjusted as of the date of such destruction.

**15.3    Rights to Insurance Proceeds.** If this Lease is terminated as provided in this Article 15 following damage to or destruction of the Theater Facility, the proceeds of all hazard insurance on the Theater Facility which is maintained by Tenant or Landlord pursuant to Article 17 shall belong to Landlord or Landlord's lender, subject to Landlord's obligation to rebuild under this Lease, if any. Insurance proceeds with respect to Tenant's Property shall belong to Tenant.

## ARTICLE 16.
## CONDEMNATION

**16.1    In General.** If any material part of the Leased Premises (meaning any part of the Theater Facility or the parking or access ways serving the Theater Facility) is taken in any proceeding by any Governmental Authority by condemnation or otherwise, or is acquired for public or quasi-public purposes, or is to be conveyed under threat of such taking or acquiring (which Landlord shall not do without Tenant's prior written consent), and Tenant reasonably determines that the remaining portion will not permit Tenant to operate its business on the Leased Premises, Tenant shall have the option of terminating this Lease by notice to Landlord of its election to do so given on or before the date which is thirty (30) days after Tenant is deprived of possession of the condemned property, and upon the giving of such notice, this Lease shall automatically terminate and the Annual Fixed Rent and other charges hereunder shall be adjusted as of the date of such notice. If a material part of the Leased Premises (meaning any part of the Theater Facility or the parking or access ways serving the Theater Facility) is so taken and Tenant elects not to terminate this Lease, then Tenant shall, to the extent and making use of the condemnation award, restore the Theater Facility to a complete unit as similar as reasonably possible in design, character and quality to the building which existed before such taking. If the Theater Facility is partially taken and this Lease is not terminated, there shall be no reduction or adjustment in the Annual Fixed Rent and other charges thereafter payable hereunder. Any restoration work to be performed pursuant to this Article 16 shall be completed in accordance with plans and specifications which shall have been approved by Landlord and Tenant, which approvals shall not be unreasonably withheld. If all or part of the Leased Premises is taken and Tenant elects to terminate this Lease in accordance with this Article 16, each party shall be free to make claim against the condemning authority for the amount of the actual provable damage

24

done to each of them by such taking. If the condemning authority refuses to permit separate claims to be made, then Landlord shall prosecute with counsel reasonably satisfactory to Tenant the claims of both Landlord and Tenant, and the proceeds of the award, after payment of Landlord's reasonable attorneys' fees and other costs incurred, shall be divided between Landlord and Tenant in a fair and equitable manner; provided, however, in the event of a condemnation which results in Tenant's election to terminate this Lease, Tenant shall be entitled to its portion of the condemnation award only so long as the amount of the award received by Landlord is equal to or greater than the net book value of the property taken, as reflected on the Landlord's financial statements on the date of the condemnation.

**16.2    Temporary Taking Awards.** If by reason of a taking Tenant is temporarily deprived in whole or in part of the use of the Theater Facility or any part thereof, the entire award made as compensation therefor shall belong to Tenant, and there shall be no abatement of the Annual Fixed Rent payable hereunder.

## ARTICLE 17.
## INSURANCE, INDEMNITY, WAIVER OF SUBROGATION
## AND FIRE PROTECTION

**17.1    Casualty Policy.** During the Term of this Lease, Tenant shall at its expense keep the Leased Premises insured in the name of Landlord and Tenant (as their interests may appear with each as named insured, additional insured or loss payee, as applicable, against damage or destruction by fire and the perils commonly covered under a special form policy in an aggregate amount equal to the full replacement cost thereof (without deduction for physical depreciation), and shall have deductibles no greater than One Hundred Thousand and No/100 Dollars ($100,000.00) (with higher deductibles for wind and earthquake coverage as the applicable insurer may require). Such policy also shall cover floods if any portion of the Leased Premises is at any time located in a "100-year flood plain" or an area designated as having special flood hazards (including Zones A, B, C, V, X and shaded X areas), along with earthquake and other similar hazards as may be customary for comparable properties in the Market Area, and such other "additional coverage" insurance as Landlord or any holder of a Mortgage on the Leased Premises may reasonably require, which at the time is usual and commonly obtained in connection with properties similar in type of building size and use to the Theater Facility located in the Market Area. Tenant shall be responsible for determining that the amount of property damage coverage insurance maintained complies with the requirements of this Lease. The proceeds of such insurance in case of loss or damage shall be held in trust and applied on account of the obligation of Tenant to repair and rebuild the Leased Premises pursuant to Article 15 to the extent that such proceeds are required for such purpose. The insurance required to be carried by Tenant under this Article 17 (i) may be covered under a so-called "blanket" policy covering other operations of Tenant and Affiliates, so long as the amount of coverage available under said "blanket" policy with respect to the Leased Premises, or Tenant's liability under this Lease, at all times meets the requirements set forth in this Lease, and (ii) shall be evidenced by a certificate of insurance (issued on ACORD 27 or equivalent form) from Tenant's insurer, authorized agent or broker. Upon request, Tenant shall name the holder of any Mortgage on the Leased Premises pursuant to a standard mortgagee, additional insured or loss payee clause as such holder shall elect with respect to the foregoing property insurance, provided such holder agrees with Tenant

25

in writing to disburse such insurance proceeds to Tenant for, and periodically during the course of, repair and restoration of the Theater Facility as set forth in this Lease.

**17.2    DIC Policy Endorsement.** If required by Landlord's lender or the holder of a Mortgage during the Term of this Lease, Tenant shall, at its expense, keep the Leased Premises insured in the name of Landlord and Tenant (as their interests may appear with each as named insured, additional insured or loss payee, as applicable, against all risks of direct physical loss or damage, except those risks excluded under Tenant's insurance required under Article 17.1, under a so-called difference in conditions policy or endorsement ("***DIC Policy***") in the amount of one hundred percent (100%) of the replacement cost thereof, which shall include the following endorsements: Agreed Value and Ordinance or Law – Coverage for loss to undamaged portion of building, demolition costs and increased cost of construction, rental loss/business income insurance. The proceeds of such insurance in case of loss or damage shall be held in trust and applied on account of the obligation of Tenant to repair and rebuild the Leased Premises pursuant to Article 15 to the extent that such proceeds are required for such purpose. The insurance required to be carried by Tenant under this Article 17.2 shall be evidenced by a certificate of insurance (issued on ACORD 27 or equivalent form) from Tenant's insurer, authorized agent or broker. Upon request, Tenant shall name the holder of any Mortgage on the Leased Premises pursuant to a standard mortgagee, additional insured or loss payee clause as such holder shall elect with respect to the DIC Policy, provided such holder agrees in writing to disburse such insurance proceeds to Tenant for, and periodically during the course of, repair and restoration of the Leased Premises as set forth in this Lease.

**17.3    Liability Insurance; Tenant Negligence.** Tenant will, subject to Article 17.7 and Article 12.5, defend, indemnify and hold Landlord, its trustees, directors, officers, agents and servants, harmless from and against any and all claims, actions, liability and expense: (i) arising out of any occurrence in, upon or at the Theater Facility or the Leased Premises, or the occupancy or use by Tenant of the Theater Facility or the Leased Premises or any part thereof, except to the extent the same is caused by the willful or negligent act or omission of Landlord; or (ii) occasioned wholly or in part by any negligent act or omission of Tenant, its agents, employees, contractors, licensees, servants, subtenants, lessees or concessionaires. If any action or proceeding is brought against Landlord, its officers, employees, agents or servants by reason of any of the aforementioned causes, Tenant, upon receiving notice thereof from Landlord, agrees to defend such action or proceeding by counsel reasonably acceptable to Landlord at Tenant's own expense. Tenant agrees to insure the foregoing obligation by contractual endorsement under a commercial general public liability policy (including personal injury and property damage) to be maintained by Tenant with combined single limits of not less than Twenty Five Million Dollars ($25,000,000.00) aggregate per location. Tenant shall cause Landlord to be named as an additional insured on all policies of liability insurance maintained by Tenant (including excess liability and umbrella policies) with respect to the Leased Premises. The insurance required to be carried by Tenant under this Article 17.3 shall be evidenced by a certificate of insurance (issued on ACORD 25 or equivalent form) from Tenant's insurer, authorized agent or broker.

**17.4    Liability Insurance; Landlord Negligence.** Landlord will, subject to Article 17.7 and Article 12.5, defend, indemnify and hold Tenant, its officers, agents and servants, harmless from and against any and all claims, actions, suits, judgments, decrees, orders,

liability and expense in connection with loss of life, bodily injury and/or damage to property occasioned wholly or in part by any willful or negligent act or omission of Landlord, its agents, employees or servants. If any action or proceeding is brought against Tenant, its agents or servants by reason of any of the aforementioned causes, Landlord, upon receiving written notice thereof from Tenant in the manner provided herein, agrees to defend such action or proceeding by counsel reasonably acceptable to Tenant at Landlord's own expense.

**17.5 Rental Loss/Business Interruption Insurance.** During the Term of this Lease, Tenant shall, at its expense, keep and maintain for the benefit of Tenant and Landlord, coverage for the loss of Rent payable hereunder for a period of at least the next succeeding twelve (12) months.

**17.6 Workers' Compensation Insurance.** Tenant shall maintain, with respect to its operations and all of its employees at the Leased Premises, a policy or policies of workers' compensation insurance in accordance with and in the amounts required by applicable Laws, protecting Tenant from and against any and all claims from any persons employed directly or indirectly on or about the Leased Premises for injury or death of such persons.

**17.7 Release; Waiver of Subrogation.** Anything in this Lease to the contrary notwithstanding, it is agreed that each party (the "*Releasing Party*") hereby releases the other (the "*Released Party*") from any liability which the Released Party would, but for this Article 17.7, have had to the Releasing Party during the Term of this Lease resulting from any accident or occurrence or casualty (i) which is covered by Tenant's property insurance required under this Lease, or (ii) which is covered by any other casualty or property damage insurance being carried by the Releasing Party at the time of such occurrence, which casualty may have resulted in whole or in part from any act or omission of the Released Party, its officers, agents or employees; PROVIDED, HOWEVER, the mutual releases hereinabove set forth shall become inoperative and null and void if the Releasing Party wishes to place such insurance with an insurance company which (y) takes the position that the existence of such release vitiates or would substantially adversely affect any policy so insuring the Releasing Party and notice thereof is given to the Released Party, or (z) requires the payment of a higher premium by reason of the existence of such release, unless in the latter case the Released Party within twenty (20) days after notice thereof from the Releasing Party pays such increase in premium. Notwithstanding anything to the contrary herein, Tenant agrees and acknowledges that Landlord shall have no responsibility or liability for any loss, damage or injury to Tenant's Property which is located in, on or about the Leased Premises or the Common Facilities at any time and from time to time, regardless of the cause of such loss, damage or injury, and that all of Tenant's Property is located in, on and about the Leased Premises and the Common Facilities at Tenant's sole risk. Tenant hereby releases Landlord from any and all claims with respect to loss, damage or injury to Tenant's Property located in, on and about the Leased Premises and the Common Facilities, regardless of the cause of such loss, damage or injury.

**17.8 General.** All policies of insurance required pursuant to this Article 17 shall be issued by companies approved by Landlord, and licensed to do business in the state where the Leased Premises is located. Furthermore, any such insurance company shall have a claims paying ability rating of "AA" or better by Standard & Poor's (other than the issuer of any policy for earthquake insurance, which issuer shall have a claims paying ability rating of "A" or better

27

by Standard & Poor's), and shall issue policies which (i) include effective waivers by the insurer of all claims for insurance premiums against all loss payees, additional loss payee, additional insured or named insured; (ii) shall contain such provisions as Landlord deems reasonably necessary or desirable to protect its interest including any endorsements providing that neither Tenant, Landlord nor any other party shall be a co-insurer under said policies and that no modification, reduction, cancellation or termination in amount of, or material change (other than an increase) in, coverage of any of the policies required hereby shall be effective until at least thirty (30) days after receipt by each named insured, additional insured and loss payee of written notice thereof or ten (10) days after receipt of such notice with respect to nonpayment of premium; (iii) provisions which permit Landlord to pay the premiums and continue any insurance upon failure of Tenant to pay premiums when due; and (iv) provisions stating that the insurance shall not be impaired or invalidated by virtue of (A) any act, failure to act, negligence of, or violation of declarations, warranties or conditions contained in such policy by Tenant, Landlord or any other named insured, additional insured or loss payee, except for the willful misconduct of Landlord knowingly in violation of the conditions of such policy, or (B) the occupation, use, operation or maintenance of the Leased Premises for purposes more hazardous than permitted by the terms of the policy.

## ARTICLE 18.
## INDEMNIFICATION GENERALLY

Except as provided in Article 12.5 and Article 17.4, Tenant agrees to defend, indemnify and hold Landlord, its trustee, directors, officers, employees, agents and servants harmless from and against all liabilities, costs and expenses (including reasonable attorney's fees and expenses) and all actual or consequential damages imposed upon or asserted against the Landlord, as owner of the Leased Premises, including, without limitation, any liabilities, costs and expenses and actual or consequential damages imposed upon or asserted against Landlord, on account of (i) any use, misuse, non-use, condition, maintenance or repair by Tenant of the Leased Premises, (ii) any Taxes, Common Facilities Expense, and other impositions which are the obligation of Tenant to pay pursuant to the applicable provisions of this Lease, (iii) any failure on the part of Tenant to perform or comply with any other of the terms of this Lease or any sublease, (iv) any liability Landlord may incur or suffer as a result of Tenant's breach of any environmental laws or the ADA affecting the Leased Premises, and (vi) accident, injury to or death of any person or damage to property on or about the Leased Premises. If at any time any claims, costs, demands, losses or liabilities are asserted against Landlord by reason of any of the matters as to which Tenant indemnifies Landlord hereunder, Tenant will, upon notice from Landlord, defend any such claims, costs, demands, losses or liabilities at Tenant's sole cost and expense by counsel reasonably acceptable to Landlord. Landlord agrees to indemnify and save harmless Tenant from and against all liabilities, costs and expenses (including reasonable attorney's fees) imposed upon or asserted against Tenant solely as a result of any failure on the part of Landlord to perform or comply with any of the terms of this Lease after expiration of all applicable notice and cure periods hereunder.

DB04/0503816.0340/5552953.4

## ARTICLE 19.
## LEASEHOLD MORTGAGES

**19.1** **Rights to Mortgage Lease.** Tenant, and its permitted successors and assigns shall have the right to mortgage and pledge its interest in this Lease (*"Leasehold Mortgage"*), only in accordance with and subject to the terms, conditions, requirements and limitations of this Article 19. Any such mortgage or pledge shall not impair or affect the rights of Landlord hereunder and shall not encumber the Landlord's fee interest in the Leased Premises.

**19.2** **Leasehold Mortgagee Qualifications.** No holder of a Leasehold Mortgage on this Lease shall have the rights or benefits mentioned in this Article 19, nor shall the provisions of this Article 19 be binding upon Landlord, unless and until each of the following terms, conditions and restrictions have been fully satisfied (and only upon all of the following terms, conditions and restrictions being fully satisfied shall the holder of a Leasehold Mortgage on this Lease be deemed a *"Leasehold Mortgagee"*):

(a) Either the Leasehold Mortgagee or a Trustee thereof, or participant in the underlying loan secured by the Leasehold Mortgage must have and maintain a tangible net worth, determined in accordance with generally accepted accounting principles, of at least $25,000,000);

(b) The Leasehold Mortgage shall contain provisions requiring that copies of all notices of default under said Leasehold Mortgage must be simultaneously sent to Landlord;

(c) Simultaneously with or promptly after the recording of the Leasehold Mortgage, Tenant shall, at its own expense, cause a copy of the Leasehold Mortgage to be delivered to Landlord and, if so requested by Landlord, shall cause to be recorded in the office of the recorder of the county or township (as applicable) where the Leased Premises is located, a written request executed and acknowledged by Landlord for a copy of all notices of default and all notices of sale under the Leasehold Mortgage as provided by applicable Laws. Inclusion of a request for notice having the effect described above in the body of the recorded Leasehold Mortgage shall constitute compliance with this provision;

(d) The Leasehold Mortgage shall be subordinate to the Landlord's fee interest in the Leased Premises and the Landlord's rights under this Lease and shall not cover any interest in any other real property of Landlord other than the leasehold estate created by this Lease including any easements contained therein;

(e) The Leasehold Mortgage shall not permit or authorize, or be construed to permit or authorize, any Leasehold Mortgagee to devote the Leased Premises to any uses, or to construct any improvements thereon, other than those uses and improvements provided for and authorized by and pursuant to the terms of this Lease;

(f) The Leasehold Mortgage shall not contain terms which are inconsistent with the terms of this Lease and Tenant shall provide Landlord with a true and accurate

29

copy of the documentation creating and evidencing the Leasehold Mortgage and the loan evidenced thereby promptly following execution of such documents by Tenant;

(g) The Leasehold Mortgage shall secure a bona fide extension of credit to Tenant or an Affiliate of Tenant and shall not be for the purpose of avoiding or extending any obligations of or restrictions on Tenant under this Lease, including restrictions on transfer or periods for curing defaults; and

(h) The Leasehold Mortgage shall provide that any proceeds from fire and other casualty insurance and extended coverage insurance shall be applied in accordance with the Lease.

**19.3** **Defaults.** If Tenant, or Tenant's successors or assigns, mortgage this Lease in compliance with the provisions of this Article 19, then so long as any such mortgage shall remain unsatisfied of record, the following provisions shall apply:

(a) Tenant shall immediately provide Landlord with written notice that a Leasehold Mortgage has been filed, along with the name, facsimile, contact person, e-mail address, and address of the Leasehold Mortgagee. Tenant shall promptly give Landlord written notice of any change in any Leasehold Mortgagee and shall ensure that Landlord has current contact information for such Leasehold Mortgagee at all times. Landlord, upon serving any notice of default on Tenant pursuant to Article 22 or any other notice under the provisions of this Lease, shall also serve a copy of such notice upon Leasehold Mortgagee, at the address provided to Landlord in writing by Tenant and no notice shall be deemed to have been duly given as to the Leasehold Mortgagee unless and until a copy thereof has been so served upon the Leasehold Mortgagee. Landlord's furnishing a copy of such notice to Leasehold Mortgagee shall not in any way affect or become a condition precedent to the effectiveness of any notice given or served upon Tenant, provided, that Landlord may not terminate this Lease or exercise any remedies against Tenant without first giving Leasehold Mortgagee notice and opportunity to cure. Any notice or other communication which Leasehold Mortgagee desires or is required to give to or serve upon Landlord shall be deemed to have been duly given or served if sent in accordance with Article 25.2.

(b) Any Leasehold Mortgagee, in case Tenant is in default under this Lease, shall have the right to remedy such default (or cause the same to be remedied) within the same period provided to Tenant hereunder and otherwise as herein provided, and Landlord shall accept such performance by or at the instance of Leasehold Mortgagee as if the same had been made by Tenant.

(c) For the purposes of this Article 19, no default shall be deemed to exist under Article 22 in respect of the performance of work required to be performed, or of acts to be done, or of conditions to be remedied, if steps shall, in good faith, have been commenced by Leasehold Mortgagee within the time permitted therefor to rectify the same and shall be prosecuted to completion with diligence and continuity and within the time periods provided therefor in Article 22.

