## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| ALAMO DRAFTHOUSE CINEMAS HOLDINGS, LLC, *et al.*, | Case No. 21-10474 (MFW) |
| | (Jointly Administered) |
| Debtors.[1] | **Re: Docket Nos. 36 and 102** |

**OMNIBUS OBJECTION OF THE ALAMO FRANCHISEES TO THE NOTICE OF POSSIBLE ASSUMPTION AND ASSIGNMENT AND CURE AMOUNTS WITH RESPECT TO EXECUTORY CONTRACTS AND UNEXPIRED LEASES OF THE DEBTORS**

COME NOW the Alamo Drafthouse Cinemas franchisees[2] (collectively the "**Alamo Franchisees**") and Franchise Holdings GA-NC LLC, by and through undersigned counsel, as the contract counterparties to those certain Franchise Agreements and Development Agreements (defined below) with Alamo Drafthouse Cinemas, LLC ("**Alamo**" or the "**Debtor**"), and file this

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: Alamo Drafthouse Cinemas Holdings, LLC (2205); Alamo Drafthouse Cinemas, LLC (5717); Alamo Vineland, LLC (1626); Alamo League Investments GP, LLC (1811); Alamo League Investments, Ltd. (7227); Alamo South Lamar GP, LLC (3632); Alamo South Lamar, LP (4563); Alamo Drafthouse Raleigh, LLC (5979); Alamo DH Anderson Lane, LLC (3642); Alamo Yonkers, LLC (4971); Alamo Mission, LLC (2284); Alamo Ritz, LLC (9465); Alamo Mueller, LLC (1221); Mondo Tees, LLC (6900); Alamo City Foundry, LLC (6092); Alamo Mainstreet, LLC (2052); Alamo City Point, LLC (3691); Alamo Liberty, LLC (5755); Alamo Satown, LLC (6197); Alamo Marketplace, LLC (7041); Alamo Stone Oak, LLC (8398); Alamo Westlakes, LLC (4931); Alamo Park North, LLC (1252); Alamo North SA, LLC (6623); Alamo Avenue B, LLC (8950); Alamo Slaughter Lane GP, LLC (6968); Alamo Slaughter Lane, Ltd. (5341); Alamo Cinema Group I GP, LLC (9537); Alamo Cinema Group I, LP (9656); Alamo Westminster, LLC (8906); Alamo Staten Island, LLC (7781); Alamo Aspen Grove, LLC (7786); Alamo Lakeline, LLC (5294); Alamo Sloans, LLC (9343). The location of the Debtors' service address is: 3908 Avenue B, Austin, Texas 78751.

[2] The "**Alamo Franchisees**" are Triple Tap Ventures LLC, Triple Tap Alamo Lubbock LLC, El Paso Texas Alamo Operations, LLC, Triple Tap Alamo Sugar Land LLC, Triple Tap Alamo LaCenterra LLC, Triple Tap Alamo League City-Operations LLC, Alamo Monteverde Operations, LLC, Iced Tea with Lemon, LLC, Two Is One, One Is None, LLC, Dos Peliculas, LLC, Tres Peliculas, LLC, Cinco Peliculas, LLC, Seis Peliculas, LLC, Woodbury Alamo, LLC, North Richland Hills Alamo, LLC, Cojeaux Cinemas, LLC, Alamo Drafthouse Cinema Charlottesville LLC, ADC Woodbridge, LLC, Alamo Drafthouse D.C., LLC, Alamo One Loudoun, LLC, ADC Crystal City, LLC, NL Entertainment, LLC, Springboard Ventures, LLC, BACH  Management, LLC, Reel Dinner Partners – Laredo, LLC, Reel Dinner Partners – Corpus Christi, LLC, Entertainment Management Co., LLC, and Midtown Alamo LLC.

objection (the "**Objection**")[3] to the *Notice of Possible Assumption and Assignment and Cure Amounts With Respect to Executory Contracts and Unexpired Leases of the Debtors* [Docket No. 102] (the "**Cure Notice**") and the proposed sale transaction for the Assets[4] and respectfully state as follows:

## INTRODUCTION

1.     The Alamo Franchisees and Holdings file this Objection to ensure that any assignment and assumption of their Franchise Agreements and Development Agreements: (i) preserves any defenses the Alamo Franchisees have existing at law or in equity; (ii) allows offset and recoupment of gift card liabilities; (iii) requires the Debtors to cure all monetary and non-monetary defaults related to the Franchise Agreements; and (iv) other relief as noted below.

## FACTS

2.     On March 3, 2021 (the "**Petition Date**"), Alamo Drafthouse Cinemas Holdings, LLC and its affiliated debtors and debtors-in-possession (collectively, the "**Debtors**") commenced these bankruptcy cases by filing voluntary petitions for relief under chapter 11 of the Bankruptcy Code (the "**Chapter 11 Cases**"). After the Petition Date, the Debtors continued to operate and

---

[3] The Debtors agreed to extend the objection deadline to the Cure Notice for the Alamo Franchisees until April 14, 2021.

[4] Capitalized terms used herein but not otherwise defined shall have the meanings ascribed to each in the *Debtors' Motion For Entry Of: (A) An Order (I) Scheduling A Hearing On The Approval Of The Sale Of All Or Substantially All Of The Debtors' Assets Free And Clear Of All Encumbrances Other Than Assumed Liabilities And Permitted Encumbrances, And The Assumption And Assignment Of Certain Executory Contracts And Unexpired Leases, (Ii) Approving Certain Bidding Procedures And Assumption And Assignment Procedures, And The Form And Manner Of Notice Thereof, (Iii) Approving The Debtors' Entry Into The Stalking Horse Apa And All Of Its Terms, Including Bidding Protections, And (Iv) Granting Related Relief; And (B) An Order (I) Approving Asset Purchase Agreement, (Ii) Authorizing The Sale Of All Or Substantially All Of The Debtors' Assets Free And Clear Of All Encumbrances Other Than Assumed Liabilities And Permitted Encumbrances, (Iii) Authorizing The Assumption And Assignment Of Certain Executory Contracts And Unexpired Leases, And (Iv) Granting Related Relief* [Docket No. 36] (the "**Bid Procedures Motion**").

manage their business as debtors and debtors-in-possession pursuant to sections 1107 and 1108 of the Bankruptcy Code.

