# **EXHIBIT A**

Master Declaration - La Cantera Master Covenants and Easements

After recording please return to:

96- 0037711

Kenneth W. Smith
VP, Real Estate Counsel
United Services Automobile Assoc.
9800 Fredericksburg Road
San Antonio, Texas 78288

## LA CANTERA MASTER COVENANTS AND EASEMENTS

**HYATT & STUBBLEFIELD, P.C.**

Attorneys and Counselors
225 Peachtree Street, 1200 South Tower
Atlanta, Georgia 30303
(404) 659-6600

Book Volume 06896 Page 00890

# - TABLE OF CONTENTS -

| ARTICLE | SECTION | | PAGE |
|---|---|---|---|
| I. | | DEFINITIONS | 2 |
| | 1.1. | Area of Common Responsibility | 2 |
| | 1.2. | Articles of Incorporation; Articles | 2 |
| | 1.3. | Board of Directors; Board | 2 |
| | 1.4. | By-Laws | 2 |
| | 1.5. | Common Expenses | 2 |
| | 1.6. | Community Organization | 2 |
| | 1.7. | Community-Wide Standard | 2 |
| | 1.8. | Declarant | 2 |
| | 1.9. | Fiesta Texas | 2 |
| | 1.10. | General Assessment | 3 |
| | 1.11. | Golf Course | 3 |
| | 1.12. | Governing Documents | 3 |
| | 1.13. | La Cantera Community | 3 |
| | 1.14. | Master Covenants | 3 |
| | 1.15. | Mortgage | 3 |
| | 1.16. | Mortgagee | 3 |
| | 1.17. | Mortgagor | 3 |
| | 1.18. | Owner | 3 |
| | 1.19. | Owners Association | 4 |
| | 1.20. | Parcel | 4 |
| | 1.21. | Person | 4 |
| | 1.22. | Public Records | 4 |
| | 1.23. | Special Assessment | 4 |
| | 1.24. | Specific Assessment | 4 |
| | 1.25. | Supplemental Declaration | 4 |
| II. | | OPERATION, MAINTENANCE AND INSURANCE OF AREA OF COMMON RESPONSIBILITY | 4 |
| | 2.1. | Area of Common Responsibility | 4 |
| | 2.2. | Obligation to Operate, Maintain and Insure | 5 |
| | 2.3. | Other Activities of the Community Organization | 5 |
| | 2.4. | Right to Request Additional or Higher Level of Maintenance or Services | 5 |
| | 2.5 | Relationship with Tax-Exempt Organizations | 5 |
| III. | | OBLIGATION TO SHARE COSTS | 6 |

VOL 9696 PG0891

<u>ARTICLE</u>  <u>SECTION</u>                                                              <u>PAGE</u>

| | | |
|---|---|---|
| 3.1. | Responsibility for Assessments | 6 |
| 3.2. | Creation and Obligation for Assessments | 6 |
| 3.3. | Declarant's Obligation for Assessments | 7 |
| 3.4. | Computation of General Assessments | 8 |
| 3.5. | Reserve Budget and Capital Contribution | 9 |
| 3.6. | Special Assessments | 10 |
| 3.7. | Specific Assessments | 10 |
| 3.8. | Lien for Assessments | 10 |
| 3.9. | Date of Commencement of Assessments | 11 |
| 3.10. | Failure to Assess | 11 |
| 3.11. | Exempt Property | 11 |
| 3.12. | Owners Association's Obligation to Pay Assessments | 12 |
| 3.13. | Expenditure of Funds | 12 |
| 3.14. | Recordkeeping | 13 |
| 3.15. | Responsibility to Insure | 13 |
| IV. | EASEMENTS | 13 |
| 4.1. | Easement for Administration | 13 |
| 4.2. | Easements of Encroachment | 14 |
| 4.3. | Easements for Utilities, Etc | 15 |
| 4.4. | Easements for Stormwater Drainage and Retention | 15 |
| V. | GOLF COURSE | 15 |
| 5.1. | General | 15 |
| 5.2. | Ownership and Operation of the Golf Course | 16 |
| 5.3. | Easements Respecting the Golf Course | 16 |
| 5.4. | View Impairment | 17 |
| 5.5. | Limitations on Amendments | 18 |
| 5.6. | Jurisdiction and Cooperation | 18 |
| 5.7. | Assumption of Risk and Indemnification | 18 |
| VI. | FIESTA TEXAS | 19 |
| VII. | DISPUTE RESOLUTION AND LIMITATION ON LITIGATION | 20 |

| **ARTICLE** | **SECTION** | **PAGE** |
|---|---|---|
| | 7.1. | Agreement to Avoid Litigation . . . . . . . . . . . . . . . . . . . . . . . . . 20 |
| | 7.2. | Claims . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20 |
| | 7.3. | Mandatory Procedures . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21 |
| | 7.4. | Allocation of Costs of Resolving Claims . . . . . . . . . . . . . . . . . . 22 |
| | 7.5. | Enforcement of Resolution . . . . . . . . . . . . . . . . . . . . . . . . . . . 22 |
| VIII. | **DECLARANT'S RIGHTS** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23 | |
| | 8.1. | Duration . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23 |
| | 8.2. | Transfer of Declarant Rights . . . . . . . . . . . . . . . . . . . . . . . . . . 23 |
| | 8.3. | Approval of Additional Covenants . . . . . . . . . . . . . . . . . . . . . . 23 |
| | 8.4. | Water Rights . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23 |
| | 8.5. | Amendment . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23 |
| IX. | **GENERAL** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24 | |
| | 9.1. | Notice . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24 |
| | 9.2. | Unilateral Annexation By Declarant . . . . . . . . . . . . . . . . . . . . . 24 |
| | 9.3. | Enforcement . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24 |
| | 9.4. | Governmental Interests . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24 |
| | 9.5. | Use of the Words "La Cantera" or "Fiesta" . . . . . . . . . . . . . . . . 25 |
| | 9.6. | Amendment . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25 |
| | 9.7. | Duration . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25 |
| | 9.8. | Interpretation . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26 |
| | 9.9. | Gender and Grammar . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26 |
| | 9.10. | Severability . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26 |
| | 9.11. | Captions . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26 |

## LA CANTERA MASTER COVENANTS AND EASEMENTS

THESE LA CANTERA MASTER COVENANTS AND EASEMENTS are hereby declared and made this ___ day of _____, 1996, by La Cantera Development Company, a Delaware corporation qualified to do business in Texas ("Declarant").

## BACKGROUND

Declarant has established a general plan of development for a mixed-use community known as La Cantera, which includes all of the property described in Exhibit "A" attached hereto. La Cantera consists of or may consist of various types of development, including, but not limited to, commercial, residential, and resort development. While each of the various types of development may be developed, owned and operated by entities other than Declarant, each will be a part of and benefit from the general plan of development for La Cantera.

It is the intent of the Declarant, as the owner of the real property described in Exhibit "A" or, if not the owner, with the consent of all owners, to impose upon such real property and such other real property as may from time to time be made a part of the La Cantera Community (as defined herein), various covenants and easements which establish a reasonable arrangement for the maintenance and operation of those certain community properties and facilities, and for the provision of community services, which benefit all of La Cantera, and to provide for an equitable allocation of the costs thereof.

The La Cantera Community Organization, Inc. ("Community Organization") shall be the entity responsible for management, maintenance, operation and control over such property and matters as are of interest to the La Cantera Community including such matters as are specifically identified herein. The Community Organization shall perform its functions in accordance with the La Cantera Master Covenants and Easements, the By-Laws of La Cantera Community Organization, Inc., the Articles of Incorporation of La Cantera Community Organization, Inc., and the laws of the State of Texas.

NOW, THEREFORE, Declarant, as the owner of the real property described in Exhibit "A" or, if not the owner, with the consent of all owners evidenced by their execution of these Master Covenants, hereby declares that all of the real property described in Exhibit "A," and such other real property as may from time to time be made subject to these Master Covenants, shall be held, sold, and conveyed subject to the covenants and easements contained herein, which are made for the express benefit of the present and future owners of such real property, and which shall run with the title to such real property. The covenants and easements contained herein shall bind all parties having any right, title, or interest in the real properties or any part thereof, their heirs, successors, successors-in-title, and assigns and shall

1

VOL 6996 PG0894

inure to the benefit of the Community Organization and each owner of any part of such real property.

## Article I
## Definitions

The terms used herein shall generally be given their normal, commonly understood meanings unless otherwise specified. Capitalized terms used herein shall be defined as follows:

1.1. "Area of Common Responsibility": The property which is the responsibility of the Community Organization, as described in Section 2.1.

1.2. "Articles of Incorporation" or "Articles": The Articles of Incorporation of La Cantera Community Organization, Inc., as filed with the Texas Secretary of State.

1.3. "Board of Directors" or "Board": The body responsible for the administration of the Community Organization, selected as provided in the By-Laws and generally serving the same role as the board of directors under Texas corporate law.

1.4. "By-Laws": The By-Laws of La Cantera Community Organization, Inc., as they may be amended from time to time as provided therein.

1.5. "Common Expenses": The actual and estimated expenses incurred, or anticipated to be incurred, by the Community Organization for the general benefit of the Owners, including any reasonable reserve, as the Board may find necessary and appropriate pursuant to these Master Covenants, the By-Laws, and the Articles of Incorporation.

1.6. "Community Organization": The La Cantera Community Organization, Inc., a Texas non-profit corporation, its successors and assigns.

1.7. "Community-Wide Standard": The standard of conduct, maintenance, or other activity generally prevailing throughout the La Cantera Community. Such standard may be more specifically determined by the Declarant and the Community Organization and may evolve over time as development progresses.

1.8. "Declarant": La Cantera Development Company, a Delaware corporation qualified to do business in Texas, or its successors, successors-in-title or assigns who are designated as the Declarant hereunder in a recorded instrument executed by the immediately preceding Declarant.

1.9. "Fiesta Texas": The theme or amusement park located in the La

2

Cantera Community which is currently known as Fiesta Texas on property more particularly described on Exhibit "C" attached hereto.

1.10.    "General Assessment": The annual assessments levied on all Parcels pursuant to these Master Covenants to fund Common Expenses for the general benefit of the La Cantera Community.

1.11.    "Golf Course": Certain real property and any improvements and facilities thereon located adjacent to, in the vicinity of, or within the La Cantera Community which is privately owned by Persons other than the Community Organization, and which is operated as a golf course, including, but not limited to, the golf course currently known as the La Cantera Golf Course.

1.12.    "Governing Documents": These Master Covenants, any Supplemental Declaration, the By-Laws, the Articles of Incorporation of La Cantera Community Organization, Inc., the Design Guidelines, and any other applicable covenants, or any of the above, as each may be amended from time to time.

1.13.    "La Cantera Community": all the real property described on Exhibit "A" attached hereto, together with such other property as is made subject to these Master Covenants by annexation pursuant to Section 9.2.

1.14.    "Master Covenants": The La Cantera Master Covenants and Easements, as the same may be amended and supplemented from time to time in accordance with the terms hereof.

1.15.    "Mortgage": A mortgage, a deed of trust, a deed to secure debt, or any other recorded instrument creating a security interest in any portion of the La Cantera Community.

1.16.    "Mortgagee": A beneficiary or holder of a Mortgage.

1.17.    "Mortgagor": Any Person who grants a Mortgage.

1.18.    "Owner": One or more Persons who hold the record title to any Parcel, but excluding in all cases any party holding an interest merely as security for the performance of an obligation; provided, if a Parcel is sold under a recorded contract of sale, and the contract specifically so provides, the purchaser (rather than the fee owner) will be considered the Owner. In addition, if a Parcel is subject to a lease and the lease so provides, then upon written notice in recordable form from the Owner to the Community Organization accompanied by a copy of such lease, the lessee shall be entitled to exercise all rights of the Owner and shall be primarily responsible for all obligations of the Owner of the Parcel for the term of such lease; provided, no such lease shall relieve the Parcel of the lien for unpaid

3

assessments pursuant to these Master Covenants.

1.19.    "Owners Association": Any commercial, residential or other community association comprised of Parcel Owners which may be formed for the purpose of administering a common set of covenants, conditions, and restrictions pertaining to such Parcels and other real property; provided, any Owners Association must have the power to assess each of its members for common expenses, including, but not limited to, expenses of the Community Organization, as described herein.

1.20.    "Parcel": A portion of the La Cantera Community, whether improved or unimproved, which may be independently owned and conveyed and which is intended for development, use and occupancy for purposes consistent with these Master Covenants, other applicable covenants and applicable zoning. By way of illustration and not limitation, each of the following might be a separate Parcel: an attached or detached residential dwelling; a golf course (including the La Cantera Golf Course) and related structures and facilities under the same ownership and used in connection with the golf course; a resort hotel; a restaurant site; an office building; a retail shopping center; Fiesta Texas; or an unimproved tract of land intended for future development. The term shall not include property owned by the Community Organization for the common use and enjoyment of all Owners, nor any property dedicated to the public.

