## **EXHIBIT C**

Protective Covenants Declaration dated Dec. 20, 2019

# DECLARATION OF PROTECTIVE COVENANTS AND COMMON AREA MAINTENANCE AGREEMENT

THIS DECLARATION OF PROTECTIVE COVENANTS AND COMMON AREA MAINTENANCE AGREEMENT (this "**Declaration**"), is made and entered into as of the 20th day of December, 2019 (the "**Effective Date**"), by and between La Cantera Crossing Retail, LLC, a Texas limited liability company ("**Declarant**"), and Alamo North SA, LLC, a Texas limited liability company ("**Theater Owner**").

## WITNESSETH:

WHEREAS, Declarant is the fee owner of those certain two (2) tracts of land containing in the aggregate approximately 6.517 acres, more or less, located near the intersection of NWC Loop 1604 and La Cantera Parkway in the City of San Antonio, Bexar County, Texas, which tracts of land are described in **Exhibit "A"** attached hereto and by this reference made a part hereof (collectively, the "**La Cantera Tract**"); and

WHEREAS, Theater Owner, on even date herewith, will become the fee owner of a certain tract of land containing approximately 3.519 acres, more or less, also located near the intersection of NWC Loop 1604 and La Cantera Parkway in the City of San Antonio, Bexar County, Texas, which tract of land is described in **Exhibit "B"** attached hereto and by this reference made a part hereof (the "**Theater Tract**"); and

WHEREAS, the La Cantera Tract and Theater Tract may hereinafter be referred to individually as a "**Tract**" and together as the "**Tracts**"; the definition of "Tract" shall also include any parcel of land within the La Cantera Tract or Theater Tract, legally existing on this date, and as created from time to time, together with the buildings and improvements located thereon, from time to time;

WHEREAS, the La Cantera Tract together with the Theater Tract together comprise the "La Cantera Crossing Shopping Center" (the "**Shopping Center**"). The location of the La Cantera Tract, and the Theater Tract are shown on **Exhibit "C"** attached hereto (the "**Site Plan**");

WHEREAS, the Shopping Center is subject to the terms of that certain La Cantera Declaration of Commercial Covenants, Conditions and Restrictions entered into by La Cantera Development Company, a Delaware corporation, qualified to do business in Texas, and recorded in the Official Public Records of Bexar County, Texas under Volume 6701, Page 876, as amended by the instruments described in **Exhibit "C-1"** (the "**Commercial Covenants**"); capitalized terms used herein, but not defined herein shall have the meaning ascribed thereto in the Commercial Covenants;

WHEREAS, the record owner of fee title to any Tract shall hereinafter be referred to as an "**Owner**";

*PDX\123060\238709\MAM\26811497.2*

24722688v.1

064883.00236 290866 v17

Chicago Title GF#4300111801667 (DB)

WHEREAS, Declarant and Theater Owner desire to enter into this Declaration to grant certain easements and to establish certain standards and restrictions governing the use, development and operation of the Tracts as set forth herein.

NOW, THEREFORE, in consideration of the foregoing, and the covenants and agreements on the part of each party to the other, as hereinafter set forth, IT IS AGREED as follows:

1.     **Common Area Maintenance**. The Commercial Covenants impose certain obligations upon the Owners to maintain their respective Commercial Parcels (as defined in the Commercial Covenants). Notwithstanding anything in the Commercial Covenants to the contrary, Declarant (or any successor Owner of the La Cantera Tract) shall maintain the common areas of the Shopping Center (the "**Common Areas**") in a first-class manner consistent with similar properties in Bexar County, Texas, subject to reimbursement from the Owners in accordance with the terms of this Declaration.  As used herein, the term "**Common Areas**" means the parking areas situated on each Tract and all storm drainage, lighting, sidewalks, driveways and landscaping located on each Tract outside the perimeter sidewalks and curbs abutting each building situated on a Tract.

2.     **Assessments**.

a.     Each Owner hereby covenants and agrees, which agreement shall be binding on any future Owner of the Theater Tract, to pay to Declarant (or any successor Owner of the La Cantera Tract) base monthly assessments (referred to as "**Assessments**"). Assessments shall be fixed, established and collected from time to time, all as hereinafter provided. The Assessments, together with such interest thereon and costs of collection thereof, as hereinafter provided, shall be a charge on and a continuing lien upon the Tracts and the improvements thereon. Each Assessment, together with such interest thereon and cost of collection thereof, as hereinafter provided, shall also be the personal or corporate obligation of the then current Owner(s) of the Tracts. In the case of co-ownership of a Tract, each co-owner shall be jointly and severally liable for the entire amount of any Assessment. Should the Declarant employ an attorney to collect any Assessment, it shall be entitled to collect, in addition thereto, all costs of collection including without limitation reasonable attorneys' fees. No Owner may waive or otherwise exempt itself from liability for any Assessments for any reason including, by way of illustration and not limitation, non-use of the Common Areas or any services provided by the Declarant or abandonment of a Tract. No diminution or abatement of any Assessment or set-off shall be claimed or allowed for any reason whatsoever, including, by way of illustration and not limitation, any alleged failure of Declarant to (1) take some action, (2) perform some function required to be taken or performed by Declarant under this Declaration or otherwise, or (3) provide some service required or permitted to be provided under the terms of this Declaration or for inconvenience or discomfort arising from the making of repairs or improvements which are the responsibility of Declarant, or from any action taken to comply with any law, ordinance or any order or directive of any municipal or other governmental authority.

b.     The Assessments levied hereunder shall be used for the purpose of paying all commercially reasonable, direct, out-of-pocket costs and expenses incurred by the Declarant in connection with providing for the maintenance and repair of the Common Areas of the Shopping

Center in accordance with the standards set forth herein and in the Commercial Covenants pursuant to the terms of this Declaration (the "**Common Area Costs**"), including but not limited to, costs of (i) landscaping and groundskeeping, including planting, replanting and replacing flowers, trees, shrubbery, planters and other landscaping items and materials, (ii) maintenance, repair, sweeping and striping of the parking lot, service drives, driveways, curbs, fences, guardrails, bumpers and sidewalks of the common area, (iii) snow and ice removal, (iv) maintenance, repair and replacement of bulbs, poles and light fixtures in connection with the common area lighting, (v) security services (if Declarant so elects), (vi) maintenance and repair of utility systems serving the Common Area, including but not limited to water, storm water lines and drainage systems, electrical and lighting systems, (vii) cleaning, sweeping and removal of Common Area trash and debris, (viii) maintaining and repairing monuments and other signs located in the Common Area other than sign panels advertising the business of an Owner or its tenants, (ix) maintenance and repair of sprinkler systems serving the Common Area, (x) pest control in the Common Area, (xi) seasonal decoration, (xii) supplies related to the operation of the Common Area, (xiii) the cost of repair, maintenance and painting of gutters, rails and benches in the Common Areas, (xiv) all utility costs associated with the operation of the Common Areas, (xv) the costs of the inspection, maintenance and repair of any and all machinery and equipment used solely for the operation and maintenance of the Common Area, including personal property taxes and other charges and taxes incurred in connection with such equipment, (xvi) detention and water quality pond and storm drainage maintenance and repair but excluding the cost of Declarant's initial construction obligations, (xvii) payment of the cost of an annual audit of the books, records, and accounts of the Declarant related to the administration of the Common Areas, (xviii) payment of labor charges due to any third-party agent or vendor engaged by Declarant to perform maintenance and repair of the Common Areas as set forth above, including Declarant's designated third-party property manager, (xix) [intentionally deleted], (xx) payment of the cost of equipment and materials necessary to carry out the authorized Common Area Cost work of the Declarant, (xxi) commercial general liability and any casualty insurance maintained by Declarant with respect to the Common Areas, (xxii) an administrative fee payable to Declarant equal to ten percent (10%) of all other Common Area Costs, (xxiii) any administration fee attributable to the Shopping Center owed to an assessing party under the Commercial Covenants or the La Cantera Master Covenants and Easements recorded in Volume 6696, Page 890 of the Official Public Records of Bexar County, Texas, as amended, unless any such fees are assessed directly to and paid by an Owner, and (xxiv) Permitted Capital Expenditures (defined below); provided, however, that such Assessments shall not be used to pay for, or to reimburse Declarant for the cost of, capital improvements contemplated and provided for in Declarant's initial development of the Shopping Center ("**Capital Improvements**").

Notwithstanding anything to the contrary set forth anywhere is this Declaration, such Assessments shall not be used to pay for or to reimburse Declarant for the following:

      (1)     property insurance premiums;

      (2)     costs of personnel, except those wholly or partially employed in the maintenance of the Common Areas as set forth above;

(3)     amounts paid to any management and/or administrative personnel of Declarant or any third-party property management fees;

(4)     expenses for accounting, legal or other professional services, except to the extent expressly included in the definition of Common Area Costs;

(5)     costs related to making the Common Areas comply with laws, rules and orders of federal, state and municipal authorities in effect prior to the Effective Date (except that the Assessments shall expressly include any costs incurred by Declarant to bring the Common Areas into compliance with changes in laws and governmental rules and regulations that are amended, promulgated or enacted after the Effective Date and laws in existence as of the Effective Date, but which are thereafter interpreted differently than the same were interpreted by the promulgating authority or courts of competent jurisdiction as of the Effective Date, applicable to the use of the Common Areas or any portion thereof including capital costs, provided that such costs are amortized (based on the useful life of the item in question determined in accordance with Generally Accepted Accounting Principles, consistently applied) ("**Common Area Legal Compliance Expenses**");

(6)     expenses in the nature of interest, fines or penalties incurred due to Declarant's failure to pay required sums prior to delinquency, except to the extent occasioned by an Owner's failure to timely make any required payment hereunder, who shall be obligated to make the payments described in this subsection;

(7)     depreciation on any personal or real property;

(8)     any capital expenditures except for Permitted Capital Expenditures (defined below) and Common Area Legal Compliance Expenses;

(9)     financing costs associated with any personal or real property including, without limitation, interest, principal amortization, ground lease payments, points, late payment fees, commissions and legal fees, except financing costs applicable to Permitted Capital Expenditures and Common Area Legal Compliance Expenses;

(10)     contributions to religious, charitable and/or political organizations;

(11)     real property taxes; or

(12)     fees, dues or expenses for advertising, promoting or marketing the Shopping Center.

