## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re:<br><br>ALAMO DRAFTHOUSE CINEMAS<br>HOLDINGS, LLC, *et al.*,<br><br>Debtors.[1] | Chapter 11<br><br>Case No. 21-10474 (MFW)<br><br>(Jointly Administered)<br><br>**Ref. Docket Nos. 278, 279 & 280** |

**DECLARATION OF MICHAEL FOREMAN IN SUPPORT OF (A) THE DEBTORS'
MOTION FOR ORDER, PURSUANT TO SECTIONS 363(b) AND 503(c) OF THE
BANKRUPTCY CODE: (I) APPROVING KEY EMPLOYEE RETENTION
PLAN, AND KEY EMPLOYEE INCENTIVE PLAN, AND (II) GRANTING
RELATED RELIEF; AND (B) THE DEBTORS' MOTION TO SEAL**

Pursuant to 28 U.S.C. § 1746, I, Michael Foreman, hereby declare under penalty of

perjury that the following is true and correct to the best of my knowledge and belief:

1.      I am the independent manager of the Board of Managers (the "**Board**") of Alamo

Drafthouse Cinemas Holdings, LLC, a limited liability company organized under the laws of the

state of Delaware and one of the debtors and debtors-in-possession in the above-captioned chapter

11 cases (collectively, the "**Debtors**").  I have held this position since January 18, 2021.  As the

sole member of the restructuring committee of the Board (the "**Restructuring Committee**"), I am

---

[1]    The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification
number, are: Alamo Drafthouse Cinemas Holdings, LLC (2205); Alamo Drafthouse Cinemas, LLC (5717);
Alamo Vineland, LLC (1626); Alamo League Investments GP, LLC (1811); Alamo League Investments, Ltd.
(7227); Alamo South Lamar GP, LLC (3632); Alamo South Lamar, LP (4563); Alamo Drafthouse Raleigh, LLC
(5979); Alamo DH Anderson Lane, LLC (3642); Alamo Yonkers, LLC (4971); Alamo Mission, LLC (2284);
Alamo Ritz, LLC (9465); Alamo Mueller, LLC (1221); Mondo Tees, LLC (6900); Alamo City Foundry, LLC
(6092); Alamo Mainstreet, LLC (2052); Alamo City Point, LLC (3691); Alamo Liberty, LLC (5755); Alamo
Satown, LLC (6197); Alamo Marketplace, LLC (7041); Alamo Stone Oak, LLC (8398); Alamo Westlakes, LLC
(4931); Alamo Park North, LLC (1252); Alamo North SA, LLC (6623); Alamo Avenue B, LLC (8950); Alamo
Slaughter Lane GP, LLC (6968); Alamo Slaughter Lane, Ltd. (5341); Alamo Cinema Group I GP, LLC (9537);
Alamo Cinema Group I, LP (9656); Alamo Westminster, LLC (8906); Alamo Staten Island, LLC (7781); Alamo
Aspen Grove, LLC (7786); Alamo Lakeline, LLC (5294); Alamo Sloans, LLC (9343). The location of the
Debtors' service address is: 3908 Avenue B, Austin, Texas 78751.

duly authorized to make and submit this declaration (this "**Declaration**") in support of (a) the *Debtors' Motion for Order Pursuant to Sections 363(b) and 503(c) of the Bankruptcy Code (I) Approving Key Employee Retention Plan and Key Employee Incentive Plan and (II) Granting Related Relief* [Docket Nos. 278 (sealed) & 279 (redacted)] (the "**KERP/KEIP Motion**"), and (b) the *Debtors' Motion for an Order Pursuant to Section 107(b) of the Bankruptcy Code, Bankruptcy Rule 9018, and Local Rule 9018-1, Authorizing the Debtors to Redact Certain Confidential Information in Connection with the Debtors' Motion for Order Pursuant to Sections 363(b) and 503(c) of the Bankruptcy Code (I) Approving Key Employee Retention Plan and Key Employee Incentive Plan and (II) Granting Related Relief* [Docket No. 280] (the "**Seal Motion**").[2]

2.      Except as otherwise indicated, all facts set forth in this Declaration are based on my personal knowledge, discussions with the Debtors' management and advisors, review of the relevant documents, or opinion based on my experience, knowledge, and information concerning the Debtors' operations and financial condition.  If called to testify, I would testify competently to the facts set forth in this Declaration.