30

(d)     Notwithstanding anything in this Lease to the contrary, upon the occurrence of an event of default other than an event of default which can be cured by the payment of money (*"**Monetary Default**"*), Landlord shall take no action to effect a termination of this Lease without first giving Leasehold Mortgagee at least thirty (30) days written notice of its intent to terminate if Tenant's default is of any type other than a Monetary Default (a *"**Non-Monetary Default**"*), and Leasehold Mortgagee fails to cure such Non-Monetary Default within said thirty (30) day period. If such Non-Monetary Default cannot reasonably be cured within said thirty (30) day period (or is such that possession of the Leased Premises is necessary to remedy the Non-Monetary Default), the date for termination shall be extended for such period of time as may be reasonably required to remedy such Non-Monetary Default, if and only if (i) subject to Article 19.4, within thirty (30) days of Landlord's notice of its intent to terminate the Lease, Leasehold Mortgagee or its designee irrevocably agrees in writing to assume Tenant's obligations under the Lease following Leasehold Mortgagee's obtaining possession of the Leased Premises, (ii) Leasehold Mortgagee shall have fully cured any default in the payment of any monetary obligations of Tenant under this Lease within five (5) business days after its receipt of notice of Landlord's intent to terminate, and shall continue to pay currently such monetary obligations as and when the same are due, subject to the applicable notice and cure provisions provided in this Lease, and (iii) Leasehold Mortgagee continues its good faith and diligent efforts to remedy such Non-Monetary Default (including its acquisition of possession of the Leased Premises if necessary to cure such Default); provided, however, that Leasehold Mortgagee shall not be obligated to pursue the cure of any Non-Monetary Default until it has obtained possession of the Leased Premises if, but only if, (x) Leasehold Mortgagee fully complies with the obligation to cure any Monetary Default of Tenant and to keep current all monetary obligations under this Lease as provided in, and within the time set forth in, subclause (d)(i) above, and (y) Leasehold Mortgagee is diligently and continuously pursuing such actions as are necessary to enable it to obtain possession of the Leased Premises at the earliest possible date.

(e)     The rights granted Leasehold Mortgagee in this Article 19.3 are accommodations only to and for the benefit of Leasehold Mortgagee and shall not be construed to grant Tenant any additional rights not specifically provided in this Lease. Nothing in this Article 19.3 shall be construed to require a Leasehold Mortgagee to continue any foreclosure proceeding it may have commenced against Tenant after all defaults have been cured by Leasehold Mortgagee, and if such defaults are cured and the Leasehold Mortgagee discontinues such foreclosure proceedings, this Lease shall continue in full force and effect as if Tenant had not defaulted under this Lease; provided, however, that in no event shall this provision be applied to allow a defaulting Tenant to remain on the Leased Premises following its failure to cure any default within the Tenant's prescribed cure period. Nothing in this Article 19 shall require a Leasehold Mortgagee who has acquired Tenant's leasehold interest and has taken possession of the Leased Premises to cure any Non-Monetary Default which is not capable of being cured by such Leasehold Mortgagee. Any such uncurable Non-Monetary Default shall be deemed to be waived following Leasehold Mortgagee's acquisition of Tenant's leasehold interest and such Leasehold Mortgagee's timely cure of all Monetary Defaults and all Non-Monetary Defaults which are capable of cure by such Leasehold Mortgagee in accordance with this Article 19. Notwithstanding the foregoing:

31

(i)     Leasehold Mortgagee shall not be obligated to continue such possession or to continue such foreclosure proceedings after such defaults have been cured,

(ii)     Landlord shall not be precluded from exercising any rights or remedies under this Lease with respect to any other default by Tenant during the pendency of such foreclosure proceedings other than termination of this Lease;

(iii)     if Leasehold Mortgagee is an entity or person other than an Authorized Institution, such Leasehold Mortgagee shall agree with Landlord in writing to comply with such of the terms, covenants and conditions of this Lease as are reasonably susceptible of being complied with by Leasehold Mortgagee during the period of forbearance by Landlord from taking action to effect a termination of this Lease; and

(iv)     it is understood and agreed that Leasehold Mortgagee, or its designee, or any purchaser in foreclosure proceedings (including, without limitation, an entity formed by Leasehold Mortgagee or by the holder(s) of the bonds or obligations secured by the Leasehold Mortgage) may, subject to the following terms of this Article 19.3, become the legal owner and holder of this Lease through such foreclosure proceedings or by assignment of this a Lease in lieu of foreclosure.

(f)     Subject to Article 19.4, it shall be a condition precedent to any assignment or transfer of this Lease by foreclosure of any Leasehold Mortgage, deed in lieu thereof or otherwise that Leasehold Mortgagee, or its designee (including, without limitation, an entity which has such a tangible net worth formed by Leasehold Mortgagee or by the holder(s) of the bonds or obligations secured by the Leasehold Mortgage) or any purchaser in any such foreclosure proceedings (any such transferee of the Lease, a "***Transferee***") (a) have and maintain (or have a guarantor with) a tangible net worth, determined in accordance with generally accepted accounting principles, of at least $25,000,000, (b) upon becoming the legal owner and holder of this Lease shall execute an agreement with Landlord, reasonably acceptable to Landlord, pursuant to which such Transferee agrees to assume all obligations of Tenant under this Lease occurring after the date of assignment, and (c) either the Transferee or an entity engaged by such Transferee to manage the Leased Premises (pursuant to a management agreement in form and substance reasonably acceptable to Landlord), operates at least 100 motion picture screens in North America and is otherwise reasonably acceptable to Landlord.

(g)     Notwithstanding the foregoing, if a Leasehold Mortgagee forecloses or takes a deed in lieu of foreclosure, but at the time of such foreclosure or taking of a deed in lieu such Leasehold Mortgagee does not meet the financial or other requirements specified in the immediately preceding paragraph, such Leasehold Mortgagee shall have ninety (90) days from the date it acquires the demised premises to either transfer the Leasehold Mortgagee's interest in this Lease to a Transferee who complies with such requirements, or otherwise comes into compliance on its own. Failure to comply with this paragraph shall be a Default under this Lease.

32

(h)     In the event of the termination of this Lease prior to the expiration of the Term, whether by summary proceedings to dispossess, service of notice to terminate, or otherwise, due to default of Tenant, Landlord shall serve upon Leasehold Mortgagee written notice that the Lease has been terminated together with a statement of any and all sums which would at that time be due under this Lease but for such termination, and of all other defaults, if any, under this Lease then known to Landlord. Leasehold Mortgagee shall thereupon have the option to obtain a new lease in accordance with and upon the following terms and conditions:

(i)     Upon the written request of Leasehold Mortgagee, delivered to Landlord within thirty (30) days after service of such notice that the Lease has been terminated to Leasehold Mortgagee, Landlord shall enter into a new lease of the Leased Premises with Leasehold Mortgagee or its designee, having (or having a guarantor having) a tangible net worth in accordance with generally accepted accounting principles of at least $25,000,000.

(ii)     Such new lease shall be entered into within thirty (30) days of such Leasehold Mortgagee's written request at the sole cost of Leasehold Mortgagee or such designee, shall be effective as of the date of termination of this Lease, shall require Leasehold Mortgagee, such designee, or an entity engaged to manage the Leased Premises to operate at least 100 motion picture screens in North America, shall be for the remainder of the Term of this Lease, and at the Rent and upon all the terms, covenants and conditions of this Lease, including any applicable Option Periods, provided that Leasehold Mortgagee or such designee shall contemporaneously with the delivery of such request pay to Landlord all the installments of Rent payable by Tenant hereunder which are then due.

(iii)     Such new lease shall require the tenant to perform any unfulfilled obligation of Tenant under this Lease which is reasonably susceptible of being performed by such tenant.

(iv)     Upon the execution of such new lease, the tenant named therein shall pay any and all Rent and other sums which would at the time of the execution thereof be due under this Lease but for such termination and shall pay all expenses, including counsel fees, court costs and disbursements incurred by Landlord in connection with such defaults and termination, the recovery of possession of the Leased Premises, and the preparation, execution and delivery of such new lease.

Nothing in this Article 19.3 shall impose any obligation on the part of Landlord to deliver physical possession of the Leased Premises to the Leasehold Mortgagee, Transferee, or any designee unless Landlord at the time of the execution and delivery of such new lease has obtained physical possession thereof.

(i)     If Tenant is in default under this Lease and by reason of Tenant's failure either to exercise any renewal option contained herein, or for any other reason whatsoever, including being in default, Tenant is not entitled to renew this Lease for any

33

Option Period, Landlord shall serve upon Leasehold Mortgagee written notice thereof and Leasehold Mortgagee shall have the option upon written request served upon Landlord to obtain from Landlord a new lease of the Leased Premises for such Option Period, provided that such written request is served upon Landlord no later than thirty (30) days after the service of the aforementioned notice by Landlord on Leasehold Mortgagee. Within thirty (30) days after the service of such written request from Leasehold Mortgagee, Landlord and Leasehold Mortgagee, or Leasehold Mortgagee's designee having a tangible net worth (with its guarantor, if any), determined in accordance with generally accepted accounting principles, of at least $25,000,000, and either (1) alone or with its Affiliates, operates at least one hundred (100) motion picture screens in North America, or (2) causes the Leased Premises to be operated by an entity which operates at least 100 motion picture screens in North America, shall enter into a new lease of the Leased Premises as follows:

      (i)     Such new lease shall be entered into at the sole cost and expense of the tenant thereunder, shall be effective as of the date of termination of the then current Term of this Lease, and shall be for the renewal term next succeeding the then current Term of this Lease, and at the rent and upon all the terms, covenants and conditions of this Lease, including any applicable Option Periods.

      (ii)    Such new lease shall require tenant to perform any unfulfilled obligation of Tenant under this Lease which is reasonably susceptible of being performed by such tenant.

      (iii)   Upon the execution of such new lease the tenant therein named shall pay any and all sums remaining unpaid under this Lease, plus all expenses reasonably incurred by Landlord in connection with the preparation, execution and delivery of such new lease.

    **19.4**   **Continuation of Liability.** If any Leasehold Mortgagee acquires title to Tenant's interest in this Lease, by foreclosure of a mortgage thereon or by assignment in lieu of foreclosure or by an assignment from a nominee or wholly owned subsidiary of such mortgagee, or under a new lease pursuant to this Article 19, such mortgagee may assign such Lease to a party (i) having a tangible net worth, or whose guarantor has a tangible net worth, determined in accordance with generally accepted accounting principles, of not less than $25,000,000, and (ii) either (1) alone or with its Affiliates operates at least 100 motion picture screens in North America or (2) causes the Leased Premises to be operated by an entity which operates at least 100 motion picture screens in North America, and notwithstanding anything contained in Article 10, shall thereupon be released from all liability for the performance or observance of the terms, covenants and conditions in such Lease contained on Tenant's part to be performed and observed from and after the date of such assignment, provided that the assignee from such Leasehold Mortgagee shall have assumed such new lease in accordance with this Article 19. Furthermore, it is the intention of the parties that entering into a Leasehold Mortgage or other pledge or hypothecation by Tenant that does not comply with the provisions of this Article 19 shall constitute a default and shall otherwise be a non-permitted transfer under this Lease. The holder of such Leasehold Mortgage or other pledge or hypothecation shall not enjoy the rights granted to a Leasehold Mortgagee under this Article 19.

<div align="center">34</div>

## ARTICLE 20.
## TENANT'S SIGNS

**20.1**  **Location and Type.**  Tenant shall have the right to erect and maintain the following signs in accordance with the provisions of this Article 20 and subject to any applicable provisions of the Site Plan, the REA, the Restrictive Agreements and Laws:

(a)  illuminated signs on the exterior walls of the Theatre Facility and on the theatre canopy or marquee;

(b)  signs on the interior or exterior of any windows of the Theatre Facility;

(c)  easel or placard signs within the lobby entrance or on sidewalks immediately in front of the Theatre Facility, provided the same do not unreasonably interfere with pedestrian traffic;

(d)  poster cases within the lobby of the Theatre Facility and on the exterior walls of the Theatre Facility;

(e)  illuminated roadside sign(s) and attraction board ("*Tenant's Pylon*");

(f)  electronic displays and billboards ("*Display Signs*") on the exterior walls of the Theatre Facility; and

(g)  directional signage on the Leased Premises.

**20.2**  **Design.**  The design of all signs presently located on the Leased Premises is hereby approved by Landlord with the design of all future signs which Tenant elects to construct pursuant to Article 20.1 (such present and future signs referred to as "*Tenant's Signs*") to be subject to Landlord's approval, which Landlord agrees not to unreasonably withhold or delay so long as Tenant's Signs are consistent with Tenant's standard signage and do not otherwise violate applicable Laws. Tenant's Signs shall advertise Tenant's business in the Theater Facility and shall be constructed and maintained in good repair at Tenant's expense. Tenant shall pay the cost of electricity consumed in illuminating Tenant's Signs.

**20.3**  **Access to Tenant's Pylon.**  If Tenant's Pylon is located outside the Leased Premises, Landlord hereby grants to Tenant such easement rights as Landlord may have under the REA or other Restrictive Agreement, which shall be appurtenant to the Leased Premises, for the purpose of enabling Tenant to have access to Tenant's Pylon, to maintain and service same and to insure the continued availability of power thereto.

**20.4**  **Loss of Tenant's Pylon.**  If Tenant is deprived of Tenant's Pylon as the result of a condemnation, Landlord shall cooperate with Tenant, at Tenant's cost and expense, (a) to make available a mutually agreeable site (and power thereto) for a substitute pylon within the Leased Premises or any applicable part of the Center strategically located so as to be visible to automobile traffic on and streets highways adjoining the Leased Premises or any applicable part of the Center or at entrances to the Center, and (b) in obtaining, at Tenant's cost and expense, easements similar to those described in Article 20.3 with respect to the new site. Nothing herein

35

shall obligate Landlord to (i) if Landlord is the owner of the Center, provide to Tenant, as the location for Tenant's Pylon, any portion of the Center which Landlord reasonably determines to have value as a developable parcel for another tenant or purchaser, or to restrict Landlord's ability to sell, lease or develop the Center in such manner as Landlord determines to be appropriate; and (ii) regardless of whether Landlord is the owner of the Center, contribute any funds to the acquisition of such new pylon site that are not specifically awarded to Landlord for that purpose in the condemnation proceedings.

**20.5    Protection of Signs Visibility.**  Landlord shall not erect or permit to be erected any sign or advertising device on the roof or exterior walls of the Theater Facility, nor any landscaping, signs or other obstructions on the Leased Premises which would block the view of Tenant's Pylon from adjoining streets.

**20.6    Interior Signs.**  Nothing in this Lease shall restrict Tenant's unlimited right to maintain signs on the interior of the Theater Facility.

### ARTICLE 21.
### ESTOPPEL; ATTORNMENT AND SUBORDINATION

**21.1    Estoppel Certificate.**  Each party agrees, within ten (10) days after request by the other party, to execute, acknowledge and deliver to and in favor of the proposed holder of any Mortgage or purchaser of the Leased Premises, the Common Facilities or the Center, any Leasehold Mortgagee, or any proposed sublessee or assignee of Tenant, an estoppel certificate in such form as Landlord may reasonably require, but stating no less than: (i) whether this Lease is in full force and effect; (ii) whether this Lease has been modified or amended and, if so, identifying and describing any such modification or amendment; (iii) the date to which rent and any other charges have been paid; and (iv) whether such party knows of any default on the part of the other party or has any claim against the other party and, if so, specifying the nature of such default or claim.

**21.2    Attornment by Tenant.**  Tenant shall, in the event any proceedings are brought for the foreclosure of, or in the event of the exercise of the power of sale under, any Mortgage prior in lien to this Lease made by Landlord, attorn to the purchaser upon any such foreclosure or sale and recognize such purchaser as Landlord under this Lease, provided such purchaser assumes in writing Landlord's obligations under this Lease.

**21.3    Subordination/Non-Disturbance.**  Upon request of the holder of any Mortgage, Tenant will subordinate its rights under this Lease to the lien thereof and to all advances made or hereafter to be made upon the security thereof, and Tenant shall execute, acknowledge and deliver an instrument effecting such subordination; PROVIDED, HOWEVER, Tenant's obligation to (a) subordinate its rights under this Lease to the lien of any holder of a Mortgage and (b) execute and deliver such instrument shall be conditioned upon Landlord obtaining and delivering to Tenant, in recordable form, from the holder of any Mortgage to which this Lease is to become subordinate a non-disturbance agreement reasonably acceptable to Tenant containing a covenant binding upon the holder thereof to the effect that as long as Tenant is not in default under this Lease, this Lease shall not be terminated or modified in any respect whatsoever, nor shall the rights of Tenant hereunder or its occupancy of the Leased Premises be affected in any

way by reason of such Mortgage or any foreclosure action or other proceeding that may be instituted in connection therewith, and that, except to the extent that the holder of such Mortgage is required to do so to effectively foreclose such Mortgage, Tenant shall not be named as a defendant in any such foreclosure action or other proceeding. Landlord warrants to Tenant that Landlord has not granted a mortgage encumbering the Leased Premises as of the date of execution of this Lease.

**21.4    Form of Documents.** Landlord and Tenant, upon request of any party in interest, shall execute promptly such commercially reasonable instruments or certificates to carry out the provisions of this Article 21; provided, however, neither party shall be required to execute any such instruments or certificates that would in any way modify the terms and provisions of this Lease.

## ARTICLE 22.
## DEFAULT

**22.1    Tenant Default.** An event of default shall exist under this Lease if:

(i)    Tenant neglects or fails to pay any installment of Rent, including Annual Fixed Rent, Annual Percentage Rent and any other charge under this Lease within ten (10) days after notice of default (but Landlord is not required to give more than two such default notices during any one Lease Year), or

(ii)    Tenant neglects or fails to perform or observe any of the other covenants, terms, provisions or conditions on its part to be performed or observed under this Lease, within thirty (30) days after notice of default (or if more than thirty (30) days shall be reasonably required because of the nature of the default, if Tenant fails to proceed diligently to cure such default after such notice), or

(iii)    upon the occurrence of any default under a Related Lease or the Guaranty that remains uncured after the expiration of the applicable cure period thereunder or

(iv)    Tenant (a) admits in writing its inability to pay its debts generally as they become due, (b) commences any case, proceeding or other action seeking to have an order for relief entered on its behalf as debtor or to adjudicate it a bankrupt or insolvent, or seeking reorganization, arrangement, adjustment, liquidation, dissolution or composition of it or its debts under any federal, state or local law relating to bankruptcy, insolvency, reorganization or relief of debtors, (c) makes an assignment for the benefit of its creditors, (d) seeks or consents to the appointment of a receiver of itself or of the whole or any substantial part of its property, or (e) files a petition or answer seeking reorganization or arrangement under an order or decree appointing, without the consent of Tenant, a receiver of Tenant of the whole or substantially all of its property, and such case, proceeding or other action is not dismissed within ninety (90) days after the commencement thereof; or

37

(v)     the estate or interest of Tenant in the Leased Premises or any part thereof is levied upon or attached in any proceeding and the same is not vacated or discharged within the later of ninety (90) days after commencement thereof or thirty (30) days after receipt by Tenant of notice thereof from Landlord (unless Tenant is contesting such lien or attachment in accordance with this Lease); or

(vi)     Tenant permanently abandons or vacates the Leased Premises during the Term of this Lease.