3.      The Alamo Franchisees are the majority of franchisees of the Debtors operating Alamo Drafthouse theaters.  They hold 26 franchise and development agreements with the Debtors for operation of theaters throughout the United States.  A chart listing each Alamo Franchisee together with the corresponding location, executory contracts, and the Debtors' asserted cure amounts is at <u>Exhibit A</u> attached hereto and incorporated herein by reference. The franchise agreements and development agreements are collectively referred to herein as "**Franchise Agreements**" and "**Development Agreements**."

4.      Prior to the Petition Date, Alamo Franchisees and Alamo Drafthouse Cinemas, LLC were parties to the Franchise Agreements and Development Agreements, pursuant to which the Debtors granted licenses to use the Debtors' intellectual property and operate Alamo Drafthouse theaters around the country.  The Alamo Franchisees have 22 locations around the country comprising 163 screens.  Operation of these movie theaters is the main livelihood and source of revenue for the Alamo Franchisees and COVID-19 has crippled, not only the Debtors' business, but its franchisees as well.  Thus it is imperative that the Debtors' business model and relations with its franchisees adapt to changing environment and allow the Alamo Franchisees the flexibility to succeed in the post-COVID theater world.

5.      A stable and profitable franchise system is vital to the stability and continued viability that any bidder is seeking, and protection and preservation of the Alamo brand is key to the Alamo Franchisees.  Indeed, the Alamo Franchisees represented roughly 55% present of the sales in the Alamo Drafthouse theater business in 2019 and an average Alamo Drafthouse customer's experience with the brand is thus more likely to be at a franchised location, and,

correspondingly the Alamo Franchisees play a critical part in the customer experience with Alamo Drafthouse.

6.       Alamo has operated the franchise system in breach of the Franchise Agreements and Development Agreements, owes liquidated and undisputed amounts to the Alamo Franchisees in connection with gift cards, and has certain agreements and concessions regarding royalties that go with the Franchise Agreements and Development Agreements. It is important to note that in 2020 the Debtors entered into a fee deferral arrangement (the "**Temporary Fee Payment Agreement**") with some of the Alamo Franchisees, under which royalties were temporarily reduced or deferred by those Alamo Franchisees.

7.       On March 4, 2021, the Debtors filed the Bid Procedures Motion. Pursuant to the Bid Procedures Motion, among other things, the Debtors seek (i) to sell substantially all or substantially all of the Debtors' Assets, free and clear of all liens, claims and encumbrances to ALMO Holdings, LLC (the "**Stalking Horse Purchaser**") and (ii) to assume and assign certain executory contracts to the Stalking Horse Purchaser.

8.       On March 17, 2021, the Debtors filed their Cure Notice listing the executory contracts and unexpired leases that the Debtors might assume and assign to the Stalking Horse Purchaser. The Cure Notice identifies the Franchise Agreements and Development Agreements with the Alamo Franchisees and Holdings with a cure amount of $0 for each agreement.

9.       On April 1, 2021, the Court entered the *Order (1) Scheduling a Hearing on the Approval of the Sale of All or Substantially All of the Debtors' Assets Free and Clear of all Encumbrances Other than Assumed Liabilities and Permitted Encumbrances, and the Assumption and Assignment of Certain Executory Contracts and Unexpired Leases (II) Approving Certain Bidding Procedures and Assumption and Assignment Procedures and the Form and Manner of*

*Notice thereof (III) Approving Bidding Protections and (IV) Granting Related Relief* [Docket No. 244] (the "**Bid Procedures Order**"), that, inter alia, approved (i) the bidding procedures pursuant to which the Debtors will solicit and select the highest and otherwise best offer for the sale of all or substantially all of the Debtors' assets (the "**Sale**"); and (ii) the procedures for the assumption and assignment of executory contracts and unexpired leases in connection with the Sale, including notice of proposed cure amounts.  Under the proposed *Order (A) Authorizing and Approving the Sale of Purchased Assets Free and Clear of Liens, Claims, Encumbrances, and Other Interests, (B) Authorizing and Approving the Assumption and Assignment of Executory Contracts and Unexpired Leases, and (C) Granting Related Relief filed with the Sale Motion* [Docket No. 36], other than cures, Assumed Liabilities and Permitted Encumbrances, the Stalking Horse Purchaser will acquire the Assets free and clear of all claims, liabilities and encumbrances. It further provides that "[e]ach non-Debtor party to a Purchased Contract hereby is also forever barred, estopped, and permanently enjoined from (i) asserting against the Debtors or Purchaser, or the property of any of them, any default or Claim arising out of any indemnity obligation or warranties for acts or occurrences arising prior to or existing as of the Closing, including those constituting Excluded Liabilities, or, against Purchaser, any counterclaim, defense, setoff or any other Claim asserted or assertable against the Debtors." Proposed Sale Order [Docket No. 36], ¶ 17. The proposed Sale Order also provides that it is intended to operate as a final determination that no claims can be asserted against the Buyer and that all Claims have been unconditionally, released, discharged and terminated. *Id*. at ¶ 11.