1.21.    "Person": A natural person, a corporation, a partnership, a trustee, a reciprocal inter-insurance exchange, an unincorporated association, or any other legal entity.

1.22.    "Public Records": The Office of the County Clerk of Bexar County, Texas, or such other place as is designated as the official location for recording of deeds and similar documents affecting title to real estate.

1.23.    "Special Assessment": Assessments levied in accordance with Section 3.6.

1.24.    "Specific Assessment": Assessments levied in accordance with Section 3.7.

1.25    "Supplemental Declaration": An instrument filed in the Public Records which subjects additional property to these Commercial Covenants and/or imposes, expressly or by reference, additional restrictions and obligations on the land described in such instrument.

## Article II
## Operation, Maintenance and Insurance of Area of Common Responsibility

2.1.    Area of Common Responsibility. The Area of Common Responsibility shall include such property as is now or in the future owned by the Community Organization

4

VOL 6696 PG0897

or, if not so owned, is maintained by the Community Organization for the benefit of the La Cantera Community, as determined in the discretion of the Board. The Area of Common Responsibility may include, but shall not be limited to, entry features serving the La Cantera Community (e.g., those entrances into La Cantera located at Charles Anderson Loop 1604 and Interstate 10 West); the grass, landscaping, community signage, lighting, irrigation lines and equipment, if any, located within the rights-of-way of those roads currently known as La Cantera Parkway, Fiesta Texas Drive, and the Interstate 10 Frontage Road and that certain unnamed road generally referred to as the South Rim Road (each as shown on the La Cantera Master Plan and as it may be amended from time to time); such other roads as may hereafter be constructed for the use and benefit of the La Cantera Community; and storm water retention basins and storm drainage facilities which serve as the storm water drainage facilities for the La Cantera Community.

2.2.    Obligation to Operate, Maintain and Insure.    The Community Organization, acting through the Board, shall cause the Area of Common Responsibility and improvements thereon to be maintained and operated consistent with the Community-Wide Standard. This obligation shall include the obligation to make any necessary capital repairs and replacements. In addition, the Community Organization shall obtain and maintain in effect sufficient property and public liability insurance on the Area of Common Responsibility as determined by the Board of Directors in a manner consistent with the By-Laws and in the exercise of its business judgment.

2.3    Other Activities of the Community Organization.    The Community Organization may, but shall not be obligated to, provide or perform such services for the La Cantera Community as permitted by the By-Laws and the Articles and as deemed to be in the best interest of the La Cantera Community, as determined in the exercise of the Board's business judgment. Such services may include, but shall not be limited to, performing or providing security-related services and the marketing or promotion of the La Cantera Community.

2.4.    Right to Request Additional or Higher Level of Maintenance or Services.    Any Owner or group of Owners or any Owners Association may request at any time that the Community Organization provide additional maintenance or a higher level of maintenance as to all or a portion of the Area of Common Responsibility than that required under Section 2.2 or services in addition to those being provided pursuant to Section 2.3. If the Community Organization agrees to provide such additional maintenance or services, any additional costs associated therewith, including administrative costs and overhead, shall be added to and become a part of the assessment payable specifically by such Owner(s) or such Owners Association hereunder.

2.5.    Relationship with Tax-Exempt Organizations.    The Declarant or the Community Organization may create, enter into agreements or contracts with, grant exclusive and/or non-exclusive easements over the Area of Common Responsibility to, or transfer

portions of the Area of Common Responsibility to non-profit, tax-exempt organizations for the benefit of the La Cantera Community, or as may be necessary to comply with the directive of any governmental authority. Any such organization may be independent of or a subsidiary of the Community Organization. The Community Organization and the Declarant may contribute money, real or personal property or services to any such entity. Any such appropriate contribution by the Community Organization shall be a Common Expense of the Community Organization and included as a line item in the Community Organization's annual budget.

For the purposes of this Section, a "tax-exempt organization" shall mean an entity which is exempt from federal income taxes under the Internal Revenue Code ("Code"), such as, but not limited to, entities which are exempt from federal income taxes under Sections 501(c)(3) or 501(c)(4), as the Code may be amended from time to time.

## Article III
## Obligation To Share Costs

3.1.    Responsibility for Assessments. Each Owner of each Parcel, whether or not it shall be expressed in any deed, covenants and agrees to pay its pro rata share of any assessment levied by the Community Organization pursuant to the terms of these Master Covenants to cover a portion of the costs incurred by the Community Organization in operating, maintaining, repairing, replacing, and insuring the Area of Common Responsibility and performing services on behalf of the La Cantera Community. Notwithstanding the obligation of each Owner, as more specifically set forth in Section 3.12, any Owners Association, which may be created with respect to any Parcels, shall be responsible for collecting and paying over to the Community Organization all assessments due from its members. The obligation to pay assessments hereunder shall be a separate and independent covenant on the part of each Owner and any Owners Association, and no diminution or abatement of the assessment or setoff shall be claimed or allowed by reason of any alleged failure of the Community Organization to adequately perform its responsibilities hereunder. The sole remedy of any Owner or any Owners Association for failure of the Community Organization to perform shall be a resolution of the dispute in accordance with the procedures set forth in Article VII, if applicable, or a suit at law or in equity.

3.2.    Creation of and Obligation for Assessments.

(a)    Purposes and Types. There are hereby created, and the Community Organization is hereby authorized to levy, assessments for expenses incurred or anticipated to be incurred by the Community Organization in performing its responsibilities and exercising its rights and powers under these Master Covenants, the Articles and the By-Laws. Such assessments shall commence at the time and in the manner set forth in Section 3.9.

There shall be three types of assessments: (a) General Assessments as described in Section 3.4; (b) Special Assessments as described in Section 3.6; and (c) Specific Assessments as described in Section 3.7. Each Owner, by accepting a deed or entering into a recorded contract of sale for any portion of the La Cantera Community, is deemed to covenant and agree to pay these assessments.

(b)      Personal Obligation and Lien.  All assessments, together with interest (computed from the due date of such assessment at a rate the Board may establish, subject to the limitations of Texas law), late charges in such amount as the Board may establish by resolution (subject to the limitations of Texas law), costs, and reasonable attorneys' fees, shall be a charge and continuing lien upon each Parcel against which the assessment is made until paid, as more particularly provided in Section 3.8.  Each such assessment, together with interest, late charges, costs, and reasonable attorneys' fees, also shall be the personal obligation of the Person who was the Owner of such Parcel at the time the assessment (whether General, Special or Specific) arose.  Upon a transfer of title to a Parcel, the grantee shall be jointly and severally liable with its grantor for any assessments and other charges due at the time of conveyance.  However, no first Mortgagee who obtains title to a Parcel, directly or through an affiliate, by exercising the remedies provided in its Mortgage, or any other Person purchasing a Parcel at a foreclosure sale pursuant to a first Mortgage, shall be liable for unpaid assessments which accrued prior to such acquisition of title.

The Community Organization shall, upon request, furnish to any Owner liable for any type of assessment a certificate in writing signed by a Community Organization officer setting forth whether such assessment has been paid.  Such certificate shall be conclusive evidence of the payment or non-payment of such assessment up to the date of issuance of the certificate.  The Community Organization may require the advance payment of a reasonable processing fee for the issuance of such certificate.

Assessments shall be paid in such manner and on such dates as the Board may establish, which may include discounts for early payment or similar time/price differentials. The Board may require advance payment of assessments at closing of the transfer of title to a Parcel and impose special requirements for Owners with a history of delinquent payment.

No Owner may exempt himself from liability for assessments by non-use of the Area of Common Responsibility, abandonment of his or her Parcel, or any other means.  No diminution or abatement of assessments or set-off shall be claimed or allowed for any alleged failure of the Community Organization or Board to take some action or perform some function required of it, or for inconvenience or discomfort arising from the making of repairs or improvements, or from any other action it takes.

3.3.      Declarant's Obligation for Assessments.  Declarant may annually elect either to pay assessments, whether General, Special or Specific, on all of its unsold Parcels or

to pay the difference between the amount of assessments levied on all other Parcels subject to these Master Covenants (and any assessments levied on other property obligated to contribute to the Community Organization's expenses pursuant to a covenant to share costs or other agreement recorded in the Public Records) and the amount of actual expenditures by the Community Organization during the fiscal year. Regardless of the Declarant's election, the Declarant's Parcels shall be considered in computing the General Assessment rate under Section 3.4, and the Community Organization shall have a lien against all Parcels owned by the Declarant to secure the Declarant's obligations under this section, which lien shall have the same attributes and shall be enforceable in the same manner as the Community Organization's lien against each Parcel under Section 3.8.

Unless the Declarant otherwise notifies the Board, the Declarant shall be deemed to have elected to continue paying on the same basis as during the immediately preceding fiscal year. The Declarant's obligations hereunder may be satisfied in the form of cash or by "in kind" contributions of services or materials, or by a combination of these. The reasonable valuation of any "in kind" contributions shall be fixed by the Declarant.

3.4.    Computation of General Assessments.  At least 60 days before the beginning of each fiscal year, the Board shall prepare a budget covering the estimated Common Expenses during the coming year, including a capital contribution to establish a reserve fund as provided in Section 3.5 ("Budget"). The Budget shall include operational and administrative costs of the Community Organization such as, by way of example and not limitation, the payment of insurance premiums, ad valorem taxes on property owned by the Community Organization and salaries and related costs of personnel. The Budget shall take into account any cash balances of the Community Organization going forward and any amounts collected from owners of other property obligated to contribute to the Community Organization's expenses pursuant to a covenant to share costs or other agreement and may consider income from sources other than General Assessments.

So long as the Declarant owns any portion of the La Cantera Community, it may, but shall not be obligated to, reduce the General Assessment for any fiscal year by payment of a subsidy (in addition to any amounts paid by Declarant under Section 3.3), which may be treated as either a contribution or an advance against future assessments due from the Declarant, in the Declarant's discretion. Any such subsidy shall be conspicuously disclosed as a line item in the Budget. The payment of such subsidy in any year shall under no circumstances obligate the Declarant to continue payment of such subsidy in future years, unless otherwise provided in a written agreement between the Community Organization and the Declarant.

The amount of the annual General Assessment allocable to each Parcel for such Parcel's proportionate share of the Common Expenses shall be based upon the appraised or market value of such Parcel ("Parcel Value"), relative to the cumulative appraised or market value, as applicable, for all Parcels ("Cumulative Value"). Each Parcel's annual General

VOL 9699 PG 0901

Assessment obligation shall be equal to the percentage of the Budget which the Parcel Value bears to the Cumulative Value multiplied by the total amount of the Budget. The following is an example, for illustrative purposes only, of how the portion of the annual General Assessment allocable to each Parcel is calculated:

> If the Cumulative Value is $10,000,000.00, a Parcel with a Parcel Value of $200,000 shall pay one-fiftieth, or 2%, of the Budget. Therefore, if the Budget is $100,000.00, the Parcel's portion of the annual General Assessment shall be $2,000.00.

Except as otherwise provided herein, the Parcel Values used to determine each Parcel's portion of the annual General Assessment shall be the appraised value of record with the Bexar Appraisal District for ad valorem tax purposes, or such other entity responsible for appraising properties for such purposes on behalf of Bexar County, and which is contained in the official records of the Bexar Appraisal District 60 days prior to the beginning of each fiscal year of the Community Organization. The Board shall not be obligated to take into account, factor in or otherwise consider the fact that such appraised value may not accurately reflect the actual or current value of the Parcel, is under appeal at such time, or any other factor which may, in the future, cause a change in the Parcel Value. In the event that no appraised value for a Parcel is listed of record with Bexar County at such time, or if the appraised value listed does not reflect the actual or intended use of the Parcel (as determined by the Board), the Parcel Value for such Parcel shall be the fair market value of the Parcel, as determined by the Board. Except as provided in Section 3.9., the portion of the General Assessment allocable to any Parcel for any fiscal year shall not change during that same fiscal year.

No Parcel shall be exempt from assessments under this Article for any reason, including, but not limited to, the exemption of such Parcel from ad valorem property taxes levied by Bexar County or such other applicable government district.

The Board shall send a copy of the Budget and notice of the amount of the General Assessment for the following year to each Owner at least 30 days prior to the beginning of the fiscal year for which it is to be effective. If the Board fails for any reason to determine the Budget for any year, then until such time as a Budget is adopted, the Budget in effect for the immediately preceding year, increased by five percent (5%), shall be the Budget for the current year.

3.5.    Reserve Budget and Capital Contribution. The Board shall annually prepare a reserve budget which takes into account the number and nature of replaceable assets within the Area of Common Responsibility, the expected life of each asset, and the expected repair or replacement cost. The Board shall set the required capital contribution in an amount sufficient to permit meeting the projected needs of the Community Organization, as shown on

9

the reserve budget, through the payment of annual General Assessments over the budget period.