As used herein, "**Permitted Capital Expenditures**" shall mean any expenditure which is capital in nature which is (i) undertaken to reduce Common Area Costs and which reduces such Common Area Costs, but only to the extent of such annual savings, or (ii) repaving of the parking areas of the Shopping Center not incurred (a) prior to the expiration of the fifth (5th) full calendar year following the Effective Date, or (b) more than once during each five (5) full calendar years following the Effective Date.

PDX\123060\238709\MAM\26811497.2
24722688v.1

c. The base monthly assessments shall be based on and calculated according to the following:

(1) The amount of base monthly assessment for a calendar year, which shall be determined by Declarant, in its reasonable discretion, shall be based upon a budget of Common Area Costs for the Shopping Center prepared by Declarant for said calendar year and delivered to each Owner of a Tract at least thirty (30) days prior to the commencement of such calendar year or as soon thereafter as practicable. If Declarant fails to provide such budget to the Owners prior to the commencement of a calendar year, the Owners shall continue to pay based upon the monthly assessment for the prior calendar year, until such time that the Declarant establishes the base monthly assessment for the applicable calendar year. If the base monthly assessment established by the Declarant is more than the amount paid by an Owner as provided in the immediately preceding grammatical sentence, then the Owner immediately shall pay to the Declarant such Owner's share of any such deficiency. If the base monthly assessment established by the Declarant is less than the amount paid by an Owner as aforesaid, then the Owner shall be refunded its excess overpayment, without interest. The fixed base monthly assessment for each Tract shall be equal to $1/12^{th}$ of the product of (a) the total estimated Common Area Costs for the applicable calendar year as set forth in such proposed budget, multiplied by (b) an Owner's Proportionate Share (as hereafter defined). "**Proportionate Share**" shall mean (i) a fraction, the numerator of which shall be the total Floor Area of the improvements constructed upon an Owner's Tract, and the denominator of which shall be the total Floor Area of the improvements constructed upon the Shopping Center, and (ii) also shall refer to the share of Common Area Costs allocable to the applicable Owner's Tract, utilizing the same formula for that calculation. As used herein, the term "**Floor Area**" shall mean the total number of square feet of floor area located within the perimeter walls of the building(s) in the Shopping Center, as the same are constructed from time to time, which number of square feet shall be based upon the measurements extending from the midpoint of the demising walls of such building(s) and the exterior surface of the perimeter walls of such building(s). The demising walls are those that separate the building(s) from space leasable to or owned by other occupants of the Shopping Center and the perimeter walls are those walls that separate building(s) from the Common Area. If at any time during a calendar year it shall appear that Declarant has underestimated an Owner's Proportionate Share of the base monthly assessment for such calendar year, Declarant may re-estimate such base monthly assessment and may bill the Owner of the applicable Tract for any deficiency which may have accrued during such calendar year and thereafter the base monthly assessment payable by that Owner shall also be adjusted, and such Owner shall be allowed at least thirty (30) days to make the necessary adjustment. Notwithstanding the foregoing provisions, if there are costs incurred in the reasonable judgment of Declarant that are otherwise includable in the definition of Common Areas Costs but that are solely attributable to the use of a Tract, such as additional security costs or additional trash pickup or pressure washing, then the Owner of that Tract shall instead be liable for one hundred percent (100%) of such actual out-of-pocket costs plus an administrative fee equal to ten percent (10%) of such costs which sum may be included in the base monthly Assessment or shall otherwise be payable by the Owner of the applicable Tract within thirty (30) days following receipt of a written invoice therefor. In addition, the applicable Owner of a Tract shall be solely responsible for asphalt or concrete repairs due to damage caused by delivery vehicles servicing the building(s)

PDX\123060\238709\MAM\26811497.2
24722688v.1

on such Owner's Tract, and shall be payable by such Owner within thirty (30) days following receipt of a written invoice therefor.

(2) Within one hundred twenty (120) days after the end of each calendar year or as soon as when actual Common Area Costs for the Shopping Center for a given calendar year are known, Declarant shall give prompt written notice of the actual Common Area Costs, whereupon Declarant shall have the right to levy an additional base assessment to cover any deficiency between the actual amounts paid by the Owners and each Owner's Proportionate Share of actual Common Areas Costs for such year. Any such additional base assessment shall be due and payable within fifteen (15) days following written notice to the Owners of such assessment from Declarant. If an Owner's payments for any calendar year of its Proportionate Share based upon Declarant's estimate of Common Area Costs exceeds such Owner's Proportionate Share of the actual Common Area Costs for such calendar year, then within thirty (30) days following determination of the actual Common Area Costs for such year, Declarant shall either refund such overpayment to the Owner or credit such overpayment to the Owner against the next ensuing Assessment(s) due. Failure to provide the notice called for hereunder shall not relieve any Owner from its obligations hereunder, provided, however, that no Owner shall be required to pay any increase in the base monthly assessments for so long as any such statement is past due.

(3) Within one hundred eighty (180) days following the receipt by each Owner of the annual statement of Common Area Costs, each Owner shall have the right to audit Declarant's books and records with respect thereto. Before conducting any audit, the applicable Owner must pay the full amount of Common Area Costs billed. Owners may review only those records of Declarant that are specifically related to Common Area Costs. Without limiting the foregoing, the Owners may not review any leases or Declarant's tax returns or financial statements. In conducting an audit, the Owner's auditor shall not be paid on a contingency or percentage of recovery basis. The audit shall be conducted during business hours in a location in the San Antonio, Texas area reasonably determined by Declarant. Such Owner will keep confidential the results of any audits conducted hereunder, except as required by law or in litigation. Notwithstanding the foregoing, an Owner shall be permitted to furnish the foregoing information to its attorneys, accountants and auditors to the extent necessary to perform their respective services for the Owner. No Owner may conduct an audit more often than once each calendar year. An Owner may audit records with respect to each calendar year only one time. No audit shall cover a period of time in excess of the calendar year immediately preceding the audit. In the event the audit discloses an overstatement of Common Area Costs of four percent (4%) or more, Declarant shall within thirty (30) days reimburse the applicable Owner for the reasonable and documented out-of-pocket cost of the audit (not to exceed Three Thousand Dollars ($3,000.00)) as well as the amount of any related overpayment by the Owner.

d. Upon written request of any Owner, mortgagee under any Mortgage or prospective owner of a Tract, the Declarant shall issue an acknowledged certificate in recordable form setting forth the amounts of any unpaid Assessments or other amounts due hereunder, if any, with respect to the Theater Tract, and setting forth generally whether or not, to the Declarant's actual knowledge (and without prejudice to the Declarant's rights and remedies under this Declaration with respect to matters of which it has no actual knowledge), such Owner is in violation of any of the terms, provisions and/or conditions of this Declaration. Said written

statement shall be conclusive upon the Declarant as to requirements and obligations set forth in this Declaration in favor of the Persons who rely thereon in good faith. Such statements shall be furnished by the Declarant within a reasonable period of time, but not to exceed ten (10) business days from the receipt of a written request for such written statement, mailed to the notice address of Declarant (if the Declarant has not yet been formed) or the Declarant. In the event the Declarant fails to furnish such statement within said ten (10) business days, it shall be conclusively presumed that there are no unpaid Assessments or other amounts due hereunder relating to the Tract as to which the request was made.

e.    Each payment of base monthly assessment shall be due and payable, without offset or deduction of any kind on the first day of each calendar month during the term of this Declaration. If any Assessment or other amount under this Declaration is not paid on or before the tenth (10th) day after the due date with respect thereto, then such Assessment and/or other amount shall become delinquent, and shall, until paid in full, together with such interest thereon at the Default Interest Rate from the due date (without taking into consideration the aforementioned ten (10) day cure period) and the third party costs of collection thereof, be a charge and continuing lien on the applicable Tract, and all improvements thereon, against which each such Assessment or other amount is made. In addition to the lien rights afforded to the Declarant hereunder, the personal obligation of the then Owner to pay such Assessment for its Tract and other amounts shall remain its personal or corporate obligation and shall further pass as a personal or corporate obligation to its successors in title whether or not expressly assumed by such successors.

f.    If an Assessment or other amount due under this Declaration is not paid within ninety (90) days after the due date with respect thereto (without taking into consideration the ten (10) day cure period set forth in subsection (e) above), the Declarant may: (1) bring an action at law against the Owner personally obligated to pay the Assessments, and/or (2) in an appropriate judicial proceeding, foreclose the lien created in favor of the Declarant by the provisions of this Section 2, and in connection therewith, the Declarant may avail itself of any and all rights and remedies available to a foreclosing mortgagee under Texas common law or statutory means of foreclosure, and (3) collect in said action or through said proceeding the delinquent Assessments, together with the Default Interest Rate thereon, the late charge permitted to be charged in the following paragraph and the third party costs of collection, the third party costs of preparation and filing of any lien, and reasonable attorneys' fees of any such action or proceeding. The lien provided for under this Section 2 shall secure the payment of the Assessments, the Default Interest Rate thereon, the aforesaid late charge and the aforesaid costs and reasonable attorneys' fees. No Owner may waive or otherwise avoid liability for Assessments due as provided for herein by non-use of the Common Areas and facilities or abandonment or transfer of a Tract. Except as otherwise provided in Section 2(h) hereof, the lien created by this Section 2(f) shall be superior to and take precedence over any mortgage or other encumbrance constituting a lien on each Tract or any portion thereof. Each Owner and its successors, by acceptance of a deed or other conveyance to a Tract, (i) vests in the Declarant, or its agents, the right and power to bring action against such Owner personally for the collection of such charges as a debt and to foreclose the aforesaid lien in any appropriate proceeding at law or in equity, and (ii) hereby waives any and all rights of redemption or reinstatement from foreclosure and from sale under any order or decree of foreclosure of any lien created pursuant to this Declaration, for itself and on behalf of: (1) any trust estate of which the Tract is a part and of all beneficially interested Persons; (2) each and every

PDX\123060\238709\MAM\26811497.2
24722688v.1

Person acquiring any interest in the Tract or title to the Tract subsequent to the date of this Declaration; and (3) all other Persons to the extent permitted by the provisions of the laws of the State of Texas. The remedies herein provided shall not be exclusive and the Declarant may enforce any other remedies to collect delinquent assessments as may be provided in this Declaration, by law and/or in equity.