## **BACKGROUND**

3.      Between January 2020 and January 2021, I served as the independent director on the boards of directors of three distressed companies, VIP Cinema Holdings, Inc., Rubio's Restaurants, Inc., and Intelsat Connect Finance, S.A.   Each of these companies filed and subsequently emerged from chapter 11 during my tenure on the boards.  In addition, throughout 2018 and 2019, I served as the Managing Director for Borrelli Walsh Inc.  Prior to that, in 2016, I served as the general counsel and chief restructuring officer for UTAC Holdings Ltd./Global A&T Electronics Ltd.  I received a B.S. degree in industrial and labor relations from Cornell University

---

[2]   All capitalized terms not herein defined have the meanings ascribed to them in the KERP/KEIP Motion.

in 1982 and a J.D. degree from Hofstra University School of Law in 1985.  I was an attorney in private practice in the field of bankruptcy and financial restructuring between 1986 and 2014, between 2014 and 2016, and then again in 2019.

4.      I have overseen many actual and potential divestitures and acquisitions relating to the disposition of both companies and assets, including under section 363 of the Bankruptcy Code.

### DEVELOPMENT OF THE KERP AND THE KEIP

5.      I was formally appointed as a manager on the Board on January 18, 2021, as the Debtors were beginning to map out their marketing and sale process.  In connection with my appointment, I had numerous conversations with the Debtors' management team, counsel, and advisors, including Portage Point Partners ("**Portage Point**") and Houlihan Lokey Capital, Inc. ("**Houlihan**"), regarding the Debtors' financial situation, discussions with their lenders, and anticipated sale process and Operations Bonus Plan.  Specifically, the Debtors' management repeatedly explained that the shuttering of the Debtors' business for several months due to the COVID-19 pandemic forced the Debtors to make significant cutbacks across not only jobs, but also salaries and bonuses—all at a time when their Employees needed the most support.  In fact, by the Petition Date, the Debtors had been operating with reduced staff, reduced wages, and reduced morale for an entire year.  Each of the Participants either had his or her wages reduced or did not receive an annual bonus as a consequence of measures taken to ensure the survival of the Debtors' business during the COVID-19 pandemic.

6.      Based on these conversations, it became clear that providing an appropriately tailored compensation program in connection with the Chapter 11 Cases and the sale process would facilitate the Debtors' prime objective of maximizing value and surviving as a going-concern.  From my prior experience in advising companies on the acquisitions and sales of assets,

I felt, and continue to believe, that instituting special compensation benefits is necessary and beneficial to a company in the process of undertaking a significant business restructuring.

7.      Following the commencement of the Chapter 11 Cases, the Debtors requested the assistance of Portage Point to review the Debtors' existing employee compensation structure and to design a bonus program that would incentivize the Debtors' senior management and a retention program that would retain other key Employees during the Chapter 11 Cases.  Portage Point assisted the Debtors in designing the KERP and KEIP consistent with the Debtors' goals of maximizing value and enhancing the Debtors' financial and operational condition.  Following a thorough review of comparable incentive and retention plans approved by this Court, Portage Point began developing the KERP and KEIP with the foresight that the proposed sale of the Debtors' business would be necessary to maximize the value of the Debtors' estates.