**22.2     Remedies.** Upon an event of default under this Lease, Landlord may immediately or at any time thereafter, as permitted by law, give Tenant written notice of Landlord's termination of this Lease, and, upon such notice, Tenant's rights to possession of the Leased Premises shall cease and this Lease shall thereupon be terminated, and Landlord may re-enter and take possession of the Leased Premises as its own property; or Landlord may remain out of possession of the Leased Premises and treat the Term of the Lease as subsisting and in full force and effect, in which event Landlord shall have all rights and remedies available at law, in equity or hereunder; and as an alternative remedy Landlord may, at Landlord's election, without terminating the then current Term, or this Lease, re-enter the Leased Premises or take possession thereof pursuant to legal proceedings or pursuant to any notice provided for by law, and having elected to re-enter or take possession of the Leased Premises without terminating the Term, or this Lease, Landlord shall use reasonable diligence as Tenant's agent to relet the Leased Premises, or parts thereof, for such term (which may be greater or less than the remaining balance of the then current Term) or terms and at such rental and upon such other terms and conditions (which may include concessions or free rent) as Landlord may reasonably deem advisable, with the right to make alterations and repairs to the Leased Premises, and no such re-entry or taking of possession of the Leased Premises by Landlord shall be construed as an election on Landlord's part to terminate this Lease, and no such re-entry or taking of possession by Landlord shall relieve Tenant of its obligation to pay Rent (at the time or times provided herein), or of any of its other obligations under this Lease, all of which shall survive such re-entry or taking of possession, and Tenant shall continue to pay Rent as provided in this Lease until the end of the Term and whether or not the Leased Premises have been relet, less the net proceeds, if any, of any reletting of the Leased Premises after deducting all of Landlord's expenses in connection with such reletting, including without limitation all repossession costs, brokerage commissions, legal expenses, expenses of employees, alterations costs and expenses of preparation for reletting. If Landlord elects to terminate this Lease, then Landlord may re-lease the Leased Premises for such price and on such terms as may be immediately obtainable, and Tenant will be and remain liable, not only for all Rent due and other obligations incurred up to the date on which the termination becomes effective, for all holdover damages that accrue under Article 4.3 until Tenant vacates or is removed from the Leased Premises, but also for stipulated or liquidated damages for its nonperformance equal to the sum of (i) all expenses that Landlord may reasonably incur in re-entering and repossessing the Leased Premises, putting the Leased Premises in proper repair and curing any default by Tenant, and removing Tenant's improvements, if Landlord has elected to require such removal, making any reasonable non-structural modifications that may be required for any new tenants, and reletting the Leased Premises, including reasonable attorneys' fees and disbursements, sheriff's fees and brokerage fees in doing so, plus (ii) twenty-four (24) months of the Annual Fixed Rent provided in this Lease. Having elected either to remain out of possession and treating this Lease as remaining in

38

full force and effect or to re-enter or take possession of the Leased Premises without terminating the Term, or this Lease, Landlord may by notice to Tenant given at any time thereafter while Tenant is in default in the payment of Rent or in the performance of any other obligation under this Lease, elect to terminate this Lease and, upon such notice, this Lease shall thereupon be terminated. If in accordance with any of the foregoing provisions of this Article 22, Landlord shall have the right to elect to re-enter and take possession of the Leased Premises, Landlord may enter and expel Tenant and those claiming through or under Tenant and remove the effects of both or either (forcibly if necessary) without being guilty of any manner of trespass and without prejudice to any remedies for arrears of Rent or preceding breach of covenant. Pursuit of any of the foregoing remedies shall not preclude pursuit of any of the other remedies herein provided or any other remedies provided by law, nor shall pursuit of any remedy herein provided constitute a forfeiture or waiver of any Rent due to Landlord hereunder or of any damage accruing to Landlord by reason of the violation of any of the terms, provisions and covenants herein contained. Forbearance by Landlord to enforce one or more of the remedies herein provided upon the occurrence of an event of default shall not be deemed or construed to constitute a waiver of such default. Following an event of default, all amounts due from Tenant to Landlord pursuant to this Lease shall bear interest at the Default Rate.

**22.3 Landlord Default, Cure Rights.** Landlord shall be in default under this Lease if Landlord neglects or fails to perform or observe any of the material covenants, terms, provisions or conditions on its part to be performed or observed under this Lease, and such failure continues for a period of thirty (30) days after written notice thereof (or if more than thirty (30) days shall be reasonably required because of the nature of the default, if Landlord fails to proceed diligently to cure such default after such notice). In the event of a Landlord default, then Tenant may immediately or at any time thereafter, in addition to any other rights and remedies as may otherwise be provided in this Lease for a Landlord default, pursue all rights and remedies it may have at law and equity generally.

**22.4 Self Help.** If either party (the "*Defaulting Party*") fails to perform any agreement or obligation on its part to be performed under this Lease, the other party (the "*Curing Party*") shall have the right (i) if no emergency exists, to perform the same after giving thirty (30) days notice to the Defaulting Party, and (ii) in any emergency situation to perform the same immediately without notice or delay. For the purpose of rectifying a default of the Defaulting Party as aforesaid, the Curing Party shall have the right to enter the Leased Premises. The Defaulting Party shall on demand reimburse the Curing Party for the costs and expenses incurred by the Curing Party in rectifying defaults as aforesaid, including reasonable attorneys' fees, together with interest thereon at the Default Rate. Any act or thing done by the Curing Party pursuant to this Article 22.4 shall not constitute a waiver of any such default by the Curing Party or a waiver of any covenant, term or condition herein contained or the performance thereof.

**22.5 Remedies Cumulative.** The various rights and remedies given to or reserved to Landlord and Tenant by this Lease or allowed by law shall be cumulative, irrespective of whether so expressly stated.

**22.6 Limitation on Landlord's Liability.** Notwithstanding anything to the contrary in this Lease: Tenant will look solely to the interest of Landlord (or its successor as Landlord hereunder) in the Leased Premises and income therefrom for the satisfaction of any judgment or

other judicial process requiring the payment of money as a result of (i) any negligence (including gross negligence) or (ii) any breach of this Lease by Landlord or its successor (including any beneficial owners, partners, shareholders, trustees or others affiliated or related to Landlord or such successor) and Landlord shall have no personal liability hereunder of any kind.

**22.7    Interest on Past Due Obligations; Late Charges.** Except where another rate of interest is specifically provided for in this Lease, any amount due from either party to the other under this Lease which is not paid when due shall bear interest at the Default Rate from the date such payment was due to and including the date of payment. In addition, Tenant acknowledges that the late payment of any installment of Annual Fixed Rent, Percentage Rent or any other amounts due Landlord will cause Landlord to incur certain costs and expenses, the exact amount of which are extremely difficult or impractical to fix. These costs and expenses may include, without limitation, administrative and collection costs and processing and accounting expenses. Therefore, if any installment of Rent, including Annual Fixed Rent, Annual Percentage Rent, and any other amount due Landlord is not received by Landlord from Tenant when due, Tenant shall immediately pay to Landlord a late charge equal to the lesser of (i) four percent (4%) of such delinquent amount, and (ii) One Thousand Dollars ($1,000.00). Landlord and Tenant agree that this late charge represents a reasonable estimate of the costs and expenses Landlord will incur and is fair compensation to Landlord for its loss suffered by reason of late payment by Tenant. Upon accrual, all such late charges shall be deemed Additional Rent.

**22.8    Development Agreement Breaches.** A breach by either party of its obligations under the Development Agreement shall constitute, at the option of the other party, an event of default under this Lease and entitle the non-defaulting party, after notice and opportunity to cure has been given under Section 22.1(ii) with respect to a Tenant breach or under Section 22.3 with respect to a Landlord breach (as applicable) to exercise any remedy available to the non-defaulting party under this Lease, at law or in equity by reason of such breach.

## ARTICLE 23.
## ACCESS TO PREMISES

**23.1    Ongoing Access and Inspection Rights.** Tenant shall permit Landlord and its authorized representatives to enter the Theater Facility at all reasonable times (upon 48 hours prior notice, except in the event of an emergency, in which no prior notice is required prior to entry) for the purposes of (i) serving or posting or keeping posted thereon notices required or permitted by Law, (ii) conducting periodic inspections, (iii) performing any work thereon required or permitted to be performed by Landlord pursuant to this Lease, and (iv) showing the Leased Premises to prospective purchasers or lenders.

**23.2    Landlord's Construction Inspection Rights.** During the Construction Term and any other period of Tenant's fixturing or construction in the Leased Premises, Landlord shall have the right to physically inspect, and to cause one or more engineers or other representatives of Landlord to physically inspect, the Leased Premises, as long as the same does not interfere with Tenant's operation of or construction activities on the Leased Premises. Such inspections shall include (without limitation) such tests, inspections and audits of environmental and soils conditions as Landlord deems necessary. Landlord shall make such inspections in good faith and with due diligence. All inspection fees, appraisal fees, engineering fees, environmental fees and

40

other expenses of any kind incurred by Landlord relating to the inspection of the Leased Premises will be solely Landlord's expense. Tenant shall cooperate with Landlord in all reasonable respects in making such inspections. Tenant reserves the right to have a representative present at the time Landlord conducts any such inspection of the Leased Premises. Landlord shall notify Tenant not less than two (2) business days in advance of making any such inspection. In making any inspection, Landlord will treat, and will cause any representative of Landlord to treat, all information obtained by Landlord pursuant to the terms of this Article 23.2 as strictly confidential. Landlord agrees to indemnify and hold Tenant, its directors, contractors, employees, agents and representatives harmless from any and all injuries, losses, liens, claims, judgments, liabilities, costs, expenses or damages (including reasonable attorneys' fees and court costs), actual or threatened, which result from or arise out of any inspections by Landlord or its authorized representatives pursuant to this Article 23.2. Notwithstanding any provision herein to the contrary, the indemnity contained in the preceding sentence shall survive the termination of this Lease.

## ARTICLE 24.
## FORCE MAJEURE

If either party is delayed or hindered in or prevented from the performance of any act required under this Lease by reason of strikes, lockouts, labor troubles, inability to procure materials, failure of power, restrictive Laws (except as otherwise specifically provided herein), riots, insurrection, terrorist acts, war or other reason beyond the reasonable control of and not the fault of the party delayed in performing the work or doing the acts required under the terms of this Lease (collectively, "*Force Majeure*"), then performance of such act shall be excused for the period of the delay, and the period for the performance of any such act shall be extended for a period equivalent to the period of such delay. The provisions of this Article shall not (i) operate to excuse Tenant from prompt payment of Rent or any other payment required by Tenant under the terms of this Lease, or (ii) be applicable to delays resulting from the inability of a party to obtain financing or to proceed with its obligations under this Lease because of a lack of funds.

## ARTICLE 25.
## MISCELLANEOUS

**25.1** **Lease Not to be Recorded.** Upon request of Landlord or Tenant, the parties hereto shall promptly execute and deliver a memorandum of this Lease for recording purposes in mutually agreeable recordable form. If Tenant elects to record such memorandum, Landlord shall promptly cause the same to be recorded, at Tenant's expense. Neither party may record this Lease without the consent of the other party.

**25.2** **Notices.** All notices, consents, requests, approvals and authorizations (collectively, "*Notices*") required or permitted under this Lease shall only be effective if in writing. All Notices (except Notices of default, which may only be sent pursuant to the methods described in (A) and (B) below) shall be sent (A) by registered or certified mail (return receipt requested), postage prepaid, or (B) by Federal Express, U.S. Post Office Express Mail, Airborne or similar nationally recognized overnight courier which delivers only upon signed receipt of the addressee, and addressed as follows or at such other address, and to the attention of such other person, as the parties shall give notice as herein provided:

| If intended for Landlord: | 30 West Pershing, LLC |
|---|---|
| | Attention: Asset Management |
| | 909 Walnut, Suite 200 |
| | Kansas City, Missouri 64106 |
| | Telephone: (816) 472-1700 |
| | |
| With a copy to: | Entertainment Properties Trust |
| | Attention: General Counsel |
| | 909 Walnut, Suite 200 |
| | Kansas City, Missouri 64106 |
| | Telephone: (816) 472-1700 |
| | |
| If intended for Tenant: | Alamo Drafthouse Cinemas |
| | Attention: Tim Reed |
| | 1717 West 6th Street |
| | Austin, Texas 78703 |
| | Telephone: (512) 861-7013 |
| | |
| With a copy to: | Alamo Drafthouse Cinemas |
| | Attn: CFO |
| | 1717 West 6th Street |
| | Austin, Texas 78703 |
| | Telephone: (512) 861-7006 |
| | |
| With a copy to: | Mark A. Manulik |
| | Schwabe, Williamson & Wyatt |
| | 1211 S.W. Fifth Avenue, Suite 2000 |
| | Portland, Oregon 97204 |
| | Telephone: (503) 796-2990 |

A notice, request and other communication shall be deemed to be duly received if delivered by a nationally recognized overnight delivery service, when delivered to the address of the recipient, if sent by mail, on the date of receipt by the recipient as shown on the return receipt card, or if sent by facsimile, upon receipt by the sender of an acknowledgment or transmission report generated by the machine from which the facsimile was sent indicating that the facsimile was sent in its entirety to the recipient's facsimile number; provided that if a notice, request or other communication is served by hand or is received by facsimile on a day which is not a Business Day, or after 5:00 p.m. local time on any Business Day at the addressee's location, such notice or communication shall be deemed to be duly received by the recipient at 9:00 a.m. local time of the addressee on the first Business Day thereafter. Rejection or other refusal to accept or the inability to delivery because of changed address of which no Notice was given shall be deemed to be receipt of the Notice as of the date of such rejection, refusal or inability to deliver.

**25.3 Waiver of Performance and Disputes.** One or more waivers of any covenant, term or condition of this Lease by either party shall not be construed as a waiver of a subsequent breach of the same or any other covenant, term or condition, nor shall any delay or omission by either party to seek a remedy for any breach of this Lease or to exercise a right accruing to such

42

party by reason of such breach be deemed a waiver by such party of its remedies or rights with respect to such breach.  The consent or approval by either party to or of any act by the other party requiring such consent or approval shall not be deemed to waive or render unnecessary consent to or approval of any similar act.

**25.4**  **Modification of Lease.**  The terms, covenants and conditions hereof may not be changed orally, but only by an instrument in writing signed by the party against whom enforcement of the change, modification or discharge is sought, or by such party's agent.

**25.5**  **Captions.**  Captions throughout this instrument are for convenience and reference only and the words contained therein shall in no way be deemed to explain, modify, amplify or aid in the interpretation or construction of the provisions of this Lease.

**25.6**  **Lease Binding on Successors and Assigns, etc.**  Except as herein otherwise expressly provided, all covenants, agreements, provisions and conditions of this Lease shall be binding upon and inure to the benefit of the parties hereto and their heirs, devisees, executors, administrators, successors in interest and assigns as well as grantees of Landlord, and shall run with the land.  Without limiting the generality of the foregoing, all rights of Tenant under this Lease may be granted by Tenant to any permitted sublessee of Tenant, subject to the terms of this Lease.

**25.7**  **Brokers.**  Landlord represents and warrants to Tenant that it has not incurred or caused to be incurred any liability for real estate brokerage commissions or finder's fees in connection with the execution or consummation of this Lease for which Tenant may be liable. Tenant represents and warrants to Landlord that it has not incurred or caused to be incurred any liability for real estate brokerage commissions or finder's fees in connection with the execution or consummation of this Lease for which Landlord may be liable.  Each of the parties agrees to indemnify and hold the other harmless from and against any and all claims, liabilities or expense (including reasonable attorneys' fees) in connection with any breach of the foregoing representations and warranties.

**25.8**  **Landlord's Status as a REIT.**  The following clause shall be applicable if the Landlord is a real estate investment trust:  Tenant acknowledges that Landlord intends to elect to be taxed as a real estate investment trust ("*REIT*") under the Code.  Tenant shall exercise its reasonable best efforts not do anything which would materially adversely affect Landlord's status as a REIT.  Tenant agrees to enter into reasonable modifications of this Lease which do not materially adversely affect Tenant's rights and liabilities if such modifications are required to retain or clarify Landlord's status as a REIT.

**25.9**  **Governing Law.**  This Lease shall be governed by and construed in accordance with the laws of the State where the Leased Premises are located, but not including such State's conflict-of-laws rules.

**25.10**  **Estoppel.**  Landlord and Tenant each confirm and agree that (a) it has read and understood all of the provisions of this Lease; (b) it is an experienced real estate investor and is familiar with major sophisticated transactions such as that contemplated by this Lease; (c) it has

43

negotiated with the other party at arm's length with equal bargaining power; and (d) it has been advised by competent legal counsel of its own choosing.

**25.11  Joint Preparation.**  This Lease (and all exhibits thereto) is deemed to have been jointly prepared by the parties hereto, and any uncertainty or ambiguity existing herein, if any, shall not be interpreted against any party, but shall be interpreted according to the application of the rules of interpretation for arm's-length agreements.

**25.12  Interpretation.**  It is hereby mutually acknowledged and agreed that the provisions of this Lease have been fully negotiated between parties of comparable bargaining power with the assistance of counsel and shall be applied according to the normal meaning and tenor thereof without regard to the general rule that contractual provisions are to be construed narrowly against the party that drafted the same or any similar rule of construction.

**25.13  Severability.**  If any provisions of this Lease are determined to be invalid by a court of competent jurisdiction, the balance of this Lease shall remain in full force and effect, and such invalid provision shall be construed or reformed by such court in order to give the maximum permissible effect to the intention of the parties as expressed therein.

**25.14  Landlord and Tenant.**  Nothing contained in this Lease shall be deemed or construed by the parties hereto or by any third party to create the relationship of principal and agent or of partnership or of joint venture or of any association whatsoever between Landlord and Tenant, it being expressly understood and agreed that neither the computation of rent nor any other provision contained in this Lease nor any act or acts of the parties hereto shall be deemed to create any relationship between Landlord and Tenant other than the relationship of landlord and tenant.

**25.15  Authority.**  The persons executing this Lease on behalf of Tenant and Landlord covenant and warrant to the other party that (a) they are duly authorized to execute this Lease on behalf of the party for whom they are acting, and (b) the execution of this Lease has been duly authorized by the party for whom they are acting.

**25.16  Time is of the Essence.**  Time is of the essence with respect to the performance of each of the terms, provisions, covenants and conditions contained in this Lease.

**25.17  Consent.**  The parties agree to act in good faith and with fair dealing with one another in the execution, performance and implementation of the terms and provisions of this Lease.  Whenever the consent, approval or other action of a party is required under any provision of this Lease, such consent, approval or other action shall not be unreasonably withheld, delayed or conditioned by a party unless the provision in question expressly authorizes such party to withhold or deny consent or approval or decline to take action in accordance with a different standard, in which case the consent or approval or the decision to not take action may be withheld, delayed or conditioned in accordance with the different standard (any provision indicating that consent is not to be unreasonably withheld is to be interpreted to mean that consent shall not be unreasonably withheld, delayed or conditioned.

**25.18  Attorneys' Fees.**  In case suit is brought because of the breach of any agreement or obligation contained in this Lease on the part of Tenant or Landlord to be kept or performed,

44

and a breach is established, the prevailing party shall be entitled to recover all expenses incurred in connection with such suit, including reasonable attorneys' fees.

**25.19  Further Assurances.**  Each of the parties hereto shall execute and provide all additional documents and other assurances that are reasonably necessary to carry out and give effect to the intent of the parties reflected in this Lease.

**25.20  Counterparts.**  This Lease may be executed at different times and in any number of counterparts, each of which when so executed shall be deemed to be an original and all of which taken together shall constitute one and the same agreement.  Delivery of an executed counterpart of a signature page to this Lease by facsimile shall be as effective as delivery of a manually executed counterpart of this Lease.  In proving this Lease, it shall not be necessary to produce or account for more than one such counterpart signed by the party against whom enforcement is sought.