## MONETARY DEFAULTS AND OFFSETS

10.     The Alamo Franchisees do not generally object to the Debtors' proposed Sale of the Assets and are supportive of the continuation of the Alamo brand and business.  They file this

Objection to assert and preserve claims and rights arising from and related to the Franchise Agreements and Development Agreements, all as set forth herein, yet omitted from the Cure Notice.    The Alamo Franchisees assert the following defaults under the Franchise and Development Agreements that must be cured:

11.    **Gift Card Liability**.  The Franchise Agreements generally state that franchisees must participate in any gift certificate, voucher, or gift card program that Alamo establishes and franchisees must honor any such gift certificates, vouchers, or cards presented the venues.  Under the Franchise Agreements, there is also an obligation of the Alamo Franchisees to purchase and maintain a minimum inventory of gift certificates or cards and honor any such gift certificates or cards presented.  In this regard, Debtors owe each Alamo Franchisee certain reimbursements in connection with that Alamo Franchisee's honoring of gift cards.  In practice, while Debtors employed third party, SVS, to implement their gift card program, Debtors maintained ultimate visibility on the transactions and would periodically submit statements to SVS to send to the Alamo Franchisees, either of amounts due by the Debtors to an entity, or amounts due from the franchisee to the Debtors, after offsetting all transactions.  Thus, these gift card claims are subject to offset and recoupment and are summarized on Exhibit B attached hereto.

12.    **Marketing Fund Breaches**.  Each Alamo Franchisee is required to contribute to the Marketing Fund pursuant to the terms of the Franchise Agreement.  The purpose of Marketing Fund is to maximize general public recognition of the acceptance of the Alamo Drafthouse brand and enhance the success of all Alamo Theaters.  Debtors control the expenditure of the funds in the Marketing Fund and are required in the Franchise Agreements to spend these funds only on legitimate marketing activities and Debtors are restricted on the types of things on which the Marketing Funds can be used.  The Franchise Agreements include express limits and prohibitions

on using the Marketing Funds to defray Debtors' general operating expenses.  However, on information and belief, Debtors have used the Marketing Funds for impermissible expenditures, including overhead, in violation of the terms of the Franchise Agreements, thus creating a default thereunder.  The Alamo Franchisees have been requesting expenditure, distribution and accounting information for the Marketing Fund from the Debtors and were provided with certain limited information shortly before the Objection Deadline. The Alamo Franchisees are investigating whether and the degree to which Debtors impermissibly used the Marketing Funds for the Debtor's own benefit, including to support Debtor's operations during the COVID-19 pandemic for non-marketing expenses, salaries, and general operational expenses and overhead, and to pay for advertising that solely benefits Debtors and its affiliates, including marketing for Alamo On Demand, and merchandise from the Debtors' non-franchise affiliates.  Further, under the Franchise Agreements, the Debtors are obligated to provide annual accountings of the Marketing Fund's operations, yet the Debtors have failed to provide any such statements for multiple years despite repeated requests, and have just provided recent information to the Alamo Franchisees to investigate. Included in Exhibit B is a listing of all of the amounts contributed to the Marketing Fund by each Alamo Franchisee in 2018, 2019 and 2020.  The Alamo Franchisees are examining the provided information and reserve all rights regarding claims relating to the same.

13. **Other breaches.**  In addition to the possible breaches associated with misuse of the Marketing Fund, Debtors have breached the express and implied covenant of good faith in the Franchise Agreements and Development Agreements in other ways:

> a. First, by providing unique and proprietary content licensed to Alamo Franchisees to Alamo competitors.  This has damaged the Alamo Franchisees by weakening the value of the entire brand. For example, the Debtors licensed to competitors the

rights to *Gremlins Rules Breakers*, together with its enhanced movie party event materials, merchandise, props, and pre-show content, items Debtors previously claimed was the proprietary intellectual property of the brand that distinguishes Alamo Drafthouse Cinemas theaters from competing theaters and what it licenses to the Alamo Franchisees in exchange for royalties.

b.   Second, by competing with the Alamo Franchisees through programs like "Alamo On Demand" VOD Platform and encouraging movie studios to release new movies digitally through video on demand instead of in theaters.[5]

c.   Third, by unreasonably restricting venues to guests who book online through the Debtors by barring walk-up guests and by prohibiting open franchised venues from selling seats through other previously permitted means, and failing to include offerings at franchised locations on the website, and unreasonably restricting aspects of operations when the local jurisdictions relaxed standards.

## RELIEF REQUESTED

14.   The Alamo Franchisees request that the Court order that to assume and assign the Franchise Agreements and Development Agreements: (i) the Debtors fully cure all monetary and non-monetary defaults; (ii) any and all defenses (whether contractual, legal or equitable) to any amounts sought, setoffs, or credits charged by Debtors to the Alamo Franchisees are preserved; (iii) allow offset and recoupment of the gift card liabilities and damages from the misuse of the Marketing Funds and other breaches in amounts established at hearing; and (iv) ensure that the

---

[5] Debtors are using franchisees' local customer information to promote Alamo On Demand. The franchisees do not share in any of the revenue from these sales or marketing efforts

Temporary Fee Payment Agreements and any side or separate agreements, agreed to by the Debtors and Alamo Franchisees are assumed with the Franchise and Development Agreements.

## OBJECTION

15.    Under Section 365(b)(1) of the United States Bankruptcy Code, 11 U.S.C. §§ 101 *et seq.* (the "**Bankruptcy Code**"), a debtor is required to cure all defaults prior to the assumption or assignment of a contract.

### A. The Debtors Must Fully Cure the All Monetary and Non-Monetary Defaults to Assume and Assign the Franchisee Agreements

16.    Bankruptcy Code Section 365(b)(2), governs the financial obligations of a debtor which wishes to assume and assign an executory contract.  Section 365(b) provides in pertinent part as follows:

> (b)(1) If there has been a default in an executory contract or unexpired lease of the debtor, the trustee may not assume such contract or lease unless, at the time of assumption of such contract or lease, the trustee—
>
> > (A) cures, or provides adequate assurance that the trustee will promptly cure, such default;
> >
> > (B) compensates, or provides adequate assurance that the trustee will promptly compensate, a party other than the debtor to such contract or lease, for any actual pecuniary loss to such party resulting from such default; and
> >
> > (C) provides adequate assurance of future performance under such contract or lease.