3.6.    Special Assessments.  In addition to other authorized assessments, the Board may levy Special Assessments from time to time to cover unbudgeted expenses or expenses in excess of those budgeted.  Special Assessments shall be payable in such manner and at such times as determined by the Board, and may be payable in installments extending beyond the fiscal year in which the Special Assessment is approved.  Any Special Assessments for Common Expenses shall be levied against all Parcels subject to assessment under Section 3.9 in accordance with the calculation method described in Section 3.4.

3.7.    Specific Assessments.  The Community Organization also shall have the power to levy Specific Assessments against a particular Parcel or Parcels to cover costs incurred in bringing the Parcel(s) into compliance with the terms of the Governing Documents, or costs incurred as a consequence of the conduct of the Owner or occupants of a Parcel, their agents, contractors, employees, licensees, invitees, or guests; provided, the Board shall give the Parcel Owner prior written notice and an opportunity for a hearing prior to levying any Specific Assessment.

3.8.    Lien for Assessments.  The Community Organization shall have a lien against each Parcel to secure payment of delinquent assessments, as well as interest, late charges (subject to the limitations of Texas law), and costs of collection (including attorneys fees).  Such lien shall be superior to all other liens, except (a) the liens of all taxes, bonds, assessments, and other levies which by law would be superior, and (b) the lien or charge of any first Mortgage of record (meaning any recorded Mortgage with first priority over other Mortgages) made in good faith and for value.  Such lien, when delinquent, may be enforced by suit, judgment, and foreclosure in the same manner as mortgages are foreclosed under Texas law.

Although no further action is required to create or perfect the lien, the Community Organization may, as further evidence and notice of the lien, execute and record a document setting forth as to any Parcel, the amount of the delinquent sums due the Community Organization at the time such document is executed and the fact that a lien exists to secure the repayment thereof.  However, the failure of the Community Organization to execute and record any such document shall not, to any extent, affect the validity, enforceability, perfection or priority of the lien.  The lien may be foreclosed through judicial or, to the extent allowed by law, nonjudicial foreclosure proceedings in accordance with Tex. Prop. Code Ann. Section 51.002 (Vernon 1984), as it may be amended, in like manner of any deed of trust on real property.  Each Owner hereby grants to the Community Organization, whether or not it is so expressed in the deed or other instrument conveying such Parcel to the Owner, a power of sale to be exercised in accordance with Tex. Prop. Code Ann. Section 51.002 (Vernon 1984), as it may be amended.

The Community Organization may bid for the Parcel at the foreclosure sale and acquire, hold, lease, mortgage, and convey the Parcel. While a Parcel is owned by the Community Organization following foreclosure, no assessment shall be levied on it and each other Parcel shall be charged, in addition to its usual assessment, its pro rata share of the assessment that would have been charged such Parcel had it not been acquired by the Community Organization. The Community Organization may sue for unpaid assessments and other charges authorized hereunder without foreclosing or waiving the lien securing the same.

The sale or transfer of any Parcel shall not affect the assessment lien or relieve such Parcel from the lien for any subsequent assessments. However, the sale or transfer of any Parcel pursuant to foreclosure of the first Mortgage shall extinguish the lien as to any installments of such assessments due prior to such sale or transfer. A Mortgagee, its affiliate or any other purchaser of a Parcel who obtains title pursuant to foreclosure of the Mortgage shall not be personally liable for assessments on such Parcel due prior to such acquisition of title. Such unpaid assessments shall be deemed to be Common Expenses collectible from Owners of all Parcels subject to assessment under Section 3.9, including such acquirer of the foreclosed Parcel, its successors and assigns.

3.9.   Date of Commencement of Assessments.  The obligation to pay assessments shall commence as to each Parcel on the first day of the month following the month in which the Board first determines a budget and levies assessments pursuant to this Article; provided, any Parcel which is newly created after the General Assessment has been levied for a particular fiscal year (the "Initial Fiscal Year") shall not be separately assessed until the following fiscal year. A Parcel shall be deemed created at such time as it is independently conveyed or otherwise made available to be independently owned and conveyed (e.g., shown as a separate Parcel on a plat or survey). In the event that a newly created Parcel is conveyed during the Initial Fiscal Year, the Parcel from which the new Parcel has been created shall remain responsible for assessments during the Initial Fiscal Year. Any allocation of assessments between such Parcels shall be by agreement between the purchaser and seller and shall not be binding upon the Community Organization.

3.10.   Failure to Assess.  Failure of the Board to fix assessment amounts or rates or to deliver or mail each Owner an assessment notice shall not be deemed a waiver, modification, or a release of any Owner from the obligation to pay assessments. In such event, each Owner shall continue to pay General Assessments on the same basis as during the last year for which an assessment was made, if any, until a new assessment is levied, at which time the Community Organization may retroactively assess any shortfalls in collections.

3.11.   Exempt Property.  The following property shall be exempt from payment of assessments:

(a)   Any property owned by the Community Organization;

11

(b)    Any property dedicated to and accepted by any governmental authority or public utility; and

(c)    Any common area of any Owners Association (e.g., property owned by the Owners Association for the common use and enjoyment of its members or property owned by the owners of units in a condominium as tenants-in-common).

3.12.    <u>Owners Associations' Obligation to Pay Assessments</u>.    Certain portions of the La Cantera Community may be separately organized into Owners Associations, such as a residential community or condominium association. The Parcel Owners who are members of an Owners Associations shall be responsible for paying assessments both to the Owners Association and the Community Organization.  Notwithstanding each Owner's obligation to pay assessments hereunder, any Owners Association shall be deemed to covenant and agree to collect and pay to the Community Organization all assessments due from its members to the Community Organization.

If the Owners Association fails to pay all or any portion of the amount payable to the Community Organization when due, a lien in favor of the Community Organization shall attach to all property within the jurisdiction of the Owners Association, including each Parcel, in an amount equal to the delinquent amount.  Such lien(s) shall also secure interest (not to exceed the maximum lawful rate) on the principal amount due, all late charges from the date first due and payable, all costs of collection, reasonable attorneys' fees actually incurred, and any other amounts provided or permitted by law.  Such lien shall be treated as all liens for assessments in the manner described in Section 3.8.

In the event that any Owners Association fails to pay assessments for which it is responsible for a period exceeding 90 days from the due date for such assessment, in addition to any action the Community Organization has against an individual Owner pursuant to Section 3.8, the Community Organization may institute suit against the Owners Association to collect such amounts past due.  All payments shall be applied first to costs and attorneys' fees, then to late charges, then to interest and then to delinquent assessments.  Each Owner within the Owners Association shall be jointly and severally liable with other Owners in the Owners Association and with the Owners Association for the full amount due.

3.13.    <u>Expenditure of Funds</u>.  The assessment funds collected by the Community Organization hereunder shall be used in such manner as the Board deems appropriate in fulfilling the Community Organization's responsibilities under Article II hereof.  **The judgment of the board in determining the level of assessments and the allocation and expenditure of such funds shall be final so long as such judgment is exercised in good faith, and neither the Community Organization, its board, any director or officer, nor any of its members shall be liable to any person or entity for any error in judgment, or any action or inaction of the Community Organization, its board, or any director or officer, relating to the expenditure of such funds; provided, nothing herein shall protect**

any person from liability for gross negligence or willful misconduct in the handling of such funds.

3.14.  Recordkeeping.  The Community Organization shall maintain or cause to be maintained full and accurate books of account with respect to the performance of its responsibilities under these Master Covenants.  Such books and records and financial statements related thereto shall be made available for inspection and copying by any Owner or any Owners Association upon request, during normal business hours or under other reasonable circumstances.  Copying charges shall be paid by the party requesting such copies.  If any party desires to have the records audited, an audit shall be performed by an auditor mutually agreed upon by the requesting party and the Community Organization.  The Community Organization shall cooperate by making available to the party performing the audit the records, including all supporting materials (e.g., check copies, invoices, etc.) for the year in question.  The party requesting the audit shall be responsible for all costs associated with performing the audit.

3.15.  Responsibility to Insure.  The Community Organization shall not be responsible for insuring individual Parcels.  Each Owner shall obtain and continue in effect property insurance over his or her Parcel in an amount sufficient to cover the full replacement value of all insurable improvements contained on such Parcel.  All costs associated with purchasing and maintaining property insurance on a Parcel shall be the responsibility of the Parcel Owner.  Notwithstanding the above, an Owner's obligation under this Section may be satisfied in whole or in part by insurance obtained on such Owner's behalf by a residential community or condominium association having jurisdiction over the Parcel.

Each Owners Association shall obtain and continue in effect commercial general liability insurance insuring the Owners Association and its members for damage or injury caused by the negligence of the Owners Association or any of its members, employees, agents, or contractors while acting on its behalf.  All such policies shall name the Declarant and the Community Organization as additional insureds and shall provide coverage (including primary and any umbrella coverage) of at least $2,000,000.00 per occurrence with respect to bodily injury, personal injury, and property damage; provided, however, the minimum coverage limits may be increased from time to time in the discretion of the Community Organization if deemed necessary in light of inflationary increases or other relevant factors.  In addition, all such policies shall contain a waiver of subrogation with respect to claims against the Declarant and the Community Organization.

## Article IV
## Easements

4.1.  Easement for Administration; Right of Entry.  A perpetual, nonexclusive easement is hereby granted to the Community Organization, for itself and its employees, agents, assignees and designated contractors, over, under and across any portion of the La

Cantera Community which is adjacent to the Area of Common Responsibility for access, ingress and egress, incidental to and necessary for the maintenance and repair of the Area of Common Responsibility. In addition, the Community Organization shall have the right, but not the obligation, to enter upon any Parcel for emergency, security, and safety reasons, and to evaluate compliance with the Governing Documents. THE RIGHTS AFFORDED UNDER THIS SECTION 4.1 SHALL NOT IMPOSE A DUTY ON THE COMMUNITY ORGANIZATION TO ENTER UPON A PARCEL FOR ANY PURPOSE. EACH OWNER HEREBY ACKNOWLEDGES AND AGREES THAT THE COMMUNITY ORGANIZATION IS NOT, AND SHALL NOT BE, RESPONSIBLE FOR, OR IN ANY WAY A GUARANTOR OR INSURER OF, SECURITY AND SAFETY WITHIN THE LA CANTERA COMMUNITY.

The exercise of this easement shall not unreasonably interfere with the use of any Parcel and, except in an emergency situation, entry onto any Parcel shall be made only with the consent of the Owner or occupant; provided, such consent may not unreasonably be withheld. In the exercise of any right afforded under this Section, the Community Organization shall comply with specific procedures and guidelines for security and safety imposed upon the Parcel by its Owner or occupant.

4.2. <u>Easements for Utilities, Etc.</u> Except under circumstances where an emergency repair is necessary, the easements granted pursuant to this Section 4.2 shall not be exercised without first providing written notice to the Owner of the affected Parcel. The party exercising any easement under this Section shall (a) negotiate in good faith with the Owner of any affected Parcel in determining a mutually acceptable manner for exercising the easement; (b) cause all work associated with the exercise of the easement to be performed with the least possible interference to the use and enjoyment of the property burdened by that easement; and (c) upon completion of all work associated with that easement, cause the property burdened by that easement to be restored, to the extent reasonably possible, to its condition prior to the commencement of the work. Any costs associated with the exercise of the easements under this Section shall be borne by the exercising party.

The following easements are hereby reserved to the Declarant, so long as the Declarant owns any property described in Exhibits "A" or "B," and its designees, and granted to the Community Organization, and its designees (the designees of each may include, without limitation, any governmental or quasi-governmental entity and any utility company):

(a)    a non-exclusive easement upon, across, over, and under the La Cantera Community (<u>but not through a building or other structure</u>), for ingress, egress, installation, monitoring, replacing, repairing, and maintaining utilities, including, but not limited to, water, sewer, telephone, cable television, gas, and electric lines and meters, as may be necessary, in the reasonable discretion of the Declarant or the Community Organization, for the performance of the Community Organization's maintenance responsibilities under the Master Covenants or any of the Governing Documents; and

14

(b)     the non-exclusive right and power to grant such specific easements as may be necessary, in the sole discretion of Declarant, in connection with the orderly development of any property in the La Cantera Community.

The easements provided for in this Section shall in no way materially adversely affect any other recorded easement on the La Cantera Community, nor shall they be exercised in any manner which materially restricts or interferes with the use and development of a Parcel by the Parcel Owner.  The easements set forth in this Section 4.2 shall not apply to the real property upon which Fiesta Texas is located.

4.3.   Easements to Serve Additional Property.  The Declarant hereby reserves for itself and its duly authorized agents, representatives, successors, successors-in-title, assigns, licensees and mortgagees, a perpetual, non-exclusive easement over the Area of Common Responsibility within the  La Cantera Community for the purposes of enjoyment, use, access and development of the property described in Exhibit "B," whether or not such property is made subject to these  Master Covenants.  This easement includes but is not limited to a right of ingress and egress over the Area of Common Responsibility (to the extent owned by the Community Organization) for construction of roads and for tying in and installation of utilities on such property.  Declarant agrees that it, its successors or assigns, shall be responsible for any damage caused to the Area of Common Responsibility or any portion of the La Cantera Community as a result of vehicular traffic connected with development of such property.