g.      In addition to the other remedies and rights afforded to Declarant in the event an Assessment or other amount due under this Declaration becomes delinquent, the Declarant, in its sole discretion, may take any or all of the following actions: (a) if not paid in full on or before the tenth (10th) day after such Assessment or other amount is due, assess a late charge of not more than five percent (5%) of the delinquent amount; (b) assess the interest charge as provided in subsection (e) above; (c) bring an action at law against any Owner personally obligated to pay the delinquent installments; and (d) subject to the terms of the immediately preceding grammatical paragraph, file a statement of lien with respect to the delinquent Owner's Tract, and foreclose on the delinquent Owner's Tract.

h.      The liens and permanent charges of all Assessments (annual, special, or otherwise) provided for herein shall be subordinate to the lien of any deed of trust or mortgage (collectively, "**Mortgage**") placed on a Tract if, and only if, all Assessments and charges with respect to such parcel authorized herein and having a due date on or prior to the date such Mortgage is filed for record have been paid in full. The liens and permanent charges hereby subordinated are only such liens and charges as relate to Assessments and charges authorized hereunder having a due date subsequent to the date such Mortgage is filed for record and prior to the satisfaction, cancellation or foreclosure of such Mortgage or the sale or transfer of a Tract pursuant to a sale under power contained in such Mortgage. Such subordination shall not relieve the Owner of the mortgaged parcel of its personal obligation to pay any and all Assessments and charges coming due at a time when it is the Owner of such parcel; and shall not relieve such parcel from the liens and permanent charges provided for herein (except to the extent a subordinated lien and permanent charge are extinguished as a result of subordination as against a mortgagee or such mortgagee's assignee or transferee by foreclosure or by sale or transfer in any proceeding in lieu of foreclosure or by sale under power; provided that such lien and permanent charge shall only be extinguished for the period of time prior to such sale or transfer and such lien securing the Assessments shall continue thereafter). No sale or transfer of a Tract to the mortgagee, or to any other Person, pursuant to a decree of foreclosure, or pursuant to any other proceeding in lieu of foreclosure, or pursuant to a sale under power shall relieve any existing or previous Owner of such Tract of any personal obligation (except to the extent a subordinated lien and permanent charge are extinguished as a result of subordination as against a mortgagee or such mortgagee's assignee or transferee by foreclosure or by sale or transfer in any proceeding in lieu of foreclosure or by sale under power), or relieve such Tract, or the then Owner of such Tract, from liability for any Assessments or charges authorized hereunder coming due after such sale or transfer. Notwithstanding the foregoing, the Declarant may at any time, either before or after any Mortgage or Mortgages are placed on a Tract, waive, relinquish, or quitclaim, in whole or in part, the right of the Declarant to Assessments and other charges collectible by the Declarant hereunder with respect to such Tract coming due during the period while such Tract is or may be held by the prior mortgagee or mortgagees which have become an Owner as the result of a sale or transfer pursuant to a decree of foreclosure, sale under power, or any other proceeding in lieu of foreclosure.

8

i. All portions of the Shopping Center dedicated to and accepted by the City of San Antonio, or any other public authority, body or agency, shall be exempt from Assessments, charges and liens created under this Declaration. Notwithstanding the foregoing, Declarant shall have the right to enter into a license agreement with the City of San Antonio or such other applicable public authority pertaining to the general maintenance and landscaping of a portion of the public right-of-way located adjacent to the Shopping Center as depicted on **Exhibit "E"** attached hereto and incorporated herein. The costs and expenses incurred by Declarant in connection with such general maintenance and landscaping of such portion of the public right-of-way shall be included as part of the Common Area Costs.

j. In addition to the personal or corporate obligation of each Owner of a Tract to pay all Assessments thereon and the Declarant's perpetual lien on the Tracts for such Assessments, all successors to the fee simple title of a Tract, except to the extent otherwise expressly provided in this Section 2, shall be jointly and severally liable with the prior Owner or Owners thereof for any and all unpaid Assessments, interest, late charges, costs, expenses, and attorneys' fees against such Tract, without prejudice to any such successor's right to recover from any prior Owner any amounts paid thereon by such successor. In addition, such successor shall be entitled to rely on the statement of liens and amounts due shown on any certificate issued by or on behalf of the Declarant as provided in this Declaration. Notwithstanding the foregoing, in no event shall a Person that owned a Tract be obligated for any amounts due and payable under this Declaration which first arise and accrue from and after the date that such Person shall have conveyed and transferred all of its interest in and to, and is no longer the Owner of, such Tract.

3. **Overflow Parking Tract**. Except as may be required by Governmental Regulations (as hereinafter defined), Declarant agrees that it shall not modify the access drives or parking areas situated within that certain approximately 4.061 acre parcel of land out of the La Cantera Tract, as depicted on the Site Plan as the "**Overflow Parking Tract**" and herein so called, in any manner that would materially and negatively affect the access to the Overflow Parking Tract or the Theater Tract as shown on the Site Plan by the Owner of the Theater Tract or its agents and invitees or reduce the number of surface parking spaces within the La Cantera Tract by more than five (5) parking spaces.

4. **Maintenance**. The Owner of a Tract shall maintain, at its sole cost and expense, all buildings and related improvements not defined as Common Areas that are located on its Tract. The maintenance obligation by the Owner of a Tract shall include the area within the curb adjacent to the building, including the sidewalks, landscaping and service areas adjacent to the building. The Owner of a Tract shall, at its sole cost and expense, arrange for the regular removal of refuse and garbage from its Tract, and shall cause all trash and garbage to be stored only in receptacles in the locations depicted on the Site Plan. An Owner of a Tract shall not operate an incinerator, or burn trash or garbage on its Tract. Notwithstanding anything to the contrary contained in this Declaration, the Owner of a Tract shall, at its sole cost and expense, maintain, repair and replace, at its sole cost and expense, any exterior shipping/receiving dock area, any truck ramp or truck parking area and any refuse, compactor or dumpster area, in good order, condition and repair. In addition, the Owner of a Tract shall be responsible, at its sole cost and expense, for any repair, replacement or renovation costs to the Common Areas located on its Tract (including the parking

lot) that are deemed to be capital in nature and that are not permitted by the terms of this Declaration to be passed through to the Owners of the Shopping Center as a Common Area Cost. The Owner of a Tract shall, at its sole cost and expense, keep the building and trash and loading areas adjacent to the building located on its Tract free from insects and pests at all times. In the event that a grease trap is utilized by the building on a Tract, the Owner of such Tract shall, at its sole cost and expense, maintain a grease trap maintenance agreement at all times which provides for regular pumping or treatments. Declarant may require the Owner of such Tract to increase the frequency of pumping or treatments in the event there is excess grease spill-over or a wastewater surcharge increase billed to Declarant due to the chemical makeup of the wastewater.

The Owner of the Theater Tract shall use reasonable efforts to construct and cause to be opened to the public a fully-equipped, stocked and staffed first-class motion picture theater (the "**Theater Building**") operated at opening under the tradename "Alamo Drafthouse" and comparable to other Alamo Drafthouse Theater properties ("**AD Theater**") within one-year of the Effective Date within a building constructed in accordance with plans approved in writing as of the date hereof by Declarant. Seating within the Theater Building shall not exceed nine hundred one (901) seats without Declarant's prior written consent.

5.     **Signage**. The Owner of the Theater Tract shall have right to install signage on the Theater Building consistent with the Alamo Drafthouse prototypical signage package, subject to the City of San Antonio's approval, any approvals required under the Commercial Covenants, Governmental Regulations and the Declarant's written approval of such prototypical signage package provided to Theater Owner as of the date hereof. In the event of a change in use of the building located on the Theater Tract, all new signage shall be subject to the prior written approval of Declarant, which shall not be unreasonably withheld. In addition, the Owner of the Theater tract shall have the right to install signs designated on the two (2) monument signs on the Site Plan as the "**Highway 1604 Sign**" and the "**La Cantera Parkway Sign**" (collectively, the "**Monument Signs**"). Upon completion of the Highway 1604 Sign, Owner of the Theater Tract shall pay to Declarant the sum of Thirty Thousand and No/100 Dollars ($30,000.00) for reimbursement to Declarant for the construction of the Highway 1604 Sign. The Theater Tract Owner's use of the Monument Signs will conform in all respects with applicable Governmental Regulations and the Commercial Covenants and in no event shall the Theater Owner be entitled to change its signage upon the Monument Signs without Declarant's prior written consent, such consent not to be unreasonably withheld, and provided further that any such changes shall be in conformance with applicable Governmental Regulations and the Community Covenants.

Declarant shall be responsible for maintaining the Monument Signs; provided, however, that the Owner of the Theater Tract shall reimburse Declarant for one hundred percent (100%) of the cost to install and maintain in a first-class manner the Theater Tract Owner's signage on the Monument Signs (or the Owner of the Theater Tract shall pay such amounts directly to the applicable vendor). The Owner of the Theater Tract shall be solely responsible for the installation, use, maintenance, repair or replacement of its signage on the Monument Signs.

6.     **Real Estate Taxes.** Each Owner shall pay all real estate taxes and assessments levied upon its Tract directly to the applicable taxing authority before delinquency; provided that each Owner shall have the right to withhold such payment so long as it contests in good faith, with

diligence, through appropriate proceedings, any such real estate taxes and assessments. Within ten (10) days after receipt of Declarant's written request therefor, an Owner shall furnish Declarant with copies of paid receipts evidencing such Owner's payment of all taxes attributable to its Tract. The Owner of the Theater Tract shall be responsible for fifty percent (50%) of all real property taxes and assessments levied against the Overflow Parking Tract attributable only to the land value plus the asphalt and concrete improvement values of the Overflow Parking Tract (and to no values for buildings or other vertical improvements) as established by the applicable taxing authority (the "**Parking Tax Assessment**"). Except for the Parking Tax Assessment, the Owner of the Overflow Parking Tract shall be responsible for all other real property taxes and assessments attributable to the Overflow Parking Tract and shall pay such taxes directly to the applicable taxing authority on or before the due date thereof. The Owner of the Theater Tract shall pay to Declarant (or the successive Owner of the Overflow Parking Tract, as applicable) as part of its Common Area costs the Parking Tax Assessment. Any such payment due by the Owner of the Theater Tract with respect to the Parking Tax Assessment shall be made on or before thirty (30) days after the Owner of the Theater Tract has been furnished with a copy of the paid tax bill for the Overflow Parking Tract and a copy of the Parking Tax Assessment computations establishing the amounts payable by the Owner of the Theater Tract. If an Owner fails to comply with this Section, any other Owner may pay the delinquent Owner's real estate taxes and assessments and shall be entitled to immediate reimbursement from the delinquent Owner upon written notice.