8.      The Debtors' ability to consummate a sale is inextricably intertwined with (i) maintaining the Debtors' everyday operations, including but not limited to, preserving and supporting vendor, customer, and employee relationships critical to the operation of the business, and (ii) meeting financial performance targets allowing the Debtors to continue operating in the ordinary course throughout the sale process and, ultimately, through the closing of a sale of the Debtors' business.  Thus, the KERP and KEIP were designed to be reasonable considering the Debtors' compensation and bonus structure as a whole, and to balance the costs of any incremental compensation while providing, respectively, the appropriate incentives to or the appropriate retention payments for the individuals essential to the success of the Chapter 11 Cases.

9.      On March 9, 2021, the Debtors' management team and Portage Point presented an early draft of the KERP and KEIP at a meeting of the Board.  The Board discussed the metrics of the proposed programs.  At that meeting, I moved to have the Board consider approval of the

KERP and KEIP as a strategic transaction within the purview of the Restructuring Committee. The Board voted unanimously to approve the motion.

10.     Over the course of the next month, I worked closely with the Debtors' management team, counsel, and Portage Point, as well as the Postpetition Lenders and their advisors and counsel, to refine the metrics of the KERP and KEIP to ensure that they were tailored to the DIP budget and were appropriate for the circumstances of the Chapter 11 Cases and for cases of this size.  The Restructuring Committee then met on April 9, 2021 to consider approval of the KERP and KEIP.  At that meeting, as the sole member of the Restructuring Committee, I voted to approve the KERP and KEIP, subject to the approval of the Postpetition Lenders.  The KERP and KEIP were shared with the Postpetition Lenders and the Committee before the KERP/KEIP Motion was filed, and neither the Postpetition Lenders nor the Committee have an objection to the approval of the KERP or the KEIP.

11.     I thought then, as I do now, that the KERP and KEIP approved by the Board are well thought-out and appropriately tailored plans, in terms of properly motivating the Participants as much as possible.

## **THE KERP**

12.     As set forth in the KERP/KEIP Motion, the KERP is designed to incentivize continued optimal performance and encourage the retention of certain valuable, hard-to-replace, non-senior management Employees (collectively, the "**KERP Participants**").  There are currently 65 KERP Participants, and the total potential aggregate payout under the KERP is approximately $352,000.  I believe that the relatively modest number of KERP Participants, the ranges of proposed KERP Bonuses, and the total potential aggregate payout under the KERP, as set forth in

more detail in the following chart, is appropriately tailored to the size of the Chapter 11 Cases and the Debtors' circumstances.

| Number of Participants | Payment Range |
|---|---|
| 9 | $15,000 - $10,000 |
| 32 | $7,500 - $5,000 |
| 24 | $3,000 - $1,500 |
| Total:       65 | Total:    $352,000 |

13.     The Debtors submit this Declaration in part to provide the Court with additional information regarding each KERP Participant's role with the Debtors.   Attached hereto as **Exhibit A** is an expanded version of Schedule I to the KERP (the "**Amended KERP Exhibit**"), which includes each KERP Participant's name, title, department name, job description, and direct supervisor.[3]

14.     The KERP Participants include Employees from various functions across the Debtors' enterprise, including but not limited to business development, accounting, operations and venue operations, legal, marketing, human resources, and sales.  Put simply, they are essential to the success of the Debtors' enterprise.  Each KERP Participant was carefully selected by management and deemed critical to the Debtors' ability to maximize value for the benefit of all interested parties.

15.     Notwithstanding that certain of the KERP Participants have titles of "Vice President," "Director," "Senior Director," and the like, none of the KERP Participants are insiders. More specifically, none of the KERP Participants is a member of the Board, attends meetings of the Board, or reports directly to the Board.  None of the KERP Participants has the authority to