**25.21  Rules of Construction.**  The following rules of construction shall be applicable for all purposes of this Lease, unless the context otherwise requires:

(a)  The terms "hereby," "hereof," "hereto," "herein," "hereunder" and any similar terms shall refer to this Lease, and the term "hereafter" shall mean after, and the term "heretofore" shall mean before, the date of this Lease.

(b)  Words of the masculine, feminine or neuter gender shall mean and include the correlative words of the other genders and words importing the singular number shall mean and include the plural number and vice versa.

(c)  The terms "include," "including" and similar terms shall be construed as if followed by the phrase "without being limited to."

**25.22  Repurchase Obligations.**  Landlord has acquired the real property included in the Leased Premises pursuant to an Earnest Money Contract dated March 9, 2012 (the "***Purchase Agreement***"), entered into by Lakeline Market, Ltd., a Texas limited partnership, as seller ("***Seller***"), and Landlord, as purchaser.  Pursuant to the provisions of Section 12(d) of the Purchase Agreement (such provisions also being restated in a Reciprocal Easement and Operation Agreement executed by Seller, Landlord and other parties), Seller has the right to repurchase the Leased Premises under certain circumstances more particularly described therein. In the event that Seller exercises and closes any of such repurchase options and the amount paid to Landlord in connection with any repurchase option is less than the total amount invested by Landlord in the Leased Premises pursuant to the Development Agreement, then Tenant shall pay such difference to Landlord on demand.

## ARTICLE 26.
## WAIVER OF TRIAL BY JURY

TO THE FULLEST EXTENT PERMITTED BY LAW, TENANT AND LANDLORD HEREBY WAIVE TRIAL BY JURY IN ANY ACTION, PROCEEDING OR COUNTERCLAIM BROUGHT BY EITHER OF THE PARTIES HERETO AGAINST THE OTHER IN ANY MATTERS ARISING OUT OF OR IN CONNECTION WITH THIS LEASE,

45

THE RELATIONSHIP OF LANDLORD AND TENANT, TENANT'S USE AND OCCUPANCY OF THE THEATER FACILITY OR THE CENTER, AND ANY CLAIM OF INJURY OR DAMAGE.

DB04/0503816.0340/5552953.4

IN WITNESS WHEREOF, Landlord and Tenant have caused this Lease to be duly executed as of the day and year first above written.

**LANDLORD:**

**30 WEST PERSHING, LLC**, a Missouri limited liability company

By: _____

Name: **Gregory K. Silvers**
**Vice President**

Title: _____


**TENANT:**

**ALAMO LAKELINE LLC**, a Texas limited liability company

By: _____

Name: DAVID J. KENNEDY

Title: MEMBER

## EXHIBIT A

### Description of the Leased Premises

Lot 2, Block A, Lakeline Retail Subdivision Section I, a subdivision of Williamson County, Texas, according to map or plat thereof, recorded under Document No. 2012005731 of the Official Public Records of Williamson County, Texas, said tract being more particularly described by metes and bounds in Exhibit A-1 attached hereto.

A-1

## EXHIBIT B

### Description of the Center

Lots 1, 3, 4 and 5, Block A, Lakeline Retail Subdivision Section I, a subdivision of Williamson County, Texas, according to map or plat thereof, recorded under Document No. 2012005731 of the Official Public Records of Williamson County, Texas, said tract being more particularly described by metes and bounds in Exhibit A-1 attached hereto.

Lot 1, Block A, Lakeline Retail Subdivision Section III, a subdivision of Williamson County, Texas, according to map or plat thereof, recorded under Document No. 2012005742 of the Official Public Records of Williamson County, Texas, said tract being more particularly described by metes and bounds in Exhibit A-2 attached hereto.

Lot 1, Block A, Lakeline Retail Subdivision Section II, a subdivision of Williamson County, Texas, according to map or plat thereof, recorded under Document No. 2012005691 of the Official Public Records of Williamson County, Texas, said tract being more particularly described by metes and bounds in Exhibit A-3 attached hereto.

DB04/0503816.0340/5552953.4

# EXHIBIT C

## Site Plan



## EXHIBIT D

### Theater Facility Description

A ten screen motion picture theater containing 36,000 square feet of floor area and approximately 1,100 theater seats known as "Alamo Lakeline" as generally depicted on plans prepared by _____ and dated _____, 2012.

D-1

## EXHIBIT E

### Restrictive Agreement

All matters of record or otherwise affecting the Center or the Leased Premises, including but not limited to:

1.  The following restrictive covenants of record:

    Volume 494, Page 339 of the Deed Records and Volume 1367, Page 456 as amended in Volume 1852, Page 818 and under Document No. 9746336 and as further affected by Volume 1371, Page 77; and Document No. 9816808 of the Official Records, all of Williamson County, Texas and Document No(s). 2010001043, 2011007017, 2011007018, 2011055234 and 2012009325 of the Official Public Records of Williamson County, Texas.

    Document No(s). 2011010276, 2012005739, 2012006170 and Declaration of Protective Covenants and Common Area Maintenance Agreement recorded under Document No. _____, and Declaration of Covenants, Restrictions and Reciprocal Easements recorded under Document No. _____ of the Official Public Records of Williamson County, Texas and Plat recorded under Document No. 2012005731 of the Official Public Records of Williamson County, Texas.

2.  Utility easement granted to Williamson County, Texas and the City of Austin, Texas, by instrument dated April 26, 1987, recorded in Volume 1522, Page 696 of the Official Records of Williamson County, Texas, and additionally shown on Plat(s) recorded under Document No. 2012005731 of the Official Public Records of Williamson County, Texas.

3.  A 1/4th non-participating royalty interest in all oil, gas and other minerals reserved by Mitchell Wolf in instrument, recorded in Volume 832, Page 838 of the Deed Records of Williamson County, Texas. Said mineral estate not traced further herein.

4.  Assessments payable to Lakeline Business and Commercial Owners Association, Inc., as set forth and secured by a Vendor's Lien retained under Document No. 9816808 of the Official Records of Williamson County, Texas, and amended by Document No. 2010001043 of the Official Public Records of Williamson County, Texas.

5.  The terms, conditions and stipulations set out in that certain Access Easement Agreement (US Hwy. 183 Driveway Easement) dated January 13, 2011, recorded under Document No. 2011007017 of the Official Public Records of Williamson County, Texas and First Amendment recorded under Document No. 2011055234 of the Official Public Records of Williamson County, Texas.

6.  The terms, conditions and stipulations set out in that certain Access Easement Agreement (Pecan Park Driveway Easement) dated January 13, 2011, recorded under Document No. 2011007018 of the Official Public Records of Williamson County, Texas.

7.  The terms, conditions and stipulations of that certain Development and Escrow

E-1

Agreement dated January 28, 2011, as evidenced by Memorandum of Development and Escrow Agreement recorded under Document No. 2011007019 of the Official Public Records of Williamson County, Texas, as further affected by unrecorded Assignment and Assumption Agreement by and between 183 BLW, LP, and Lakeline Market, Ltd., and Amendment to Development and Escrow Agreement and Memorandum of Development and Escrow Agreement recorded under Document No. 2012009328 of the Official Public Records of Williamson County, Texas.

8.     The terms, conditions and stipulations of that certain Joint Use Access Easement dated July 14, 2011, recorded under Document No. 2011054889 of the Official Public Records of Williamson County, Texas.

9.     Electric and telecommunications easement 15 feet in width along the Pecan Park Boulevard, S. Lakeline Boulevard and U.S. Highway 183 property line(s), as shown by the Plat recorded under Document No. 2012005731 of the Official Public Records of Williamson County, Texas.

10.    Joint access shall be provided from Lots 1 and 5 to S. Lakeline Boulevard and Lots 1, 2 and 3 to Pecan Park Boulevard, as stated on Plat recorded under Document No. 2012005731 of the Official Public Records of Williamson County, Texas.

11.    Obligation to provide additional easements to Austin Energy as set forth on the Plat recorded under Document No. 2012005731 of the Official Public Records of Williamson County, Texas.

12.    The terms, conditions and stipulations of that certain Declaration of Easements and Restrictive Covenant Regarding Unified Development and Maintenance of Drainage Facilities dated January 18, 2012, recorded under Document No. 2012006170 of the Official Public Records of Williamson County, Texas.

13.    Sidewalk easement granted to the City of Austin, by instrument dated January 18, 2012, recorded under Document No. 2012006169 of the Official Public Records of Williamson County, Texas.

14.    A 0.571 acre water and wastewater easement granted to the City of Austin, by instrument dated January 18, 2012, recorded under Document No. 2012007051 of the Official Public Records of Williamson County, Texas.

15.    Terms, conditions and stipulations of that certain Edwards Aquifer Protection Plan approved October 13, 2011, evidenced by Affidavit recorded under Document No. 2011085891 of the Official Public Records of Williamson County, Texas.

16.    Subject property lies within the boundaries of Upper Brushy Creek Water Control and Improvement District.

17.    The terms, conditions and stipulations of that certain Declaration of Protective Covenants and Common Area Maintenance Agreement dated September 14, 2012, recorded under Document No. _____ of the Official Public Records of

Williamson County, Texas, including but not limited to repurchase rights.

18.    Assessments payable to Lakeline Market, Ltd., as set forth and secured by a Vendor's Lien retained in instrument recorded under Document No. _____ of the Official Public Records of Williamson County, Texas. The terms, conditions and stipulations of that certain Declaration of Covenants, Restrictions and Reciprocal Easements dated September 14, 2012, recorded under Document No. _____ of the Official Public Records of Williamson County, Texas. Terms, conditions and stipulations of that certain Edwards Aquifer Protection Plan approved May 25, 2012, evidenced by Affidavit recorded under Document No. 2012048143 of the Official Public Records of Williamson County, Texas.

E-3

## EXHIBIT F

### Memorandum of Term Commencement

THIS MEMORANDUM OF TERM COMMENCEMENT (the "***Memorandum***") is made as of the _____ day of _____, 20__, by and between 30 West Peshing, LLC, a Missouri limited liability company, with an office at 30 West Pershing, Suite 201, Kansas City, Missouri 64108 ("**Landlord**") and Alamo Lakeline LLC, a Texas limited liability company, with an address of 1717 West 6th Street, Austin, Texas 78703 (***"Tenant"***).

### AGREEMENT

1.    Pursuant to that certain Lease dated as of _____, 2012 (the "**Lease**"), between Landlord and Tenant, Landlord leased to Tenant and Tenant leased from Landlord certain premises located on certain real property in the City of Austin, Texas, as more particularly described in the Lease (the "***Premises***").

2.    The Lease is for an initial term of 20 years commencing on _____, 20____ and expiring on _____, 20____ (the "***Expiration Date***"), unless extended in accordance with the Lease.

3.    All of the other terms and conditions of the Lease are more fully set forth in the Lease and are incorporated herein by this reference.

4.    This Memorandum shall inure to the benefit of and be binding upon Landlord and Tenant and their respective representatives, successors and assigns.

IN WITNESS WHEREOF, Landlord and Tenant have caused this Memorandum of Term Commencement to be duly executed as of the day and year first above written.

**LANDLORD:**                                    **TENANT:**

**30 WEST PESHING, LLC,**                **ALAMO LAKELINE LLC,**
a Missouri limited liability company        a Texas limited liability company

By: _____          By: _____

Name: _____          Name: _____

Title: _____          Title: _____

F-1

# **EXHIBIT 7**

## FIRST AMENDMENT TO LEASE

**THIS FIRST AMENDMENT TO LEASE** (this "**Amendment**") is made and entered into as of the 30th day of March, 2013 (the "**Effective Date**"), by and between 30 WEST PERSHING, LLC, a Missouri limited liability company (hereinafter referred to as "**Landlord**"), and ALAMO LAKELINE LLC, a Texas limited liability company (hereinafter referred to as "**Tenant**").

### RECITALS:

A.    Landlord and Tenant are parties to a Lease dated September 17, 2012 (the "**Original Lease**"), with respect to certain real property in Austin, Texas.

B.    Landlord and Tenant desire to amend the Original Lease as set forth below.

**NOW THEREFORE,** in consideration of the above premises, the mutual covenants and agreements stated herein and other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the parties hereto agree as follows:

1.    **Annual Fixed Rent.** Effective from and after the Effective Date, Section 5.2(a) and Section 5.2(b) of the Original Lease are hereby deleted and replaced with the following:

(a)    From the Effective Date through the end of the Construction Term, Variable Rent (defined in the Development Agreement), calculated and payable in accordance with the terms of the Development Agreement.

(b)    From the Commencement Date through the fifth Lease Year, Nine Hundred Twenty-Four Thousand Eight Hundred Forty and No/100 Dollars ($924,840.00) per year ($77,070.00 per month).

2.    Exhibits. Exhibits A and B to the Original Lease are deleted and Exhibits A and B attached hereto are substituted in lieu thereof.

3.    **Counterparts.**    This Amendment may be executed in any number of counterparts, each of which shall be deemed to be an original and all of which shall together constitute one agreement which is binding upon all the parties hereto, notwithstanding that all parties are not signatories to the same counterpart.

4.    **Affirmation of Lease.** All other terms and provisions of the Original Lease that are not specifically modified by this Amendment shall remain in full force and effect, unmodified by the terms of this Amendment. All references herein or in the Original Lease to the "Lease" shall mean and refer to the Original Lease as amended by this Amendment. Capitalized terms used but not otherwise defined in this Amendment shall have the meanings assigned to them in the Original Lease.

5.    **Binding Effect**.  This Amendment shall be binding upon and inure to the benefit of the parties and their respective successors and assigns.

IN WITNESS WHEREOF, Landlord and Tenant have caused this Amendment to be duly executed as of the day and year first above written.

**Landlord:**

**30 WEST PERSHING, LLC,**
a Missouri limited liability company

By:
Name:
Title:                    Michael L. Hirons
                                Vice President

**Tenant:**

**ALAMO LAKELINE LLC,**
a Texas limited liability company

By:
Name:    DAVID J. KENNEDY
Title:    MEMBER

## GUARANTOR'S CONSENT

The undersigned Guarantor of the Lease hereby (i) acknowledges and consents to the terms of the foregoing Amendment, (ii) reaffirms the full force and effect of its Guaranty dated September 17, 2012 (the "Guaranty"), as of the day and year first above written, and (iii) agrees that the Guaranty guarantees payment and performance of all Obligations, as defined in the Guaranty, as modified pursuant to this Amendment.

DAVID J. KENNEDY

## EXHIBIT A

### Description of the Leased Premises

Lot 2, Block A, Lakeline Retail Subdivision Section I, a subdivision of Williamson County, Texas, according to the map or plat thereof, recorded under Document No. 2012005731 of the Official Public Records of Williamson County, Texas.

## **EXHIBIT B**

### **Description of the Center**

Lots 1, 2, 4 and 5, Block A, Lakeline Retail Subdivision Section I, a subdivision of Williamson County, Texas, according to the map or plat thereof, recorded under Document No. 2012005731 of the Official Public Records of Williamson County, Texas.

Lot 1, Block A, Lakeline Retail Subdivision Section III, a subdivision of Williamson County, Texas, according to the map or plat thereof, recorded under Document No. 2012005742 of the Official Public Records of Williamson County, Texas.

Lot 1, Block A, Lakeline Retail Subdivision Section II, a subdivision of Williamson County, Texas, according to the map or plat thereof, recorded under Document No. 2012005691 of the Official Public Records of Williamson County, Texas.

# EXHIBIT 8



August 28, 2018

VIA EMAIL


Missy Reynolds
Alamo Drafthouse Cinema
612 A East 6th Street
Austin, TX 78701
missy.reynolds@drafthouse.com


RE:     Lease dated September 17, 2012, as amended, (the "Lease") by and between 30 West Pershing, LLC (the "Landlord") and Alamo Lakeline, LLC ("Tenant") for the premises located at 3729 Research Boulevard in Austin, TX.

Dear Ms. Reynolds:

Pursuant to Section 5.2 (c) of the Lease, a rental adjustment is due on the first day of the sixth Lease Year, which was August 1, 2018. The rental increase is to be the lesser of 10% or three times the CPI increase over the prior 5 year term. Since three times the CPI of 7.88% is greater than 10%, the annual rent will increase by 10%. The new Annual Rent effective August 1, 2018 is $1,017,324.00, which is $84,777.00 per month.

Please remit the additional $7,707.00 that was due for August as soon as possible and make sure to update the September monthly payment to reflect the new rent amount of $84,777.00.


Please feel free to call me at (816) 472-1700 or e-mail me at johnnad@eprkc.com if you have any questions.

Sincerely,



Johnna Davis
Senior Lease Operations - Entertainment
30 West Pershing, LLC

CC:     ZoAnn Peace
        Tammy Perkins

909 Walnut, Suite 200
Kansas City, MO 64106
816.472.1700
Toll Free: 888 EPR REIT
Fax: 816.472.5794
www.eprkc.com

# EPR Properties

## MINIMUM RENT  CPI INVOICE

Property Address:    Alamo Drafthouse-Lakeline
Tenant Name:         Lakeline/Alamo-Facility Lease
Space Number:        A
Invoice Date:        Tuesday, August 28, 2018

| CONSUMER PRICE INDEX ADJUSTMENT |
| CPI - Urban Consumer |

| | |
|---|---:|
| Billing Index for 7/2018 | 252.006 |
| Base Index for 7/2013 | 233.596 |
| | |
| Percentage Increase | 7.88% |
| | |
| Annual Amount for Increase Calculation | 924,840.00 |
| Percent Share of Increase per Lease | 100.00% |
| Annual Amount Subject to CPI Increase | 924,840.00 |
| | |
| Amount of Annual Increase Based on Percent Increase in CPI Effective 8/1/2018 | 72,887.83 |
| Amount of Annual Increase Based on 10% Maximum | 92,484.00 |
| | |
| Amount of Annual Increase after Min/Max Comparison | 72,887.83 |
| Current Annual Minimum Rent          Amount | 924,840.00 |
| New Annual Minimum Rent          Amount | 1,017,324.00 |

**New Monthly Minimum Rent**
    **Amount Effective Wednesday, August 01, 2018**      **84,777.00**

| RETROACTIVE AMOUNT DUE FOR PRIOR PERIODS |

| | | |
|---|---|---:|
| Minimum Rent | Due From 8/1/2018 To 8/31/2018 | 84,777.00 |
| Minimum Rent | Billed From 8/1/2018 To 8/31/2018 | 77,070.00 |

**Minimum Rent**    **7,707.00**
**0.00**

**Retroactive Amount Now Due**    **7,707.00**

Database:   ENTERTAINPRP
Compare Period:   07/18
Posted to Batch #HO026317

CPI Increase Report
EPR Properties

Page: 1
Date: 8/28/2018
Time: 11:18 AM

| Lease Id Occupant Name | Formula | Inc Cat Actual/ Alt. | Frq. | CPI Id | R B Y | Base/ Comp Period | Base/ Comp Index | Max/ Min. % | CPI Incr % | Annual Amt to Base Calc | Limit % | U C | Annual Increase Amount | Current Annual Amount to Increase | Bill Freq | New Recurring Amount | Effective/ Next Bill Date | Retroactive/ Rent Tax Billing |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 100740-HOO437 Lakeline/Alamo-Facility Lease | CPIBILL3 | MIN | 60 | CPIU | Y | 07/13 07/18 | 233.596 252.006 | 10 | 23.64 | 924,840.00 | 100.00 | Y | 92,484.00 | 924,840.00 | M | 84,777.00 | 8/1/2018 9/1/2018 | 7,707.00 0.00 |

# EXHIBIT 9

## DECLARATION OF PROTECTIVE COVENANTS AND COMMON AREA MAINTENANCE AGREEMENT

THIS DECLARATION OF PROTECTIVE COVENANTS (this "**Declaration**"), is made and entered into as of the 17 day of September, 2012 (the "**Effective Date**"), by and between **LAKELINE MARKET, LTD.**, a Texas limited partnership ("**Declarant**" or "**Lakeline**"), and **30 West Pershing, LLC**, a Missouri limited liability company ("**Pershing**").