*See In re Knight Jewelry*, 168 B.R. 199, 203 (Bankr. W.D. Mo. 1994) ("In order to assume the lease under § 365(b)(1) . . ., debtor must be able to (1) cure or provide adequate assurance of ability to cure the default promptly, i.e. pay 100% of the arrearage; (2) provide adequate assurance of future performance; and (3) compensate the other party to the lease for any pecuniary loss to such party resulting from such default.").

17.    Congress' intent in imposing cure and adequate assurance conditions on the ability of a purchaser to assume an executory contract was to ensure that contracting parties receive the

full benefit of their bargain if they are forced to continue performance. *In re Superior Toy & Manufacturing Co.,* 78 F.3d 1169, 1174 (7th Cir. 1996).  Claims of default arising under an assumed contract must be resolved so that the debtor-creditor relationship is restored to pre-default conditions, thereby bringing the contract back into compliance with its terms. *In re Wireless Data, Inc.*, 547 F.3d 484 (2d Cir. 2008).

18.     A cure under 11 U.S.C. § 365 means that all unpaid amounts due under the agreement have been paid. *In re Network Access Solutions, Corp.*, 330 B.R. 67, 76 (Bankr. D. Del. 2005).  "When attempting to assume under § 365, a Debtor must cure both prepetition and post-petition defaults.  *In re Rachels Industries, Inc.*, 109 B.R. 797, 812–813 (Bankr.W.D.Tenn.1990); *In re Berkshire Chemical Haulers, Inc.*, 20 B.R. 454, 457 (Bankr.D.Mass.1982); *In re Robinson Truck Line, Inc.*, 47 B.R. 631, 636–637 (Bankr.N.D.Miss.1985)."  *In re Emerald Forest Const., Inc.*, 226 B.R. 659, 664 (Bankr. D. Mont. 1998).  Thus, all pre and post-petition amounts must be paid as part of the assumption and assignment.

19.     Additionally, aside from monetary defaults, Debtors have to cure non-monetary defaults under the Franchise Agreement under the requirements of Section 365.  *See In re Empire Equities Capital Corp*., 405 B.R. 687, 691 (Bankr. S.D.N.Y. 2009) ("Congress provided no room for the contention that non-monetary defaults in non-lease executory contracts are exempt from the cure obligation.  *In re Gilmore,* 261 B.R. 175, 180-81 (Bankr. W.D. Pa. 2001) (agreeing that certain non-monetary breaches can be cured); ); *In re Yardley,* 77 B.R. 643, 645 (Bankr.M.D.Tenn.1987) ("It is implicit in the structure of § 365 hat Congress contemplated the curing of non-monetary defaults."); *see also In re Claremont Acquisition Corp., Inc.,* 113 F.3d 1029, 1033 (9th Cir.1997) (stating that all defaults, both monetary and non-monetary, must be

cured before a lease can be assumed under § 365); *In re Ruffin,* No. 91-14195S, 1991 WL 173331, at *1 (Bankr.E.D.Pa. Sept.6, 1991) (permitting, under § 365, the cure of a non-monetary breach).[6]

20.     As detailed throughout, the Debtors have certain obligations to the Alamo Franchisees under the Franchise Agreements and Development Agreements. All of the Franchise Agreements and Development Agreements are presently proposed to be assumed and assigned to the Stalking Horse Purchaser. Notwithstanding, the Debtors appear to be proposing a transaction without compensating the Alamo Franchisees for the stated defaults—stating zero dollars to cure and apparently not allowing offsetting, recoupment and netting of amounts owed between the parties, thereby avoiding the assumption and assignment of all of the related burdens under the Franchise Agreements and Development Agreements. The Alamo Franchisees object to this.

21.     The Debtors must cure the defaults existing as of the Closing in order to assume and assign the Franchise Agreements and Development Agreements. This includes paying the damages associated with the above-described breaches.

22.     As to the Gift Card amounts listed on <u>Exhibit B</u>, the Gift Card amounts should be preserved for offsetting and recoupment purposes in the Sale process, to reflect the Debtors and the Alamo Franchisees previous practices to offset these amounts.

**B.  The Debtors Cannot Sever the Franchise Agreements, But Must Assume or Reject the Franchise Agreements in Full, Preserving Any Defenses, Offsets and Recoupments Under the Franchise Agreements and Preserving the Temporary Fee Payment Agreement as Part of the Assumption of the Franchise Agreements**

23.     The Alamo Franchisees object to the Sale to the extent it extinguishes valid and enforceable claims, defenses, setoff and recoupment rights and any related claims arising thereto under the Franchise Agreements and Development Agreements.

---

[6] Franchisees do not waive any arguments under applicable law and Section 365 that non-monetary defaults prevent an executory contract from being assumed without consent of the counter-party.

24.     The Debtors cannot unilaterally modify the Franchise Agreements, through the assumption and assignment process, but must assume or reject the them in their totality as provided in 11 U.S.C. § 365(b)(3)(C).  *See In re Trigg*, 630 F.2d 1370 (10th Cir. 1980) (a debtor in possession cannot accept the benefits of an executory contract without accepting the burdens as well); *In re Downtown Properties, Inc.*, 162 B.R. 244, 247 (Bankr. W.D. Mo. 1993) ("A debtor which assumes a lease or executory contract cannot choose to accept the benefits of the contract and reject its burdens; it must either assume the agreement in full or reject.") *In re Buffets Holdings, Inc.*, 387 B.R. 115, 119 (Bankr. D. Del. 2008) ("If the debtor decides to assume a lease, however, it must generally assume all the terms of the lease and may not pick and choose only favorable terms to be assumed. "The [debtor] may not blow hot and cold. If he accepts the contract he accepts it *cum onere*. If he receives the benefits he must adopt the burdens. He cannot accept one and reject the other.") *Thompson v. Texas Mexican Railway Co.*, 328 U.S. 134 (1946); *In re Jamesway Corp.*, 201 B.R. 73, 76 (Bankr. S.D.N.Y. 1996); *Rockland Center Assoc. v. TSW Stores of Nanuet, Inc. (In re TSA Stores of Nanuet, Inc.)*, 34 B.R. 299, 304 (Bankr. S.D.N.Y. 1985).  Thus, any order assuming and assigning the Franchise Agreements should state that the Franchise Agreements are unmodified, all defenses of the Alamo Franchisees are preserved, reserved and not waived, reduced or released by the sale process.