4.4.   Easements Subject to Water Rights.  The easements contained in this Article shall be subject to any reservation of water rights by La Cantera Development Company, or its successors to or assigns of such rights whether in a conveyance of any parcel or in a conveyance to the Community Organization of an area of Community Responsibility or otherwise.

## Article V
## Golf Course

5.1.   General.  Access to and use of the Golf Course is strictly subject to the rules and procedures of the owner(s) of the Golf Course, and no Person gains any right to enter or to use such facilities by virtue of ownership or occupancy of a Parcel.

Rights to use the Golf Course will be granted only to such persons, and on such terms and conditions, as may be determined from time to time by the owner(s) of the Golf Course.  The owner(s) of the Golf Course shall have the right, from time to time in their sole and absolute discretion and without notice, to amend or waive the terms and conditions of use of the Golf Course, including, without limitation, eligibility for and duration of use rights, categories of use and extent of use privileges, and number of users, and shall also have the right to reserve use rights and to terminate use rights altogether, subject to the provisions of

15

VOL 6 996 PG 0908

any outstanding membership documents.

5.2.  <u>Ownership and Operation of the Golf Course</u>.  All Persons, including all Owners, are hereby advised that no representations or warranties, either written or oral, have been or are made by the Declarant or any other Person with regard to the nature or size of improvements to, or the continuing ownership or operation of the Golf Course.  No purported representation or warranty, written or oral, in regard to the Golf Course shall be effective unless set forth in an amendment to these Master Covenants executed by the Declarant and the owner(s) of the Golf Course.

The ownership and/or operation of the Golf Course may change at any time and from time to time by virtue of, but without limitation, (a) the sale to or assumption of operations of the Golf Course by an independent Person; (b) the conversion of the ownership and/or operating structure of the Golf Course to an "equity" club, or similar arrangement whereby the Golf Course or the rights to operate it are transferred to an entity which is owned or controlled by its members; or (c) the transfer of ownership or control of the Golf Course to one or more affiliates, shareholders, employees, or independent contractors of the Declarant. No consent of the Community Organization or any Owner shall be required to effectuate such transfer or conversion.

5.3.  <u>Easements Respecting the Golf Course</u>.  The following easements apply only to the Golf Course:

(a)  The owner(s) of the Golf Course, their respective agents, successors, and assigns, are hereby granted perpetual non-exclusive easements over the La Cantera Community as necessary for ingress and egress, utilities, and such other purposes as may be reasonably necessary or convenient to the establishment, operation, maintenance, repair and replacement of the Golf Course.  The benefitted parties shall be obligated to use due care in the exercise of such easement rights.

(b)  The owner(s) of the Golf Course, their respective agents, successors, and assigns, are hereby granted perpetual, non-exclusive easements over the La Cantera Community allowing the flight of golf balls over and above the La Cantera Community, the use of necessary and usual equipment on the Golf Course, the usual and common noise level created by the playing of the game of golf, and permitting golf balls unintentionally to come upon the La Cantera Community and for golfers or the owner(s) of the Golf Course at reasonable times and in a reasonable manner to come upon a Parcel or the Area of Common Responsibility to retrieve errant golf balls.

Golfers shall not be liable for damage caused by errant golf balls which result from ordinary and usual conduct associated with playing the game of golf EVEN IF RESULTING FROM THE NEGLIGENCE IN WHOLE OR IN PART, OF SUCH GOLFER; PROVIDED, HOWEVER, GOLFERS SHALL NOT BE RELIEVED

**FROM LIABILITY FOR DAMAGES CAUSED BY THEIR OWN GROSS NEGLIGENCE OR WILLFUL MISCONDUCT.**

(c)     The owner(s) of the Golf Course, and their respective agents, successors and assigns are hereby granted a perpetual non-exclusive easement over any portion of the La Cantera Community within 25 feet of any Golf Course boundary line for the purposes of maintaining a natural buffer area between golf and other uses, facilitating play on the Golf Course, construction and maintenance of golf cart paths, landscaping, irrigating, and maintaining the Golf Course, and providing for the retrieval of errant golf balls.  No construction or improvement of any type, other than underground improvements, shall be permitted within such easement area, and no hedges or shrubs planted which would obstruct access to such easement areas from the Golf Course shall be placed or permitted to remain in the easement area.  No plantings, trees or foliage may be removed from this easement area without specific prior approval of the owner(s) of the Golf Course, its successors or assigns.

(d)     The owner(s) of the Golf Course, their respective agents, employees, contractors, successors and assigns, are hereby granted a perpetual non-exclusive easement over any portion of the La Cantera Community which is immediately adjacent to the Golf Course for overspray of water, pesticides and chemicals from the irrigation system serving the Golf Course.

(e)     The owner(s) of the Golf Course, their respective agents, employees, contractors, successors and assigns, are hereby granted a perpetual non-exclusive easement, to the extent reasonably necessary, over the La Cantera Community, for the installation, operation, maintenance, repair, replacement, observation and control of the entire irrigation system and equipment serving all or portions of the Golf Course.

(f)     The owner(s) of the Golf Course, their respective agents, employees, contractors, successors and assigns, are hereby granted a perpetual, non-exclusive easement over the La Cantera Community for natural drainage of storm water runoff from the Golf Course.

(g)     The Declarant hereby reserves for itself, its successors and assigns, and may assign to the owner(s) of the Golf Course, a perpetual, non-exclusive easement to draw water from bodies of water within the portion of the Area of Common Responsibility for purposes of irrigation of the Golf Course and for access to and the right to enter upon the portion of the Area of Common Responsibility for installation and maintenance of any irrigation systems.

5.4.     <u>View Impairment</u>.  Neither the Declarant nor the Community Organization guarantees or represents that any view over and across the Golf Course from adjacent Parcels will be preserved without impairment.  The owner(s) of the Golf Course shall have no obligation to prune or thin trees or other landscaping and shall have the right, in its

VOL 9 9 9 PG 0910

17

sole and absolute discretion, to add trees and other landscaping to the Golf Course from time to time. In addition, the owner(s) of the Golf Course may, in its sole and absolute discretion, change the location, configuration, size and elevation of the tees, bunkers, fairways and greens on the Golf Course from time to time. Any such additions or changes to the Golf Course may affect the view of the Golf Course from the Parcels.

5.5. <u>Limitations on Amendments</u>. In recognition of the fact that the provisions of this Article are for the benefit of the owner of the Golf Course, no amendment to this Article, and no amendment in derogation of any rights reserved or granted to the owner of the Golf Course by other provisions of these Master Covenants, may be made without the written approval of the owner of the Golf Course. The foregoing shall not apply, however, to amendments made by the Declarant, which amendments shall not require approval of the owner(s) of the Golf Course.

5.6. <u>Jurisdiction and Cooperation</u>. It is Declarant's intention that the Community Organization and the owner(s) of the Golf Course shall cooperate to the maximum extent possible in the operation of the La Cantera Community and the Golf Course. Each shall reasonably assist the other in upholding the Community-Wide Standard. The Community Organization shall have no power to promulgate rules and regulations affecting activities on or use of the Golf Course.

5.7. **<u>Assumption of Risk, Release and Indemnification</u>. Each Owner, by its purchase of a Parcel in the vicinity of the Golf Course, hereby expressly assumes the risk of personal injury property damage, or other loss caused by maintenance and operation of the Golf Course, including, without limitation: (a) noise from maintenance equipment (it being specifically understood that such maintenance typically takes place around or before sunrise or after sunset) (b) noise caused by golfers, (c) use of pesticides, herbicides and fertilizers, (d) view restrictions caused by maturation of trees and shrubbery, (e) use of effluent in the irrigation of the Golf Course, (f) reduction in privacy caused by constant golf traffic on the Golf Course or the removal or pruning of shrubbery or trees on the Golf Course, (g) errant golf balls and golf clubs, and (h) design of the Golf Course.**

Each such Owner agrees that neither Declarant; any successor Declarant; the Community Organization; the owner(s) of the Golf Course or their successors, successors-in-title, or assigns; any entity managing the Golf Course; any officer, director or partner of any of the foregoing, or any officer or director of any partner; or any organizer or sponsor of any tournament or special event (collectively, for purposes of this Section 5.7, the "Released Parties") shall be liable to any Owner claiming any loss, injury, or damage based upon, due to, arising from, directly or indirectly, or otherwise related to the proximity of such Owner's Parcel to the Golf Course, the management of the Golf Course, or the exercise of the easement rights set forth in this Article V, even if such loss, damage or injury is caused in whole or in part by the negligence of any of the Released

VOL 6 996 PG0911

Parties.  Each Owner hereby agrees to indemnify, defend, and hold harmless the Released Parties from and against any and all such claims as set forth in the preceding sentence by Owner or Owner's lessees, licensees, invitees and employees with respect to tenants such Owner's Parcel for injury, loss, or damage, whether known or unknown, foreseen, or unforeseen, arising from or resulting from, directly or indirectly, acts or omissions of the Released Parties, even if caused in whole or in part by the negligence of the Released Parties.  THE FOREGOING RELEASE AND INDEMNITY IS INTENDED TO RELEASE AND INDEMNIFY THE RELEASED PARTIES FROM AND AGAINST THEIR OWN NEGLIGENCE.

**Article VI**
**Fiesta Texas**

Each Owner and each occupant or any tenant of any Parcel acknowledges that Fiesta Texas is located within, near or adjacent to the La Cantera Community and that the existence and operation of Fiesta Texas as an amusement or theme park has or may have a significant impact upon the La Cantera Community, including, without limitation, the transmission, discharge, or emission over and across the La Cantera Community of noise, artificial lighting, laser beams, and other acts, conditions, events, and circumstances that are normally created by, result from, or associated with activities related to or incidental to the ownership, management, or operation of an amusement park or theme park, including traffic congestion, and noise, light, and disturbances arising from or related to the existence of crowds, or the existence or operation of rides, concerts, games, fireworks, laser shows, or associated with other existing and future activities associated with Fiesta Texas, including all future expansions and future improvements to Fiesta Texas (all of the foregoing shall hereinafter be referred to as "Fiesta Texas Operational Impact").

In recognition of the foregoing factors, a perpetual easement over the entirety of the La Cantera Community, including each Parcel, is hereby granted by Declarant in favor of and for the benefit of the owner(s) of Fiesta Texas and their respective successors and assigns, for such Fiesta Texas Operational Impact.  The foregoing easement does not include physical debris that is discharged in connection with any fireworks displayed at Fiesta Texas, however, the foregoing easement does cover noise, light, and smoke that normally results from or emanates from the airborne display of fireworks or other pyrotechnic displays.

Each Owner, by its purchase of a Parcel in the La Cantera Community, hereby expressly assumes the risk of personal injury, property damage or other loss caused, directly or indirectly, by the Fiesta Texas Operational Impact of  the easement set forth in the preceding paragraph.  Further, each Owner agrees that neither the Declarant, the Community Organization, any owner(s), lessee(s), manager(s), operator(s) of Fiesta Texas, and each of their respective successors and  assigns, and each of their respective partners, directors, officers, employees and agents (collectively, the "Indemnitees"), shall not be liable to any Owner claiming any loss, injury or damage

19

based upon, due to or arising, directly or indirectly, from the Fiesta Texas Operational Impact. **Each Owner hereby agrees to indemnify, defend, and hold harmless the Indemnitees** from and against any loss, damage or injury, including, without limitation, reasonable attorneys' fees, whether known, unknown, or unforeseen, arising out of or resulting from, directly or indirectly, any Fiesta Texas Operational Impact to such Owner's Parcel or to Owner (and to any lessee(s), licensee(s), invitee(s) or employee(s) with respect to such Owner's Parcel) arising out of such person's use or occupancy of such Owner's Parcel. **THE FOREGOING INDEMNITY IS INTENDED TO INDEMNIFY THE INDEMNITEES FROM AND AGAINST THEIR OWN NEGLIGENCE OR STRICT LIABILITY.**

## Article VII
### Dispute Resolution and Limitation on Litigation

7.1.    Agreement to Avoid Litigation. The Declarant, the Community Organization, its officers, directors, and committee members, all Persons subject to these Master Covenants and any Person not otherwise subject hereto who agrees to submit to this Article (collectively, "Bound Parties") agree to encourage the amicable resolution of disputes involving the La Cantera Community, without the emotional and financial costs of litigation. Accordingly, each Bound Party covenants and agrees that those claims, grievances or disputes described in Section 7.2 ("Claims") shall be submitted to the procedures set forth in Section 7.3 prior to filing suit in any court.

7.2.    Claims. Unless specifically exempted below, all claims, grievances or disputes arising out of or relating to the interpretation, application or enforcement of the Governing Documents, or the rights, obligations and duties of any Bound Party under the Governing Documents shall be subject to the provisions of Section 7.3.