7.    **Use of Theater Tract and La Cantera Tract**.

a.    The Theater Tract shall be initially opened and operated as an AD Theater (the "**Permitted Use**"); provided that any so-called adult or X-rated movie business which, as a general policy, exhibits such films shall not be permitted to be operated on the Theater Tract (but the Owner or operator of the AD Theater shall be permitted to show such motion pictures or telecasts occasionally if, in such person's reasonable business judgment, such motion picture or telecast has artistic merit or is a so-called "legitimate" film). For purposes hereof, the Theater Building will be deemed operated as an AD Theater provided that a minimum of eight (8) of its eleven (11) screens are in operation. During the first four (4) years of operation commencing upon the date that the Theater Building opens to the public pursuant to Section 4 above (the "**Required Operations Period**"), the Theater Tract may only be used for the Permitted Use. Following the expiration of the Required Operations Period, the Theater Tract, subject to the restrictions on use set forth below, may be used for any other lawful first-class retail purpose commonly found in comparable shopping centers in San Antonio, Texas. Notwithstanding the foregoing, the Theater Tract may under no circumstances be used for any use which (i) is the same or essentially similar to the use of any existing tenant or occupant of the Shopping Center who occupies in excess of ten thousand (10,000) square feet of Floor Area, (ii) violates any of matters of record in Bexar County which affect the Theater Tract as of the date hereof as reflected in the Special Warranty Deed from Declarant to Theater Owner of even date herewith, (iii) violates any laws, regulations, ordinances, or requirements of any governmental authority having jurisdiction over the Theater Tract (the "**Governmental Regulations**"), (iv) constitutes a prohibited use set forth in the Commercial Covenants (the "**Prohibited Uses**"), (v) violates any exclusive use provision granted by Landlord to another tenant, owner or occupant of any portion of the Shopping Center as of the date hereof, as set forth on **Exhibit "D"** attached hereto (the "**Exclusive Use Restrictions**").

b.     Declarant shall be the sole determinant of the type and amount of security services to be provided to the Common Areas of the Shopping Center, if any, but the Theater Owner may separately provide for security of the Theater Tract at its option and at its sole cost and expense.   Notwithstanding the foregoing, in no event shall Declarant be obligated to provide security services to the Shopping Center, and Declarant's determination not to provide security services to the Shopping Center shall in no event be deemed a failure by Declarant to comply with its operations and maintenance obligations pertaining to the Shopping Center. If Declarant provides security services to the Shopping Center, then Declarant shall not be liable to any Owner of the Shopping Center, and each Owner of the Shopping Center hereby waives any claim against Declarant for any unauthorized or criminal entry of third parties over, upon and across the Shopping Center and into any buildings located upon the Shopping Center, including any damage or loss resulting therefrom, regardless of any action, inaction, failure, breakdown or insufficiency of security.

c.     The Owners shall not permit any objectionable or unpleasant odors to emanate from the building on a Tract, nor place or permit any radio, television, loudspeaker or amplifier on the roof or outside the building except in the patio area, which shall be permitted to play music of reasonable decibels so as not to cause any unreasonable interruption to other occupants of the Shopping Center, or where the same can be heard from outside any building on a Tract, provided that the Owner of the Theater Tract may have outdoor speakers playing music and for announcements on its Tract so long as such music is played at a level which does not unreasonably or materially interfere with any other tenants' or Owners' use or occupancy of the Shopping Center, as determined by Declarant, nor place an antenna or awnings (except as shown on the plans approved by Declarant) banner or other projection on the exterior of the buildings on the building (except one satellite dish may be installed on the roof so long as the same is screened from view of the Common Areas on the La Cantera Tract).  No Owner shall solicit business or distribute leaflets or other advertising material on the Shopping Center, nor take any action which would reasonably constitute a nuisance, or disturb or endanger other tenants, owners or occupants of any portion of Shopping Center, or unreasonably interfere with their use of their respective premises, nor do anything which would tend to injure the reputation of the Shopping Center.  Each Owner shall use reasonable efforts to cause their respective tenant's employees to park their vehicles only in the parking areas within the Tract owned by it.   Declarant shall use reasonable efforts to insure that the employees of other lessees/occupants that may be located on the Shopping Center do not park vehicles within the Theater Tract.

d.     No Owner shall use, or permit the use of Hazardous Materials on, about, under or in its Tract, except in the ordinary course of its usual business operations conducted thereon, and any such use shall at all times be in compliance with all Environmental Laws.  For the purpose of this section, the term (i) **"Hazardous Materials"** shall mean:  petroleum products, asbestos, polychlorinated biphenyls, radioactive materials and all other dangerous, toxic or hazardous pollutants, contaminants, chemicals, materials or substances listed or identified in, or regulated by, any Environmental Law, and (ii) **"Environmental Laws"** shall mean:  all federal, state or local laws and regulations relating to pollution control, hazardous or toxic wastes, substances and constituents, including hydrocarbonic substances, and other environmental and ecological matters, including but not limited to the Federal Water Pollution Control Act (33 U.S.C. § 1251 et seq.), Resource Conservation and Recovery Act (42 U.S.C. § 6901 et seq.), Safe

PDX\123060\238709\MAM\26811497.2
24722688v.1

Drinking Water Act (42 U.S.C. § 300f et seq.), Toxic Substances Control Act (15 U.S.C. § 2601 et seq.), the Clean Air Act (42 U.S.C. § 7401 et seq.), Comprehensive Environmental Response of Compensation and Liability Act (42 U.S.C. § 9601 et seq.), and other comparable state laws. The Owners shall maintain their respective property and conduct their business thereon in compliance with Environmental Laws. Each Owner agrees to indemnify and hold the other Owners and their guest and invitees harmless from and against all causes, claims, demands, losses, liabilities, costs and expenses (including without limitation attorneys' fees) incurred, directly or indirectly, by such other Owners or their guests and invitees as a result of or in connection with the indemnifying Owner's failure to comply with any of the provisions of this Section 7(d).

e. Declarant agrees that it and any entity owned or controlled, in whole or in part, by Declarant or a principal investor in Declarant, shall not lease or sell any space in the Shopping Center (other than the Theater Tract), to any other entity for the operation of a motion picture theater (the "**Theater Exclusive**"); provided, however, that motion pictures may be shown on the other Tract solely if such use is ancillary to another operation and no admission is charged to view such motion pictures. The provisions of this paragraph 7(e) shall be binding on the Shopping Center for so long as the Theater Building is operating as a first run dine-in theater in the Shopping Center, but will terminate upon the permanent cessation of operations in the Shopping Center.

f. The Owner(s) of the La Cantera Tract shall have the right to add, remove, enlarge or eliminate buildings upon the La Cantera Tract as shown on the Site Plan in its sole discretion, provided that (i) the aggregate square footages of all buildings located upon the La Cantera Tract do not exceed 45,000 square feet, and (ii) parking which is situated on the La Cantera Tract is not reduced by more than five (5) parking spaces.

g. Provided that a fully-equipped, stocked and staffed first-class motion picture theater is operating in the Theater Building upon the Theater Tract, in no event shall "Building 1" of the Overflow Parking Parcel or any space in Building 1 ("Building 1" being depicted on the Site Plan) be used for a "full-service, sit down restaurant." As used herein, a "full-service, sit down restaurant" shall mean a restaurant where guests are seated by a host, waitstaff takes orders and brings food and drinks to the table, meals are paid for after they are eaten, and guests are served throughout the duration of the meal.

8. **Easements**.

a. Declarant hereby establishes, grants and retains a nonexclusive easement for ingress and egress by vehicular and pedestrian traffic over and across the Common Area located within the Shopping Center and for vehicular parking over, upon and across the parking areas situated in the Shopping Center, except for those areas devoted to service facilities serving a Parcel such as by way of example and not limitation, loading docks, trash compactors and enclosures, bottle storage areas, exterior coolers, electrical and refrigeration facilities and other similar service facilities. Such easement is for the benefit of all Owners, Occupants and their respective Permittees. Each Owner shall maintain a sufficient number of parking spaces on its Tract which when combined with its other parking rights under this Declaration satisfies parking ratios established as of the date hereof by applicable government authorities. Each Owner and its

13

Occupant shall require its employees to park only on such Owner's own Tract. Notwithstanding anything to the contrary set forth herein, in no event shall the "Critical Access Drives" of the Shopping Center (as depicted on the Site Plan attached hereto) be materially modified or eliminated without the prior written consent of Declarant and each Owner (which consent may be withheld by each such party in its sole and absolute discretion).

As used herein, (i) the term "**Occupant**" shall mean any Person, from time to time, entitled to the use and occupancy of any portion of a Tract under any lease, sublease, license, concession or other similar agreement; and (ii) the term "**Permittees**" shall mean, collectively, all Owners, Occupants and the officers, directors, employees, agents, contractors, customers, vendors, suppliers, visitors, invitees and licensees of such Owners and Occupants; "**Permittee**" means any of the Permittees.

b.　　Declarant hereby establishes, grants and retains a nonexclusive easement for the benefit of each Tract and the Owner(s), Occupants and Permittee(s) thereof over, on, across and under the Common Area for purposes of the installation, use, maintenance, replacement and repair of public utility services and distribution systems, including, without limitation, storm drains, sewers, utilities and other proper services necessary for the orderly development and operation of the Shopping Center, now upon or hereafter installed on, across or under the Common Areas, to the extent necessary to service such Tract. No such lines, sewers, utilities or services shall be installed within the areas of a Tract upon which a building or other structure has been constructed from time to time (the "**Building Area**") unless the same serve the building in the particular Building Area. The location of any utilities hereafter installed within any Tract shall be determined by the Owner of the Tract upon which such utilities are to be installed, in such Owner's reasonable discretion. Any utility services installed within a Tract may be relocated by the Owner of that Tract to another location within such Tract, subject to compliance with applicable laws, at the expense of such relocating Owner, provided that (a) such relocation shall not interfere with, increase the cost of, or in any way diminish utility services to any other Tract within the Shopping Center, and (b) the relocating Owner shall provide at least thirty (30) days prior written notice of such relocation to the Owners of all other Tracts.

c.　　Declarant will cause to be constructed to completion an underground water quality and detention pond (the "**Detention Pond**") located upon the portion of the La Cantera Tract as more particularly depicted on the Site Plan. The Detention Pond will be constructed for the purposes of providing stormwater detention and filtration for the entire Shopping Center and will be constructed to accommodate the detention capacity for the intended development of the Shopping Center. Following the completion of the Detention Pond, the Detention Pond shall be maintained by Declarant as part of Declarant's obligations to maintain the Common Areas as set forth in this Declaration. The costs incurred by Declarant for the maintenance, repair and/or replacement of the Detention Pond shall be subject to reimbursement from the Owners of the Shopping Center, as part of the Assessments. Declarant hereby creates a blanket non-exclusive drainage easement over, across and upon each portion of the Shopping Center for water flow and drainage to the Detention Pond, and an easement over, across and upon the portion of the La Cantera Tract upon which the Detention Pond is located to accept the discharge and for the detention of surface water from any portion of the Shopping Center.