---

[3]  The Amended KERP Exhibit is being filed under seal pursuant to the *Debtors' Motion for an Order Pursuant to Section 107(b) of the Bankruptcy Code, Bankruptcy Rule 9018, and Local Rule 9018-1, Authorizing the Debtors to Redact Certain Confidential Information in Connection With the Debtors' Motion for Order, Pursuant to Sections 363(b) and 503(c) of the Bankruptcy Code (i) Approving Key Employee Retention Plan and Key Employee Incentive Plan and (ii) Granting Related Relief* [Docket No. 280]

make company-wide decisions for the Debtors.  Furthermore, the KERP Participants do not control the Debtors' chapter 11 efforts, nor do the KERP Participants manage the Chapter 11 Cases.  Each of the KERP Participants' duties is limited to specific and discrete areas of the Debtors' operations, and each of the KERP Participants reports to a more senior member of the Debtors' workforce.

16.     It is common in the Debtors' industry for employees subordinate to the board of directors and executive management levels to bear the titles "director" and "vice president." Accordingly, the titles "director" and "vice president" are not reliable indicators of whether a particular employee is accountable for enterprise-level management decisions or whether such an employee has any role in the governance of the organization.

17.     Consistent with these conventions, even though certain KERP Participants hold the title of "director" or "vice president," the Amended KERP Exhibit, as supplemented by this Declaration, demonstrates that none of the KERP Participants take part in the management of the Debtors, and therefore none of the KERP Participants are insiders.

18.     It is also my understanding that none of the KERP Participants is a relative of any director, officer, or person in control of the Debtors.  Moreover, none of the KERP Participants had any role in, or provided any input with respect to, the development or proposed implementation of the KERP.

19.     Based on my experience and knowledge of the Debtors' business, operations, and financial affairs, I believe that the KERP Participants are vital to the Debtors' efforts in the Chapter 11 Cases and are non-insiders, despite any presumption of insider status conferred by their titles.

20.     It is essential that the KERP Participants remain employed by the Debtors throughout the Chapter 11 Cases to facilitate the consummation of the sale of the Debtors' business, as well as to assist in the operation of the Debtors' ongoing business and the

administration of the Debtors' estates during the Chapter 11 Cases.  It cannot be understated that each KERP Participant, whether he or she is in the accounting group or a front-line operations manager, is crucial to these efforts.  Payment of the KERP Bonuses permits the Debtors to avoid the likelihood that the KERP Participants may pursue alternative employment opportunities, especially in light of the increased workload, administrative burdens, and general uncertainty imposed by the bankruptcy process, as well as the increased health and safety risk placed upon the KERP Participants as a consequence of the COVID-19 pandemic.

21.    Furthermore, failure to make the KERP Bonuses increases the likelihood of additional attrition, harming the value of the Debtors' estates and undermining the successful wind-down of the Chapter 11 Cases.  Further losses of key Employees will create transition issues for the business. In fact, retaining the KERP Participants will avoid the need for the Debtors to incur significant time and expense to hire and train replacement employees, which would, in turn, divert their attention and efforts from consummating the sale and reopening the Debtors' theaters. Therefore, I believe that approval of the KERP is in the best interest of the Debtors, their estates, creditors, and other parties in interest.

**THE KEIP**

22.    As set forth in the KERP/KEIP Motion, the KEIP provides potential incentive payments to the following six (6) senior executives:  (i) Shelli Taylor, Chief Executive Officer; (ii) Matt Vonderahe, Chief Financial Officer; (iii) Michael Sherrill, Chief Creative Officer; (iv) Michael Trafton, Chief Brand Officer; (v) Jamie Thorpe, Vice President – People; and (vi) Christopher Dzaba, Chief Development Officer (the "**KEIP Participants**" and, together with the KERP Participants, the "**Participants**").  The amount of the award (the "**KEIP Bonus**") earned and payable under the KEIP will be based upon achievement of the following metrics: (i) the

consummation of a sale of the Debtors' business (the "**Sale Target**"), and (ii) improved operating

cash flow, as detailed below and as measured against the DIP Budget filed on the Petition Date

(each, a "**Cash Flow Target**") as of May 17, 2021 (the "**KEIP Target Date**").