### WITNESSETH:

WHEREAS, Lakeline is the fee owner of a tract of land containing in the aggregate approximately 38.956 acres, more or less, located near the southwest corner of S. Lakeline Boulevard and U.S. Highway 183, in the City of Austin, Williamson County, Texas, which tract of land is described in **Exhibit "A"** attached hereto and by this reference made a part hereof (the "**Lakeline Tract**"); and

WHEREAS, Pershing, on even date herewith, will become the fee owner of a certain tract of land containing 3.739 acres, more or less, also located near the southwest corner of S. Lakeline Boulevard and U.S. Highway 183, in the City of Austin, Williamson County, Texas, which tract of land is described in **Exhibit "B"** attached hereto and by this reference made a part hereof (the "**Theater Tract**"); and

WHEREAS, the Lakeline Tract and Theater Tract may hereinafter be referred to individually as a "**Tract**" and together as the "**Tracts**"; the definition of "Tract" shall also include any parcel of land within the Lakeline Tract or Theater Tract, legally existing on this date, and as created from time to time, together with the buildings and improvements located thereon, from time to time;

WHEREAS, the Lakeline Tract together with the Theater Tract together comprise the Lakeline Market Shopping Center (the "**Shopping Center**"). The location of the Shopping Center, and the Theater Tract are shown on **Exhibit "C"** attached hereto (the "**Site Plan**");

WHEREAS, the Shopping Center is subject to the terms of that certain Declaration of Covenants, Restrictions and Reciprocal Easements entered into by Lakeline and recorded in the Official Public Records of Williamson County, Texas under Document No.2012076732(the "**Master Declaration**"); terms used herein, but not defined herein shall have the meaning ascribed thereto in the Master Declaration;

WHEREAS, the record owner of fee title to any Tract shall hereinafter be referred to as an "**Owner**";

WHEREAS, Lakeline and Pershing desire to enter into this Declaration to grant certain easements and to establish certain standards and restrictions governing the use, development and operation of the Tracts as set forth herein.

NOW, THEREFORE, in consideration of the foregoing, and the covenants and agreements on the part of each party to the others, as hereinafter set forth, IT IS AGREED as follows:

1.      **Common Area Maintenance.** The Master Declaration imposes certain obligations upon the Owners to maintain the Common Areas (as defined in the Master Declaration) situated upon their Tracts. Notwithstanding anything in the Master Declaration to the contrary the Owner of Lot 1, Block "A" of the Lakeline Retail Subdivision Section I according to the map or plat thereof recorded under Document No. 2012005731 of the Plat Records of Williamson County, Texas (the "**Main Shopping Center Tract**") as depicted on the Site Plan shall maintain the Common Areas of the Theater Tract in

accordance with the maintenance standards set forth in the Master Declaration, subject to reimbursement from the Owner of the Theater Tract in accordance with the terms of this Declaration.

2. **Assessments**.

a. Pershing hereby covenants and agrees, which agreement shall be binding on any future Owner of the Theater Tract, to pay to Declarant (or any successor Owner of the Main Shopping Center Tract) base monthly assessments (referred to as "**Assessments**"). Assessments shall be fixed, established and collected from time to time, all as hereinafter provided. The Assessments, together with such interest thereon and costs of collection thereof, as hereinafter provided, shall be a charge on and a continuing lien upon the Theater Tract and the improvements thereon. Each Assessment, together with such interest thereon and cost of collection thereof, as hereinafter provided, shall also be the personal obligation of the Owner(s) that own the Theater Tract. In the case of co-ownership of the Theater Tract, each co-owner shall be jointly and severally liable for the entire amount of any Assessment. Should the Declarant employ an attorney to collect any Assessment, it shall be entitled to collect, in addition thereto, all costs of collection including without limitation reasonable attorney's fees. No Owner may waive or otherwise exempt itself from liability for any Assessments for any reason including, by way of illustration and not limitation, non-use of the Common Areas or any services provided by the Declarant or abandonment of the Theater Tract. No diminution or abatement of any Assessment or set-off shall be claimed or allowed for any reason whatsoever, including, by way of illustration and not limitation, any alleged failure of Declarant to (1) take some action, (2) perform some function required to be taken or performed by Declarant under this Declaration or otherwise, or (3) provide some service required or permitted to be provided under the terms of this Declaration or for inconvenience or discomfort arising from the making of repairs or improvements which are the responsibility of Declarant, or from any action taken to comply with any law, ordinance or any order or directive of any municipal or other governmental authority.

b. The Assessments levied hereunder shall be used for the purpose of paying all costs and expenses incurred by the Declarant in connection with providing for the maintenance and repair of the Common Areas of the Shopping Center in accordance with the standards set forth in the Master Declaration pursuant to the terms of this Declaration (the "**Common Area Costs**"), including but not limited to, costs of (i) landscaping and groundskeeping, including planting, replanting and replacing flowers, trees, shrubbery, planters and other landscaping items and materials (ii) maintenance, repair, sweeping and striping of the parking lot, service drives, driveways, curbs, fences, guardrails, bumpers and sidewalks of the common area , (iii) snow and ice removal, (iv) maintenance, repair and replacement of bulbs, poles and light fixtures in connection with the common area lighting, (v) security service and personnel (including within such costs and expenses for such personnel, salaries, wages, expenses and other compensation, life, disability, medical and health insurance and the like) (if Declarant so elects), (vi) maintenance and repair of utility systems serving the Common Area, including but not limited to water, storm water lines and drainage systems, electrical and lighting systems (vii) cleaning, sweeping and removal of Common Area trash and debris, (viii) installing and maintaining signs located in the Common Area, (ix) maintenance and repair of sprinkler systems serving the Common Area, (x) pest control in the Common Area, (xi) seasonal decoration, (xii) supplies related to the operation of the Common Area, (xiii) the cost of repair, maintenance and painting of gutters, rails and benches in the Common Areas, (xiv) all utility costs associated with the operation of the Common Areas, (xv) the costs of the inspection, maintenance and repair of any and all machinery and equipment used in the operation and maintenance of the Common Area, including personal property taxes and other charges and taxes incurred in connection with such equipment, (xvi) detention and water quality pond and storm drainage maintenance and repair but excluding the cost of Declarant's initial construction obligations, and the costs of insurance and taxes, (xvii) payment of the cost of an annual audit of the books, records, and accounts of the Declarant related to the administration of the Common Areas, (xviii) payment of legal fees, (xix)

2

payment of the salary, fee, administrative costs and other charges of any agent, (xx) establishment of reasonable reserves for future repairs, replacements and improvements, (xxi) payment of the cost of labor, equipment, materials, management, and supervision necessary to carry out the authorized functions of the Declarant; (xxii) commercial general liability insurance maintained by Declarant with respect to the Common Areas; and (xxiii) an administrative fee payable to Declarant equal to ten percent (10%) of all other Common Area Costs; provided, however, that such Assessments shall not be used to pay for, or to reimburse Declarant for the cost of, capital improvements contemplated and provided for in Declarant's initial development plans for the Shopping Center ("**Capital Improvements**").

Notwithstanding anything to the contrary set forth anywhere is this Declaration, such Assessments shall not be used to pay for, or to reimburse Declarant for the following:

        (1)     property insurance premiums;

        (2)     costs of personnel except those wholly or partially employed in the maintenance of the Common Areas;

        (3)     amounts paid to any management and/or administrative personnel of Declarant at or above the level of Shopping Center manager, nor any third party property management fees.

        (4)     expenses for accounting, legal or other professional services, except to the extent related to Common Area maintenance;

        (5)     costs related to making the Common Areas comply with laws, rules and orders of federal, state and municipal authorities in effect prior to the Effective Date (except that the Assessments shall expressly include any costs incurred by Declarant to bring the Common Areas into compliance with changes in laws and governmental rules and regulations that are amended, promulgated or enacted after the Effective Date and laws in existence as of the Effective Date but which are thereafter interpreted differently than the same were interpreted by the promulgating authority or courts of competent jurisdiction as of the Effective Date applicable to the occupancy and use of the Shopping Center or any portion thereof including capital costs, provided that such costs are amortized (based on the useful life of the item in question determined in accordance with Generally Accepted Accounting Principles, consistently applied) ("**Common Area Legal Compliance Expenses**");

        (6)     expenses in the nature of interest, fines or penalties incurred due to Declarant's failure to pay required sums prior to delinquency, except to the extent occasioned by the Owner of the Theater Parcel's failure to timely make any required payment hereunder;

        (7)     depreciation on any personal or real property;

        (8)     except for permitted capital improvements, financing costs associated with any personal or real property including, without limitation, interest, principal amortization, ground lease payments, points, late payment fees, commissions and legal fees;

        (9)     contributions to religious, charitable and/or political organizations;

        (10)    fees, dues or expenses incurred for or relating to any merchants association or for the purpose of advertising, promoting or otherwise marketing the Shopping Center;

        (11)    real property taxes;

064883.00093  153278 v7

(12)     expenses for maintaining portions of the Commons Areas maintained or required to be maintained by any Stand Alone Occupant of the Shopping Center.

c.     The base monthly assessments shall be based on and calculated according to the following:

(1)     The amount of base monthly assessment for a calendar year, which shall be determined by Declarant, in its reasonable discretion, shall be based upon a budget of Common Area Costs for the Shopping Center prepared by Declarant for said calendar year and delivered to the Owner of the Theater Tract at least thirty (30) days prior to the commencement of such calendar year or as soon thereafter as practicable. If Declarant fails to provide such budget prior to the commencement of a calendar year, the Owner of the Theater Tract shall continue to pay based upon the monthly assessment for the prior calendar year, until such time that the Declarant establishes the base monthly assessment for the applicable calendar year. If the base monthly assessment established by the Declarant is more than the amount paid by the Owner of the Theater Tract as provided in the immediately preceding grammatical sentence, then the Owner of the Theater Tract immediately shall pay to the Declarant such Owner's share of any such deficiency. If the base monthly assessment established by the Declarant is less than the amount paid by the Owner of the Theater Tract as aforesaid, then the Owner of the Theater Tract shall be refunded its excess overpayment, without interest. The fixed base monthly assessment for the Theater Tract shall be equal to the product of (a) the total estimated Common Area Costs for the applicable calendar year as set forth in such proposed budget, (b) Pershing's Proportionate Share (as hereafter defined) and (c) 1/12th. As used herein, "**Proportionate Share**" shall mean a fraction, the numerator of which shall be the total Floor Area (as such term is defined in the Master Declaration) of the improvements constructed upon the Theater Tract, and the denominator of which shall be the total Floor Area of the improvements constructed upon the Shopping Center. If at any time during a calendar year it shall appear that Declarant has underestimated the owner of the Theater Tract's proportionate share of the base monthly assessment for such calendar year, Declarant may re-estimate the Owner of the Theater Tract's base monthly assessment and may bill the Owner of the Theater Tract for any deficiency which may have accrued during such calendar year and thereafter the base monthly assessment payable by the Owner of the Theater Tract shall also be adjusted, and the Owner of the Theater Tract shall be allowed at least thirty (30) days to make the necessary adjustment. Notwithstanding the foregoing provisions, if there are costs incurred in the reasonable judgment of Declarant that are otherwise includable in the definition of Common Areas Costs but that are solely attributable to the use of the Theater Tract, such as additional security costs or additional trash pickup, pressure washing, etc., then the Owner of the Theater Tract shall instead be liable for 100% of such actual out-of-pocket costs plus an administrative fee equal to ten percent (10%) of such costs which sum may be included in the base monthly Assessment or shall otherwise be payable by the Owner of the Theater Tract within thirty (30) days following receipt of a written invoice therefor. In addition, the Owner of the Theater Tract shall be solely responsible for asphalt or concrete repairs due to damage caused by delivery vehicles servicing the building(s) on the Theater Tract, and shall be payable by the Owner of the Theater Tract within thirty (30) days following receipt of a written invoice therefor. Notwithstanding the foregoing provisions, in any instance where a lessee, an occupant or owner (for convenience, referred to herein as a "**Stand Alone Occupant**") of any portion of the Shopping Center, at its expense, separately maintains its improvements and a portion of the Common Area and provided no charges for maintenance applicable to the portion of Common Areas of the Shopping Center maintained by such Stand Alone Occupant are included in Common Area Costs billed to Theater Tract Owner hereunder, the Floor Area of such occupant's building shall be excluded from the denominator used to compute Theater Tract's Proportionate Share of Common Area costs.

(2)     Within one hundred twenty (120) days after the end of each calendar year or as soon as when actual Common Area Costs for the Shopping Center for a given calendar year are known, Declarant shall give prompt written notice of the actual Common Area Costs, whereupon

4                    064883.00093  153278 v7

Declarant shall have the right to levy an additional base assessment to cover any deficiency between the actual amounts paid by the Owner of the Theater Parcel and the Owner of the Theater Tract's Proportionate Share of actual Common Areas Costs for such year. Any such additional base assessment shall be due and payable within fifteen (15) days following written notice to the Owner of the Theater Tract of such assessment from Declarant. If Tenant's payments for any calendar year of its Proportionate Share based upon Declarant's estimate of Common Area Costs exceeds Tenant's Proportionate Share of the actual Common Area Costs for such calendar, then within thirty (30) days following determination of the actual Common Area Costs for such year, Declarant shall either refund such overpayment to the Owner of the Theater Tract or credit such overpayment to the Owner of the Theater Tract against the nest ensuing Assessment(s) due. Failure to provide the notice called for hereunder shall not relieve the Owner of the Theater Tract from its obligations hereunder, provided, however, the Owner of the Theater Tract shall not be required to pay any increase in the base monthly assessments for so long as any such statement is past due.

(3)     Within one hundred eighty (180) days following the Owner of the Theater Tract's receipt of the annual statement of Common Area Costs, the Owner of the Theater Tract shall have the right to audit Declarant's books and records with respect thereto. Before conducting any audit, the Owner of the Theater Tract must pay the full amount of Common Area Costs billed. The Owner of the Theater Tract may review only those records of Declarant that are specifically related to Common Area Costs. Without limiting the foregoing, the Owner of the Theater Tract may not review any other leases or Declarant's tax returns or financial statements. In conducting an audit, the Owner of the Theater Tract's auditor shall not be paid on a contingency or percentage of recovery basis. The audit shall be conducted during business hours in a location in the Austin, Texas area reasonably determined by Declarant. The Owner of the Theater Tract will keep confidential all agreements involving the Owner of the Theater Tract's audit rights hereunder and the results of any audits conducted hereunder. Notwithstanding the foregoing, the Owner of the Theater Tract shall be permitted to furnish the foregoing information to its attorneys, accountants and auditors to the extent necessary to perform their respective services for the Owner of the Theater Tract. The Owner of the Theater Tract may not conduct an audit more often than once each calendar year. The Owner of the Theater Tract may audit records with respect to each calendar year only one time. No audit shall cover a period of time in excess of the calendar year immediately preceding the audit. In the event the audit discloses an overstatement of Common Area Costs of four percent (4%) or more, Declarant shall within 30 days reimburse the Owner of the Theater Tract for the reasonable and documented out-of-pocket cost of the audit (not to exceed $3,000.00) as well as the amount of any related overpayment by the Owner of the Theater Tract.

d.     Upon written request of any Owner, mortgagee under any Mortgage or prospective owner of the Theater Tract, the Declarant shall issue an acknowledged certificate in recordable form setting forth the amounts of any unpaid Assessments or other amounts due hereunder, if any, with respect to the Theater Tract, and setting forth generally whether or not, to the Declarant's actual knowledge (and without prejudice to the Declarant's rights and remedies under this Declaration with respect to matters of which it has no actual knowledge), the existing Owner is in violation of any of the terms, provisions and/or conditions of this Declaration. Said written statement shall be conclusive upon the Declarant as to requirements and obligations set forth in this Declaration in favor of the Persons who rely thereon in good faith. Such statements shall be furnished by the Declarant within a reasonable period of time, but not to exceed ten (10) Business Days from the receipt of a written request for such written statement, accompanied by the required fee, mailed to the notice address of Declarant (if the Declarant has not yet been formed) or the Declarant. In the event the Declarant fails to furnish such statement within said ten (10) Business Days, it shall be conclusively presumed that there are no unpaid Assessments or other amounts due hereunder relating to the Theater Tract as to which the request was made.

064883.00093   153278 v7

e.     Each payment of base monthly assessment shall be due and payable, without offset or deduction of any kind on the first day of each calendar month during the term of this Declaration. If any Assessment or other amount under this Declaration is not paid on or before the tenth (10th) day after the due date with respect thereto, then such Assessment and/or other amount shall become delinquent, and shall, until paid in full, together with such interest thereon at the Default Interest Rate from the due date (without taking into consideration the aforementioned ten (10) day cure period) and the third party costs of collection thereof, be a charge and continuing lien on the Theater Tract, and all improvements thereon, against which each such Assessment or other amount is made. In addition to the lien rights afforded to the Declarant hereunder, the personal obligation of the then Owner to pay such Assessment and other amounts shall remain its personal obligation and shall further pass as a personal obligation to its successors in title whether or not expressly assumed by such successors.

f.     If an Assessment or other amount due under this Declaration is not paid within ninety (90) days after the due date with respect thereto (without taking into consideration the ten (10) day cure period set forth in subsection (e) above), the Declarant may: (1) bring an action at law against the Owner personally obligated to pay the Assessments, and/or (2) in an appropriate judicial proceeding, foreclose the lien created in favor of the Declarant by the provisions of this Section 2, and in connection therewith, the Declarant may avail itself of any and all rights and remedies available to a foreclosing mortgagee under Texas common law or statutory means of foreclosure, and (3) collect in said action or through said proceeding the delinquent Assessments, together with the Default Interest Rate thereon, the late charge permitted to be charged in the following paragraph and the third party costs of collection, the third party costs of preparation and filing of any lien, and reasonable attorneys' fees of any such action or proceeding. The lien provided for under this Section 2 shall secure the payment of the Assessments, the Default Interest Rate thereon, the aforesaid late charge and the aforesaid costs and reasonable attorneys' fees. No Owner may waive or otherwise avoid liability for Assessments due as provided for herein by non-use of the Common Areas and facilities or abandonment or transfer of the Theater Tract. Except as otherwise provided in Section 2(h) hereof, the lien created by this Section 2(f) shall be superior to and take precedence over any mortgage or other encumbrance constituting a lien on the Theater Tract or any portion thereof. Pershing and each successor Owner, by his acceptance of a deed or other conveyance to the Theater Tract, (i) vests in the Declarant, or its agents, the right and power to bring action against such Owner personally for the collection of such charges as a debt and to foreclose the aforesaid lien in any appropriate proceeding at law or in equity; and (ii) hereby waives any and all rights of redemption or reinstatement from foreclosure and from sale under any order or decree of foreclosure of any lien created pursuant to this Declaration, for itself and on behalf of: (1) any trust estate of which the Theater Tract is a part and of all beneficially interested Persons; (2) each and every Person acquiring any interest in the Theater Tract or title to the Theater Tract subsequent to the date of this Declaration; and (3) all other Persons to the extent permitted by the provisions of the laws of the State of Texas. The remedies herein provided shall not be exclusive and the Declarant may enforce any other remedies to collect delinquent assessments as may be provided in this Declaration, by law and/or in equity.

g.     In addition to the other remedies and rights afforded to Declarant and the Declarant in the event an Assessment or other amount due under this Declaration becomes delinquent, the Declarant, in its sole discretion, may take any or all of the following actions: (a) if not paid in full on or before the tenth (10th) day after such Assessment or other amount is due, assess a late charge of not more than five percent (5%) of the delinquent amount; (b) assess the interest charge as provided in subsection (e) above; (c) bring an action at law against any Owner personally obligated to pay the delinquent installments; (d) subject to the terms of the immediately preceding grammatical paragraph, file a statement of lien with respect to the Theater Tract, and foreclose on the Theater Tract; and (e) suspend the rights of the Owner and the Owner's occupants to use the Common Areas during any period of delinquency, except for those Common Areas that are essential for ingress and egress to and from the Theater Tract.