25.     Further, any related agreements between the Debtors and the Alamo Franchisees, must be assumed as part of the assumption of the Franchise Agreements.  Recognizing the economic realities COVID-19 imposed on the movie theater industry, Debtors entered into Temporary Fee Payment Agreements with some of the Alamo Franchisees, temporarily reducing the amount of fees owed to Debtors by those Alamo Franchisees.  Under the terms of the Temporary Fee Payment Agreements, they "deemed incorporated in, and modifie[d] and

amend[ed] those Franchise Agreements listed in Exhibit A." (Paragraph 9 of the Temporary Fee Payment Agreement). Thus, the parties formed an integrated agreement that must be assumed and assigned in whole.

26.     A court may also find two or more contracts or leases to be part of one integrated transaction. *In re Abitibibowater Inc.,* 419 B.R. 815, 823 (Bankr. Del. 2009) (all of the contracts that comprise an integrated agreement must either be assumed or rejected since they all make up one contract); *In re Texstone Venture, Ltd.*, 54 B.R. 54 (Bankr. S.D. Tex. 1985) (creditor's option to obtain equity in building part of overall loan transaction). When a court integrates various agreements, the trustee or debtor-in-possession may not assume one agreement without also assuming all other integrated agreements. See *In re A. R. Dameron & Associates, Inc.*, 3 B.R. 450, (Bankr. N.D. Ga. 1980) (lessee's agreement to construct improvements integrated with lease; amount due for construction must be paid as a condition for assumption). Accord, *In re Atlantic Computer Systems, Inc.*, 173 B.R. 844 (S.D.N.Y. 1994) (master agreements, equipment schedules, and "flexleases" with lessee of computer equipment not shown to be separate agreements so as to permit debtor-in-possession to reject portions of agreements and assume portions of agreements).

27.     The determination of whether separate contracts are integrated is based on state law, which largely turns on the intent of parties. As a bankruptcy court in the Northern District of Texas has stated:

> Various Bankruptcy Courts have recognized the general rule of construction which provides that instruments that are conditionally dependent upon one another are to be read and interpreted as one agreement. *In the Matter of Wall Tire Distributors, Inc.*, supra at 617 (asset lease and purchase agreement was indivisible contract for purchase of business, although business was to be transferred in stages); *In re Rachels Indus-tries, Inc.*, 109 B.R. 797, 803 (Bankr.W.D.Tenn.1990); *In the Matter of East Hampton Sand and Gravel Co., Inc*., 25 B.R. 193 (Bankr.E.D.N.Y.1982) (lease of concrete plant and promissory note interpreted together since both documents arose out of same transaction [sale of concrete business] and were conditionally dependent upon each other); *In the Matter of T & H Diner, Inc*., 108

B.R. 448 (D.N.J.1989) (citing *East Hampton Sand* approvingly, lease and promissory note interpreted together since each was integral to a single transaction, the sale of a restaurant); *In re OK-KWI Lynn Candles, Inc.*, 75 B.R. 97 (Bankr.N.D.Ohio 1987) (where a lease incorporated a franchise agreement, court held compliance with the terms of the franchise agreement and adequate assurance of future performance of same must be shown before assumption of the lease could occur).

*In re Independent American Real Estate, Inc.,* 146 B.R. 546, 550-551 (N.D. Tex. Bankr. 1992).

Here, by its terms, the parties decided that the Temporary Fee Payment Agreements are "incorporated in, modifie[d] and amend[ed] . . . the Franchise Agreements," clearly indicating that they must be read and considered one agreement for assumption and rejection purposes. Debtors have intimated that they could split these agreements in this Bankruptcy to hold more leverage over the Alamo Franchisees. Any order approving the Sale should mandate that if a Franchise Agreement is being assumed, a Temporary Fee Reeducation Agreement with that Alamo Franchisee must also be assumed. Also any forbearance agreements and related side or letter agreements agreed to between the Debtors and the Alamo Franchisees must be assumed as part of the process if the Franchisee Agreements are being assumed.

### C. Any Claims for Setoff or Recoupment of the Gift Card Amounts Should be Preserved in the Sale and Allowed to be Offset by the Alamo Franchisees

28.      Section 553 of the Bankruptcy Code expressly recognizes and preserves creditors' setoff rights. "The doctrine of setoff, as incorporated in Bankruptcy Code section 553, gives a creditor the right 'to offset a mutual debt owing by such creditor to the debtor,' provided that both debts arose before commencement of the bankruptcy action and are in fact mutual." *In re University Med. Ctr.,* 973 F.2d 1065, 1079 (3d Cir. 1992), citing *In re Davidovich,* 901 F.2d 1533, 1537 (10th Cir. 1990); 11 U.S.C. § 553(a). The right of setoff allows entities that owe money to each other to apply their mutual debts against each other, "thereby avoiding the absurdity of making A pay B when B owes A." *In re Bennett Funding Group, Inc.,* 146 F.3d 136, 140 (2d Cir.

1998), citing *Citizens Bank v. Strumpf,* 516 U.S. 16, 17, 133 L. Ed. 2d 258, 116 S. Ct. 286 (1995);
*Studley v. Boylston Nat'l Bank,* 229 U.S. 523, 528, 57 L. Ed. 1313, 33 S. Ct. 806 (1913).