Notwithstanding the above, unless all parties thereto otherwise agree, the following shall not be Claims and shall not be subject to the provisions of Section 7.3:

(a)    any suit by the Community Organization against any Bound Party to enforce the obligation to pay any assessment to the Community Organization under these Master Covenants or any other applicable covenants;

(b)    any suit by the Declarant or the Community Organization to obtain a temporary restraining order (or equivalent emergency equitable relief) and such other ancillary relief as the court may deem necessary in order to maintain the status quo and preserve the Declarant's or the Community Organization's ability to enforce use restrictions or architectural controls under any applicable covenants;

(c)    any suit between Owners, which does not include Declarant or the Community Organization as a party, if such suit asserts a Claim which would constitute a

VOL 9696 PG0913

20

cause of action independent of the Governing Documents;

(d)    any suit in which any indispensable party is not a Bound Party; and

(e)    any suit which otherwise would be barred by any applicable statute of limitations.

With the consent of all parties thereto, any of the above may be submitted to the alternative dispute resolution procedures set forth in Section 7.3.

7.3.    Mandatory Procedures.

(a)    Notice.  Any Bound Party having a Claim ("Claimant") against any other Bound Party ("Respondent") (collectively, the "Parties") shall notify each Respondent in writing (the "Notice"), stating plainly and concisely:

1. the nature of the Claim, including the Persons involved and Respondent's role in the Claim;

2. the legal basis of the Claim (i.e., the specific authority out of which the Claim arises);

3. Claimant's proposed remedy; and

4. that Claimant will meet with Respondent to discuss in good faith ways to resolve the Claim.

(b)    Negotiation and Mediation.

1. The Parties shall make every reasonable effort to meet in person and confer for the purpose of resolving the Claim by good faith negotiation.  If requested in writing, accompanied by a copy of the Notice, the Board may appoint a representative to assist the Parties in resolving the dispute by negotiation.

2. If the Parties do not resolve the Claim within 30 days of the date of the Notice (or within such other period as may be agreed upon by the Parties) ("Termination of Negotiations"), Claimant shall have 30 additional days to submit the Claim to mediation under the auspices of the Texas Chapter of the Community Associations Institute or, if the Parties otherwise agree, to an independent agency providing dispute resolution services in the San Antonio, Texas, area.

3. If Claimant does not submit the Claim to mediation within 30 days after Termination of Negotiations, or does not appear, either in person or through an

authorized representative, for the mediation, Claimant shall be deemed to have waived the Claim, and Respondent shall be released and discharged from any and all liability to Claimant on account of such Claim; provided, nothing herein shall release or discharge Respondent from any liability to any Person other than the Claimant.

4. Any settlement of the Claim through mediation shall be documented in writing by the mediator.  If the Parties do not settle the Claim within 30 days after submission of the matter to the mediation process, or within such time as determined by the mediator, the mediator shall issue a notice of termination of the mediation proceedings ("Termination of Mediation").  The Termination of Mediation notice shall set forth that the Parties are at an impasse and the date that mediation was terminated.

5. Within five days of the Termination of Mediation, the Claimant shall make a final written settlement demand ("Settlement Demand") to the Respondent and the Respondent shall make a final written settlement offer ("Settlement Offer") to the Claimant.  If the Claimant fails to make a Settlement Demand, Claimant's original Notice shall constitute the Settlement Demand.  If the Respondent fails to make a Settlement Offer, Respondent shall be deemed to have made a "zero" or "take nothing" Settlement Offer.

7.4.    Allocation of Costs of Resolving Claims.  Each Party shall bear its own costs, including any attorneys fees incurred, through the mediation proceeding and each Party shall share equally all charges rendered by the mediator(s).

If the Parties fail to settle the Claim by negotiation or mediation, either Party may pursue its available legal or equitable remedies; provided, however, if any award or judgment rendered in such subsequent suit on the Claim is equal to or more favorable to Claimant than Claimant's Settlement Demand, Respondents shall be obligated to pay all costs relating to such suit, including attorneys' fees, incurred by Claimant after presentation of Claimant's Settlement Demand.  Any award or judgment which is equal to or less favorable to Claimant than any Respondent's Settlement Offer shall award to such Respondent its costs incurred subsequent to the presentation of its Settlement Offer.

7.5.    Enforcement of Resolution.  After resolution of any Claim by negotiation or mediation, if any Party fails to abide by the terms of any agreement, then any other Party may file suit or initiate administrative proceedings to enforce such agreement without the need to again comply with the procedures set forth in Section 7.3.  In such event, the Party taking action to enforce the agreement shall be entitled to recover from the non-complying Party (or if more than one non-complying Party, from all such Parties, jointly and severally) all costs incurred in enforcing such agreement, including, without limitation, attorneys' fees and court costs.

VOL 699 PG0915

## Article VIII
### Declarant's Rights

8.1.    <u>Duration</u>.  Unless otherwise specifically indicated in these Master Covenants, the Declarant's rights hereunder shall exist for so long as Declarant, any affiliate of Declarant or any assignee of Declarant's rights as Declarant owns any property described in Exhibits "A" or "B."

8.2.    <u>Transfer of Declarant Rights</u>.  Any or all of the special rights and obligations of the Declarant reserved in these Master Covenants may be transferred in whole or in part to other Persons, provided that the transfer shall not reduce an obligation nor enlarge a right beyond that contained in these  Master Covenants or the By-Laws, and provided further, no such transfer shall be effective unless it is in a written instrument signed by the Declarant and duly recorded in the Public Records.  Any such transfer may be made effective only for so long as the transferee is the owner of any property described in Exhibits "A" or "B" provided, after such time any rights shall revert to the transferor for so long as it owns any property described in Exhibits "A" or "B."  The foregoing sentence shall not preclude Declarant from permitting other Persons to exercise, on a one time or limited basis, any right reserved to Declarant in these Master Covenants where Declarant does not intend to transfer such right in its entirety.  In such case it shall not be a requirement that the written assignment be recorded, however, the Declarant may record the assignment, in its discretion, to evidence its intentions.

8.3.    <u>Approval of Additional Covenants</u>.  No Person shall record any declaration of covenants, conditions and restrictions, or declaration of condominium or similar instrument affecting any portion of the La Cantera Community without Declarant's review and written consent.  Any attempted recordation without such consent shall result in such instrument being voidable and of no force and effect unless subsequently approved by recorded consent signed by the Declarant.

8.4.    <u>Water Rights</u>.  Neither the Community Organization, any Owners Association, nor any Owner, other than Declarant, may drill any ground water wells within the La Cantera Community without the prior written consent of the Declarant, which consent shall not be unreasonably withheld.

8.5.    <u>Amendment</u>.  This Article may not be amended without the written consent of the Declarant so long as Declarant, or the assignee of any Declarant rights, owns any property described in Exhibits "A" or "B."

VOL 6 9 6 9 PG 16 0 1 6

**Article IX**
**General**

9.1.    <u>Notice</u>.  Any notice provided for in these Master Covenants shall be served personally or shall be mailed by United States Mail, first class, postage prepaid, registered or certified mail to the Owner, or to the president or secretary of the Community Organization or an Owners Association, as applicable, at its address within the La Cantera Community or at such other address as is designated in writing with the Community Organization.  All such notices shall, for all purposes, be deemed delivered (a) upon personal delivery to the party or address specified above; or (b) on the third (3rd) day after being deposited in the United States Mail (whether by first class, registered or certified mail), postage prepaid, and properly addressed.

9.2.    <u>Unilateral Annexation By Declarant</u>.  Until the first to occur of all the property described on Exhibit "B" being subjected to these Master Covenants, or 50 years after the recording of these Master Covenants, Declarant shall have the unilateral right, privilege and option from time to time at any time to subject all or any portion of the real property described on Exhibit "B" to the terms and provisions of these Master Covenants. Such annexation shall be accomplished by filing in the Public Records a Supplemental Declaration describing the property to be annexed.  Declarant may transfer or assign this right to annex property, provided that the transferee or assignee is the owner of at least a portion of the real property described in Exhibits "A" or "B" and that such transfer or assignment is memorialized in a written, recorded instrument executed by Declarant.

Nothing herein shall preclude the annexation of property that is not owned by Declarant, provided the owner thereof executes a written consent to such annexation.  The rights reserved to Declarant to subject additional land to these Master Covenants shall not, and shall not be implied or construed so as to, impose any obligation upon Declarant to subject any additional land to these Master Covenants.

9.3.    <u>Enforcement</u>.  These Master Covenants are made for the express benefit of the Community Organization, all Owners and any Owners Association(s).  The obligations created hereunder may be enforced by the Declarant, the Community Organization, any Owner and/or any Owners Association by any means available at law or in equity.

9.4.    <u>Governmental Interests</u>.  So long as the Declarant owns any  Parcel, the Declarant may designate sites within the La Cantera Community for fire, police, utility facilities, public parks, and other public or quasi-public facilities.  The sites may include undeveloped portions of the La Cantera Community, in which case the  Community Organization shall take whatever action is required with respect to such site to permit such use, including conveyance of the site, if so directed by Declarant.  The sites may include other property not owned by Declarant provided the Owner consents.

VOL 9699 PG0917

9.5.    Use of the Words "La Cantera" or "Fiesta".  No Person shall use the words "La Cantera" or "Fiesta," or any derivative thereof or the logo adopted by the Declarant for itself, the La Cantera Community or Fiesta Texas in the name of any building or any business or enterprise or in any printed or promotional material without the Declarant's prior written consent.  However, Owners may specify that particular property is located within the La Cantera Community, and the Community Organization shall be entitled to use the name "La Cantera" or the related logo in its name.

9.6.    Amendment.

(a)    By Declarant.  In addition to the rights set forth in Section 9.2, these Master Covenants may be amended unilaterally by Declarant for so long as Declarant owns any portion of the La Cantera Community if such amendment is (i) necessary to bring any provision hereof into compliance with any applicable governmental statute, rule or regulation or judicial determination which is in conflict therewith; (ii) is necessary to enable any reputable title insurance company to issue title insurance coverage with respect to any portion of the La Cantera Community; (iii) is required by an institutional or governmental lender, purchaser, holder, insurer or guarantor of mortgage loans to enable it to make, purchase, insure or guarantee mortgage loans on any portion of the La Cantera Community; or (iv) does not materially and adversely affect the title to any Parcel unless the Owner thereof shall consent thereto in writing.

(b)    By Community Organization.  In addition to the above, these Master Covenants may be amended upon the affirmative vote or written consent, or any combination thereof, of at least a majority of the directors of the Community Organization and, so long as the Declarant owns any portion of the La Cantera Community, the consent of the Declarant or its assignee.  No amendment by the Community Organization may materially and adversely affect the title to any Parcel unless the Owner thereof shall consent thereto in writing.

Notwithstanding the above, no amendment shall remove, revoke, or modify any right or privilege of Declarant without the written consent of Declarant or its assignee of such right or privilege.

(c)    Validity of Amendments.  Amendments to these Master Covenants shall become effective upon recordation in the Public Records unless a later effective date is specified therein.  Any challenge to an amendment must be made within six months of its recordation.  In no event shall a change of conditions or circumstances operate to amend any provisions of these Master Covenants.

9.7.    Duration.

(a)    Unless terminated as provided below, these Master Covenants shall have perpetual duration.  If Texas law hereafter limits the period during which covenants may run

25

with the land, then to the extent consistent with such law, the Master Covenants shall automatically be extended at the expiration of such period for successive periods of 20 years each, unless terminated as provided below. Notwithstanding the above, if any of the covenants, conditions, restrictions, or other provisions of the Master Covenants shall be unlawful, void, or voidable for violation of the rule against perpetuities, then such provisions shall continue only until 21 years after the death of the last survivor of the now living descendants of Elizabeth II, Queen of England.

(b)    Unless otherwise required by Texas law, these Master Covenants shall not be terminated except by an instrument approved by at least a majority of the directors of the Community Organization and, so long as the Declarant owns any property described in Exhibits "A" or "B," the consent of Declarant.

9.8.    <u>Interpretation</u>. These Master Covenants shall be governed by Texas law.

9.9.    <u>Gender and Grammar</u>. The singular, wherever used herein, shall be construed to mean the plural, when applicable, and the use of the masculine pronoun shall include the neuter and feminine.

9.10.    <u>Severability</u>. Whenever possible, each provision of these Master Covenants shall be interpreted in such manner as to be effective and valid, but if the application of any provision of these Master Covenants to any person or to any property shall be prohibited or held invalid, such prohibition or invalidity shall not affect any other provision or the application of any provision which can be given effect without the invalid provision or application, and, to this end, the provisions of these Master Covenants are declared to be severable.

9.11.    <u>Captions</u>. The captions of each Article and Section hereof, as to the contents of each Article and Section, are inserted only for convenience and are in no way to be construed as defining, limiting, extending, or otherwise modifying or adding to the particular Article or Section to which they refer.

**(SIGNATURES ON NEXT PAGE)**

IN WITNESS WHEREOF, the undersigned Declarant and all owners of real property described in Exhibit "A" have set their hands and seals evidencing their approval and joinder in the foregoing Master Covenants on the date first above written.