PDX\123060\238709\MAM\26811497.2
24722688v.1

The Detention Pond may not be dedicated to the public without the written approval or consent of the Owners of the Property, such approval not to be unreasonably withheld, conditioned or delayed.

d.　　Any Owner using any of the easements established in this <u>Section 8</u> shall indemnify and save harmless Declarant (so long as Declarant owns property within the Shopping Center) and all of the other Owners and all parties claiming under any of the indemnified Owners from any and all claims, liabilities, liens, damages, losses, judgments, settlements, causes of action, costs and expenses (including, without limitation, court costs and reasonable attorneys' fees) of any kind whatsoever, arising out of the use of any of the easements established in this <u>Section 8</u> by the indemnifying Owner and/or any of its Permittees.　Additionally, all work performed and the construction, maintenance, repair, replacement, alteration or expansion of any utility improvements by any Owner, Occupant or Permittee on any other Tract shall be performed in a good and workmanlike manner and in compliance with all laws, rules, regulations, orders and ordinances of all applicable governmental authorities and shall be effected as expeditiously as possible and in such a manner as not to unreasonably interfere, obstruct or delay (i) access to and from the Tract in which such work is being performed, or any part thereof, to or from any right-of-way or the Shared Internal Drive, or (ii) with customer vehicular parking in the Tract in which such work is being performed. Staging for the construction, replacement, alteration or expansion of any utility improvements located on another Tract, including the storage of materials, and the parking of construction vehicles and equipment shall be limited to the Tract owned by the Owner performing such work.　Additionally, any Owner that proposes performing any such work on the Tract of another Owner must provide at least twenty (20) days prior written notice to such other Owner, including proposed plans and specifications for such work, and all such work shall be approved by such Owner, such approval not to be unreasonably withheld.

e.　　Nothing herein shall create a gift or dedication of any portion of the Shopping Center to the general public. Notwithstanding any other provision hereof to the contrary, each Owner periodically may temporarily restrict ingress and egress on its Tract as is (a) necessary in order to prevent a prescriptive easement from arising by continued public use of same, (b) required by any applicable governmental law, ordinance, rule or regulation,(c) necessary in connection with the performance of maintenance and repairs, whether pursuant to this Declaration or otherwise, or (d) due to an emergency that poses imminent danger to person and/or property. Any restriction on ingress or egress permitted hereby shall be limited to the minimum time period necessary to effectuate the purposes of the restriction and, shall occur at such times as to have minimum effect on the construction and/or operation of the Shopping Center.

### 9.　　**Casualty; Eminent Domain.**

a.　　In the event of the exercise of eminent domain or transfer in lieu thereof of a Tract or any portion thereof (the "<u>**Condemned Parcel**</u>"), the award attributable to the Condemned Parcel shall be payable only to the Owner of the Condemned Parcel; provided, however, that if the exercise of eminent domain or transfer in lieu thereof affects any portion of the easement areas created in this Declaration ("<u>**Easement Areas**</u>"), then each affected Owner shall have the right to assert a claim against the applicable condemning authority for award attributable to such affected Owner's deprivation of use of the Easement Areas arising out of such

15

condemnation. No other Owner shall have an interest in any award or payment made in connection with the exercise of eminent domain or transfer in lieu thereof of the Condemned Parcel except as provided herein with respect to taking of an Easement Area, provided, however, that the other Owner(s) may file claims with the condemning authority for their losses and may receive payment for the loss of use of an Easement Area.

b.    In the event of any casualty affecting any Easement Area, the Owner of the affected Tract shall have the right to any insurance proceeds with respect thereto. No other Owner shall have an interest in such insurance proceeds, but the applicable Owner shall use such insurance proceeds to rebuild affected Common Areas.

c.    If any Easement Area or Common Area, or any portions thereof, are so condemned or transferred or damaged by a casualty event, the Owner of the Condemned Parcel shall promptly repair and restore the remaining portion of the affected Easement Area and Common Area as nearly as practicable to the condition which existed immediately prior to such condemnation or transfer or casualty.

10.    **Repurchase Events**. Theater Owner hereby agrees that each of following events shall constitute a "**Repurchase Event**":

a.    Theater Owner fails to provide Declarant with the "Notice to Proceed" on or before July 1, 2020 in accordance with the terms, provisions and conditions of that certain Development Agreement (the "**Development Agreement**") executed by and between Declarant and Theater Owner as of the Effective Date of this Declaration.

b.    Theater Owner fails to commence construction (which, for the purposes hereof, shall mean the pouring of footing and foundations related to Theater Owner's building on the Theater Tract) of the Theater Building within one hundred eighty (180) days after Declarant's delivery of a rough graded building pad, subject to extension for Force Majeure (but in no event later than twelve (12) months following the Effective Date after giving effect to Force Majeure).

c.    If Theater Owner (i) fails to cause the building on the Theater Tract to open to the public for business as an AD Theater prior to the date which is fifteen (15) months after the Effective Date; provided, however, that if Theater Owner fails to cause an AD Theater to open for business within fifteen (15) months after the Effective Date, but construction of such is underway and Theater Owner is diligently proceeding with construction, then the 15-month period may be extended for an additional three (3) months (the "**Opening Extension**") (but in no case to exceed eighteen (18) months) upon Theater Owner's written notice to Declarant prior to the end of the 15-month period; provided further that Theater Owner's construction obligations are subject to extension for Force Majeure (but in no event later than twenty-four (24) months following the Effective Date after giving effect to Force Majeure).

d.    Theater Owner (i) following such initial opening for business fails to continuously operate or cause to be operated the AD Theater (except that the trade name of the AD Theater may be changed to a trade name of another dine-in theater franchise comparable to other Alamo Drafthouse Cinemas existing as of the Effective Date, if such theater franchise has acquired

16

the theater operating in the Theater Building and all other Alamo Drafthouse Cinemas in the State of Texas) within the Theater Building for the Required Operation Period; or (ii) after the Required Operation Period, the building on the Theater Tract is closed for a period of twelve (12) months for any reason other than a Permitted Discontinuance, as defined below. For purposes hereof, "**Permitted Discontinuance**" shall mean the discontinuance of the business operations on the Theater Tract by Theater Owner for any of the following reasons:

        (1)    the Theater Building or other improvements on the Theater Tract are destroyed or damaged in whole or in part by fire or other casualty, and Theater Owner is diligently pursuing the repair, replacement, or rebuilding of such improvements, provided that such repair, replacement or restoration of the improvements does not exceed eighteen (18) months following the date of such casualty); or

        (2)    alterations, renovations or repairs to the improvements on the Theater Tract, provided that Theater Owner is diligently pursuing such alterations, renovations or repairs to the improvements to completion (and the period for completion of alterations, renovations or repairs to the improvements do not exceed six (6) months in any one event); or

        (3)    the occurrence of an event of Force Majeure.

As referenced in this Declaration, the term "**Force Majeure**" shall mean any of the following events or circumstances: strikes, lockouts or other labor difficulties, acts of God, the requirements of any local, state or federal law, rule or regulation, fire or other casualty, condemnation, war, riot, insurrection or any other event or circumstance beyond the reasonable control of the party asserting the existence of Force Majeure. A party's inability to pay any amounts due hereunder shall not be an event of Force Majeure.

    11.    **Declarant's Right to Repurchase**. If a Repurchase Event occurs and is continuing, then Declarant shall have the right, but not the obligation, in its sole and absolute discretion, exercisable only by the earlier of (x) one hundred eighty (180) days following the occurrence of the Repurchase Event or (y) the date Theater Owner satisfies the obligation giving rise to the Repurchase Event, to repurchase the Theater Tract and all improvements thereon (collectively, the "**Repurchase Property**") by paying Theater Owner the Repurchase Price. Following the occurrence of any Repurchase Event, the Owner of the Theater Tract shall at Declarant's request promptly provide Declarant with copies of any leases affecting the Theater Tract and evidence of the Unamortized Cost (as hereafter defined). The Repurchase Price shall be: (A) if the Owner of the Theater Tract has not provided the "Notice to Proceed" pursuant to the terms, provisions and conditions of the Development Agreement by July 1, 2020, or if the Owner of the Theater Tract has not commenced construction of the Theater Building on the Theater Tract within one hundred eighty (180) days after Declarant's delivery of the "Seller's Initial Work" in accordance with the terms, provisions and conditions of the Development Agreement, subject to extension for Force Majeure (but in no event later than twelve (12) months following the Effective Date after giving effect to Force Majeure), then the lesser of (i) one hundred percent (100%) of the Purchase Price originally paid by the Owner of the Theater Tract to Declarant to acquire the Theater Tract ("**Original Purchase Price**") and (ii) one hundred percent of the Fair Market Value (as defined below) of the Theater Tract and improvements thereon; (B) if an AD Theater has not opened for