23.     The Debtors worked collaboratively with their professionals, keeping in mind the

Debtors' goals of maximizing the value of their estates, enhancing their financial condition,

ensuring effective management throughout the Chapter 11 Cases, and maintaining operational

stability as the Debtors transition to operations on the other side of chapter 11 protection.  The

KEIP Bonuses are modest rewards, and the KEIP was designed in a reasonable, cost-effective way

to incentivize key members of the Debtors' senior management to take on substantial additional

responsibilities in connection with, and following exit from, the chapter 11 process.  In addition,

the Debtors engaged with their Postpetition Lenders for over a month to develop the KEIP.  The

Debtors and their professionals also worked to ensure that the KEIP was competitive within the

industry, and served as an appropriate incentive for the executives participating in the KEIP.

24.     The KEIP Participants were identified and selected after significant and careful

consideration.  The KEIP Participants are responsible for, among other things, running the

Debtors' day-to-day business operations and affairs, maintaining the Debtors' books and records,

assisting the Debtors' professionals in the preparation of essential reporting and bankruptcy-related

documents, facilitating the Debtors' sale process, and otherwise participating in the Debtors'

efforts to successfully prosecute the Chapter 11 Cases and actualize the most value-maximizing

sale for the Debtors and their estates.  Losing any of the KEIP Participants at this point in the

Chapter 11 Cases would be detrimental to the successful conclusion of the sale process.

25.     After significant negotiations with the Postpetition Lenders, the Debtors selected

the Sale Target and Cash Flow Target as appropriate performance metrics, in part, because the

KEIP Bonus and the results to be obtained are directly connected.  If the Debtors do not achieve either of the Cash Flow Targets but achieve the Sale Target, a low aggregate KEIP Bonus of $198,600 will be earned.  If the Debtors achieve the Sale Target and a Cash Flow Target of 5% improvement as of the KEIP Target Date, the middle aggregate KEIP Bonus of $223,425 will be earned.  Finally, if the Debtors achieve the Sale Target and the Cash Flow Target of 10% improvement as of the KEIP Target Date, the maximum aggregate KEIP Bonus of $248,250 will be earned.

26.    For the duration of the Chapter 11 Cases, the Debtors have marketed their business for sale.  Notwithstanding the Debtors' nearing the finish line of their sale process, much work remains.  This work, which will continue well after the sale hearing has taken place, will demand extraordinary amounts of time, dedication, and focus from the Participants—particularly in light of the Debtors' theaters reopening as the country recovers from the effects of the COVID-19 pandemic.

27.    Also, based on my understanding of the sale process, and discussions with the Debtors' other advisors, including Houlihan Lokey, at the time that the Debtors developed the KEIP, it was far from guaranteed that the Sale Target would be satisfied.  Indeed, to the extent the Sale Target was satisfied, it was the general understanding among the Debtors' advisors and me that a successful sale that triggered the KEIP on the tight timeline approved by the Court would be the result of the KEIP Participants' focused and extraordinary efforts.  I believe that maximizing the value received in connection with the sale process has required, and will continue to require, extensive and devoted assistance from the KEIP Participants, all of whom were—and are—needed to (i) continue operating the business under challenging circumstances beyond those associated with the KEIP Participants' typical operational duties, including simultaneously assisting and

supervising the Debtors' professionals with the marketing of the Debtors' business and facilitating the sale; (ii) meet diligence requests; (iii) facilitate and conduct management presentations to foster and attract higher and better bids; (iv) respond to detailed bidder diligence requests; (v) educate bidders so that they fully understood the Debtors' business; and (vi) expedite the closing of the Successful Bid on the truncated timeline required under the Final DIP Order.  These obligations have been compounded by the already-extraordinary pressures and demands of running the Debtors' business in the current economic climate.  Accordingly, I believe that incentivizing the KEIP Participants' performance directly resulted in the Successful Bid preserving go-forward business relationships for many of the Debtors' vendors and offering a valued brand and product to the Debtors' customers (some of whom may be creditors) on a go-forward basis.