064883.00093   153278 v7

h. The liens and permanent charges of all Assessments (annual, special, or otherwise) provided for herein shall be subordinate to the lien of any deed of trust or mortgage (collectively, "**Mortgage**") placed on the Theater Tract if, and only if, all Assessments and charges with respect to such parcel authorized herein and having a due date on or prior to the date such Mortgage is filed for record have been paid in full. The liens and permanent charges hereby subordinated are only such liens and charges as relate to Assessments and charges authorized hereunder having a due date subsequent to the date such Mortgage is filed for record and prior to the satisfaction, cancellation or foreclosure of such Mortgage or the sale or transfer of the Theater Tract pursuant to a sale under power contained in such Mortgage. Such subordination shall not relieve the Owner of the mortgaged parcel of its personal obligation to pay any and all Assessments and charges coming due at a time when it is the Owner of such parcel; and shall not relieve such parcel from the liens and permanent charges provided for herein (except to the extent a subordinated lien and permanent charge are extinguished as a result of subordination as against a mortgagee or such mortgagee's assignee or transferee by foreclosure or by sale or transfer in any proceeding in lieu of foreclosure or by sale under power). No sale or transfer of the Theater Tract to the mortgagee, or to any other Person, pursuant to a decree of foreclosure, or pursuant to any other proceeding in lieu of foreclosure, or pursuant to a sale under power shall relieve any existing or previous Owner of Theater Tract of any personal obligation (except to the extent a subordinated lien and permanent charge are extinguished as a result of subordination as against a mortgagee or such mortgagee's assignee or transferee by foreclosure or by sale or transfer in any proceeding in lieu of foreclosure or by sale under power), or relieve Theater Tract, or the then Owner of the Theater Tract, from liability for any Assessments or charges authorized hereunder coming due after such sale or transfer. Notwithstanding the foregoing, the Declarant may at any time, either before or after any Mortgage or Mortgages are placed on Theater Tract, waive, relinquish, or quitclaim, in whole or in part, the right of the Declarant to Assessments and other charges collectible by the Declarant hereunder with respect to the Theater Tract coming due during the period while Theater Tract is or may be held by the prior mortgagee or mortgagees which have become an Owner as the result of a sale or transfer pursuant to a decree of foreclosure, sale under power, or any other proceeding in lieu of foreclosure.

i. All portions of the Property (1) dedicated to and accepted by the City of Austin, or any other public authority, body or agency, or (2) owned by the Declarant (or owned by Declarant, but designated as a Common Area, even if not yet conveyed to the Declarant) shall be exempt from Assessments, charges and liens created under this Declaration.

j. In addition to the personal obligation of each Owner of the Theater Tract to pay all Assessments thereon and the Declarant's perpetual lien on the Theater Tract for such Assessments, all successors to the fee simple title of the Theater Tract, except to the extent otherwise expressly provided in this Section 2, shall be jointly and severally liable with the prior Owner or Owners thereof for any and all unpaid Assessments, interest, late charges, costs, expenses, and attorneys fees against Theater Tract, without prejudice to any such successor's right to recover from any prior Owner any amounts paid thereon by such successor. In addition, such successor shall be entitled to rely on the statement of liens and amounts due shown on any certificate issued by or on behalf of the Declarant as provided in this Declaration. Notwithstanding the foregoing, in no event shall a Person that owned the Theater Tract be obligated for any amounts due and payable under this Declaration which first arise and accrue from and after the date that such Person shall have conveyed and transferred all of its interest in and to, and is no longer the Owner of, the Theater Tract.

3. **Protected Area**. Except as may be required by Governmental Regulations (as hereinafter defined), Declarant agrees that it shall not modify the access drives or parking areas situated within the Protected Area shown on the Site Plan and herein so called in any manner that would

064883.00093 153278 v7

materially and negatively affect the access to the Theater Tract from that shown thereon or materially reduce the number of surface parking spaces within the Protected Area.

4. **Maintenance.** The Owner of the Theater Tract shall maintain, at its sole cost and expense, all buildings and related improvements not defined as Common Areas that are located on the Theater Tract. The maintenance obligation by the Owner of the Theater Tract shall include the area within the curb adjacent to the building, including the sidewalks, landscaping and service areas adjacent to the building. The Owner of the Theater Tract shall, at its sole cost and expense, arrange for the regular removal of refuse and garbage from the Theater Tract, and shall cause all trash and garbage to be stored only in receptacles of the size, design and color of Declarant, and only in locations approved by Declarant. The Owner of the Theater Tract shall not operate an incinerator, or burn trash or garbage on the Theater Tract. Notwithstanding anything to the contrary contained in this Declaration, the Owner of the Theater Tract shall, at its sole cost and expense, maintain, repair and replace, at its sole cost and expense, any exterior shipping/receiving dock area, any truck ramp or truck parking area and any refuse, compactor or dumpster area, in good order, condition and repair. In addition, the Owner of the Theater Tract shall be responsible, at its sole cost and expense, for any repair, replacement or renovation costs to the Common Areas located on the Theater Tract (including the parking lot) that are deemed to be capital in nature and that are not permitted by the terms of this Declaration to be passed through to the Owner of the Theater Tract as a Common Area Cost. The Owner of the Theater Tract shall, at its sole cost and expense, keep the building and trash and loading areas adjacent to the building located on the Theater Tract free from insects and pests at all times. In the event that a grease trap is utilized by the building on the Theater Tract, the Owner of the Theater Tract shall, at its sole cost and expense, maintain a grease trap maintenance agreement at all times which provides for regular pumping or treatments. Declarant may require the Owner of the Theater Tract to increase the frequency of pumping or treatments in the event there is excess grease spill-over or a wastewater surcharge increase billed to Declarant due to the chemical makeup of the wastewater.

The Owner of the Theater Tract shall use reasonable efforts to construct and cause to be opened to the public a fully-equipped, stocked and staffed first-class motion picture theater operated under the tradename "Alamo Drafthouse Theater" comparable to other Alamo Drafthouse Theater locations ("**AD Theatre**") within one-year of the Effective Date within a building constructed in accordance with plans therefore approved by Declarant pursuant to the Master Declaration (the "**Theater Building**"). Seating within the Theater Building shall not exceed 1,000 seats without Declarant's prior written consent.

5. **Signage.** Notwithstanding anything to the contrary in the Master Declaration, the Owner of the Theater Tract shall have right to install signage on the Theater building consistent with the Alamo Drafthouse prototypical signage package, subject to the City of Austin's approval, Governmental Regulations and the Declarant's approval, which shall not be unreasonably withheld. In the event of a change in use of the building located on the Theater Tract, all new signage shall be subject to the prior written approval of Declarant, which shall not be unreasonably withheld. In addition, the Owner of the Theater Parcel shall have the right to install signage on a panel on the pylon sign (the "**Highway 183 Sign**"); designated A-1 on the Master Signage Plan attached hereto as **Exhibit "E"** (the "**Sign Plan**"), provided that the Owner of the Theater Tract shall pay its proportionate share (based on the size of the panels) of the cost to design, permit, construct, install and maintain such pylon sign. Pershing's designated sign panels on the Highway 183 Sign shall be third from the top. Prior to installation of its vinyl sign faces on its designated sign panel on the Highway 183 Sign, the Owner of the Theater Tract shall reimburse Declarant for the Owner of the Theater Tract's pro-rata share (as hereinafter defined) of the cost of construction of the Highway 183 Sign and obtain Declarant's prior written approval of the design of such sign faces, such approval by Declarant not to be unreasonably withheld, conditioned or delayed. The Owner of the Theater Tract's use of its designated sign panel on the Highway 183 Sign will conform in all respects with applicable Governmental Regulations. The Owner of the Theater Tract shall

064883.00093 153278 v7

have the right, at its sole cost and expense, to design, install and construct signage on a panel on a monument sign to be constructed by the Owner of the Theater Tract along Pecan Park Boulevard (the "**Pecan Park Sign**"), in the approximate locations designated as B-2 on the Sign Plan. Pershing shall obtain Declarant's prior written approval of the design of the Pecan Park Sign, such approval by Declarant not to be unreasonably withheld, conditioned or delayed provided that such Pecan Park Sign is of consistent size and design as the other monument signs in the Shopping Center.

Declarant shall be responsible for maintaining the Highway 183 Sign; provided, however, that the Owner of the Theater Tract shall reimburse Declarant for (i) 100% of the cost to install and maintain in a first-class manner the Owner of the Theater Tract's vinyl sign faces on its designated sign panel on the Highway 183 Sign (or the Owner of the Theater Tract shall pay such amounts directly to the applicable vendor), and (ii) the Owner of the Theater Tract's pro-rata share of the out-of-pocket costs incurred by Declarant to operate, repair, insure and maintain the Highway 183 Sign (including, without limitation, operation, repair, replacement, utilities, insurance and taxes associated therewith), and (iii) 100% of the costs incurred by Declarant to operate, repair, insure and maintain the Pecan Park Sign (including, without limitation, operation, repair, replacement, utilities, insurance and taxes associated therewith). For purposes hereof, the Owner of the Theater Tract's pro-rata share of the Highway 183 Sign costs shall equal the ratio, expressed as a percentage, that the square footage of the sign panel of the Owner of the Theater Parcel bears to the total square footage of all of the sign panels on the Pecan Park Sign. The Owner of the Theater Tract's pro-rata share of the Highway 183 Sign costs and the maintenance costs described above shall be payable within thirty (30) days following its receipt of a written request therefor from Declarant (but in no event more often than quarterly). Declarant, at its sole discretion and expense, may relocate or rebuild the Highway 183 Sign without the Owner of the Theater Tract's consent, provided that the Owner of the Theater Tract shall retain use of its designated sign panel on the Highway 183 Sign as set forth above. The Owner of the Theater Tract hereby agrees to indemnify, defend and hold harmless Declarant from and against any and all injuries, losses, liabilities, damages, expenses, causes of action, suits, claims or judgments, including but not limited to, reasonable attorneys' fees, arising out of or attributable to the Owner of the Theater Tract's installation, use, maintenance, repair or replacement of its designated sign panel on the Highway 183 Sign.

6.     **Real Estate Taxes.** Each Owner shall pay all real estate taxes and assessments levied upon its Tract before delinquency; provided that each Owner shall have the right to withhold such payment so long as it contests in good faith, with diligence, through appropriate proceedings, any such real estate taxes and assessments. Declarant shall use commercially reasonable efforts to cause the Additional Tax Parcel shown on **Exhibit "D"** attached hereto (the "**Additional Tax Parcel**") to be assessed as a separate tax parcel from the balance of the Shopping Center. If the Additional Tax Parcel is separately assessed, the Owner of the Theater Tract shall pay all real property taxes and assessments against the Additional Tax Parcel directly to the applicable taxing authority or authorities. The Owner of the Theater Tract shall make payments attributable to the Theater Tract, and if separately assessed, the Additional Tax Parcel, directly to an applicable taxing authority on or before the due date thereof or (ii) fifteen (15) days after Declarant provides the Owner of the Theater Tract with a copy of the tax bill for the Additional Tax Parcel (if not sent directly to The Owner of the Theater Tract by the taxing authority). Within ten (10) days after receipt of Declarant's written request therefor, the Owner of the Theater Tract shall furnish Declarant with copies of paid receipts evidencing the Owner of the Theater Tract's payment of all taxes attributable to the Theater Tract and, to the extent applicable, the Additional Tax Parcel. Notwithstanding the foregoing, if the Additional Tax Parcel has not been separately assessed (despite Declarant's having exercised commercially reasonable efforts to cause such separate assessment) during any tax year, Declarant shall pay the real property taxes and assessments for the Additional Tax Parcel for such tax year and the Owner of the Theater Tract shall reimburse Declarant, the Proportionate Share of real property taxes and assessments for the Shopping Center, provided that real estate taxes shall exclude any building improvements and the determination of Proportionate Share and taxes shall exclude taxes

9                     064883.00093  153278 v7

paid by any Stand Alone Occupant who pays taxes directly to the taxing authority on a portion of the Shopping Center. Any such payment due by the Owner of the Theater Tract to Declarant shall be made on or before the later of (i) thirty (30) days prior to the due date therefor, or (ii) fifteen (15) days after Declarant has furnished the Owner of the Theater Tract with a copy of the paid tax bill and a copy of Declarant's computations establishing the amounts payable by the Owner of the Theater Tract. If an Owner fails to comply with this Section, any other Owner may pay the delinquent Owner's real estate taxes and assessments and shall be entitled to immediate reimbursement from the delinquent Owner upon written notice.

7.  **Use of Theater Tract**.

a.  The Theater Tract shall be initially opened and operated as an AD Theater (the "**Permitted Use**"); provided that any so-called adult or X-rated movie business which, as a general policy, exhibits "X-rated" or "NC-17" (or equivalent) films shall not be permitted to be operated on the Theater Tract (but the Owner or operator of the AD Theater shall be permitted to show such motion pictures or telecasts occasionally if, in such person's reasonable business judgment, such motion picture or telecast has artistic merit or is a so-called "legitimate" film). The Owner of the Theater Tract has entered into a Lease of the Theater Tract with Alamo Lakeline LLC ("**Alamo Drafthouse**") which contains a covenant that Alamo Drafthouse will operate as an AD Theater throughout the Required Operations Period except for Permitted Discontinuances (the "**Operations Covenant**"). For purposes hereof, the Theater Building will be deemed operated as an AD Theater provided that a minimum of Six (6) of its ten (10) screens are in operation. The Owner of the Theater Tract agrees to use commercially reasonable efforts to enforce the Operations Covenant and shall not release, modify or reduce the Operations . Covenant during the Required Operations Period. During the Required Operations Period (as hereafter defined), the Theater Tract may only be used for the Permitted Use. Following the expiration of the Required Operations Period, the Theater Tract, subject to the restrictions on use set forth below, may be used for any other lawful first-class retail purpose commonly found in comparable shopping centers in Austin, Texas. Notwithstanding the foregoing, the Theater Tract may under no circumstances be used for any use which (i) is the same or essentially similar to the use of any existing tenant or occupant of the Shopping Center who occupies in excess of ten thousand square feet of Floor Area (as such term is defined in the Master Declaration), (ii) violates any of matters of record in Williamson County which affect the Theater Tract as of the date hereof as reflected in the Special Warranty Deed from Declarant to Pershing of even date herewith, (iii) constitutes a public or private nuisance, (iv) violates any laws, regulations, ordinances, or requirements of any governmental authority having jurisdiction over the Theater Tract (the "**Governmental Regulations**"), (v) constitutes a prohibited use set forth in the Master Declaration (the "**Prohibited Uses**"), (vi) violates any exclusive use provision granted by Landlord to another tenant, owner or occupant of any portion of the Shopping Center as of the date hereof, as set forth on **Exhibit "F"** attached hereto (the "**Exclusive Use Restrictions**").

b.  Declarant shall be the sole determinant of the type and amount of security services to be provided to the Common Areas of the Shopping Center, if any. Declarant shall not be liable to the Owner of the Theater Tract, and the Owner of the Theater Tract hereby waives any claim against Declarant for any unauthorized or criminal entry of third parties into the building on the Theater Tract, including any damage or loss resulting therefrom, regardless of any action, inaction, failure, breakdown or insufficiency of security, even if the claim is the result of or is caused the negligent acts or omissions of Declarant or its agents.

c.  The Owner of the Theater Tract shall not permit any objectionable or unpleasant odors to emanate from the building on the Theater Tract, nor place or permit any radio, television, loudspeaker or amplifier on the roof or outside the building, or where the same can be seen or heard from outside any building on the Theater Tract, provided that the Owner of the Theater Tract may have outdoor

064883.00093  153278 v7

speakers playing music and for announcements on its Tract so long as such music is played at a level which does not unreasonably or materially interfere with any other tenant's or Owner's use or occupancy of the Shopping Center, as determined by Declarant, nor place an antenna, awnings (except as shown on the plans approved by Declarant) banner or other projection on the exterior of the buildings on the building (except one satellite dish may be installed on the roof so long as the same is screened from view of the Common Areas on the Lakeline Tract); nor solicit business or distribute leaflets or other advertising material on the Shopping Center, nor take any action which in the reasonable judgment of Declarant would constitute a nuisance, or disturb or endanger other tenants, owners or occupants of any portion of Shopping Center, or unreasonably interfere with their use of their respective premises, nor do anything which would tend to injure the reputation of the Shopping Center. The Owner the Theater Tract shall use reasonable efforts to cause its tenant's employees to park their vehicles only in the parking areas within the Theater Tract. Declarant shall use reasonable efforts to insure that the employees of other lessees/occupants that may be located on the Shopping Center do not park vehicles within the Theater Tract.

        d.      The Owner of the Theater Tract shall not use, or permit the use of Hazardous Materials on, about, under or in its Tract, except in the ordinary course of its usual business operations conducted thereon, and any such use shall at all times be in compliance with all Environmental Laws. For the purpose of this section, the term (i) **"Hazardous Materials"** shall mean: petroleum products, asbestos, polychlorinated biphenyls, radioactive materials and all other dangerous, toxic or hazardous pollutants, contaminants, chemicals, materials or substances listed or identified in, or regulated by, any Environmental Law, and (ii) **"Environmental Laws"** shall mean: all federal, state or local laws and regulations relating to pollution control, hazardous or toxic wastes, substances and constituents, including hydrocarbonic substances, and other environmental and ecological matters, including but not limited to the Federal Water Pollution Control Act (33 U.S.C. § 1251 et seq.), Resource Conservation and Recovery Act (42 U.S.C. § 6901 et seq.), Safe Drinking Water Act (42 U.S.C. § 300f et seq.), Toxic Substances Control Act (15 U.S.C. § 2601 et seq.), the Clean Air Act (42 U.S.C. § 7401 et seq.), Comprehensive Environmental Response of Compensation and Liability Act (42 U.S.C. § 9601 et seq.), and other comparable state laws. The Owner of the Theater Tract will maintain its property and conduct its business thereon in compliance with Environmental Laws. The Owner of the Theater Tract agrees to indemnify and hold the other Owners and such person's guest and invitees harmless from and against all causes, claims, demands, losses, liabilities, costs and expenses (including without limitation attorneys' fees) incurred, directly or indirectly, by such other Owners or their guests and invitees as a result of or in connection with the Owner of the Theater Tract's failure to comply with any of the provisions of this Section 7(d).