29.     As stated above, the amounts owed to the Alamo Franchisees for gift card liabilities
are valid, enforceable non-contingent, liquidated claims. The foregoing constitutes mutual debts
for the purposes of section 553 of the Bankruptcy Code and clearly qualify for setoff.

30.     Pursuant to section 506(a) of the Bankruptcy Code, Alamo Franchisees rights of
setoff provide the Alamo Franchisees with a secured claim to the extent of the amount subject to
setoff. 11 U.S.C. § 506(a)(1).  The Stalking Horse APA does assume "all Liabilities for gift card
or gift certificates issued by any Seller in the ordinary course of business prior to the Closing
Date."  *See* Stalking Horse APA Section 2.3(d).  This language should be amended to include any
gift cards or gift certificates issued by any Alamo Franchisee as well, and preserve the parties pre-
petition practice of offsetting those obligations between themselves.  *See, e.g., In re Kellstrom
Industries, Inc.*, 282 B.R. 787, 794 (Bankr. D. Del. 2002) (where the sale of assets was conditioned
on the availability of adequate protection). The adequate protection must be equivalent to the rights
lost by the non-debtor as a result of the relief granted the debtor or trustee under section 363(f) of
the Bankruptcy Code. *Id*. At 794-95. Accordingly, the free and clear sale of the Assets can be
granted only if the Debtors provide the Alamo Franchisees with adequate protection under sections
361 and 363(e) of the Bankruptcy Code in connection with any approved sale. Thus, the Alamo
Franchisees object to the Sale to the extent it impairs the Alamo Franchisees' setoff rights without
having been adequately protected.

31.     The doctrine of recoupment, on the other hand, "allows the creditor to assert that
certain mutual claims extinguish one another in bankruptcy, in spite of the fact that they could not
be "setoff" under 11 U.S.C. § 553." *Lee v. Schweiker,* 739 F.2d 870, 875 (3d Cir. 1984).

Recoupment "is the setting up of a demand arising from the same transaction as the plaintiffs claim or cause of action, strictly for the purpose of abatement or reduction of such claim." *University Med. Ctr.,* 973 F.2d at 1079 (quoting, 4 COLLIER ON BANKRUPTCY § 553.03, at 553-15-17). As long as the creditor's claim arises out of the same transaction as the debtor's, that claim may be recouped against the debt owed to the debtor, without concern for the limitations put on the doctrine of setoff by Bankruptcy Code section 553. *Id.,* quoting *In re Davidovich,* 901 F.2d 1533, 1537 (10th Cir.1990). In other words, the doctrine of recoupment does not contain the same limitation as setoff that both the debtor's and creditor's debt arose prior to the commencement of the bankruptcy case, and pre-petition debts may be recouped against post-petition obligations. Thus, so long as the creditor's claim arises out of the same transaction as the debtor's, that claim may be recouped against the debt owed to the debtor, without the limitations that Section 553 of the Bankruptcy Code places upon the doctrine of setoff. *University Med. Ctr.,* 973 F.2d at 1079, quoting *Davidovich,* 901 F.2d at 1537. To the extent the Alamo Franchisees are deemed to hold recoupment rights against the Debtors, those recoupment rights similarly should not be extinguished through this Sale.

32.     Additionally, Franchise Holdings GA-NC LLC is the holder of certain agreed offset and credit rights against the Debtors. Franchise Holdings GA-NC LLC paid $150,000 to secure the development rights in the Georgia and North Carolina franchise territory for Alamo. Franchise Holdings GA-NC LLC was not able to open venues in the time specified under their franchise agreement due to the COVID-19 pandemic. However, pre-petition, the Debtors did agree that because the failure was caused by COVID-19 that the Debtors would allow a future credit at $50,000 per site, toward the franchise fees of any venue Franchise Holdings GA-NC LLC opens in the future, whatever the locations. These offsets and recoupments must be preserved in the Sale

process.[7]  This amendment of the applicable Franchise Agreement by agreement, must also be assumed as part of the franchise agreement.

33.     Additionally, the Triple Tap Alamo Franchisees[8] have provisions in their individual Franchise Agreements which require Debtors to pay the Triple Tap Alamo Franchisees a percentage of the sale of collateral products in their designated areas.  The Triple Tap Alamo Franchisees have asked the Debtors for an accounting of the sales to verify what amounts are owed based on sales to calculate that payment owed to the Triple Tap Alamo Franchisees.  The Triple Tap Alamo Franchisees reserve their rights to amend and supplement this amount as part of the cure once that information is provided and can be calculated.

### D.  Reservation of Rights

34.     The Alamo Franchisees and Franchise Holdings GA-NC LLC hereby expressly reserve all of its rights to amend, supplement, modify, or withdraw this Objection in whole or in part at any time.  The Alamo Franchisees do not waive any right it may have by filing this Objection, including, without limitation, the right to object to and/or raise any other issue in connection with the Sale.  The Alamo Franchisees also reserve the right to further address the Sale Motion, Sale, Sale Order and any other issues raised by the Debtors or any other party at any hearing or through any pleading.

WHEREFORE, the Alamo Franchisees respectfully request that the proposed Sale Order expressly (i) provide that valid and enforceable claims, defenses, setoff and recoupment rights are preserved in all respects and may be asserted against the Stalking Horse Purchaser as applicable;

---

[7] This agreement was embodied in an email dated September 16, 2020 from Chris Drazba, the Chief Development Officer of the Debtors to John Martin of Franchise Holdings GA-NC LLC.