DECLARANT:    LA CANTERA DEVELOPMENT
              COMPANY, a Delaware corporation
              qualified to do business in Texas

By: _Glen E. Mitts_____

Glen E. Mitts
Assistant Vice President


THE STATE OF TEXAS    )
                      )    REPRESENTATIVE ACKNOWLEDGMENT
COUNTY OF _Bexar_     )

This instrument was acknowledged before me on the _15th_ day of _march_, 19_96_ by Glen E. Mitts, the Assistant Vice President of La Cantera Development Company, a Delaware corporation, on behalf of said corporation.

GIVEN UNDER MY HAND AND SEAL OF OFFICE this _15th_ day of _mown_, 19_96_

_Linda L. Calvert_____
NOTARY PUBLIC IN AND FOR
THE STATE OF TEXAS

_LINDA L. CALVERT_____
[Print or Type Name of Notary]
My Commission Expires:
_9-13-97_____

FIESTA TEXAS:                    FIESTA TEXAS THEME PARK, LTD.,
                                 a Texas limited partnership

                      By:    LA CANTERA GROUP LIMITED
                             PARTNERSHIP, a Texas limited
                             partnership, its General Partner

                      By:    LA CANTERA DEVELOPMENT
                             COMPANY, a Delaware corporation
                             qualified to do business in Texas, its
                             General Partner

                      By:    _Glen E. Mitts_ (signature)
                             Glen E. Mitts
                             Assistant Vice President


THE STATE OF TEXAS          )
                            )    REPRESENTATIVE ACKNOWLEDGMENT
COUNTY OF _Bexar_           )


        This instrument was acknowledged before me on the _15th_ day of _march_, 19_96_
by La Cantera Development Company, a Delaware corporation, as general partner of La
Cantera Group Limited Partnership, the general partner of Fiesta Texas Theme Park, Ltd., a
Texas limited partnership.

        GIVEN UNDER MY HAND AND SEAL OF OFFICE this _15th_ day of _march_, 19_96_

                             _Linda L. Calvert_ (signature)
                             NOTARY PUBLIC IN AND FOR
                             THE STATE OF TEXAS

                             _LINDA L. CALVERT_
                             [Print or Type Name of Notary]

                             My Commission Expires:
                             _9-13-97_

28

**GOLF COURSE:**          LA CANTERA HOSPITALITY, INC., a Texas corporation

By: _____
Glen E. Mitts
Assistant Vice President

THE STATE OF TEXAS          )
                            ) REPRESENTATIVE ACKNOWLEDGMENT
COUNTY OF _Bexar_           )

     This instrument was acknowledged before me on the _15th_ day of _March_, 1996 by _Glen E. Mitts_ the _Assistant Vice President_ of La Cantera Hospitality, Inc., a Texas corporation, on behalf of said corporation.

     GIVEN UNDER MY HAND AND SEAL OF OFFICE this _15th_ day of _march_, 1996

_Linda L. Calvert_
NOTARY PUBLIC IN AND FOR
THE STATE OF TEXAS

_LINDA L. CALVERT_
[Print or Type Name of Notary]

My Commission Expires:
_9-13-97_

14261\2\11
3/14/96

VOL 6696 PG0922

29

PAPE-DAWSON
CIVIL & ENVIRONMENTAL ENGINEERS
Filed 35 of 54
(210)824-8494
FAX 824-3491
SAN ANTONIO, TEXAS 78217-5961

EXHIBIT "A"
FIELD NOTES

FOR

A 1,234 ACRE TRACT

A 1,234 acre tract of land out of B.B.B.& C.R.R. Survey No. 21, Abstract No. 104 , CB 4765; the Comanche Creek Irrigation Company Survey No. 437, Abstract No. 888, CB 4724, the Cal. Brannon Survey No. 433½, Abstract No. 994, CB 4722, the Jose M. Perez Survey No. 436, Abstract No. 593, CB 4723; the Texas Central Railway Survey No. 599, Abstract No. 1071, CB 4762, the Chas. H. Seidenschnur Survey No. 410, Abstract No. 1222, CB 4725, the Henry Wagenfuhr Survey No. 429, Abstract No. 817, CB 4761; the Wilhelm Kerchner Survey No. 340¼, Abstract No. 408, CB 4763; and the S.R. Roberts Survey No. 22½, Abstract No. 640, CB 4721, said 1,234 acres, being further described by metes and bounds as follows:

BEGINNING: At a point being the intersection of the north right-of-way line of C.W. Anderson Loop (F.M. 1604) with the west right-of-way line of Old Fredericksburg Road;

THENCE: Westerly, along the north right-of-way line of F.M. 1604, the following calls and distances:

S 82°34'28" W, a distance of 228.31 feet;

S 73°24'02" W, a distance of 708.59 feet;

S 81°11'07" W, a distance of 1000.20 feet;

S 85°54'27" W, a distance of 400.78 feet;

N 89°08'17" W, a distance of 505.59 feet;

S 82°19'52" W, a distance of 550.00 feet;

S 74°26'53" W, a distance of 68.49 feet;

S 74°28'58" W, a distance of 223.06 feet;

S 82°21'57" W, a distance of 877.69 feet;

S 82°17'55" W, a distance of 1522.67 feet to a point in the eastern property line of University Hills Subdivision Unit 4;

THENCE:    Departing said north right-of-way line of F.M. 1604 and continuing in a northerly direction along said eastern property line of University Hills Subdivision Unit 4, N06°50'21" W, a distance of 1107.94 feet;

THENCE:    Westerly along the northern property line of University Hills Subdivision Unit 4, S 83°09'13" W, a distance of 210.45 feet, to a point in the west right-of-way line of Market Hill Boulevard;

THENCE:    Southerly along said west right-of-way line of Market Hill Boulevard to the northwest intersection of Market Hill Boulevard and Seco Creek Drive, S 06°50'47" E, a distance of 135.00 feet to a point of curvature;

THENCE:    Southerly and southwesterly, with a curve to the right, said curve having a radius of 15.00 ft, a central angle of 90°00'00", a chord bearing and distance of S 38°09'13" W, 21.21 feet, and an arc length of 23.56 feet to a point of tangency;

THENCE:    S 83°09'13" W, a distance of 16.03 feet to a point of curvature;

THENCE:    Westerly, and northwesterly, with a curve to the right, said curve having a radius of 370.00 feet, a central angle of 43°18'19", a chord bearing and distance of N 75°11'38" W, 273.04 feet, and an arc length of 279.65 feet to a point of tangency;

THENCE:    N 53°32'28" W, a distance of 143.56 feet to an angle point in the western easement line of a 75-foot City Public Service Transmission Line;

THENCE:    Continuing in a northerly direction, along the western easement line of said 75-foot City Public Service Transmission Line Easement, the following calls and distances:

N36°27'32" E, a distance of 25.00 feet;

N 44°55'13" E, a distance of 33.98 feet;

N 36°27'32" E, a distance of 56.17 ft to an angle point in the western line of a 15' Sanitary Sewer Easement;

VOL 6696 PG0924

**THENCE:**   Continuing in a northerly direction, along the western line of said 15 foot Sanitary Sewer Easement, the following calls and distances:

N 15°17'33" E, a distance of 245.41 feet;

N 14°16'08" W, a distance of 17.40 feet;

N 43°49'47" W, a distance of 782.41 feet;

N 21°06'17" W, a distance of 229.67 feet;

N 04°13'36" W, a distance of 274.08 feet;

N 08°05'36" W, a distance of 19.95 feet;

N 11°57'36" W, a distance of 267.89 feet;

N 20°17'46" W, a distance of 19.80 feet;

N 28°37'56" W, a distance of 259.50 feet;

N 53°20'23" W, a distance of 18.16 feet;

N 78°02'50" W, a distance of 526.72 feet;

N 64°31'58" W, a distance of 236.28 feet a point;

**THENCE:**   Departing the western line of said 15 foot sanitary sewer easement, S 89°44'13" W, a distance of 568.50 ft to a point in the eastern right-of-way line of Babcock Road;

**THENCE:**   Along said eastern right-of-way line of Babcock Road, the following calls and distances:

N 30°07'41" E, a distance of 218.32 feet;

N 28°45'08" E, a distance of 31.69 feet;

N 14°53'44" E, a distance of 300.65 feet;

N 00°55'29" W, a distance of 644.76 feet to a point of curvature;

VOL 6 9 9 6 PG 0 9 2 5

Northerly, with a curve to the right, said curve having a radius of 691.92 feet, a central angle of 18°24'22", a chord bearing and distance of N 08°16'41" E, 221.32 feet, and an arc length of 222.27 feet at a point of intersection with a non-tangent line;

N 25°17'38" E, a distance of 154.45 feet;

N 26°02'53" E, a distance of 134.64 feet;

N 46°36'59" E, a distance of 160.03 feet;

N 09°58'30" E, a distance of 1278.07 feet;

N 02°13'15" W, a distance of 524.99 feet to an angle point;

THENCE: Departing the eastern right-of-way line of Babcock Road, S73°46'47" E, a distance of 86.48 feet to a point in the eastern line of a 25 foot Sanitary Sewer Easement;

THENCE: Along the eastern line of said 25 foot Sanitary Sewer Easement, the following calls and distances:

N 39°18'45" E, a distance of 395.89 feet;

N 28°08'37" E, a distance of 403.66 feet;

N 06°03'26" E, a distance of 596.98 feet;

N 53°12'54" E, a distance of 796.19 feet;

N 38°11'54" E, a distance of 404.32 feet;

N 14°05'36" E, a distance of 320.82 feet;

N23°54'56" W, a distance of 19.19 feet to a point on a non-tangent curve in the southern right-of-way line of Camp Bullis Road;

THENCE: Along said southern right-of way line of Camp Bullis Road, the following calls and distances:

Northeasterly, and easterly with a curve to the right, said curve having a radial bearing of S 22°49'31" E, a radius of 657.00 feet, a central angle of 15°37'24", a chord bearing and distance of N 74°59'11" E, 178.60 feet, and an arc length of 179.15 feet to a point of tangency;

N 82°47'53" E, a distance of 963.97 feet to an angle point in the western property line of Crownridge Subdivision;

THENCE:    Departing said southern right-of-way line of Camp Bullis Road, and along the western limits of Crownridge Subdivision,   S 05°41'34" E, a distance of 2943.22 feet to a point being the southwest corner for Crownridge Subdivision;

THENCE:    Along the southern property line of Crownridge Subdivision, N 89°05'02" E, a distance of 1415.00 feet to an angle point;

THENCE:    N89°01'25" E, a distance of 691.97 feet to an angle point;

THENCE:    N 01°06'06" W, a distance of 507.05 feet;

THENCE:    N00°18'34" W, a distance of 225.59 feet to an angle point;

THENCE:    Along the northern property line of La Cantera, the following calls and distances:

S 33°27'48" E, a distance of 179.13 feet;

S 53°15'39" E, a distance of 358.26 feet;

S 59°00'17" E, a distance of 546.61 feet;

N 52°49'37" E, a distance of 394.16 feet to a point of curvature;

Northeasterly, and northerly, with a curve to the left, said curve having a radius of 1157.00 feet, a central angle of 31°07'39", a chord bearing and distance of N 37°15'47" E, 620.87 feet, and an arc length of 628.57 feet to a point of intersection with a non-tangent line;

S 68°18'02" E, a distance of 111.33 feet to a point of curvature;

Easterly, with a curve to the left, said curve having a radius of 1000.00 feet, a central angle of 36°05'59", a chord bearing and distance of S 86°21'02" E, 619.69 feet, and an arc length of 630.06 feet to a point of tangency;

N 75°35'59" E, a distance of 318.81 feet to a point in the west right-of-way line of Interstate Highway 10;

**THENCE:** Continuing in the southerly direction along said west right-of-way line of Interstate Highway 10, the following calls and distances:

S 09°11'02" E, a distance of 107.94 feet;

S 15°50'02" E, a distance of 1100.00 feet;

S 12°58'17" E, a distance of 200.25 feet;

S 15°50'02" E, a distance of 750.00 feet;

S 22°28'11" E, a distance of 514.66 feet;

S 22°10'38" E, a distance of 13.34 feet;

S 22°10'36" E, a distance of 25.80 feet;

S 15°53'50" E, a distance of 631.68 feet to a point of curvature;

Southerly, with a curve to the right, said curve having a radius of 2804.93 feet, a central angle of 05°30'00", a chord bearing and distance of S 13°08'50" E, 269.15 feet, and an arc length of 269.25 feet to a point of intersection with a non-tangent line;

S 04°07'03" W, a distance of 235.18 feet;

S 19°08'27" W, a distance of 47.79 feet;

S 19°13'49" W, a distance of 531.94 feet;

S 20°19'23" W, a distance of 215.00 feet;

**THENCE:** Departing the western right-of-way line of Interstate Highway 10 and Old Fredericksburg Road, S 83°04'37" W, a distance of 523.55 feet to an angle point;

**THENCE:** S 00°57'35" E, a distance of 321.78 feet to an angle point;

**THENCE:** S 88°57'35" E, a distance of 367.72 feet to an angle point in the western right-of-way line of Old Fredericksburg Road;

**THENCE:**  Southerly along said western right-of-way line of Old Fredericksburg Road, the following calls and distances:

S 19°42'46" W, a distance of 131.62 feet;

S 19°53'49" W, a distance of 526.52 feet;

S 11°44'46" W, a distance of 192.27 feet;

S 02°14'15" W, a distance of 243.34 feet;

S 09°22'18" E, a distance of 121.32 feet;

S11°03'11" E, a distance of 142.92 feet;

S 28°52'55" E, a distance of 186.49 feet to the POINT OF BEGINNING and containing 1237 acres, SAVE AND EXCEPT a 3.07 acre City Water Tract being a net acreage of 1234 acres in the City of San Antonio, Bexar County, Texas.