PDX\123060\238709\MAM\26811497.2
24722688v.1

business within fifteen (15) months after the Effective Date, subject to extension by Theater Owner's exercise of the Opening Extension or for a Force Majeure (but in no event later than twenty-four (24) months following the Effective Date after giving effect to Force Majeure), then an amount equal to the lesser of (i) ninety percent (90%) of the Fair Market Value of the Theater Tract and improvements thereon or (ii) ninety percent (90%) of the sum of the development costs expended by Theater Owner on the construction of improvements to the Theater Tract as reflected on Theater Owner's books and records, maintained in accordance with sound accounting practices consistently applied, plus the Original Purchase Price for the Theater Tract, or (C) if Theater Owner ceases to operate the AD Theater within the Theater Building for the Required Operation Period (Permitted Discontinuances excepted), or after the expiration of the Required Operation Period Theater Owner ceases to cause the building on the Theater Tract to be operated as required herein, but in any event such cessation not to exceed eighteen (18) months in total, then an amount equal to the lesser of (i) Fair Market Value of the Theater Tract and improvements thereon or (ii) the Unamortized Cost plus the Original Purchase Price. As used herein, the phrase "**Unamortized Costs**") shall mean all costs expended by the Theater Owner for the construction and remodeling of improvements situated on the Theater Tract as reflected on the books and records of the Owner of the Theater Tract, maintained in accordance with sound accounting practices, consistently applied, and amortized on a straight-line basis over a twenty (20) year period. The fair market value of the Theater Tract (the "**Fair Market Value**") shall be determined as follows. Within fifteen (15) business days following Theater Owner's receipt of a Repurchase Notice, Theater Owner shall deliver written notice (the "**FMV Notice**") to Declarant of its determination of the Fair Market Value of the Theater Tract. In the event Declarant disagrees with Theater Owner's determination and the parties cannot agree upon the Fair Market Value within fifteen (15) business days following receipt of the FMV Notice (the "**Negotiation Period**"), Declarant shall, within ten (10) business days after the Negotiation Period, deliver written notice to Theater Owner requesting that the Fair Market Value be determined by the appraisal method herein provided, which notice shall specify the name of Declarant's appraiser (the "**Appraisal Notice**"). If Declarant fails to provide Theater Owner with an Appraisal Notice within the time period provided above, Declarant shall be deemed to have accepted Theater Owner's determination of the Fair Market Value. If Declarant delivers the Appraisal Notice, within ten (10) business days thereafter, Theater Owner shall notify Declarant of the name of Theater Owner's appraiser. Upon appointment, the two appraisers shall agree to determine the Fair Market Value faithfully, fairly and within thirty (30) days following the appointment of the Theater Owner's appraiser. The two appraisers shall afford Declarant and Theater Owner the right to submit evidence with respect to the Fair Market Value and shall, with all possible speed, make their respective determinations in writing and give notice thereof to Declarant and Theater Owner. If the higher of the two estimates of the Fair Market Value exceeds the lower estimate by less than five percent (5%), the average of the Fair Market Value estimates so determined shall be the Fair Market Value for purposes hereof. If the higher of the two estimates exceeds the lower estimates by more than five percent (5%), the appraisers, within ten (10) days after both of the appraisers have made their determinations, shall appoint in writing a third appraiser and give written notice of such appointment to Declarant and Theater Owner. If the two appraisers shall fail to appoint or agree upon a third appraiser within the 10-day period, a third appraiser shall be selected by Declarant and Theater Owner if they agree upon such third appraiser within a further period of ten (10) days. The third appraiser shall be sworn to determine faithfully and fully, pursuant to the procedures set forth above, the Fair Market Value. The third appraiser's determination of value shall be controlling unless it is higher than the higher

PDX\123060\238709\MAM\26811497.2
24722688v.1

(or lower than the lower) determination of value of the original two appraisers, in which case such previous high (or low) determination shall be controlling. The decision of the appraisers shall establish the Fair Market Value. If any person appointed as an appraiser by or on behalf of either Declarant or Theater Owner dies, fails to act, resigns or becomes disqualified, the Party by or on behalf of whom such appraiser was appointed shall designate a replacement. If the Party by or on behalf of whom such appraiser was appointed shall fail to appoint a substitute appraiser within ten (10) days after being requested to do so by the other Party, the sole appraiser appointed shall make the Fair Market Value determination. If a third appraiser is not appointed as provided above, the appraiser in question shall be appointed by the appropriate court in Bexar County, Texas, upon application of either Declarant or Theater Owner. Each Party shall bear and pay the cost of the appraiser appointed by (or for) it, and the cost of the third appraiser shall be borne and paid equally by Declarant and Theater Owner. All appraisal proceedings shall be held in San Antonio, Texas. Declarant and Theater Owner shall be given reasonable advance notice of the time and place of any appraisal proceedings, and both shall have the right to be present, heard and represented by counsel. The appraisers shall not have the power to add or to subtract from or otherwise change the terms and provisions of this Declaration, and their determination shall be consistent and in accordance with the terms and provisions of this Declaration. The appraisers shall give prompt notice of their decision to Declarant and Theater Owner. Any appraiser to be appointed hereunder shall have no less than five (5) years' experience in the appraisal of real property of the type owned by Theater Owner and hold the professional designation of M.A.I. or its equivalent.

a.    The closing of any such purchase of the Repurchase Property by Declarant shall occur no later than ninety (90) days after the later of the date Declarant elects in writing to purchase the Repurchase Property (the "**Repurchase Date**"). On the Repurchase Date, Theater Owner shall convey the Theater Tract and improvements to Declarant by special warranty deed and, by a separate assignment in a form reasonably acceptable to Theater Owner and Declarant, assign to Declarant all of Theater Owner's interest in the balance of the Repurchase Property.

b.    If Declarant elects to exercise its Repurchase Right pursuant to this paragraph, then Declarant shall be acquiring the property AS-IS subject only to the exceptions to title set forth in the original deed of the Theater Tract from Declarant to Theater Owner and any exceptions created thereafter in the ordinary course of business by Theater Owner, other than liens securing debt of Theater Owner, with a special warranty of title, but without any other representations and warranties by Theater Owner to Declarant.

c.    Within ten (10) days from written request from either party to the other, the party being requested shall reasonably cooperate to provide an estoppel certificate (in a form reasonably satisfactory to the requesting party) to any future purchaser or lender on the Theater Tract, either reaffirming the terms of any then existing Repurchase Right of Declarant and/or stating the Repurchase Right has been waived or terminated. Upon the termination or expiration of Declarant's Repurchase Right, and upon written request from Theater Owner, Declarant agrees to cooperate with Theater Owner to cause the execution and recordation of a document affirming the termination or expiration of such Repurchase Right.

12.    **Right of First Offer**. If operation of an AD Theater or another dine-in first run cinema of similar quality permanently ceases operations in the Theater Building and the Theater Tract Owner desires to sell the Theater Tract, then prior to offering for sale ("**ROFO Offer**")

PDX\123060\238709\MAM\26811497.2
24722688v.1

Theater Owner's ownership interest in all or any portion of the Theater Tract (the "**ROFO Property**"), Theater Owner shall give written notice thereof to Declarant, together with a copy of the ROFO Offer ("**ROFO Notice**"), which ROFO Offer shall include the applicable terms for the purchase of the ROFO Property. Declarant shall have the right of first offer ("**ROFO**") to purchase all such ROFO Property on the same terms, conditions and provisions as set out in the ROFO Offer by giving notice to Theater Owner of such election ("**ROFO Election Notice**") within thirty (30) days following Seller's delivery of the ROFO Notice to Declarant. Promptly following Declarant's delivery of the ROFO Election Notice, if applicable, Declarant shall deliver, and Theater Owner and Declarant shall execute, a purchase contract containing the terms and provisions of the sale as set forth in the ROFO Offer, or as may otherwise be customary for the sale of similar property in Bexar County, Texas to the extent not covered by the ROFO Offer, on terms, provisions and conditions acceptable to Declarant and the Theater Tract Owner. At closing, Declarant and Theater Owner shall perform their respective obligations under the contract. If Declarant fails to deliver the ROFO Election Notice to Theater Owner within the 30-day period specified above, Declarant's ROFO will terminate as to the applicable ROFO Offer, but not as to future ROFO Offer(s). In the event Declarant fails to deliver or waives an ROFO Election Notice with respect to any ROFO Offer, but the terms set forth in such ROFO Offer are thereafter modified such that the purchase price is reduced by more than five percent (5%), Declarant's ROFO shall apply to such modified ROFO Offer in accordance with the terms, provisions and conditions set forth above.

13. **Remedies and Enforcement**.

a. In the event of a breach or threatened breach by Declarant or an Owner of a Tract and/or their tenants, occupants, customers, patrons, employees, suppliers, licensees and invitees (collectively, jointly and severally, the "**Defaulting Party**") of any of the terms, covenants, restrictions or conditions hereof, the other Owner(s) and their tenants or occupants (collectively, a "**Benefitted Party**") shall be entitled forthwith to full and adequate relief by injunction and/or all such other available legal and equitable remedies from the consequences of such breach from the Defaulting Party. Declarant and Owners shall use their reasonable efforts to enforce the restrictions and fulfill their obligations herein contained.

b. In addition to all other remedies available at law or in equity, upon the failure of a Defaulting Party to cure a breach of this Declaration within thirty (30) days following written notice thereof by an Owner or Benefitted Party (unless, with respect to any such breach the nature of which cannot reasonably be cured within such 30-day period, the Defaulting Party commences such cure within such 30-day period and thereafter diligently pursues such cure to completion), any Owner or Benefitted Party shall have the right to perform such obligations contained in this Declaration on behalf of such Defaulting Party and be promptly reimbursed by such Defaulting Party upon written demand for the reasonable costs thereof together with interest at the Prime Rate charged from time to time by Citibank (its successors or assigns) as published in the Wall Street Journal plus three percent (3%) per annum (not to exceed the maximum rate of interest allowed by law). Notwithstanding the foregoing, in the event of (i) an emergency, (ii) material impairment of the easement rights, and/or (iii) the unauthorized parking of vehicles on a Tract, an Owner or Benefitted Party may provide for forty-eight (48) hour advance notice, or if not practicable, as soon as possible thereafter, cure the same and be reimbursed by the Defaulting

20

Party upon written demand for the reasonable documented, out-of-pocket cost thereof together with interest at the Prime Rate, plus three percent (3%), as above described.

c.      Notwithstanding anything herein to the contrary, no breach hereunder shall entitle any Owner to cancel, rescind, or otherwise terminate this Declaration. All of the remedies permitted or available to an Owner in this Declaration shall be cumulative and not mutually exclusive of one another, and the invocation of any one right or remedy shall not constitute an election or remedies or preclude an Owner from exercising any other remedy under this Declaration, at law or in equity. Notwithstanding anything herein to the contrary, in no event shall any Owner, its respective officers, directors, shareholders, members, partners, employees or agents ever be liable hereunder for punitive, special or consequential damages in connection with this Declaration. In addition, upon the transfer by an Owner of its interest in any Tract, such transferring Owner shall thereafter be released and discharged and all covenants and obligations arising from and attributable to the period from and after the date of such transfer, and thereafter, such covenants and obligations shall be binding during the term of this Declaration upon each new Owner for the duration of such Owner's ownership.