28.    Additionally, KEIP Bonus amounts are only earned and payable if the KEIP Participants meet or exceed the Cash Flow Target, which, like the Sale Target, cannot be met without the dedication and effort of the KEIP Participants.  The Cash Flow Target measures outcomes within the KEIP Participants' control and is an indicator of the Debtors' overall performance and the success of the business and the Chapter 11 Cases.  Moreover, the KEIP Target is directly correlated to the consummation of the sale, thereby aligning the interests of the KEIP Participants with the interests of the Debtors and their estates.   Accordingly, the Cash Flow Target is well suited to incentivize, measure, and reward the KEIP Participants' performance.

29.    Based on my experience in other similar chapter 11 proceedings, I believe that the KEIP is reasonable given the facts and circumstances of these Chapter 11 Cases and was—and remains—necessary to maximize the value of the Debtors' estates for all parties in interest.  Based on my and Portage Point's research and experience, the design and the cost of the proposed KEIP is within the range of the market practice as compared to plans proposed and approved in cases

involving similarly situated (and sized) companies when considering the scope of the payments under the KEIP Program relative to the KEIP Participants' base salaries and the payment amounts for individual KEIP Participants.

30.     In sum, I believe that the KEIP was carefully structured, will only be triggered upon the successful achievement of extremely challenging goals, and directly incentivized the KEIP Participants to exercise optimal performance under very difficult circumstances.

31.     Under the circumstances, the implementation of the KERP and KEIP represents an extremely prudent and highly appropriate exercise of the Debtors' business judgement. Accordingly, I believe it is imperative that the Debtors incentivize key Employees to maintain the leadership and stability required to ensure the consummation of the Debtors' sale and achievement of the Debtors' business plan.

## REDACTION OF THE KERP AND KEIP IS WARRANTED

32.     As set forth in the Seal Motion, the Debtors filed an unredacted version of the KERP/KEIP Motion, together with exhibits annexed thereto, under seal, to protect against the detrimental public disclosure of certain information related to the KERP and KEIP, respectively.

33.     I believe that, as discussed in the Seal Motion and augmented herein, the KERP/KEIP Motion provides sufficient information to allow all interested parties to assess the KERP and KEIP, the metrics contemplated thereby, and the aggregate economic scope of the proposed payments.  The KERP/KEIP Motion publicly discloses the range of payments that will be triggered upon realizing certain sale results, the concept for the baseline value that must be surpassed, the sliding scale of percentage payout to which the Participants would be entitled, and the aggregate potential payout under both programs.  In addition, to address the concerns of the United States Trustee, the identities of the KEIP Participants are disclosed herein.  I believe that

this information provides all interested parties with sufficient detail to consider whether the KERP and KEIP are appropriate and justified under the circumstances, which is further demonstrated by the dearth of objections to both the Seal Motion and the KERP/KEIP Motion.

34.     Moreover, I believe that disclosing the names of KERP Participants—all of whom are rank and file, and none of whom are "insiders" of the Debtors—would be damaging to employee morale and cause undue embarrassment and stress for such Participants.

## **CONCLUSION**

35.     In light of the foregoing, for the reasons stated herein and in the KERP/KEIP Motion, the relief sought in the KERP/KEIP Motion represents a key initiative to efficiently and successfully administer the sale process and maximize value in the Debtors' chapter 11 efforts.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing statements are true and correct to the best of my knowledge, information and belief.


Executed on April 28, 2021

                                                        */s/ Michael Foreman*
                                                        Michael Foreman
                                                        Independent Manager
                                                        Alamo Drafthouse Holdings Cinemas, LLC

13

## EXHIBIT A

**Amended KERP Exhibit**

## [FILED UNDER SEAL]