        8.     **Casualty; Eminent Domain**.

        a.      Owner's Right to Award. In the event of the exercise of eminent domain or transfer in lieu thereof of a Tract or any portion thereof, whether or not such taking includes the permanent easement areas as created in this Declaration (the "**Easement Area**") or a portion thereof (the "**Condemned Parcel**"), the award attributable to the Condemned Parcel shall be payable only to the Owner thereof. No other Owner shall have an interest in any award or payment made in connection with the exercise of eminent domain or transfer in lieu thereof of the Condemned Parcel, provided, however, that the other Owner(s) may file collateral claims with the condemning authority for their losses and may receive payment if awarded separately and apart from the award made to the Owner of the Condemned Parcel.

        b.      Casualty Proceeds. In the event of any casualty affecting any Easement Area, the Owner of the affected Tract shall have the right to any insurance proceeds with respect thereto. No other Owner shall have an interest in such insurance proceeds.

064883.00093  153278 v7

c.  Restoration of Easement Area. If any Easement Area or Common Area, or any portions thereof, are so condemned or transferred or damaged by a casualty event, the Owner of the Condemned Parcel shall promptly repair and restore the remaining portion of the affected Easement Area and Common Area as nearly as practicable to the condition which existed immediately prior to such condemnation or transfer or casualty.

9.  **Repurchase Events**.

Pershing hereby agrees that each of following events shall constitute a "**Repurchase Event**":

a.  Failure to Commence Construction. Pershing fails to commence construction (which, for the purposes hereof, shall mean the pouring of footing and foundations related to Pershing's building on the Theater Tract) of the Theater Building within one (1) year following the Effective Date, subject to extension for Force Majeure (but in no event later than eighteen (18) months following the Effective Date after giving effect to Force Majeure).

b.  Failure to Open and Continuously Operate. Pershing (i) fails to cause the building on the Theater Tract to open to the public for business as an AD Theater prior to the date which is eighteen (18) months after the Effective Date, subject to extension for Force Majeure (but in no event later than twenty-four (24) months following the Effective Date after giving effect to Force Majeure) or (ii) following such initial opening for business fails to continuously operate or cause to be operated the AD Theater within the Theater Building for a period of three (3) years (the "**Required Operation Period**"), or (iii) after the Required Operation Period, the building on the Theater Tract is closed for a period of eighteen (18) months, or if following for any reason other than a Permitted Discontinuance, as defined below. For purposes hereof, "**Permitted Discontinuance**" shall mean the discontinuance of the business operations on the Demised Premises by Pershing for any of the following reasons:

(1)  the Theater Building or other improvements on the Theater Tract are destroyed or damaged in whole or in part by fire or other casualty, and Pershing is diligently pursuing the repair, replacement, or rebuilding of such improvements (provided that such repair, replacement or restoration of the improvements does not exceed the earlier of the completion of repairs, replacement or restoration of the improvements or six months following the date of such casualty);

(2)  alterations, renovations or repairs to the improvements on the Demised Premises permitted hereunder, provided that Pershing is diligently pursuing such alterations, renovations or repairs to the improvements to completion (provided that such alterations, renovations or repairs to the improvements do not exceed six (6) months in any one event and no more than one (1) such renovation may be undertaken in any three (3) year period).

10.  **Lakeline's Right to Repurchase**. If a Repurchase Event occurs and is continuing, then Lakeline shall have the right, but not the obligation, in its sole and absolute discretion, exercisable only by the earlier of (x) one hundred eighty (180) days following the occurrence of the Repurchase Event or (y) the date Pershing satisfies the obligation giving rise to the Repurchase Event, to repurchase the Theater Tract and all improvements thereon (collectively, the "**Repurchase Property**") by paying Pershing the Repurchase Price. Following the occurrence of any Repurchase Event, the Owner of the Theater Tract shall at Declarant's request promptly provide Declarant with copies of any leases affecting the Theater Tract and evidence of the Unamortized Cost (as hereafter defined). The Repurchase Price shall be: (A) if the Owner of the Theater Tract has not commenced construction of the Theater Building on the Theater Tract within one (1) year following the Effective Date, subject to extension for Force Majeure (but in no event later than eighteen (18) months following the Effective Date after giving effect to Force Majeure),

064883.00093  153278 v7

then the lesser of (i) one hundred percent (100%) of the Purchase Price originally paid by the Owner of the Theater Tract to Declarant to acquire the Theater Tract ("**Original Purchase Price**") and (ii) one hundred percent of the Fair Market Value (as defined below); (B) if an AD Theater has not opened for business within eighteen (18) months after the Effective Date, subject to extension for a Force Majeure (but in no event later than twenty-four (24) months following the Effective Date after giving effect to Force Majeure), then an amount equal to the lesser of (i) ninety (90%) of the Fair Market Value or (ii) the sum of the unamortized costs expended by Pershing on the construction of improvements to the Theater Tract as reflected on Pershing's books and records, maintained in accordance with sound accounting practices, consistently applied (the "**Unamortized Cost**") plus the Original Purchase Price for the Property or (C) if Pershing ceases to cause to operate the AD Theater within the Theater Building for the Required Operation Period (Permitted Discontinuances excepted), or after the expiration of the Required Operation Period Pershing ceases to cause the building on the Theater Tract to be operated for a period of eighteen (18) months (Permitted Discontinuance excepted), then an amount equal to the Unamortized Cost plus the Original Purchase Price. The fair market value of the Theater Tract (the "**Fair Market Value**") shall be determined as follows. Within fifteen (15) business days following Pershing's receipt of a Repurchase Notice, Pershing shall deliver written notice (the "**FMV Notice**") to Lakeline of its determination of the Fair Market Value of the Theater Tract. In the event Lakeline disagrees with Pershing's determination and the parties can not agree upon the Fair Market Value within fifteen (15) business days following receipt of the FMV Notice (the "**Negotiation Period**"), Lakeline shall, within ten (10) business days after the Negotiation Period, deliver written notice to Pershing requesting that the Fair Market Value be determined by the appraisal method herein provided, which notice shall specify the name of Lakeline's appraiser (the "**Appraisal Notice**"). If Lakeline fails to provide Pershing with an Appraisal Notice within the time period provided above, Lakeline shall be deemed to have accepted Pershing's determination of the Fair Market Value. If Lakeline delivers the Appraisal Notice, within five (5) business days thereafter, Pershing shall notify Lakeline of the name of Pershing's appraiser. Upon appointment, the two appraisers shall agree to determine the Fair Market Value faithfully, fairly and within thirty (30) days following the appointment of the Pershing's appraiser. The two appraisers shall afford Lakeline and Pershing the right to submit evidence with respect to the Fair Market Value and shall, with all possible speed, make their respective determinations in writing and give notice thereof to Lakeline and Pershing. If the higher of the two estimates of the Fair Market Value exceeds the lower estimate by less than five percent (5%), the average of the Fair Market Value estimates so determined shall be the Fair Market Value for purposes hereof. If the higher of the two estimates exceeds the lower estimates by more than five percent (5%), the appraisers, within ten (10) days after both of the appraisers have made their determinations, shall appoint in writing a third appraiser and give written notice of such appointment to Lakeline and Pershing. If the two appraisers shall fail to appoint or agree upon a third appraiser within the 10-day period, a third appraiser shall be selected by Lakeline and Pershing if they agree upon such third appraiser within a further period of ten (10) days. The third appraiser shall be sworn to determine faithfully and fully, pursuant to the procedures set forth above, the Fair Market Value. The third appraiser's determination of value shall be controlling unless it is higher than the higher (or lower than the lower) determination of value of the original two appraisers, in which case such previous high (or low) determination shall be controlling. The decision of the appraisers shall establish the Fair Market Value. If any person appointed as an appraiser by or on behalf of either Lakeline or Pershing dies, fails to act, resigns or becomes disqualified, the Party by or on behalf of whom such appraiser was appointed shall designate a replacement. If the Party by or on behalf of whom such appraiser was appointed shall fail to appoint a substitute appraiser within ten (10) days after being requested to do so by the other Party, the sole appraiser appointed shall make the Fair Market Value determination. If a third appraiser is not appointed as provided above, the appraiser in question shall be appointed by the appropriate court of the State of Texas, upon application of either Lakeline or Pershing. Each Party shall bear and pay the cost of the appraiser appointed by (or for) it, and the cost of the third appraiser shall be borne and paid equally by Lakeline and Pershing. All appraisal proceedings shall be held in Austin, Texas. Lakeline and Pershing shall be given reasonable advance notice of the time and place of any appraisal proceedings, and both

064883.00093  153278 v7

shall have the right to be present, heard and represented by counsel. The appraisers shall not have the power to add or to subtract from or otherwise change the terms and provisions of this Agreement, and their determination shall be consistent and in accordance with the terms and provisions of this Agreement. The appraisers shall give prompt notice of their decision to Lakeline and Pershing. Any appraiser to be appointed hereunder shall have no less than five (5) years' experience in the appraisal of real property of the type owned by Pershing and hold the professional designation of M.A.I. or its equivalent.

        a.     The closing of any such purchase of the Repurchase Property by Lakeline shall occur no later than ninety (90) days after the later of the date Lakeline elects in writing to purchase the Repurchase Property (the "**Repurchase Date**"). On the Repurchase Date, Pershing shall convey the Theater Tract and improvements to Lakeline by special warranty deed and, by a separate assignment in a form reasonably acceptable to Pershing and Lakeline, assign to Lakeline all of Pershing's interest in the balance of the Repurchase Property.

        b.     If Lakeline elects to exercise its Repurchase Right pursuant to this paragraph, then Lakeline shall be acquiring the property AS-IS subject only to the exceptions to title set forth in the original deed of the Theater Tract from Lakeline to Pershing with a special warranty of title, but without any other representations and warranties by Pershing to Lakeline.

        c.     Within ten (10) days from written request from either party to the other, the party being requested shall reasonably cooperate to provide an estoppel certificate (in a form reasonably satisfactory to the requesting party) to any future purchaser or lender on the Theater Tract, either reaffirming the terms of any then existing Repurchase Right of Lakeline and/or stating the Repurchase Right has been waived or terminated. Upon the termination or expiration of Lakeline's Repurchase Right, and upon written request from Pershing, Lakeline agrees to cooperate with Pershing to cause the execution and recordation of a document affirming the termination or expiration of such Repurchase Right.

    11.    **Remedies And Enforcement**.

        a.     <u>All Legal and Equitable Remedies Available</u>. In the event of a breach or threatened breach by an Owner of a Tract and/or its tenants, occupants, customers, patrons, employees, suppliers, licensees and invitees (collectively, jointly and severally, the "**Defaulting Owner**") of any of the terms, covenants, restrictions or conditions hereof, the other Owner(s) and its tenants or occupants (collectively, a "**Benefitted Party**")shall be entitled forthwith to full and adequate relief by injunction and/or all such other available legal and equitable remedies from the consequences of such breach from the Defaulting Owner. Lakeline and Pershing shall use their reasonable efforts to enforce the restrictions and fulfill their obligations herein contained.

        b.     <u>Self-Help</u>. In addition to all other remedies available at law or in equity, upon the failure of a Defaulting Owner to cure a breach of this Declaration within thirty (30) days following written notice thereof by an Owner or Benefitted Party (unless, with respect to any such breach the nature of which cannot reasonably be cured within such 30-day period, the Defaulting Owner commences such cure within such 30-day period and thereafter diligently pursues such cure to completion), any Owner or Benefitted Party shall have the right to perform such obligations contained in this Declaration on behalf of such Defaulting Owner and be promptly reimbursed by such Defaulting Owner upon written demand for the reasonable costs thereof together with interest at the Prime Rate charged from time to time by Citibank (its successors or assigns) as published in the Wall Street Journal plus three percent (3%) per annum (not to exceed the maximum rate of interest allowed by law). Notwithstanding the foregoing, in the event of (i) an emergency, (ii) material impairment of the easement rights, and/or (iii) the

    064883.00093 153278 v7

unauthorized parking of vehicles on a Tract, an Owner or Benefitted Party may provide for 48 hour advance notice, or if not practicable, as soon as possible thereafter, cure the same and be reimbursed by the Defaulting Owner upon written demand for the reasonable documented, out-of-pocket cost thereof together with interest at the Prime Rate, plus three percent (3%), as above described.

      c.     No Termination for Breach. Notwithstanding anything herein to the contrary, no breach hereunder shall entitle any Owner to cancel, rescind, or otherwise terminate this Declaration. All of the remedies permitted or available to an Owner in this Declaration shall be cumulative and not mutually exclusive of one another, and the invocation of any one right or remedy shall not constitute an election or remedies or preclude an Owner from exercising any other remedy under this Declaration, at law or in equity. Notwithstanding anything herein to the contrary, in no event shall any Owner, its respective officers, directors, shareholders, members, partners, employees or agents ever be liable hereunder for punitive, special or consequential damages in connection with this Declaration. In addition, upon the transfer by an Owner of its interest in any Tract, such transferring Owner shall thereafter be released and discharged and all covenants and obligations arising from and attributable to the period from and after the date of such transfer, and thereafter, such covenants and obligations shall be binding during the term of this Declaration upon each new Owner for the duration of such Owner's ownership.

12.    **Indemnity.**

      Each Owner shall indemnify, defend and hold the other Owner(s) and their employees, directors, officers, shareholders, partners, agents, representatives, heirs, executors, successors and assigns harmless from and against any and all liabilities, losses, costs (including reasonable attorneys' fees), liens (including mechanics' liens), damages, suits or claims asserted against or incurred in connection with, arising from, due to or as a result of the death of any person or any accident, personal and/or bodily injury, loss or damage whatsoever caused to any person or to the property of any person arising from the indemnifying Owner's or its employees, agents, contractors, licensees, tenants and invitees exercise of the easement rights and performance or non-performance of the obligations set forth herein, except claims resulting from the joint or sole negligence or willful act or omission of the indemnified Owner.

13.    **Insurance Requirements.**

    The Owner of the Theater Tract shall maintain or cause to be maintained commercial general liability insurance (including without limitation contractual liability insurance covering the indemnities in this Declaration) insuring against claims on account of loss of life, bodily injury, personal injury, or property damage that arises upon, in or about such Owner's Tract and the Common Areas on the Owner's Tract, or that arises as a result of the acts or omissions of such Owner, its Occupants or Permittees (as such terms are defined in the Master Declaration), except as herein provided. Said insurance shall be carried by a reputable insurance company or companies qualified to do business in Texas and which has a financial rating of VIII or better and a policyholder's rating of A or better in the latest edition of *Best's Key Rating Guide Property-Casualty United States*. Further, such insurance shall have limits of not less than Two Million Dollars ($2,000,000.00) for each occurrence. The Owner of the Theater Tract shall also maintain an umbrella Excess Liability Insurance excess of the underlying commercial general liability with limits not less than $5,000,000 (five million dollars) per occurrence and aggregate. Each insurance policy shall name the Declarant as an additional insured, and shall provide that the policy may not be canceled or materially reduced in amount or coverage without at least thirty (30) days prior written notice by the insurer to each insured and any additional insureds. In addition, so long as alcoholic beverages are sold from or consumed upon the Theater Tract, such liability insurance shall include "liquor liability" or "dram shop" coverage or the Owner of the Theatre Tract shall provide equivalent coverage in the amount of $2,000,000.00 per occurrence through a separate liquor liability policy. Notwithstanding the foregoing, any Owner or party responsible to maintain such insurance who has a net worth of at least One Hundred

15

064883.00093  153278 v7

Million Dollars ($100,000,000.00) may "self insure", or provide for a deductible from said coverage related to the Parcel, to the extent of one percent (1%) of the net worth of said Owner or party in its last annual or fiscal year as certified by an independent certified public accountant and computed in accordance with generally accepted accounting principles, consistently applied. Such insurance may be carried under a "blanket" policy or policies covering other properties of the party and its subsidiaries, controlling or affiliated corporations. Each Owner shall, upon written request from any other Owner, furnish to the party making such request certificates of insurance evidencing the existence of the insurance required to be carried pursuant to this section or evidence of a self-insurance capacity as herein above provided, as the case may be. All such insurance shall include provisions denying to the insurer subrogation rights against the other parties to the extent such rights have been waived by the insured prior to the occurrence of damage or loss. Each Owner hereby waives any rights of recovery against any other Owner, its Occupants and Permittees for any damage or consequential loss covered by said policies, against which the non-waiving Owner is protected by insurance, to the extent of the proceeds payable under such policies, whether or not such damage or loss shall have been caused by any acts or omissions of the non-waiving Owner or its Occupants or Permittees, **INCLUDING MATTERS ARISING FROM THE NEGLIGENCE OF SUCH NON-WAIVING PARTY.**

Prior to commencing any construction activities upon the Theater Tract, the Owner shall obtain or require its contractor to obtain and thereafter maintain so long as such construction activity is occurring, at least the minimum insurance coverage set forth below:

 (i)  Workers' Compensation – statutory limits;

 (ii)  Employers Liability - $2,000,000 each accident for bodily injury, $2,000,000 policy limit for bodily injury by disease and $2,000,000 each employee for bodily injury by disease;

 (iii)  Commercial General Liability insurance covering all operations by or on behalf of the general contractor, which shall include the following minimum limits of liability and coverages:

  (a)  Premises and Operations;

  (b)  Products and Completed Operations;

  (c)  Contractual Liability, insuring the indemnity obligations assumed by Contractor under the Contract Documents;

  (d)  Broad Form Property Damage (including Completed Operations);

  (e)  Explosion, Collapse, and Underground Hazards;

  (f)  Personal Injury Liability:

   (i)  $2,000,000 each occurrence (for bodily injury and property damage;

   (ii)  $3,000,000 for Personal Injury Liability;

   (iii)  $5,000,000 aggregate for Products and Completed Operations (which shall be maintained for a three (3) year period following final completion of the work);

   (iv)  $5,000,000 general aggregate.

064883.00093   153278 v7

(g)     Automobile Liability Insurance. Any automobile liability insurance (bodily injury and property damage liability) including coverage for owned, hired, and non-owned automobiles, shall have limits of liability of not less than $1,000,000 combined single limit each accident for bodily injury and property damage combined. The general contractor shall require each of its subcontractors to include in their liability insurance policies coverage for Automobile Contractual Liability.

(h)     Umbrella/Excess Liability Insurance:

The general contractor shall also carry umbrella/excess liability insurance in the amount of $5,000,000.

Effective upon the commencement of construction of any Building on the Theater Tract and so long as such Building exists, the Owner of the Theater Tract shall carry, or cause to be carried, property insurance with "Special Form" coverage, in the amount of one hundred percent (100%) of full replacement cost thereof (excluding footings, foundations and excavations).

14.     **Restrictions.**

It is understood and agreed that the covenants, agreements, rights, easements, licenses, obligations, requirements and restrictions applicable to the Lakeline Tract and the Theater Tract set forth in this Declaration (collectively, the "**Restrictions**") shall constitute and be construed to the fullest extent possible as covenants running with the land which is benefited and burdened therewith and not as conditions, and that the violation of any of the Restrictions shall not result in a forfeiture or reversion of title; provided, however, that the Restrictions relative to the Lakeline Tract and the Theater Tract and all of the obligations of Lakeline and Pershing with respect to the Restrictions shall continue to apply fully to any person having any fee simple or leasehold interest in the Lakeline Tract or the Theater Tract. In the event ownership of a Tract has been transferred to a subsequent Owner, a violation of any Restrictions herein shall only be enforceable against the respective successor to Lakeline's interest in the Lakeline Tract or any part thereof and the respective successor to Pershing's interest in the Theater Tract or any part thereof, and the violating party.

15.     **Ground Lease.**

In the event of a ground lease of all or any part of the Lakeline Tract or the Theater Tract, for purposes of enforcement of the Restrictions, the ground lessee shall be deemed the Owner in lieu of the record Owner for the term of such ground lease provided that such ground lessee assumes the obligations herein in a recorded memorandum of ground lease or other instrument of record.

16.     **Governing Law.**

This Declaration shall be construed in accordance with the laws of the State of Texas.