[8] Triple Tap Ventures LLC, Triple Tap Alamo Lubbock LLC, El Paso Texas Alamo Operations, LLC, Triple Tap Alamo Sugar Land LLC, Triple Tap Alamo LaCenterra LLC, Triple Tap Alamo League City-Operations LLC, and Alamo Monteverde Operations, LLC

(ii) condition such Sale upon the cure of all defaults (monetary and non-monetary) thereunder as required by section 365(b)(1)(A) and (B) (including, without limitation, payment of all outstanding cure amounts up to the Closing Date), and compliance with all other requirements of section 365 of the Bankruptcy Code; (iii) ensure that the Temporary Fee Payment Agreements, as agreed to by the Debtors and Alamo Franchisees are assumed with the Franchise and Development Agreements, along with any other side or letter agreements between the Debtors and the Alamo Franchisees; and (iv) grant the Alamo Franchisees such other and further relief as the Court deems just and proper.

Dated: April 14, 2021                                    Respectfully Submitted,
        Wilmington, Delaware

                                        **POLSINELLI PC**

                                        */s/ Shanti M. Katona*
                                        Shanti M. Katona (DE Bar No. 5352)
                                        222 Delaware Ave, Suite 1101
                                        Wilmington, DE 19801
                                        Telephone: (302) 252-0920
                                        Facsimile: (302) 252-0921
                                        skatona@polsinelli.com

                                        -and-

                                        Andrew J. Nazar
                                        900 West 48th Place, Suite 900
                                        Kansas City, Missouri 64112
                                        Telephone: (816) 753-1000
                                        Facsimile: (816) 753-1536
                                        anazar@polsinelli.com

                                        *Counsel to ADC Franchisee Association, Inc., Triple*
                                        *Tap Ventures LLC, Triple Tap Alamo Lubbock LLC,*
                                        *El Paso Texas Alamo Operations, LLC, Triple Tap*
                                        *Alamo Sugar Land LLC, Triple Tap Alamo*
                                        *LaCenterra LLC, Triple Tap Alamo League City-*
                                        *Operations LLC, Alamo Monteverde Operations,*
                                        *LLC, Iced Tea with Lemon, LLC, Two Is One, One Is*
                                        *None, LLC, Dos Peliculas, LLC, Tres Peliculas, LLC,*
                                        *Cinco Peliculas, LLC, Seis Peliculas, LLC, Woodbury*
                                        *Alamo, LLC, North Richland Hills Alamo, LLC,*
                                        *Cojeaux Cinemas, LLC, Alamo Drafthouse Cinema*
                                        *Charlottesville LLC, ADC Woodbridge, LLC, Alamo*
                                        *Drafthouse D.C., LLC, Alamo One Loudoun, LLC,*
                                        *ADC Crystal City, LLC, NL Entertainment, LLC,*
                                        *Springboard Ventures, LLC, BACH Management,*
                                        *LLC, Reel Dinner Partners – Laredo, LLC, Reel*
                                        *Dinner Partners – Corpus Christi, LLC,*
                                        *Entertainment Management Co., LLC, Midtown*
                                        *Alamo LLC, and Franchise Holdings GA-NC LLC*

## Exhibit A

### List of Alamo Franchisees, Contracts and Cure Amounts

| Entity | Location | Contract | Debtor's Stated Cure Amount |
|---|---|---|---|
| 1. Triple Tap Ventures LLC | TBD | Development Agreement | $0 |
| 2. Triple Tap Alamo Lubbock LLC | Lubbock | Franchise Agreement | $0 |
| 3. El Paso Texas Alamo Operations, LLC | Monticello | Franchise Agreement | $0 |
| 4. Triple Tap Alamo Sugar Land LLC | TBD | Franchise Agreement | $0 |
| 5. Triple Tap Alamo LaCenterra LLC | Katy TX | Franchise Agreement | $0 |
| 6. Triple Tap Alamo League City-Operations LLC | TBD | Franchise Agreement | $0 |
| 7. Alamo Monteverde Operations, LLC | El Paso | Franchise Agreement | $0 |
| 8. Iced Tea with Lemon, LLC | Richardson, TX | Franchise Agreement | $0 |
| 9. Dos Peliculas, LLC | Cedars – Dallas TX | Franchise Agreement | $0 |
| 10. Tres Peliculas, LLC | Las Colinas – Irving TX | Franchise Agreement | $0 |
| 11. Cinco Peliculas, LLC | Lake Highlands – Dallas TX | Franchise Agreement | $0 |
| 12. Seis Peliculas, LLC | Denton TX | Franchise Agreement | $0 |
| 13. Woodbury Alamo, LLC | Woodbury MN | Franchise Agreement | $0 |
| 14. North Richland Hills Alamo, LLC | North Richland Hills TX | Franchise Agreement | $0 |
| 15. Cojeaux Cinemas, LLC | Loudoun VA | Franchise Agreement | $0 |
| 16. Alamo Drafthouse Cinema Charlottesville LLC | Charlottseville VA | Franchise Agreement | $0 |
| 17. ADC Woodbridge, LLC | Woodbridge VA | Franchise Agreement | $0 |
| 18. Alamo Drafthouse D.C., LLC | Washington DC | Franchise Agreement | $0 |
| 19. ADC Crystal City, LLC | Arlington VA | Franchise Agreement | $0 |
| 20. N/L Entertainment, LLC | Winchester VA | Franchise Agreement | $0 |
| 21. Springboard Ventures, LLC | Springfield MO | Franchise Agreement | $0 |

| 22. BACH Management, LLC | TBD | Development Agreement | $0 |
|---|---|---|---|
| 23. Reel Dinner Partners – Laredo, LLC | Laredo | Franchise Agreement | $0 |
| 24. Reel Dinner Partners – Corpus Christi, LLC | Corpus Christi | Franchise Agreement | $0 |
| 25. Entertainment Management Co., LLC | La Vista NE | Franchise Agreement | $0 |
| 26. Midtown Alamo LLC | Omaha NE | Franchise Agreement | $0 |