### THIS DOCUMENT IS NOT A LEGAL SURVEY

VOL 6 9 6 9 PG 0 9 2 9

| | |
|---|---|
| Prepared by: | Pape-Dawson Consulting Engineers, Inc. |
| Job No: | 3010-07 |
| Date: | June 22, 1995 |
| Doc Id: | M0621-01.DM |

## EXHIBIT
## OF
## TRACT 4

Being a 1.365 acre, or 59,480 square foot tract of land, being all of a called 1.365 acre tract as recorded in Volume 5420, Page 2015, of the Official Public Records of Real Property of Bexar County, Texas, being out of the Texas Central Railway Co. Survey No. 599, Abstract 1071, CB 4762, in the corporate limits of the City of San Antonio, Texas and in NCB 14883, said 1.365 acre tract being further described as follows:

**BEGINNING:**  At a point in the west right-of-way line of Interstate Highway 10, said point being located at a 201.6 foot offset from Station 590+34.2 and at the intersection of the west right-of-way line of Interstate Highway 10 with the cut-back of Old Fredericksburg Road, for the northeast corner of this tract;

**THENCE:**  With the west right-of-way line of Interstate Highway 10, S 07°25'00" E, a distance of 408.31 feet to a point;

**THENCE:**  Departing the west right-of-way line of Interstate Highway 10, S 89°22'08" W, a distance of 245.64 feet to a point in the east right of way line of Old Fredericksburg Road;

**THENCE:**  With the east right-of-way line of Old Fredericksburg Road, N 18°04'09" E, a distance of 31.67 feet to a point;

**THENCE:**  Continuing with the east right-of-way line of Old Fredericksburg Road, N 21°11'00" E, a distance of 45.24 feet to a point;

**THENCE:**  Continuing with the east right-of-way line of Old Fredericksburg Road, N 19°38'11" E, a distance of 360.92 feet to a point at the cut-back line with Interstate Highway 10;

**THENCE:**  With said cut-back line, S 84°12'00" E, a distance of 45.70 feet to the POINT OF BEGINNING, and containing 1.365 acres of land, more or less, in the City of San Antonio, Bexar County, Texas.

"THIS DOCUMENT IS NOT A LEGAL SURVEY"

**PREPARED BY:**  PAPE-DAWSON CONSULTING ENGINEERS, INC.
**DATE:**  March 16, 1993
**JOB NO.:**  3010.25
**DOC. ID.:**  0312-05.DE

VOL 6 696 PG 0930

## EXHIBIT "B"

### Land Subject to Annexation

Any and all real property located within five miles of the perimeter boundary of the real property described in Exhibit "A" to the La Cantera Master Covenants and Easements.

**PAPE-DAWSON** **ENGINEERS**
CIVIL & ENVIRONMENTAL

9310 BROADWAY. BUILDING II
SAN ANTONIO. TEXAS 78217-5967

(210) 824-9494
FAX 824-3491

EXHIBIT "C"

## FIELD NOTES

## FOR

A 202.9 acre, or 8,840,000 square feet, tract of land being comprised of the remainder of Lot 1, Block 9, New City Block (N.C.B.) of the City of San Antonio, Bexar County, Texas, recorded as the Fiesta Texas Subdivision in Volume 9522, Pages 117-120 and amended in Volume 9524, Pages 115-119 of the Deed and Plat Records of Bexar County, Texas, said remaining portion including the 0.0569 acre tract the 0.1276 acre tract and the 4.5105 acre tract recorded in Volume 6612, Page 328-335 of the Official Public Records of Real Property of Bexar County, Texas, and Lot 2, Block 9, N.C.B. 18339 recorded as the Fiesta Texas Unit 2 in Volume 9531, Page 31 of the Deed and Plat Records of Bexar County, Texas. Said 202.9 acres being further described by metes and bounds as follows:

**BEGINNING:** At a found "+" in concrete at the most easterly southeast corner of that 3.2219 acre tract out of the said Lot 1 recorded in Volume 6612, Page 309-313 of the Official Public Records of Real Property of Bexar County, Texas, said point being the most easterly northeast corner of this tract on the west right-of-way line of Fiesta Drive, a 98-foot right-of-way described in the La Cantera Parkway Phase I Subdivision recorded in Volume 9522, Page 115-116 of the Deed and Plat Records of Bexar County, Texas;

**THENCE:** Along and with the east line of the said Lot 1 and the west right-of-way line of Fiesta Drive the following calls and distances:

S 15°58'20" E, a distance of 53.34 feet to a set ½" iron rod with yellow cap marked Pape-Dawson at a point of curvature;

Southerly, with a curve to the right, said curve having a radius of 801.00 feet, a central angle of 15°00'00", a chord bearing and distance of S 08°28'20" E, 209.10 feet, and an arc length of 209.70 feet to a set ½" iron rod with yellow cap marked Pape-Dawson at a point of tangency;

**THENCE:** S 00°58'20" E, at 57.13 feet passing the southwest corner of Fiesta Drive and continuing for a total distance of 73.12 feet to a set ½" iron rod with yellow cap marked Pape-Dawson;

**THENCE:** Continuing along and with the line of the said Lot 1 the following calls and distances:

S 02°46'24" W, a distance of 237.51 feet to a found ½" iron rod;

S 03°06'22" E, a distance of 504.60 feet to a found ½" iron rod;

VOL 6696 PG 0932

S 09°56'37" W, a distance of 512.14 feet to a found ½" iron rod;

Southerly, southwesterly, westerly, and northwesterly, with a curve to the right, said curve having a radius of 150.00 feet, a central angle of 109°12'38", a chord bearing and distance of S 64°32'56" W, 244.55 feet, and an arc length of 285.91 feet to a found ½" iron rod ;

N 60°50'45" W, a distance of 192.50 feet to a found ½" iron rod at a point of curvature;

Northwesterly, with a curve to the right, said curve having a radius of 250.00 feet, a central angle of 35°35'19", a chord bearing and distance of N 43°03'06" W, 152.80 feet, and an arc length of 155.28 feet to a found ½" iron at a point of tangency;

N 25°15'26" W, a distance of 99.97 feet a set "+" in concrete;

N 69°04'05" W, a distance of 137.23 feet to a set ½" iron rod with yellow cap marked Pape-Dawson;

S 12°47'30" W, a distance of 442.27 feet to a a set "+" in concrete;

S 38°29'21" E, a distance of 120.76 feet to a set railroad spike at a point of curvature;

Southeasterly, and southerly, with a curve to the right, said curve having a radius of 450.00 feet, a central angle of 34°42'47", a chord bearing and distance of S 21°07'58" E, 268.48 feet, and an arc length of 272.64 feet to a found ½" iron rod with yellow cap marked Pape-Dawson at a point of tangency;

S 03°46'34" E, a distance of 243.66 feet to a set "+" in concrete at a point of curvature;

THENCE:     Southerly, southwesterly, and westerly, with a curve to the right, said curve having a radius of 625.00 feet, a central angle of 102°12'04", a chord bearing and distance of S 47°19'28" W, 972.81 feet, and an arc length of 1114.84 feet to a found ½" iron rod at a point of tangency;

N 81°34'30" W, a distance of 745.66 feet to a set ½" iron rod with yellow cap marked Pape-Dawson;

S 61°14'23" W, a distance of 18.54 feet to a found ½" iron rod at a point of curvature;

Southwesterly, westerly, and northwesterly, with a curve to the right, said curve having a radius of 250.00 feet, a central angle of 87°12'57", a chord bearing and distance of N 75°09'08" W, 344.86 feet, and an arc length of 380.55 feet to a found ½" iron rod at a point of tangency;

N 31°32'39" W, a distance of 103.62 feet to a found ½" iron rod ;

N 16°18'10" W, a distance of 328.05 feet to a found ½" iron rod with yellow cap marked Pape-Dawson;

N 49°56'51" W, a distance of 213.58 feet to a found "+" in concrete;

N 70°59'49" W, a distance of 101.97 feet to a set ½" iron rod with yellow cap marked Pape-Dawson;

N 67°46'29" W, a distance of 274.84 feet to a found ½" iron rod with yellow cap marked Pape-Dawson at a point of curvature;

Westerly, with a curve to the left, said curve having a radius of 188.00 feet, a central angle of 24°08'40", a chord bearing and distance of N 79°50'49" W, 78.64 feet, and an arc length of 79.22 feet to a found ½" iron rod with yellow cap marked Pape-Dawson at a point of tangency;

S 88°04'51" W, a distance of 366.31 feet to a found ½" iron rod with yellow cap marked Pape-Dawson;

N 00°49'49" E, a distance of 136.44 feet to a found ½" iron rod with yellow cap marked Pape-Dawson at a point of curvature;

Northerly, and northwesterly, with a curve to the left, said curve having a radius of 170.00 feet, a central angle of 33°37'55", a chord bearing and distance of N 15°59'08" W, 98.36 feet, and an arc length of 99.79 feet to a found "+" in rock at a point of tangency;

N 32°48'06" W, a distance of 53.09 feet to a found ½" iron rod with yellow cap marked Pape-Dawson at a point of curvature;

Northwesterly, and northerly, with a curve to the right, said curve having a radius of 161.25 feet, a central angle of 20°51'37", a chord bearing and distance of N 22°22'18" W, 58.38 feet, and an arc length of 58.71 feet to a found ½" iron rod with yellow cap marked Pape-Dawson at point of intersection with a non-tangent curve, the most southerly southeast corner of the said Lot 2;

THENCE:    Westerly, and northwesterly along and with the south line of the said Lot 2 with a curve to the right, said curve having a radial bearing of N 14°11'05" W, a radius of 260.00 feet, a central angle of 54°17'03", a chord bearing and distance of N 77°02'33" W, 237.22 feet, and an arc length of 246.33 feet to a set "+" in concrete at a point of intersection of a non-tangent line, the east right-of-way line of La Cantera Parkway, an 86-foot right-of-way at this point, as described in the La Cantera Parkway Phase II Subdivision recorded in Volume 9525, Page 12-16 of the Deed and Plat Records of Bexar County, Texas;

THENCE:    N 36°27'39" E, along and with the said east right-of-way line of La Cantera Parkway, a distance of 20.04 feet to a found "+" in concrete at a point on curve of a non-tangent curve, a corner of the said Lot 2;

THENCE:    Departing the east right-of-way line of La Cantera Parkway and along and with the northwest line of the said Lot 2 the following calls and distances:

Southeasterly, and easterly with a curve to the left, said curve having a radial bearing of N 40°24'12" E, a radius of 240.00 feet, a central angle of 50°15'44", a chord bearing and distance of S 74°43'40" E, 203.85 feet, and an arc length of 210.54 feet to a found ½" iron rod at point of intersection with a non-tangent curve;

Northerly, and northeasterly with a curve to the right, said curve having a radial bearing of N 84°22'51" E, a radius of 181.25 feet, a central angle of 42°13'09", a chord bearing and distance of N 15°29'25" E, 130.56 feet, and an arc length of 133.56 feet to a found ½" iron rod at a point of tangency;

N 36°35'59" E, a distance of 140.10 feet to a set ½" iron rod with yellow cap marked Pape-Dawson;

N 47°08'15" E, a distance of 36.80 feet to a set ½" iron rod with yellow cap marked Pape-Dawson;

N 70°24'25" E, a distance of 97.52 feet to a set ½" iron rod with yellow cap marked Pape-Dawson at a point on curve of a non-tangent curve;

Northeasterly with a curve to the right, said curve having a radial bearing of S 46°19'43" E, a radius of 535.00 feet, a central angle of 06°37'10", a chord bearing and distance of N 46°58'53" E, 61.78 feet, and an arc length of 61.81 feet to a set ½" iron rod with yellow cap marked Pape-Dawson at a point of reversing curvature;

Northeasterly, with a curve to the left, said curve having a radius of 865.00 feet, a central angle of 07°39'04", a chord bearing and distance of N 46°27'56" E, 115.42 feet, and an arc length of 115.51 feet to a set ½" iron rod with yellow cap marked Pape-Dawson at a point of compound curvature;