14.     **Indemnity**. Each Owner (including Declarant) shall indemnify, defend and hold the other Owner(s) and their employees, directors, officers, shareholders, partners, agents, representatives, heirs, executors, successors and assigns harmless from and against any and all liabilities, losses, costs (including reasonable attorneys' fees), liens (including mechanics' liens), damages, suits or claims asserted against or incurred in connection with, arising from, due to or as a result of the death of any person or any accident, personal and/or bodily injury, loss or damage whatsoever caused to any person or to the property of any person arising from the indemnifying Owner's or its employees, agents, contractors, licensees, tenants and invitees exercise of the easement rights and performance or non-performance of the obligations set forth herein, except claims resulting from the joint or sole negligence or willful act or omission of the indemnified Owner.

15.     **Insurance Requirements**. Each Owner shall maintain or cause to be maintained commercial general liability insurance (including without limitation contractual liability insurance covering the indemnities in this Declaration) insuring against claims on account of loss of life, bodily injury, personal injury, or property damage that arises upon, in or about such Owner's Tract and the Common Areas on the Owner's Tract, or that arises as a result of the acts or omissions of such Owner, its occupants or permittees, except as herein provided. Said insurance shall be carried by a reputable insurance company or companies qualified to do business in Texas and which has a financial rating of VIII or better and a policyholder's rating of A or better in the latest edition of *Best's Key Rating Guide Property-Casualty United States*. Further, such insurance shall have limits of not less than Two Million Dollars ($2,000.000) for each occurrence. The Owners shall also maintain umbrella Excess Liability Insurance excess of the underlying commercial general liability with limits not less than Five Million Dollars ($5,000,000) per occurrence and aggregate. Each liability insurance policy shall name the Declarant and Owners as additional insureds, and shall provide that the policy may not be canceled or materially reduced in amount or coverage without at least thirty (30) days prior written notice by the insurer to each insured and any additional insureds. In addition, so long as alcoholic beverages are sold from or consumed upon a Tract, such liability insurance shall include "liquor liability" or "dram shop" coverage or the Owner

21

of the Theater Tract shall provide equivalent coverage in the amount of Two Million Dollars ($2,000,000) per occurrence through a separate liquor liability policy. Notwithstanding the foregoing, any Owner or party responsible to maintain such insurance who has a net worth of at least One Hundred Million Dollars ($100,000,000) may "self insure", or provide for a deductible from said coverage related to the Parcel, to the extent of one percent (1%) of the net worth of said Owner or party in its last annual or fiscal year as certified by an independent certified public accountant and computed in accordance with generally accepted accounting principles, consistently applied. Such insurance may be carried under a "blanket" policy or policies covering other properties of the party and its subsidiaries, controlling or affiliated corporations. Each Owner shall, upon written request from any other Owner, furnish to the party making such request certificates of insurance evidencing the existence of the insurance required to be carried pursuant to this section or evidence of a self-insurance capacity as herein above provided, as the case may be. All such insurance shall include provisions denying to the insurer subrogation rights against the other parties to the extent such rights have been waived by the insured prior to the occurrence of damage or loss. Each Owner hereby waives any rights of recovery against any other Owner, its Occupants and Permittees for any damage or consequential loss covered by said policies, against which the non-waiving Owner is protected by insurance, to the extent of the proceeds payable under such policies, whether or not such damage or loss shall have been caused by any acts or omissions of the non-waiving Owner or its Occupants or Permittees, **INCLUDING MATTERS ARISING FROM THE NEGLIGENCE OF SUCH NON-WAIVING PARTY.**

Prior to commencing any construction activities upon a Tract, the Owner of the Tract shall obtain or require its contractor to obtain and thereafter maintain so long as such construction activity is occurring, at least the minimum insurance coverage set forth below:

(i)      Workers' Compensation – statutory limits;

(ii)      Employers Liability – Two Million Dollars ($2,000,000) each accident for bodily injury, Two Million Dollars ($2,000,000) policy limit for bodily injury by disease and Two Million Dollars ($2,000,000) each employee for bodily injury by disease;

(iii)      Commercial General Liability insurance covering all operations by or on behalf of the general contractor, which shall include the following minimum limits of liability and coverages:

(a)      Premises and Operations;

(b)      Products and Completed Operations;

(c)      Contractual Liability, insuring the indemnity obligations assumed by Contractor under the Contract Documents;

(d)      Broad Form Property Damage (including Completed Operations);

(e)      Explosion, Collapse, and Underground Hazards;

(f)     Personal Injury Liability:

(i)     Two Million Dollars ($2,000,000) each occurrence (for bodily injury and property damage;

(ii)     Three Million Dollars ($3,000,000) for Personal Injury Liability;

(iii)     Five Million Dollars ($5,000,000) aggregate for Products and Completed Operations (which shall be maintained for a three (3) year period following final completion of the work);

(iv)     Five Million Dollars ($5,000,000) general aggregate.

(g)     Automobile Liability Insurance. Any automobile liability insurance (bodily injury and property damage liability) including coverage for owned, hired, and non-owned automobiles, shall have limits of liability of not less than One Million Dollars ($1,000,000) combined single limit each accident for bodily injury and property damage combined. The general contractor shall require each of its subcontractors to include in their liability insurance policies coverage for Automobile Contractual Liability.

(h)     Umbrella/Excess Liability Insurance:  The general contractor shall also carry umbrella/excess liability insurance in the amount of Five Million Dollars ($5,000,000).

Effective upon the commencement of construction of any Building on the a Tract and so long as such Building exists, the Owner of the Tract shall carry, or cause to be carried, property insurance with "Special Form" coverage, in the amount of one hundred percent (100%) of full replacement cost thereof (excluding footings, foundations and excavations).

16.     **Restrictions**.  It is understood and agreed that the covenants, agreements, rights, easements, licenses, obligations, requirements and restrictions applicable to the La Cantera Tract and the Theater Tract set forth in this Declaration (collectively, the "**Restrictions**") shall constitute and be construed to the fullest extent possible as covenants running with the land which is benefited and burdened therewith and not as conditions, and that the violation of any of the Restrictions shall not result in a forfeiture or reversion of title; provided, however, that the Restrictions relative to the La Cantera Tract and the Theater Tract and all of the obligations of Declarant and Theater Owner with respect to the Restrictions shall continue to apply fully to any person having any fee simple or leasehold interest in the La Cantera Tract or the Theater Tract. In the event ownership of a Tract has been transferred to a subsequent Owner, a violation of any Restrictions herein shall only be enforceable against the respective successor to Declarant's interest in the La Cantera Tract or any part thereof and the respective successor to Theater Owner's interest in the Theater Tract or any part thereof, and the violating party.

17.     **Ground Lease**.  In the event of a ground lease of all or any part of the La Cantera Tract or the Theater Tract, for purposes of enforcement of the Restrictions, the ground lessee shall be deemed the Owner in lieu of the record Owner for the term of such ground lease provided that

such ground lessee assumes the obligations herein in a recorded memorandum of ground lease or other instrument of record.

18.    **Governing Law**.  This Declaration shall be construed in accordance with the laws of the State of Texas.

19.    **Covenants Run With The Land**.  Each and all of the easements, covenants, restrictions and the provisions contained in this Declaration: (a) are made for the direct common mutual and reciprocal benefit of each Tract; (b) will create mutual equitable servitudes upon each Tract in favor of the land benefited; (c) will bind every person having a fee, leasehold or other interest in any portion of the Theater Tract or La Cantera Tract at any time or from time to time to the extent that such portion is affected or bound by the covenant, restriction or provision in question, or that the covenant, restriction or provision is to be performed on such portions; and (d) will inure to the benefit of the parties and their respective successors and assigns as to the respective Tracts in the Theater Tract or La Cantera Tract.

In the event of a sale or transfer of all of the La Cantera Tract, Declarant (and any Successor Declarant), shall assign all or a part of its interests as "Declarant" hereunder to one (1) or more of its successors in interest in ownership of the La Cantera Tract (the "Successor Declarant") by executing and recording in the Real Property Records of Bexar County, Texas a written instrument expressly assigning such rights and referencing this Declaration, whereupon such Successor Declarant shall be deemed to have assumed the rights and obligations of "Declarant" hereunder.

20.    **Notices**.  All notices, consents, requests, approvals and other communication required or permitted herein shall be in writing and shall be deemed to have been duly given (i) upon personal delivery, (ii) seventy-two (72) hours after deposit in the United States mail, registered or certified with return receipt requested, or (iii) the next succeeding business day after deposit with a responsible overnight delivery service similar to UPS and/or Federal Express to the intended Owner at such Owner's last known address. Any party shall have the right from time to time and at any time until the termination hereof to change its address, and each party shall have the right to specify its address to any other address within the United States of America. Addresses for Declarant and Theater Owner are as follows:

Declarant:          La Cantera Retail, LLC
                    901 S. Mopac Expwy
                    Barton Oaks Plaza II, Suite 550
                    Austin, Texas 78746
                    Attention: C. Patrick Oles, Jr.

Theater Owner:      Alamo North SA, LLC
                    3908 Avenue B
                    Austin, Texas 78751
                    Attention:  CFO

PDX\123060\238709\MAM\26811497.2
24722688v.1

21.     **Multiple Counterparts**.  To facilitate execution, this instrument may be executed in as many counterparts as may be convenient or required. All counterparts shall collectively constitute a single instrument.

22.     **Entire Agreement; Duration; Amendment**.  This Declaration contains the entire agreement between the parties relating to the rights herein granted and the obligations herein assumed. The easements contained in this Declaration shall be perpetual. The remaining covenants, conditions and restrictions contained in this Declaration shall continue in full force and effect for a period of sixty-five (65) years following the date hereof. This Declaration may be changed, modified or amended in whole or in part only by written instrument executed by the Owner of the Theater Tract, the Declarant and the Owner of any other Tract that would be materially and directly adversely affected by such change, modification or change.