17.     **Covenants Run With The Land.**

Each and all of the easements, covenants, restrictions and the provisions contained in this Declaration: (a) are made for the direct common mutual and reciprocal benefit of each Tract; (b) will create mutual equitable servitudes upon each Tract in favor of the land benefited; (c) will bind every person having a fee, leasehold or other interest in any portion of the Theater Tract or Lakeline Tract at any time or from time to time to the extent that such portion is affected or bound by the covenant,

064883.00093  153278 v7

restriction or provision in question, or that the covenant, restriction or provision is to be performed on such portions; and (d) will inure to the benefit of the parties and their respective successors and assigns as to the respective Tracts in the Theater Tract or Lakeline Tract.

Notwithstanding anything contained in this Declaration to the contrary, the rights of Declarant hereunder are personal to Declarant; provided, however, in the event of a sale or transfer of all or part of the Shopping Center, Lakeline Market, Ltd., a Texas limited partnership (and any Successor Declarant), may assign all or a part of its interests as "Declarant" hereunder to one (1) or more of its successors in interest (the "Successor Declarant") by executing and recording in the Real Property Records of Williamson County, Texas a written instrument expressly assigning such rights and referencing this Declaration, whereupon such Successor Declarant shall have the rights and obligations of "Declarant" hereunder, except as otherwise retained by the original Declarant or any Successor Declarant, as applicable.

18. **Notices**.

All notices, consents, requests, approvals and other communication required or permitted herein shall be in writing and shall be deemed to have been duly given (i) upon personal delivery (including confirmed facsimile or electronic delivery), (ii) seventy-two hours after deposit in the United States mail, registered or certified with return receipt requested, or (iii) the next succeeding business day after deposit with a responsible overnight delivery service similar to UPS and/or Federal Express to the intended Owner at such Owner's last known address. Any party shall have the right from time to time and at any time until the termination hereof to change its address, and each party shall have the right to specify its address to any other address within the United States of America.

19. **Multiple Counterparts**.

To facilitate execution, this instrument may be executed in as many counterparts as may be convenient or required. All counterparts shall collectively constitute a single instrument.

20. **Entire Agreement; Duration; Amendment**.

This Declaration contains the entire agreement between the parties relating to the rights herein granted and the obligations herein assumed. The easements contained in this Declaration shall be perpetual. The remaining covenants, conditions and restrictions contained in this Declaration shall continue in full force and effect for a period of sixty-five (65) years following the date hereof. This Declaration may be changed, modified or amended in whole or in part only by written instrument executed by the Owner of the Theater Tract, the Declarant and the Owner of any other Tract that would be materially and directly adversely affected by such change, modification or change.

21. **Severability**.

If any clause, sentence, or other portion of the terms, covenants and restrictions of this Declaration becomes illegal, null, or void for any reason, or be held by any court of competent jurisdiction to be so, the remaining portions will remain in full force and effect.

22. **Waiver**.

No waiver by any Owner of any default under this Declaration shall be effective or binding on any such Owner unless made in writing and no such waiver shall be implied from any omission by any party to take action with respect to such default. No delay or omission of an Owner in

18

the exercise of any right accruing upon default by another Owner shall impair any such right or be construed to be a waiver thereof. A waiver on one occasion by an Owner of a breach or a default of any of the terms and conditions of this Declaration by another Owner shall not be construed to be a waiver of subsequent breaches or defaults or of any other provisions hereof.

23. **Attorneys Fees.**

If litigation is ever instituted by either party hereto to enforce, or to seek damages for the breach of, any provision hereof, the prevailing party therein shall be promptly reimbursed by the other party for all attorneys' fees reasonably incurred by the prevailing party in connection with such litigation.

[signatures follow]

064883.00093   153278 v7

**LAKELINE MARKET, LTD.,**
a Texas limited partnership

By:    **Lakeline Market GP, LLC,**
a Texas limited liability company,
its general partner

By:    _____
C. Patrick Oles, Jr., Manager


**30 WEST PERSHING, LLC,**
**a Missouri limited liability company**


By:    _____
Name:  _____
Title:   _____

064883.00093 153278 v7

**LAKELINE MARKET, LTD.,**
a Texas limited partnership

By:     **Lakeline Market GP, LLC,**
          a Texas limited liability company,
          its general partner

      By:     _____
                  C. Patrick Oles, Jr., President

**30 WEST PERSHING, LLC,**
**a Missouri limited liability company**

By: _____
Name: Michael L. Hirons
Title: Vice President

064883.00093   153278 v7

STATE OF TEXAS        §
                                   §

COUNTY OF TRAVIS

        The foregoing instrument was acknowledged before me this ⎿3⏌ day of September, 2012, by C. Patrick Oles, Jr., as the Manager of Lakeline Market GP, LLC, the general partner of Lakeline Market, Ltd. , a Texas limited partnership, on behalf of such limited partnership.



Print: Jennifer Leigh Koppen
Notary Public

My Commission Expires: 08-05-2015

STATE OF _____      §
COUNTY OF _____    §

        The foregoing instrument was acknowledged before me this_____ day of September, 2012, by _____, as _____ for 30 West Pershing, LLC, a Missouri limited liability company.

Print: _____
Notary Public

My Commission Expires:_____

064883.00093   153278 v7

**STATE OF TEXAS** §
§

**COUNTY OF TRAVIS**

The foregoing instrument was acknowledged before me this _____ day of September, 2012, by C. Patrick Oles, Jr., as the Manager of Lakeline Market GP, LLC, the general partner of Lakeline Market, Ltd. , a Texas limited partnership, on behalf of such limited partnership.

_____
Print:
Notary Public

My Commission Expires:

**STATE OF** Missouri §
**COUNTY OF** Jackson §

The foregoing instrument was acknowledged before me this 3th day of September, 2012, by Michael L. Hirons , as Vice President for 30 West Pershing, LLC, a Missouri limited liability company.

CHRYSA V. ZINSER
My Commission Expires
September 23, 2012
Jackson County
Commission #08642449

_____
Print:
Notary Public
My Commission Expires:

## EXHIBIT LIST

Exhibit A – Legal Description of the Lakeline Tract
Exhibit B – Legal Description of the Theater Tract
Exhibit C – Site Plan
Exhibit D – Theater Tract Additional Tax Parcel
Exhibit E – Master Sign Plan
Exhibit F – Exclusive Use Restrictions

064883.00093   153278 v7

## EXHIBIT A

Lots 1, 3, 4 and 5, Block A, Lakeline Retail Subdivision Section I, a subdivision of Williamson County, Texas, according to map or plat thereof, recorded under Document No. 2012005731 of the Official Public Records of Williamson County, Texas.

Lot 1, Block A, Lakeline Retail Subdivision Section III, a subdivision of Williamson County, Texas, according to map or plat thereof, recorded under Document No. 2012005742 of the Official Public Records of Williamson County, Texas.

Lot 1, Block A, Lakeline Retail Subdivision Section II, a subdivision of Williamson County, Texas, according to map or plat thereof, recorded under Document No. 2012005691 of the Official Public Records of Williamson County, Texas.

064883.00093   153278 v7

## EXHIBIT B

Lot 2, Block A, Lakeline Retail Subdivision Section I, a subdivision of Williamson County, Texas, according to map or plat thereof, recorded under Document No. 2012005731 of the Official Public Records of Williamson County, Texas, said tract being more particularly described by metes and bounds in Exhibit A-1 attached hereto.

064883.00093  153278 v7

## EXHIBIT C



RECORDERS MEMORANDUM
All or part of the text on this page was not
clearly legible for satisfactory recordation

064883.00093  153278 v7

## EXHIBIT D



**THEATER TRACT ADDITIONAL TAX PARCEL**

**LAKELINE MARKET**
AUSTIN, TX

EXHIBIT D

Bury+Partners

RECORDERS MEMORANDUM
All or part of the text on this page was not
clearly legible for satisfactory recordation

064883.00093 153278 v7

# EXHIBIT E



MASTER SIGNAGE PLAN

LAKELINE MARKET
AUSTIN, TX

EXHIBIT E

RECORDERS MEMORANDUM
All or part of the text on this page was not
clearly legible for satisfactory recordation

27

064883.00093   153278 v7

EXCLUSIVE USE RESTRICTIONS

## BELLA NAILS SALON

### EXCLUSIVE USE

A.  "Restriction". Subject to the conditions and exceptions listed below, Landlord agrees that during the term of this Lease, Landlord will not lease any property in the Shopping Center, as shown on the attached Exhibit "A", to any other tenant or occupant (other than Tenant) whose Primary Use is a nail salon ("Tenant's Exclusive Item/Service"). As used herein, "Primary Use" shall mean fifteen percent (15.0%) or more of the Gross Sales of such tenant or occupant derived from the performance of nail services from its premises at the Shopping Center. Notwithstanding the foregoing, in no event shall the foregoing exclusive be construed to apply to the sale of beauty supplies in the Shopping Center.

## KILPPER ENTERPRISES, LLC - TRADE NAME: WATERLOO TAN

### EXCLUSIVE USE

A.  "Restriction". Subject to the conditions and exceptions listed below, Landlord agrees that during the term of this Lease, Landlord will not lease any property in the Shopping Center, as shown on the attached Exhibit "A", to any other tenant or occupant (other than Tenant) whose Primary Use is the operation of a tanning salon ("Tenant's Exclusive Item/Service"). As used herein, "Primary Use" shall mean twenty-five percent (25.0%) or more of the Gross Sales of such tenant or occupant from its premises at the Shopping Center.

## NEXTGENM3 ENTERPRISES, INC. – TRADE NAME: ELEMENTS THERAPEUTIC MASSAGE

### EXCLUSIVE USE

A.  "Restriction". Subject to the conditions and exceptions listed below, Landlord agrees that during the term of this Lease, Landlord will not lease any property in the Shopping Center, as shown on the attached Exhibit "A", to any other tenant or occupant (other than Tenant) whose Primary Use is the operation of a business providing massage services ("Tenant's Exclusive Service"). As used herein, "Primary Use" shall mean twenty percent (20.0%) or more of the Gross Sales of such tenant or occupant from its premises at the Shopping Center for any calendar year.

## SOUTHWEST MATTRESS SALES, INC. – TRADE NAME: FACTORY MATTRESS

### EXCLUSIVE USE

A.  "Restriction". Subject to the conditions and exceptions listed below, Landlord agrees that during the term of this Lease, Landlord will not lease any property in the Shopping Center, as shown on the attached Exhibit "A", to any other tenant or occupant (other than Tenant) whose Primary Use is the sale of mattresses ("Tenant's Exclusive Item/Service"). As used herein, "Primary Use" shall mean twenty percent (20.0%) or more of the Gross Sales of such tenant or occupant from its premises at the Shopping Center.

064883.00093   153278 v7

**HEB GROCERY COMPANY, LP**

**EXCLUSIVE USE**

Exclusive set forth in that certain Memorandum of Lease dated February 8, 2012, recorded under Document No. 2012009325, Official Public Records of Williamson County, Texas.

**MICHAELS**

**EXCLUSIVE USE**

Section 16.4.1 of Exhibit C to the Lease provides as follows: "Neither Landlord nor any entity controlled by Landlord will use, lease (or permit the use, leasing or subleasing of) or sell any space in or portion of the Shopping Center (other than the Premises) or any property contiguous to the Shopping Center (including, without limitation, any property that would be contiguous or adjacent to the Shopping Center but for any intervening road, street, alley or highway) owned or controlled now or at any time hereafter by Landlord or any affiliate of Landlord, to any "craft store", store selling arts and crafts, art supplies, craft supplies, picture frames or picture framing services, framed art, artificial flowers and/or plants, artificial floral and/or plant arrangements, holiday ·themed decor, decorations and costumes, wedding goods (except apparel), party goods, scrapbooking/memory book store, or a store selling scrapbooking/memory book supplies, accessories, and/or decorations or other papercrafting (e.g. making greeting cards, gift bags, tags, and other related or similar items) supplies, accessories and/or decorations associated with the foregoing, or providing classes on any of the foregoing or any combination of the foregoing categories, or any store similar to Tenant named herein in operation or merchandising as of the Effective Date. This Section 16.4.1 shall not apply (A) to any lessee whose lease was fully executed on the Effective Date hereof and is identified on Exhibit I as an "Existing Lease Not Subject to Tenant's Exclusive;" provided, however, that this exception shall not apply if (i) Landlord permits or agrees to an expansion of the premises for any such permitted use which violates Tenant's exclusive (except for an expansion of the premises leased to HEB Grocery Company, LP), or (ii) Landlord permits or agrees to the change of a permitted use by any such lessee or its successors or assigns, or (iii) Landlord permits or agrees to an assignment or sublease of such existing lease if Landlord may avoid the granting of such permission, or (iv) Landlord has the right, by virtue of the provisions of the existing lease, to cause said lessee to honor the exclusive granted to Tenant by giving said existing lessee notice of this exclusive or otherwise, or (B) any lessee for which the sale of a product or service covered by the exclusive granted to Tenant hereunder is merely incidental to such lessee's primary use, unless the total space which such lessee devotes to the products or services which violate the exclusive contained In this Section 16.4.1 exceeds the lesser of one thousand five hundred (1,500) Leasable Square Feet (inclusive of allocable aisle space and linear shelf space) or ten percent (10%) of such lessee's Leasable Square Feet; and further provided, in no event shall this exception for incidental use apply to picture framing services, it being the intention that no other lessee or occupant of the Shopping Center shall be permitted to offer picture framing services not even on an incidental basis. The operation in the Shopping Center of (i) a typical Kohls store as such stores operate as of the Effective Date, (ii) a typical JCPenney store as such stores operate as of the Effective Date, or (iii) a typical Target store as such stores operate as of the Effective Date, shall be deemed not to be a violation of this Section 16.4.1. If, for a period of twelve (12) consecutive months, Tenant fails to operate Tenant's business (other than for reasons beyond Tenant's reasonable control) or changes its use such that for two (2) full seasonal sales cycles it is no longer selling items covered by the exclusive granted in this Section 16.4.1, Tenant shall no longer have an exclusive right as to the specific item not sold but described In this Section 16.4.1; provided, however, in the event Tenant recommences its business in the Premises or again sells or offers the items or services covered by this Section 16.4.1, then, upon Landlord's receipt of notice of such recommencement, the exclusive granted to Tenant hereunder

064883.00093   153278 v7

shall again be effective, and any leases executed during the interim period during which this exclusive was not effective, shall be deemed to be an "Existing Lease Not Subject to Tenant's Exclusive." If a successor or assign of Landlord owns property contiguous or adjacent to the Shopping Center and subsequently acquires the Shopping Center, any lessee whose lease was fully executed on the date of the acquisition of the Shopping Center shall be considered an "Existing Lease Not Subject to Tenant's Exclusive" and Landlord shall provide a list of such leases, which includes the name of the lease, date of lease, and party names, which Landlord represents and warrants was fully executed as of the date of acquisition of the Shopping Center. "

064883.00093   153278 v7

**FILED AND RECORDED**

OFFICIAL PUBLIC RECORDS   2012076734

*Nancy E. Rister*

09/18/2012 09:59 AM

MARIA $140.00

NANCY E. RISTER, COUNTY CLERK

WILLIAMSON COUNTY, TEXAS

HERITAGE TITLE COMPANY
401 CONGRESS AVE STE 1500
AUSTIN, TX 78701

# **EXHIBIT 10**

# Lease Ledger

| Lease Information | |
|---|---|
| **Date** | 03/30/2021 |
| **Lease Id** | t0015039 |
| **Property** | re2254 |
| **Location** | Lakeline Market |
| **Assigned Space(s)** | ADH |
| **Customer** | Not Applicable |
| **ICS Code** | Motion Picture Theaters (except Drive-Ins) |
| **Lease Type** | Retail |
| **Sales Category** | Other Amusement and Recreation Industries |
| **Lease Term** | **From** 04/01/2013 **To** 09/17/2077 |
| **Lease Area** | (GLA) |
| **Monthly Rent** | |
| **Office Phone** | |
| **Fax No** | |
| **E-Mail** | |

**30 West Pershing, LLC**
**30 West Pershing, LLC**

| Date | Description | Charges | Payments | Balance |
|---|---|---|---|---|
| | **Balance Forward** | | | **(12,966.87)** |
| 03/01/20 | CAM Estimate | 6,393.00 | | (6,573.87) |
| 03/01/20 | Insurance Reim Est | 129.00 | | (6,444.87) |
| 03/05/20 | Chk# 13179 - march cam | | 6,662.00 | (13,106.87) |
| 03/31/20 | 2019 rec of cam | (7,691.91) | | (20,798.78) |
| 03/31/20 | 2019 rec of ins | (159.62) | | (20,958.40) |
| 04/01/20 | CAM Estimate | 6,393.00 | | (14,565.40) |
| 04/01/20 | Insurance Reim Est | 129.00 | | (14,436.40) |
| 05/01/20 | CAM Estimate | 6,393.00 | | (8,043.40) |
| 05/01/20 | Insurance Reim Est | 129.00 | | (7,914.40) |
| 05/27/20 | Chk# 13216 - payment on account-check says for April 2020 | | 6,662.00 | (14,576.40) |
| 06/01/20 | CAM Estimate | 6,393.00 | | (8,183.40) |
| 06/01/20 | Insurance Reim Est | 129.00 | | (8,054.40) |
| 07/01/20 | CAM Estimate | 6,393.00 | | (1,661.40) |
| 07/01/20 | Insurance Reim Est | 129.00 | | (1,532.40) |
| 08/01/20 | CAM Estimate | 6,356.00 | | 4,823.60 |
| 08/01/20 | Insurance Reim Est | 140.00 | | 4,963.60 |
| 09/01/20 | CAM Estimate | 6,356.00 | | 11,319.60 |
| 09/01/20 | Insurance Reim Est | 140.00 | | 11,459.60 |
| 09/10/20 | Chk# 13253 - payment on account | | 4,963.60 | 6,496.00 |
| 10/01/20 | CAM Estimate | 6,356.00 | | 12,852.00 |
| 10/01/20 | Insurance Reim Est | 140.00 | | 12,992.00 |
| 10/30/20 | Chk# 13273 - Sep & Oct Rent | | 12,992.00 | 0.00 |
| 11/01/20 | CAM Estimate | 6,356.00 | | 6,356.00 |
| 11/01/20 | Insurance Reim Est | 140.00 | | 6,496.00 |
| 12/01/20 | CAM Estimate | 6,356.00 | | 12,852.00 |
| 12/01/20 | Insurance Reim Est | 140.00 | | 12,992.00 |
| 01/01/21 | CAM Estimate | 6,356.00 | | 19,348.00 |
| 01/01/21 | Insurance Reim Est | 140.00 | | 19,488.00 |
| 02/01/21 | CAM Estimate | 6,356.00 | | 25,844.00 |
| 02/01/21 | Insurance Reim Est | 140.00 | | 25,984.00 |
| 02/11/21 | 2020 rec cam | 195.17 | | 26,179.17 |
| 02/11/21 | 2020 rec ins | (35.95) | | 26,143.22 |
| 02/11/21 | 2020 rec tax | 13,827.17 | | 39,970.39 |
| 03/01/21 | CAM Estimate | 6,356.00 | | 46,326.39 |
| 03/01/21 | Insurance Reim Est | 140.00 | | 46,466.39 |

| 0-30 Days | 31-60 Days | 61-90 Days | Above 90 Days | Amount Due |
|---|---|---|---|---|
| 6,496.00 | 20,482.39 | 6,496.00 | 12,992.00 | 46,466.39 |