**Exhibit B**
*Information as of April 8, 2021* **Gift Cards**          Ad/Marketing Fund Contributions

| Entity: | Due to Franchisee | Due to Franchisor | Sub-Total | Fiscal 2018 | Fiscal 2019 | Fiscal 2020 | Fiscal 2021 | Sub-Total | Amounts Due to Franchisor or Offset By Franchisee |
|---|---|---|---|---|---|---|---|---|---|
| **Corpus Christi** | ($21,237.88) | | *($21,237.88)* | | $39,648.00 | $41,070.00 | $9,213.00 | $1,841.00 | *($91,772.00)* | ***($113,009.88)*** |
| **Laredo** | ($655.73) | | *($655.73)* | | $26,069.00 | $28,602.00 | $4,062.00 | — | *($58,733.00)* | ***($59,388.73)*** |
| **Charlottesville** | ($12,227.10) | — | *($12,227.10)* | | $31,411.62 | $31,897.41 | $7,287.50 | $1,495.81 | *($72,092.34)* | ***($84,319.44)*** |
| **Loudoun** | ($41,536.72) | — | *($41,536.72)* | | $57,321.50 | $47,622.15 | $12,381.00 | $2,918.50 | *($120,243.15)* | ***($161,779.87)*** |
| **Woodbridge** | ($10,898.94) | — | *($10,898.94)* | | $25,612.04 | $54,625.96 | $11,579.73 | $1,732.86 | *($93,550.59)* | ***($104,449.53)*** |
| **La Vista** | ($10,713.79) | | *($10,713.79)* | | $35,073.68 | $30,034.63 | $4,297.06 | | *($69,405.37)* | ***($80,119.16)*** |
| **Midtown** | | $2,268.18 | *$2,268.18* | | — | $12,365.18 | $1,876.93 | | *($14,242.11)* | ***($11,973.93)*** |
| **Dallas** | ($62,226.36) | | *($62,226.36)* | | $49,047.68 | $44,065.97 | $6,754.33 | | *($99,867.98)* | ***($162,094.34)*** |
| **Denton** | ($19,136.36) | | *($19,136.36)* | | $13,092.67 | $29,520.68 | $4,768.27 | | *($47,381.62)* | ***($66,517.98)*** |
| **Lake Highlands** | ($6,069.16) | | *($6,069.16)* | | $31,599.42 | $44,122.39 | $7,276.36 | | *($82,998.17)* | ***($89,067.33)*** |
| **Las Colinas** | | $15,188.64 | *$15,188.64* | | $15,875.19 | $23,194.38 | $2,561.31 | | *($41,630.88)* | ***($26,442.24)*** |
| **North Richland Hills** | ($19,958.66) | | *($19,958.66)* | | | $21,277.67 | $4,619.07 | | *($25,896.74)* | ***($45,855.40)*** |
| **Richardson** | ($37,950.87) | | *($37,950.87)* | | $42,353.97 | $40,068.39 | $5,804.59 | | *($88,226.95)* | ***($126,177.82)*** |
| **Woodbury** | | $40,310.05 | *$40,310.05* | | $12,531.20 | $34,794.28 | $5,693.19 | | *($53,018.67)* | ***($12,708.62)*** |
| **Winchester** | | $6,365.04 | *$6,365.04* | | $40,855.61 | $40,498.33 | $11,725.52 | $3,458.68 | *-$96,538.14* | ***($90,173.10)*** |
| **Springfield** | — | $60,617.54 | *$60,617.54* | | $63,599.61 | $67,637.33 | $8,631.35 | — | *($139,868.29)* | ***($79,250.75)*** |
| **East El Paso** | ($1,797.07) | $903.10 | *($893.97)* | | | | | $1,044.69 | *($1,044.69)* | ***($1,938.66)*** |
| **LaCenterra** | ($92,822.80) | $56,193.11 | *($36,629.69)* | | $31,205.98 | $40,798.64 | $9,123.01 | $2,320.63 | *($83,448.27)* | ***($120,077.96)*** |
| **Lubbock** | ($97,491.88) | $104,018.29 | *$6,526.41* | | $37,277.87 | $33,852.73 | $6,653.21 | — | *($77,783.81)* | ***($71,257.40)*** |
| **Montecillo** | ($79,398.55) | $65,714.04 | *($13,684.51)* | | $39,676.42 | $36,322.07 | $7,612.04 | $2,712.80 | *($86,323.33)* | ***($100,007.84)*** |

77586542.3

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that on the 14th day of April, 2021, a true and correct copy of the **Omnibus Objection of the Alamo Franchisees to the Notice of Possible Assumption and Assignment and Cure Amounts with Respect to Executory Contracts and Unexpired Leases of the Debtors** was served upon all parties of record via CM/ECF and upon the parties listed below via electronic mail.

Young Conaway Stargatt & Taylor, LLP
Rodney Square
1000 North King Street
Wilmington, Delaware 19801
Attn: Matthew B. Lunn (mlunn@ycst.com) and Kenneth J. Enos (kenos@ycst.com)

Pachulski Stang Ziehl & Jones LLP
919 N. Market Street, 17th Floor
Wilmington DE, 19801
Attn: Bradford Sandler (bsandler@pszjlaw.com) and Robert Feinstein (rfeinstein@pszjlaw.com)

Ropes & Gray LLP
1211 Avenue of the Americas
New York, New York 10036
Attn: Gregg M. Galardi (gregg.galardi@ropesgray.com)

Proskauer Rose LLP
One International Place
Boston, MA 02110
Attn: Charles A. Dale (cdale@proskauer.com)

Office of the United States Trustee
for the District of Delaware
855 King Street, Suite 2207
Lockbox 35
Wilmington, Delaware 19801
Attn: Timothy J. Fox, Jr. (timothy.fox@usdoj.gov)

*/s/ Shanti M. Katona*
Shanti M. Katona (Del Bar. No. 5352)