Northeasterly, with a curve to the left, said curve having a radius of 425.00 feet, a central angle of 17°52'57", a chord bearing and distance of N 33°41'56" E, 132.11 feet, and an arc length of 132.65 feet to a set ½" iron rod with yellow cap marked Pape-Dawson at a point of compound curvature;

Northeasterly, and northerly, with a curve to the left, said curve having a radius of 165.00 feet, a central angle of 16°08'10", a chord bearing and distance of N 16°41'23" E, 46.32 feet, and an arc length of 46.47 feet to a set ½" iron rod with yellow cap marked Pape-Dawson at a point of tangency;

N 08°37'18" E, a distance of 116.06 feet to a set ½" iron rod with yellow cap marked Pape-Dawson;

N 06°21'31" E, a distance of 179.70 feet to a set ½" iron rod with yellow cap marked Pape-Dawson;

S 89°14'11" E, a distance of 226.69 feet to a found ½" iron rod with yellow cap marked Pape-Dawson;

S 13°09'01" W, a distance of 86.53 feet to a ½" iron rod reset with yellow cap marked Pape-Dawson;

S 80°02'28" E, a distance of 37.14 feet to a point;

N 71°39'56" E, a distance of 202.32 feet to a set ½" iron rod with yellow cap marked Pape-Dawson;

N 09°52'47" E, a distance of 130.00 feet to a set ½" iron rod with yellow cap marked Pape-Dawson;

N 37°25'50" E, a distance of 95.00 feet to a set ½" iron rod with yellow cap marked Pape-Dawson;

N 76°38'37" E, a distance of 220.00 feet to a set ½" iron rod with yellow cap marked Pape-Dawson;

S 79°51'31" E, a distance of 89.77 feet to a a set railroad spike;

S 46°10'59" E, a distance of 127.26 feet to a set ½" iron rod with yellow cap marked Pape-Dawson;

N 81°13'18" E, a distance of 81.84 feet to a set ½" iron rod with yellow cap marked Pape-Dawson on a northwest line of the said Lot 1;

THENCE:    Along and with the line of the said Lot 1 the following calls and distances:

N 71°39'56" E, a distance of 58.06 feet to a set ½" iron rod with yellow cap marked Pape-Dawson;

N 18°00'00" W, a distance of 338.59 feet to a set ½" iron rod with yellow cap marked Pape-Dawson;

N 29°18'36" W, a distance of 15.30 feet to a set ½" iron rod with yellow cap marked Pape-Dawson;

N 18°00'00" W, a distance of 245.13 feet to a set ½" iron rod with yellow cap marked Pape-Dawson;

N 30°05'41" W, a distance of 35.79 feet to a set ½" iron rod with yellow cap marked Pape-Dawson;

N 18°00'00" W, a distance of 198.34 feet to a set ½" iron rod with yellow cap marked Pape-Dawson at a point of curvature;

Northerly, with a curve to the right, said curve having a radius of 483.00 feet, a central angle of 37°36'35", a chord bearing and distance of N 00°48'17" E, 311.39 feet, and an arc length of 317.05 feet to a set ½" iron rod with yellow cap marked Pape-Dawson at a point of intersection of a non-tangent line;

Case 21-10474-MFW   Doc 313-1   Filed 04/22/21   Page 50 of 54

N 14°08'01" W, a distance of 142.41 feet to a set ½" iron rod with yellow cap marked Pape-Dawson;

N 24°10'27" E, a distance of 363.21 feet to a found ½" iron rod at a point of curvature;

Northeasterly, and easterly, with a curve to the right, said curve having a radius of 100.00 feet, a central angle of 49°03'27", a chord bearing and distance of N 48°42'11" E, 83.03 feet, and an arc length of 85.62 feet to a set ½" iron rod at a point of tangency;

N 73°13'55" E, a distance of 461.21 feet to a set ½" iron rod with yellow cap marked Pape-Dawson at a point of curvature;

Easterly, with a curve to the right, said curve having a radius of 179.74 feet, a central angle of 36°16'27", a chord bearing and distance of S 88°37'52" E, 111.90 feet, and an arc length of 113.79 feet to a set ½" iron rod with yellow cap marked Pape-Dawson at a point of compound curvature on the southeast right-of-way line of the aforementioned La Cantera Parkway;

THENCE:   Along and with the said southeast right-of-way line of La Cantera Parkway the following calls and distances:

Easterly, and southeasterly, with a curve to the right, said curve having a radius of 1000.00 feet, a central angle of 15°20'10", a chord bearing and distance of S 62°49'34" E, 266.87 feet, at an arc length of 116.53 passing the west corner of the La Cantera Parkway described in the La Cantera Parkway Phase I Subdivision recorded in Volume 9522, Page 115-116 of the Deed and Plat Records of Bexar County, Texas and continuing for a total arc length of 267.66 feet to a set ½" iron rod with yellow cap marked Pape-Dawson at a point of tangency;

S 55°09'29" E, a distance of 329.50 feet to a set ½" iron rod with yellow cap marked Pape-Dawson at a point of curvature;

Southeasterly, and easterly, with a curve to the left, said right-of-way now of variable width, said curve having a radius of 1113.00 feet, a central angle of 33°26'25", a chord bearing and distance of S 71°52'42" E, 640.42 feet, and an arc length of 649.60 feet to a set ½" iron rod with yellow cap marked Pape-Dawson with yellow cap marked Pape-Dawson at a point of intersection of a non-tangent line, the most northerly northwest corner of the said 3.2219 acre tract;

THENCE:      Along and with the southwest line of the said 3.2219 acre tract the following
             calls and distances:

             S 38°11'15" W, a distance of 25.84 feet to a set ½" iron rod with yellow cap
             marked Pape-Dawson at a point of curvature;

             Southwesterly, with a curve to the left, said curve having a radius of 498.00
             feet, a central angle of 11°31'47", a chord bearing and distance of S 32°25'21"
             W, 100.04 feet, and an arc length of 100.21 feet to a set ½" iron rod with
             yellow cap marked Pape-Dawson at a point of intersection of a non-tangent
             line;

             S 54°00'00" E, a distance of 627.35 feet to a set ½" iron rod with yellow cap
             marked Pape-Dawson at a point on curve of a non-tangent curve;

             Easterly with a curve to the right, said curve having a radial bearing of S
             19°09'54" E, a radius of 287.00 feet, a central angle of 02°09'54", a chord
             bearing and distance of N 71°55'03" E, 10.84 feet, and an arc length of 10.84
             feet to a set ½" iron rod with yellow cap marked Pape-Dawson at a point of
             tangency;

THENCE:      N 73°00'00" E, a distance of 39.14 feet to the POINT OF BEGINNING and
             containing 202.90 acres in the City of San Antonio, Bexar County, Texas.
             Said tract described in accordance with a survey prepared by Pape-Dawson
             Engineers Inc.

VOL b 696 PG 0939

Prepared by:   Pape-Dawson Consulting Engineers, Inc.
Job No:        3726-10
Date:          January 26, 1996
Doc Id:        M960126A2.JF

**PAPE-DAWSON** **ENGINEERS**
CIVIL & ENVIRONMENTAL

9310 BROADWAY. BUILDING II
SAN ANTONIO. TEXAS 78217-5967

(210) 824-9494
FAX 824-3491

## FIELD NOTES
## FOR

A 3.069 acre, or 133,700 square feet, tract of land being that same 3.069 acre tract recorded in Volume 6684, Page 1132 of the Official Public Records of Real Property of Bexar County, Texas, being 0.1213 acres out of a Drainage Easement, and 1.9927 acres out of an Ingress/Egress, Drain and Water Easement both recorded on La Cantera Parkway Phase I in Volume 9522, Page 115-116 of the Deed and Plat Records of Bexar County, Texas, and 0.9551 acres out of a 316.054 acre tract recorded in Volume 4210, Page 1842-1854 of the Official Public Records of Real Property of Bexar County, Texas, out of the Texas Central Railway Co. Survey No. 599, Abstract 1071, County Block 4762, and the Wilhelm Kerchner Survey No. 340¼, Abstract 408, County Block 4763 now all in New City Block (N.C.B.) 18339 of the City of San Antonio, Bexar County, Texas. Said 3.069 acres being further described by metes and bounds as follows:

BEGINNING:   At a found ½" iron rod with yellow cap marked Pape-Dawson on the north right-of-way line of La Cantera Parkway, a variable width right-of-way at this point, described in the said La Cantera Phase I Subdivision, said point being at the northeast corner of said Ingress/Egress, Drain, and Water easement and the northeast corner of this tract;

THENCE:   Along and with the said north right-of-way line of La Cantera Parkway the following calls and distances:

S 13°30'11" W, a distance of 45.30 feet to a found ½" iron rod with yellow cap marked Pape-Dawson at a point on curve of a non-tangent curve;

Southwesterly, and westerly with a curve to the right, said curve having a radial bearing of N 35°47'20" W, a radius of 1428.00 feet, a central angle of 14°39'46", a chord bearing and distance of S 61°32'33" W, 364.45 feet, and an arc length of 365.45 feet to a found "+" in concrete at a point of tangency;

S 68°52'26" W, a distance of 18.23 feet to a found "+" in concrete;

S 71°38'51" W, a distance of 104.80 feet to a found ½" iron rod with yellow cap marked Pape-Dawson at a point on curve of a non-tangent curve;

Westerly with a curve to the right, said curve having a radial bearing of N 18°21'04" W, a radius of 963.90 feet, a central angle of 17°58'49", a chord bearing and distance of S 80°38'20" W, 301.25 feet, and an arc length of 302.49 feet to a found ½" iron rod with yellow cap marked Pape-Dawson at a point of intersection of a non-tangent line;

N 38°11'14" E, a distance of 3.06 feet to a found ½" iron rod with yellow cap marked Pape-Dawson;

N 69°51'22" W. at 72.94 feet departing the north right-of-way line of La Cantera Parkway and continuing with the line of the said 3.069 acre tract a total distance of 84.14 feet to a found ½" iron rod with yellow cap marked Pape-Dawson;

THENCE:    Continuing along and with the line of the said 3.069 acre tract the following calls and distances:

N 38°11'05" E, a distance of 125.68 feet to a found ½" iron rod with yellow cap marked Pape-Dawson;

N 69°28'05" E, a distance of 42.00 feet to a found ½" iron rod with yellow cap marked Pape-Dawson;

N 43°55'18" E, a distance of 129.37 feet to a found ½" iron rod with yellow cap marked Pape-Dawson;

N 18°22'31" E, a distance of 60.21 feet to a found ½" iron rod with yellow cap marked Pape-Dawson;

N 62°06'52" E, a distance of 120.41 feet to a found ½" iron rod with yellow cap marked Pape-Dawson;

S 74°08'47" E, a distance of 92.54 feet to a found ½" iron rod with yellow cap marked Pape-Dawson;

S 08°22'20" E, a distance of 90.22 feet to a found "+" in concrete at a point on curve of a non-tangent curve;

Easterly with a curve to the right, said curve having a radial bearing of S 13°00'36" E, a radius of 724.52 feet, a central angle of 12°12'35", a chord bearing and distance of N 83°05'42" E, 154.10 feet, and an arc length of 154.39 feet to a found ½" iron rod with yellow cap marked Pape-Dawson at a point of reversing curvature;

Easterly, and northeasterly, with a curve to the left, said curve having a radius of 606.20 feet, a central angle of 22°49'33", a chord bearing and distance of N 77°47'13" E, 239.91 feet, and an arc length of 241.50 feet to the POINT OF BEGINNING and containing 3.069 acres in the City of San Antonio, Bexar County, Texas. Said tract described in accordance with a survey prepared by Pape-Dawson Engineers Inc.

Prepared by:    Pape-Dawson Consulting Engineers, Inc.
Job No:         3726-10
Date:           March 8, 1996
Doc Id:         M960126A1.JF

Any provision herein which restricts the sale, rental, or use of the described real property because of race is invalid and unenforceable under Federal law.
STATE OF TEXAS, COUNTY OF BEXAR
I hereby certify that this instrument was FILED in File Number Sequence on the date and at the time stamped hereon by me and was duly RECORDED in the Official Public Record of Real Property of Bexar County, Texas on

**MAR 1 8 1996**

*Gerry Rickhoff*

COUNTY CLERK BEXAR COUNTY, TEXAS

Filed for Record in:
BEXAR COUNTY, TX
GERRY RICKHOFF, COUNTY CLERK

On Mar 15 1996

At  1:10pm

Receipt #:      206934
Recording:      105.00
Doc/Mgmt :        6.00

Doc/Num  : 96- 0037711

Deputy -Jane Hernandez

**RECORDER'S MEMORANDUM**

AT THE TIME OF RECORDATION, THIS
INSTRUMENT WAS FOUND TO BE INADEQUATE
FOR THE BEST PHOTOGRAPHIC REPRODUCTION
BECAUSE OF ILLEGIBILITY, CARBON OR
PHOTO COPY, DISCOLORED PAPER, ETC.

VOL 6696 PG 0942