23.     **Severability**.  If any clause, sentence, or other portion of the terms, covenants and restrictions of this Declaration becomes illegal, null, or void for any reason, or be held by any court of competent jurisdiction to be so, the remaining portions will remain in full force and effect.

24.     **Waiver**.  No waiver by any Owner of any default under this Declaration shall be effective or binding on any such Owner unless made in writing and no such waiver shall be implied from any omission by any party to take action with respect to such default. No delay or omission of an Owner in the exercise of any right accruing upon default by another Owner shall impair any such right or be construed to be a waiver thereof. A waiver on one occasion by an Owner of a breach or a default of any of the terms and conditions of this Declaration by another Owner shall not be construed to be a waiver of subsequent breaches or defaults or of any other provisions hereof.

25.     **Attorneys' Fees**.  If litigation is ever instituted by either party hereto to enforce, or to seek damages for the breach of, any provision hereof, the prevailing party therein shall be promptly reimbursed by the other party for all attorneys' fees reasonably incurred by the prevailing party in connection with such litigation.

26.     **Development Restriction**. Barshop & Oles Company and its operating principals, specifically, Pat Oles, Dan Wheat, Clay Golden and Wade McGinnis, agree not to construct another Theater within a one (1) mile radius of the Shopping Center for a period of eight (8) years following the Effective Date; provided, however, that if AD Theater ceases to operate a first run dine-in Theater in the Shopping Center for a period of six (6) months, other than for a Permitted Discontinuance, then this restriction will terminate on the earlier date that AD Theater ceases operations

27.     **Conveyance to Alamo**. Declarant and Theater Owner hereby acknowledge and agree that contemporaneously with Declarant's recordation of this Declaration, Theater Owner will purchase from Declarant the Theater Tract and Theater Owner's execution of this Declaration hereby signifies Theater Owner's express agreement that the Theater Tract shall be bound by the terms, provisions and conditions of this Declaration.

[signatures follow]

PDX\123060\238709\MAM\26811497.2
*24722688v.1*

DECLARANT:

**LA CANTERA CROSSING RETAIL, LLC,**
a Texas limited liability company

        By:    B&O La Cantera Developers, L.P.,
                   a Texas limited partnership,
                   its managing member

            By: B&O La Cantera Developers GP, LLC,
               a Texas limited liability company
               its general partner

               By:
               Name: C. Patrick Oles, Jr.
               Title:  Manager

STATE OF TEXAS       §
                        §
COUNTY OF TRAVIS    §

     This instrument was acknowledged before me on the ___18___ day of December, 2019, by C. PATRICK OLES, JR., as Manager of B&O LA CANTERA DEVELOPERS GP, LLC, a Texas limited liability company, as General Partner of B&O LA CANTERA DEVELOPERS, L.P., as Manager of LA CANTERA CROSSING RETAIL, LLC, a Texas limited liability company, on behalf of said limited liability company.

                                     Notary Public, State of Texas

CAROL BADE
Notary Public, State of Texas
Comm. Expires 06-05-2021
Notary ID 1936775

PDX\123060\238709\MAM\26811497.2

064883.00236 290866 v18

THEATER OWNER:

**ALAMO NORTH SA, LLC,**
a Texas limited liability company

By:     Alamo Drafthouse Cinemas, LLC,
        a Texas limited liability company,
        its sole member

        By: _____
        Name: CESAR GUZMAN
        Title: CHIEF OPERATING OFFICER

STATE OF TEXAS     §
                     §
COUNTY OF TRAVIS    §

     This instrument was acknowledged before me on the 19th day of December, 2019, by CESAR GUZMAN , CHIEF OPERATING OFFICER of Alamo Drafthouse Cinemas, LLC, a Texas limited liability company, sole member of Alamo North SA, LLC, a Texas limited liability company on behalf of said limited liability companies.

MELISSA REYNOLDS
Notary ID #5963291
My Commission Expires
August 19, 2023

_____
Notary Public, State of TEXAS

PDX\123060\238709\MAM\26811497.2

064883.00236 290866 v18

LA CANTERA DEVELOPMENT COMPANY, LLC, ACTING IN ITS CAPACITY AS DECLARANT UNDER THE LA CANTERA MASTER COVENANTS AND EASEMENTS DATED MARCH 15, 1996, RECORDED IN VOLUME 6696, PAGE 890, IN THE REAL PROPERTY RECORDS OF BEXAR COUNTY, TEXAS, JOINS IN THE EXECUTION OF THIS DECLARATION FOR PURPOSES OF CONSENTING TO THE RECORDATION OF THIS DECLARATION.

**LA CANTERA DEVELOPMENT COMPANY, LLC,**
a Texas limited liability company

By:  US REAL ESTATE LIMITED PARTNERSHIP,
     a Texas limited partnership
     its sole member

    By:  USAA REAL ESTATE COMPANY,
       a Delaware corporation
       its general partner

       By: _____
       Name: Bruce C. Petersen
       Title: Executive Managing Director

STATE OF TEXAS         §
                     §
COUNTY OF BEXAR     §

This instrument was acknowledged before me on the 19th day of December, 2019, by Bruce C. Petersen, as Executive Managing Director of USAA REAL ESTATE COMPANY, a Delaware corporation, the General Partner US REAL ESTATE LIMITED PARTNERSHIP, a Texas limited partnership, the Sole Member of LA CANTERA DEVELOPMENT COMPANY, LLC, a Texas limited liability company, on behalf of said corporation, limited partnership and limited liability company.



Notary Public, State of Texas

MELISSA WILLIAMS
Notary Public, State of Texas
My Comm. Exp. 01-11-2020
ID No. 481464-1

**AFTER RECORDING, PLEASE RETURN TO:**

Golden Steves & Gordon
200 E. Basse, Suite 200
San Antonio, Texas 78209
Attn: Lane W. Golden

PDX\123060\238709\MAM\26811497.2
*24722688v.1*

## EXHIBIT LIST

Exhibit A – Legal Description of the La Cantera Tract
Exhibit B – Legal Description of the Theater Tract
Exhibit C – Site Plan
Exhibit D – Exclusive Use Restrictions

PDX\123060\238709\MAM\26811497.2
*24722688v.1*

**EXHIBIT A TO DECLARATION**
**Legal Description of the La Cantera Tract**

Lots 8 and 9, Block 5, NCB 16603, La Cantera 1604 Retail, City of San Antonio, Bexar County, Texas, according to a plat thereof recorded in Volume 20001, Pages 1613-1614, Plat Records of Bexar County, Texas.

PDX\123060\238709\MAM\26811497.2
24722688v.1

## EXHIBIT B TO DECLARATION
### Legal Description of the Theater Tract

Lot 10, Block 5, NCB 16603, La Cantera 1604 Retail, City of San Antonio, Bexar County, Texas, according to a plat thereof recorded in Volume 20001, Pages 1613-1614, Plat Records of Bexar County, Texas.

PDX\123060\238709\MAM\26811497.2
24722688v.1

## EXHIBIT C TO DECLARATION
### Site Plan



## EXHIBIT C-1 TO DECLARATION
### Commercial Covenants

First Amendment recorded in Volume 7126, Page 1483 of the Official Public Records of Bexar County, Texas.

Second Amendment recorded in Volume 7211, Page 1793 of the Official Public Records of Bexar County, Texas.

Third Amendment recorded in Volume 7246, Page 397 of the Official Public Records of Bexar County, Texas.

Fourth Amendment recorded in Volume 7531, Page 1263 of the Official Public Records of Bexar County, Texas.

Fifth Amendment recorded in Volume 7691, Page 1989 of the Official Public Records of Bexar County, Texas.

Sixth Amendment recorded in Volume 9573, Page 1812 of the Official Public Records of Bexar County, Texas.

Seventh Amendment recorded in Volume 10189, Page 317 of the Official Public Records of Bexar County, Texas.

Eighth Amendment recorded in Volume 10189, Page 326 of the Official Public Records of Bexar County, Texas.

Ninth Amendment recorded in Volume 16888, Page 2246 of the Official Public Records of Bexar County, Texas.

Tenth Amendment recorded in Volume 17042, Page 45 of the Official Public Records of Bexar County, Texas.

Eleventh Amendment recorded in Volume 17870, Page 340 of the Official Public Records of Bexar County, Texas.

Twelfth Amendment recorded in Volume 18185, Page 1714 of the Official Public Records of Bexar County, Texas.

Thirteenth Amendment recorded in Volume 18659, Page 1643 of the Official Public Records of Bexar County, Texas.

Fourteenth Amendment recorded in Volume 18803, Page 1725 of the Official Public Records of Bexar County, Texas.

PDX\123060\238709\MAM\26811497.2
24722688v.1

Fifteenth Amendment recorded in Volume 18742, Page 2426 of the Official Public Records of Bexar County, Texas.

Sixteenth Amendment recorded in Volume 18952, Page 1242 of the Official Public Records of Bexar County, Texas.

PDX\123060\238709\MAM\26811497.2
24722688v.1

## EXHIBIT D TO DECLARATION
### Exclusive Use Restrictions

None

PDX\123060\238709\MAM\26811497.2
*24722688v.1*

**File Information**

**eFILED IN THE OFFICIAL PUBLIC eRECORDS OF BEXAR COUNTY**
**LUCY ADAME-CLARK, BEXAR COUNTY CLERK**

| | |
|---|---|
| **Document Number:** | 20190260729 |
| **Recorded Date:** | December 23, 2019 |
| **Recorded Time:** | 3:05 PM |
| **Total Pages:** | 36 |
| **Total Fees:** | $162.00 |

**\*\* THIS PAGE IS PART OF THE DOCUMENT \*\***

**\*\* Do Not Remove \*\***

Any provision herein which restricts the sale or use of the described real property because of race is invalid and unenforceable under Federal law

STATE OF TEXAS, COUNTY OF BEXAR

I hereby Certify that this instrument was eFILED in File Number Sequence on this date and at the time stamped hereon by me and was duly eRECORDED in the Official Public Record of Bexar County, Texas on: 12/23/2019 3:05 PM

*Lucy Adame-Clark*
**Lucy Adame-Clark**
**Bexar County Clerk**